UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



—————————————————————— x

THE UNION CENTRAL LIFE INSURANCE :
COMPANY, AMERITAS LIFE INSURANCE :
CORP. and ACACIA LIFE INSURANCE
COMPANY,

                Plaintiffs,

      vs.

CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP., CREDIT
SUISSE FIRST BOSTON LLC, CREDIT
SUISSE SECURITIES (USA) LLC, DLJ
MORTGAGE CAPITAL, INC., CITIGROUP
GLOBAL MARKETS INC., CITIGROUP
MORTGAGE LOAN TRUST INC.,
CITICORP MORTGAGE SECURITIES, INC.,
CITIGROUP, INC., INDYMAC MBS, INC.,
GS MORTGAGE SECURITIES CORP.,
GOLDMAN SACHS MORTGAGE
COMPANY, MORTGAGE ASSET
SECURITIZATION TRANSACTIONS, INC.,
MORGAN STANLEY CAPITAL I INC.,
MORGAN STANLEY & CO.
INCORPORATED, RESIDENTIAL
ACCREDIT LOANS, INC., WELLS FARGO
ASSET SECURITIES CORPORATION,
WELLS FARGO BANK, N.A., UBS
SECURITIES LLC, RESIDENTIAL
FUNDING SECURITIES, LLC, GOLDMAN,
SACHS & CO., EDWARD D. JONES & CO.,
L.P., HSBC SECURITIES (USA) INC.,

—————————————————————— x

[Caption continued on following page.]

Civil Action No.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND NEW
YORK COMMON LAW FRAUD,
NEGLIGENT MISREPRESENTATION AND
UNJUST ENRICHMENT



DEMAND FOR JURY TRIAL

———————————————————————————— x
       :

SUNTRUST CAPITAL MARKETS, INC.,  :
WASHINGTON MUTUAL MORTGAGE  :
SECURITIES CORP., WAMU CAPITAL  :
CORP., DEUTSCHE BANK SECURITIES  :
INC., RBS SECURITIES, INC., DANIEL L.  :
SPARKS, DAVID MOSKOWITZ,  :
RANDALL COSTA, DOUGLAS R.  :
KRUEGER and BRUCE J. PARADIS,  :
       :
      Defendants.  :
———————————————————————————— x

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ...................................................................................................1

JURISDICTION AND VENUE ..............................................................................................2

PARTIES ................................................................................................................................3

    Depositor Defendants........................................................................................................3

    Underwriter Defendants....................................................................................................6

    Individual Defendants.....................................................................................................11

BACKGROUND ...................................................................................................................14

    Residential Mortgage Loan Securitizations....................................................................14

    The Secondary Market....................................................................................................15

    Securitizations.................................................................................................................18

    Financial Crisis Inquiry Commission .............................................................................23

    Clayton Holdings ............................................................................................................23

    Appraisal Manipulation ..................................................................................................25

    Deteriorating Mortgage Practices ...................................................................................25

RECKLESS ORIGINATION PRACTICES WERE USED TO GENERATE LOANS
INCLUDED IN THE SECURITIZATIONS ..........................................................................27

    CSFB (DLJ Mortgage).....................................................................................................28

    BofA.................................................................................................................................28

    Countrywide.....................................................................................................................29

    Wells Fargo......................................................................................................................31

    GreenPoint .......................................................................................................................32

    SunTrust Mortgage ..........................................................................................................32

    CitiMortgage....................................................................................................................33

**Page**

IndyMac ....................................................................................................... 35

American Home .......................................................................................... 36

PHH ............................................................................................................ 37

ABN AMRO ............................................................................................... 38

National City .............................................................................................. 38

GMAC ........................................................................................................ 39

Wachovia .................................................................................................... 40

WMMSC ..................................................................................................... 41

DEFENDANTS' FALSE STATEMENTS ABOUT LOAN UNDERWRITING
GUIDELINES .................................................................................................... 42

DISCLOSURES EMERGE ABOUT THE PROBLEMS UNDERLYING THE LOANS ........... 63

COUNT I ............................................................................................................ 66

For Common Law Fraud Against All Defendants ........................................ 66

COUNT II ........................................................................................................... 68

Claim for Negligent Misrepresentation Against All Defendants ................. 68

COUNT III .......................................................................................................... 70

Claim for Unjust Enrichment Against the Underwriter Defendants ............. 70

COUNT IV .......................................................................................................... 71

Claim for Aiding and Abetting Against All Defendants ............................... 71

COUNT V ........................................................................................................... 71

For Violation of §10(b) of the 1934 Act and Rule 10b-5 as to the Trusts Listed in
Exhibit 2 Against Defendants CMLT, CMSI, GSMSC, IndyMac MBS,
Residential Accredit, Wells Fargo Asset, Sparks, Moskowitz, Costa, Krueger and
Paradis ........................................................................................................ 71

COUNT VI .......................................................................................................... 73

**Page**

For Violation of §20(a) of the 1934 Act as to the Trusts Listed in Exhibit 2
Against Defendants Citigroup, GSMC, Wells Fargo, Sparks, Moskowitz, Costa,
Krueger and Paradis ........................................................................................................................ 73

PRAYER FOR RELIEF ............................................................................................................... 75

JURY DEMAND ............................................................................................................................ 75

## NATURE OF THE ACTION

1.      The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and
Acacia Life Insurance Company (collectively "Plaintiffs" or "Union Central") bring this action to
recover losses suffered due to Plaintiffs' acquisition of asset-backed securities (the "Certificates")
pursuant to false and misleading statements made by the defendants listed below in ¶¶10-39,
including in Registration Statements and Prospectus Supplements filed with the United States
Securities and Exchange Commission ("SEC") (collectively, the "Registration Statements").

2.      The Certificates were supported by pools of residential mortgage loans generally
secured by first or second liens on residential properties. The Registration Statements and other
statements disseminated to Union Central were false and misleading in that they included false
statements and/or omissions about the processes and practices used to select the pools of mortgage
loans and the quality of those loans. Defendants concealed important information, including that
outside firms that investment banks had hired to evaluate the loans had found a large percentage of
those banks' mortgage loans included in offerings during this time period did not conform to
standards which the defendants represented to investors had been used to originate the loans.
Defendants actually knew about these deficiencies prior to securitization and failed to require
replacement loans for large numbers of the deficiencies and concealed the deficiencies from Union
Central and other investors. Defendants intended for Union Central to believe that defendants'
underwriting and due diligence procedures were being used to identify and exclude problem loans,
not to simply waive through problem loans even when identified.

3.      The defendants established the trusts identified herein (the "Trusts") to issue billions
of dollars worth of Certificates, including those listed in Exhibit 1 attached hereto, in 2005 through
2007.

1

4.      Many of the Certificates have dropped significantly in value since the time of Union Central's purchases due to defects in the underlying mortgage loans. In 2010, the truth began to be revealed to the public as to defendants' actual knowledge at the time of the securitizations of defects in the mortgage pools that supported the Certificates. In late 2010, the Financial Crisis Inquiry Commission ("FCIC") began disclosing its findings. The FCIC had spent more than a year examining the causes of the financial crisis.

5.      Union Central has suffered losses on its investments in the Certificates as many have defaulted and all have dropped significantly in value. The Certificates still held by Union Central are no longer marketable at prices anywhere near the prices paid and it is now clear that the Certificates were exposed to much more risk with respect to both the timing and absolute cash flow to be received than the defendants' statements represented. Plaintiffs were never compensated for the level of risk the Certificates actually posed. Plaintiffs sought investments that were conservative but also generated a reasonable yield. As part of their purchases, Plaintiffs and their advisors relied on term sheets, the Registration Statements and other statements provided to Plaintiffs by defendants that made representations about the mortgages and the underwriting standards, appraisals and ratios, including the loan-to-value ratio. These representations were material to Plaintiffs' investment decisions. These representations were also materially false and misleading. Defendants omitted key information which would have been material to Union Central's decision to invest. Defendants either negligently, recklessly or knowingly made these false and misleading statements and omissions.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331. Certain claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934

2

Act"), and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. Jurisdiction is conferred by §27 of the 1934 Act and venue is proper pursuant to §27 of the 1934 Act.

7.    Venue is proper in this District because the violations of law complained of herein occurred in part in this District, including the dissemination of the materially false and misleading statements complained of herein, and defendants conduct business in this District. The depositors of the mortgage loans for many of the Trusts had principal offices in New York, New York.

8.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.    Plaintiffs The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company acquired Certificates in reliance on defendants' false statements, including those in the Registration Statements and Prospectus Supplements, and have been damaged thereby. Plaintiffs purchased Certificates as described in Exhibit 1 attached hereto.

**Depositor Defendants**

10.    Defendant Credit Suisse First Boston Mortgage Securities Corp. is a Delaware corporation with principal executive offices in New York, New York, and was the depositor for certain of the Trusts. Credit Suisse First Boston Mortgage Securities Corp. assigned mortgage pools to these Trusts in exchange for the Certificates. Defendant DLJ Mortgage Capital, Inc. ("DLJ Mortgage"), a Delaware corporation with principal offices in New York, New York, and an affiliate of the depositor, was the seller of certain of the Trusts. Defendants Credit Suisse First Boston Mortgage Securities Corp. and DLJ Mortgage are collectively referred to herein as "CSFB." CSFB acted as the depositor for the following Trust:

Adjustable Rate Mortgage Trust 2005-7

11.    Defendant Citigroup Mortgage Loan Trust Inc. ("CMLT"), a Delaware corporation, is an affiliate of defendant Citigroup Global Markets Inc. ("CGMI"), the brokerage and securities arm of defendant Citigroup, Inc. CMLT engaged in the securitization of mortgage loans. CMLT acted as the depositor for the following Trust:

Citigroup Mortgage Loan Trust 2007-10

12.    Defendant Citicorp Mortgage Securities, Inc. ("CMSI"), a Delaware corporation, is a wholly-owned subsidiary of CitiMortgage, Inc. ("CitiMortgage"), the mortgage lending unit of defendant Citigroup, Inc. ("Citigroup"). In 2009, CitiMortgage separated from Citigroup, becoming Citi Holdings. CMSI acted as the depositor for the following Trusts:

Citicorp Mortgage Securities Trust, Series 2007-5
Citicorp Mortgage Securities Trust, Series 2007-8

13.    Defendant IndyMac MBS, Inc. ("IndyMac MBS"), a Delaware corporation, was the wholly-owned subsidiary of IndyMac Bank, F.S.B. ("IndyMac"), which was closed by the Federal Deposit Insurance Corporation ("FDIC") on July 11, 2008. IndyMac MBS acquired mortgage loans and acted as the depositor for the following Trust:

IndyMac IMJA Mortgage Loan Trust 2007-A1

14.    Defendant GS Mortgage Securities Corp. ("GSMSC"), a Delaware corporation, was a wholly-owned subsidiary of defendant Goldman Sachs Mortgage Company ("GSMC"). GSMSC acquired mortgage loans and acted as the depositor for the following Trusts:

GSR Mortgage Loan Trust 2006-7F
GSR Mortgage Loan Trust 2006-9F

4

15.     Defendant Mortgage Asset Securitization Transactions, Inc. ("Mortgage Asset"), a Delaware corporation, is a wholly-owned limited purpose finance subsidiary of UBS Americas Inc. Mortgage Asset acted as the depositor for the following Trusts:

> MASTR Asset Securitization Trust 2005-1
> MASTR Asset Securitization Trust 2005-2
> MASTR Asset Securitization Trust 2006-1

16.     Defendant Morgan Stanley Capital I Inc. ("MSCI"), a Delaware corporation, was a wholly-owned subsidiary of defendant Morgan Stanley & Co. Incorporated.  MSCI acted as the depositor for the following Trust:

> Morgan Stanley Mortgage Loan Trust 2005-5AR

17.     Defendant Residential Accredit Loans, Inc. ("Residential Accredit"), is an affiliate of Residential Funding Company, LLC ("RFC"), an indirect wholly-owned subsidiary of GMAC Mortgage Group.  Residential Accredit acted as the depositor for the following Trusts:

> RALI Series 2005-QA9 Trust
> RALI Series 2005-QS7 Trust
> RALI Series 2005-QS9 Trust
> RALI Series 2005-QS14 Trust
> RALI Series 2005-QA5 Trust
> RALI Series 2006-QS2 Trust
> RALI Series 2006-QS6 Trust
> RALI Series 2006-QS18 Trust

18.     Defendant Washington Mutual Mortgage Securities Corp. ("WMMSC") acted as the depositor for the following Trust:

> Washington Mutual Mortgage Pass-Through Certificates,
> WMALT Series 2005-3 Trust

5

19.     Defendant Wells Fargo Asset Securities Corporation ("Wells Fargo Asset"), a Delaware corporation, is a direct, wholly-owned subsidiary of defendant Wells Fargo Bank, N.A. ("Wells Fargo"), and an indirect, wholly-owned subsidiary of Wells Fargo & Company. Wells Fargo Asset acquired the mortgage loans from the sponsor and transferred the mortgage loans to each trust. Wells Fargo Asset acted as the depositor for the following Trusts:

> Wells Fargo Mortgage Backed Securities 2005-13 Trust
> Wells Fargo Mortgage Backed Securities 2005-15 Trust
> Wells Fargo Mortgage Backed Securities 2005-AR9 Trust
> Wells Fargo Mortgage Backed Securities 2005-AR11 Trust
> Wells Fargo Mortgage Backed Securities 2006-1 Trust
> Wells Fargo Mortgage Backed Securities 2006-20 Trust
> Wells Fargo Mortgage Backed Securities 2006-AR14 Trust
> Wells Fargo Mortgage Backed Securities 2006-9 Trust
> Wells Fargo Mortgage Backed Securities 2007-3 Trust

20.     The defendants identified in ¶¶10-19 are referred to herein as the "Depositor Defendants."

**Underwriter Defendants**

21.     Defendant Credit Suisse First Boston LLC ("Credit Suisse"), an affiliate of CSFB, acted as the underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. Credit Suisse failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. Credit Suisse acted as an underwriter for the following:

> Adjustable Rate Mortgage Trust 2005-7

22.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse (USA)"), an affiliate of CSFB, acted as the underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. Credit Suisse (USA) failed to perform adequate due diligence

6

to ensure the statements incorporated into the Registration Statements were not misleading. Credit Suisse (USA) acted as an underwriter for the following:

Wells Fargo Mortgage Backed Securities 2006-1 Trust

23.     Defendant CGMI is the brokerage and securities arm of defendant Citigroup. CGMI provides investment banking services to corporate, institutional, government, and retail clients. CGMI acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. CGMI failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. CGMI acted as an underwriter for the following:

Citigroup Mortgage Loan Trust 2007-10
Citicorp Mortgage Securities Trust, Series 2007-5
Citicorp Mortgage Securities Trust, Series 2007-8
RALI Series 2005-QS7 Trust
RALI Series 2005-QS14 Trust
Wells Fargo Mortgage Backed Securities 2005-13 Trust
Wells Fargo Mortgage Backed Securities 2005-AR9 Trust
Wells Fargo Mortgage Backed Securities 2006-1 Trust

24.     Defendant UBS Securities LLC ("UBS"), affiliated with Depositor Defendant Mortgage Asset, is a Delaware corporation which engages in a nationwide securities business, providing equity research, sales, trading services, merger and acquisition advisory services, private banking services, and underwriting services. UBS's principal place of business is located in New York, New York. UBS acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. UBS failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. UBS acted as an underwriter for the following:

Citicorp Mortgage Securities Trust, Series 2007-5
IndyMac IMJA Mortgage Loan Trust 2007-A1
MASTR Asset Securitization Trust 2005-1
MASTR Asset Securitization Trust 2005-2
MASTR Asset Securitization Trust 2006-1
RALI Series 2005-QA9 Trust
RALI Series 2005-QS9 Trust
RALI Series 2005-QS7 Trust
Wells Fargo Mortgage Backed Securities 2007-3 Trust
Wells Fargo Mortgage Backed Securities 2006-AR14 Trust

25.     Defendant Residential Funding Securities, LLC ("Residential Funding"), also referred
to as GMAC RFC Securities, operates as a securities broker and is based in the United States.
Residential Funding is a subsidiary of GMAC LLC and is an affiliate of Depositor Defendant
Residential Accredit.  Residential Funding acted as underwriter in the sale of the Certificates and in
doing so drafted and disseminated the offering documents.  Residential Funding failed to perform
adequate due diligence to ensure the statements incorporated into the Registration Statements were
not misleading.  Residential Funding acted as an underwriter for the following:

RALI Series 2005-QS7 Trust
RALI Series 2005-QS9 Trust
RALI Series 2005-QS14 Trust
RALI Series 2005-QA5 Trust
RALI Series 2006-QS6 Trust
RALI Series 2006-QS2 Trust
RALI Series 2006-QS18 Trust

26.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a full service investment
banking and securities firm.  Goldman Sachs acted as underwriter in the sale of the Certificates and
in doing so drafted and disseminated the offering documents.  Goldman Sachs failed to perform
adequate due diligence to ensure the statements incorporated into the Registration Statements were
not misleading.  Goldman Sachs acted as an underwriter for the following:

8

GSR Mortgage Loan Trust 2006-7F
GSR Mortgage Loan Trust 2006-9F

27.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm. Morgan Stanley acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. Morgan Stanley failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. Morgan Stanley acted as an underwriter for the following:

Morgan Stanley Mortgage Loan Trust 2005-5AR

28.     Defendant Edward D. Jones & Co., L.P. ("Edward Jones") is a financial services firm which serves investment clients in the United States and Canada. Edward Jones acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. Edward Jones failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. Edward Jones acted as an underwriter for the following:

MASTR Asset Securitization Trust 2005-1
MASTR Asset Securitization Trust 2005-2

29.     Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm that provides financial advisory services and is based in New York, New York. The firm's services include mergers and acquisitions, capital raising, privatization, and strategic advice. HSBC acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. HSBC failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. HSBC acted as an underwriter for the following:

IndyMac IMJA Mortgage Loan Trust 2007-A1
Wells Fargo Mortgage Backed Securities 2006-9 Trust

30.    Defendant SunTrust Capital Markets, Inc. ("SunTrust") provides investment banking services.  SunTrust is a wholly-owned subsidiary of SunTrust Banks, Inc.  SunTrust acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents.  SunTrust failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading.  SunTrust acted as an underwriter for the following:

MASTR Asset Securitization Trust 2006-1

31.    Defendant WaMu Capital Corp. ("WCC") is a subsidiary of JPMorgan Chase & Co. WCC acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents.  WCC failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading.  WCC acted as an underwriter of the following:

Washington Mutual Mortgage Pass-Through Certificates WMALT
Series 2005-3 Trust

32.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank that provides security brokerage services and is based in New York, New York.  Deutsche Bank acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents.  Deutsche Bank failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading. Deutsche Bank acted as an underwriter for the following:

10

RALI Series 2006-QS18 Trust
RALI Series 2006-QS2 Trust

33.     Defendant RBS Securities, Inc. ("RBS Securities"), a subsidiary of Greenwich

Capital Holdings, Inc., was formerly known as Greenwich Capital Markets, Inc. and later changed its

name to RBS Securities, Inc. in April 2009.  RBS Securities operates as a security brokerage firm

and provides asset-backed loans, including mortgage, auto, and manufactured housing loans. It also

offers trading and investment banking services.  RBS Securities acted as underwriter in the sale of

the Certificates and in doing so drafted and disseminated the offering documents.  RBS Securities

failed to perform adequate due diligence to ensure the statements incorporated into the Registration

Statements were not misleading.  RBS Securities acted as an underwriter for the following:

RALI Series 2006-QS6 Trust

34.     The defendants identified in ¶¶21-33 are referred to herein as the "Underwriter

Defendants."

**Individual Defendants**

35.     Defendant Daniel L. Sparks ("Sparks") was Chief Executive Officer ("CEO") and a

director of GSMC during the relevant time period.  Defendant Sparks signed the Form S-3

comprising part of the Registration Statements pursuant to the offerings of the following Trusts:

| Trust Name | Registration Statement Date | Registration Statement No. |
|---|---|---|
| GSR Mortgage Loan Trust 2006-7F | March 29, 2006 | 333-132809 |
| GSR Mortgage Loan Trust 2006-9F | March 29, 2006 | 333-132809 |

Defendant Sparks not only signed off as CEO of these Trusts but was also instrumental at Goldman

Sachs with winning bets against the U.S. mortgage market.

11

36.     Defendant David Moskowitz ("Moskowitz") was President, CEO, Secretary and a

director of Wells Fargo Asset during the relevant time period. Defendant Moskowitz signed the

Forms S-3 comprising part of the Registration Statements pursuant to the offerings of the following

Trusts:

| Trust Name | Registration Statement Date | Registration Statement No. |
| --- | --- | --- |
| Wells Fargo Mortgage Backed Securities 2005-13 Trust | June 29, 2005 | 333-127031 |
| Wells Fargo Mortgage Backed Securities 2006-1 Trust | June 29, 2005 | 333-127031 |
| Wells Fargo Mortgage Backed Securities 2005-15 Trust | June 29, 2005 | 333-127031 |
| Wells Fargo Mortgage Backed Securities 2006-9 Trust | October 20, 2005 | 333-129159 |
| Wells Fargo Mortgage Backed Securities 2006-20 Trust | September 27, 2006 | 333-137620 |
| Wells Fargo Mortgage Backed Securities 2006-AR14 Trust | October 20, 2005 | 333-129159 |
| Wells Fargo Mortgage Backed Securities 2007-3 Trust | September 27, 2006 | 333-137620 |

37.     Defendant Randall Costa ("Costa") was President and a director of CMLT during the

relevant time period. Defendant Costa signed the Form S-3 comprising part of the Registration

Statements pursuant to the offerings of the following Trust:

| Trust Name | Registration Statement Date | Registration Statement No. |
| --- | --- | --- |
| Citigroup Mortgage Loan Trust 2007-10 | October 25, 2006 | 333-138237 |

38.     Defendant Douglas R. Krueger ("Krueger") was President and a director of CMSI.

Defendant Krueger signed the Form S-3 comprising part of the Registration Statements pursuant to

the offerings of the following Trusts:

12

| Trust Name | Registration Statement Date | Registration Statement No. |
|---|---|---|
| Citicorp Mortgage Securities Trust, Series 2007-5 | December 15, 2005 | 333-130333 |
| Citicorp Mortgage Securities Trust, Series 2007-8 | December 15, 2005 | 333-130333 |

39.    Defendant Bruce J. Paradis ("Paradis") was President, CEO and a director of Residential Accredit during the relevant time period. Defendant Paradis signed the Forms S-3 comprising part of the Registration Statements pursuant to the offerings of the following Trusts:

| Trust Name | Registration Statement Date | Registration Statement No. |
|---|---|---|
| RALI Series 2005-QA5 Trust | August 14, 2003 | 333-107959 |
| RALI Series 2005-QA9 Trust | July 20, 2005 | 333-126732 |
| RALI Series 2005-QS7 Trust | August 14, 2003 | 333-107959 |
| RALI Series 2005-QS9 Trust | August 14, 2003 | 333-107959 |
| RALI Series 2005-QS14 Trust | July 20, 2005 | 333-126732 |
| RALI Series 2006-QS2 Trust | July 20, 2005 | 333-126732 |
| RALI Series 2006-QS6 Trust | January 3, 2006 | 333-131213 |
| RALI Series 2006-QS18 Trust | January 3, 2006 | 333-131213 |

40.    The defendants identified in ¶¶35-39 are referred to herein as the "Individual Defendants." The Individual Defendants each held positions of responsibility with the respective Depositor Defendants and/or Underwriter Defendants. Each had control over other personnel involved in the mortgage-backed securities pipelines and each Individual Defendant had control over the contents of the respective prospectus supplements for which they were responsible.

41.    The Underwriter Defendants and the Individual Defendants aided and abetted and/or participated with and/or conspired with the Depositor Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

13

## BACKGROUND

### Residential Mortgage Loan Securitizations

42.     Borrowers who require funds to finance the purchase of a house or to refinance an existing mortgage apply for residential mortgage loans with a loan originator. These loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score. Borrowers with higher FICO scores were able to receive loans with less documentation during the approval process, as well as higher loan-to-value ("LTV") ratios. Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the rate of the loan to issue, the amount of the loan, and the general structure of the loan.

43.     A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health. Borrowers who are issued "prime" mortgage loans are deemed to be the most creditworthy and receive the best rates and structure on mortgage loans.

44.     If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a "low-doc" or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower. While borrowers in "low-doc" or Alt-A loans typically have clean credit histories, the risk profile of the "low-doc" or Alt-A loan increases because of, among other things, higher LTV ratios, higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves.

14

45.     A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt-to-equity ratio. Borrowers that have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger than average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.

**The Secondary Market**

46.     Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan. The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation. Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan. As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

47.     Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages. As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market. As discussed below, these innovations altered (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender, and (2) the risks normally associated with mortgage loans.

15

48.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages. Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution. By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as mortgage-backed securities or MBS. In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default – that risk is transferred with the mortgages to investors who purchase the MBS.

49.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



(Source: *The Wall Street Journal*)

50.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors. The highest tranche (also referred

to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.

51.     In this MBS structure, the senior tranches receive the highest investment rating by the rating agencies, usually AAA.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the rating agencies.

52.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within an MBS comprised of residential mortgages (often referred to as a residential mortgage-backed securities or "RMBS"):



(Source: *The Wall Street Journal*)

53.     As illustrated below, in the typical securitization transaction, participants in the transaction are (1) the servicer of the loans to be securitized, often called the "sponsor," (2) the depositor of the loans in a trust or entity for securitization, (3) the underwriter of the MBS, (4) the

17

entity or trust responsible for issuing the MBS, often called the "trust," and (5) the investors in the MBS.

54.     The securitization process begins with the sale of mortgage loans by the sponsor – the original owner of the mortgages – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors:



55.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors.  After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

**Securitizations**

56.     The Depositor Defendants acquired mortgage loan pools either from affiliated originators or unrelated third parties and transferred the mortgage pools to the Trusts in exchange for the Certificates.  Many of the Certificates purchased by Union Central were issued by New York

18

trusts. Each of the Trusts issued hundreds of million of dollars worth of Certificates pursuant to the Registration Statements.

57.     The Underwriter Defendants acquired the Certificates from the Depositor Defendants and sold them to the investing public pursuant to the Registration Statements.

58.     The Certificates were sold pursuant to Prospectus Supplements that were issued pursuant to Form S-3 Registration Statements, which were created as "shelf" registrations under Rule 415 of the Securities Act of 1933 ("1933 Act"). These shelf registration statements allowed defendants to rapidly access the capital markets with offerings of MBS to investors, including Plaintiffs. Plaintiffs purchased Certificates arranged by the following depositors pursuant to Registration Statements:

(a)     Defendant Credit Suisse First Boston Mortgage Securities Corp. was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Adjustable Rate Mortgage Trust 2005-7 | June 28, 2005 | 333-120966 |

(b)     Defendant CMLT was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Citigroup Mortgage Loan Trust 2007-10 | October 31, 2007 | 333-138237 |

(c)     Defendant CMSI was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Citicorp Mortgage Securities Trust Series 2007-5 | June 25, 2007 | 333-130333 |
| Citicorp Mortgage Securities Trust Series 2007-8 | September 26, 2007 | 333-130333 |

(d)     Defendant GSMSC was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
| --- | --- | --- |
| GSR Mortgage Loan Trust 2006-7F | July 27, 2006 | 333-132809 |
| GSR Mortgage Loan Trust 2006-9F | October 26, 2006 | 333-132809 |

(e)     Defendant Mortgage Asset was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| MASTR Asset Securitization Trust 2005-1 | May 25, 2005 | 333-106982 |
| MASTR Asset Securitization Trust 2005-2 | October 25, 2005 | 333-124678 |
| MASTR Asset Securitization Trust 2006-1 | March 28, 2006 | 333-124678 |

(f)     Defendant MSCI was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2005-5AR | August 29, 2005 | 333-125593 |

(g)     Defendant Residential Accredit was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| RALI Series 2005-QA5 Trust | May 3, 2005 | 333-107959 |
| RALI Series 2005-QA9 Trust | August 26, 2005 | 333-126732 |
| RALI Series 2005-QS7 Trust | June 27, 2005 | 333-107959 |
| RALI Series 2005-QS9 Trust | June 27, 2005 | 333-107959 |
| RALI Series 2005-QS14 Trust | September 28, 2005 | 333-126732 |
| RALI Series 2006-QS2 Trust | February 27, 2006 | 333-126732 |
| RALI Series 2006-QS6 Trust | June 27, 2006 | 333-131213 |
| RALI Series 2006-QS18 Trust | December 27, 2006 | 333-131213 |

(h)     Defendant WMMSC was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 | April 21, 2005 | 333-103345 |

(i)     Defendant Wells Fargo Asset was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Wells Fargo Mortgage Backed Securities 2005-13 Trust | October 24, 2005 | 333-127031 |
| Wells Fargo Mortgage Backed Securities 2005-15 Trust | November 23, 2005 | 333-127031 |

21

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Wells Fargo Mortgage Backed Securities 2005-AR9 Trust | April 25, 2005 | 333-122307 |
| Wells Fargo Mortgage Backed Securities 2005-AR11 Trust | May 11, 2005 | 333-122307 |
| Wells Fargo Mortgage Backed Securities 2006-1 Trust | February 23, 2006 | 333-127031 |
| Wells Fargo Mortgage Backed Securities 2006-20 Trust | November 27, 2006 | 333-137620 |
| Wells Fargo Mortgage Backed Securities 2006-AR14 Trust | September 27, 2006 | 333-129159 |
| Wells Fargo Mortgage Backed Securities 2006-9 Trust | July 27, 2006 | 333-129159 |
| Wells Fargo Mortgage Backed Securities 2007-3 Trust | March 27, 2007 | 333-137620 |

(j)     Defendant IndyMac MBS was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| IndyMac IMJA Mortgage Loan Trust 2007-A1 | June 28, 2007 | 333-132042 |

59.     The defendants also filed various documents with the SEC, including Form 8-K and Form 10-K reports subsequent to the issuances. Those documents were incorporated by reference into and along with the Prospectus Supplements which comprise certain of the Registration Statements.

60.     The Registration Statements that were filed with the SEC purport to describe the assets supporting the Certificates. Accurate information about the composition of the asset pool – including, importantly, the manner in which it was created – is the cornerstone of the disclosure required under the securities laws to enable investors to make informed decisions about the Certificates. Complete and accurate information is even more important in the context of selling "asset-backed securities" such as the Certificates, because the performance of the Certificates is based almost entirely upon the quality of the assets the Depositor Defendants sold to the Trusts.

22

**Financial Crisis Inquiry Commission**

61.     The FCIC was created to examine the causes of the recent financial and economic crisis in the United States. The FCIC spent more than a year examining the causes, with 19 days of public hearings, interviews of more than 700 witnesses and the review of millions of pages of documents. The FCIC released some findings in 2010 and issued its final report in January 2011 ("FCIC Report"). The FCIC's findings revealed much of the intentional and negligent conduct which caused the crisis.

**Clayton Holdings**

62.     Clayton Holdings ("Clayton"), a Connecticut-based firm that analyzes home mortgages for banks, hedge funds, insurance companies and government agencies, played an important role in the securitization process in that investment banks hired Clayton to analyze a subsection of the home mortgage loans to be securitized. Clayton performed this role and did find defects. However, Clayton's findings were largely ignored.

63.     In late September 2010, Clayton provided its data to the FCIC. The FCIC held its last public hearing in Sacramento, where top Clayton executives testified under oath about the firm's role in the mortgage securitization chain. Note the following chart prepared as part of the FCIC inquiry, mentioning Clayton's findings with regard to many of the defendants named herein:

23

## Rejected Loans Waived in by Selected Banks

*From January 2006 through June 2007, Clayton rejected 28% of the mortgages
it reviewed. Of these, 39% were waived in anyway.*

| Financial Institution | A<br>ACCEPTED<br>LOANS<br>(Event 1 & 2)/<br>Total pool of<br>loans | B<br>REJECTED<br>LOANS<br>(Event 3)/<br>Total pool of<br>loans | C<br>REJECTED<br>LOANS<br>WAIVED IN BY<br>FINANCIAL<br>INSTITUTIONS | D<br>REJECTED<br>LOANS AFTER<br>WAIVERS<br>(B-C) | E<br>FINANCIAL<br>INSTITUTION<br>WAIVER RATE<br>(C/B) |
|---|---|---|---|---|---|
| Citigroup | 58% | 42% | 13% | 29% | 31% |
| Credit Suisse | 68 | 32 | 11 | 21 | 33 |
| Deutsche | 65 | 35 | 17 | 17 | 50 |
| Goldman | 77 | 23 | 7 | 16 | 29 |
| JP Morgan | 73 | 27 | 14 | 13 | 51 |
| Lehman | 74 | 26 | 10 | 16 | 37 |
| Merrill | 77 | 23 | 7 | 16 | 32 |
| UBS | 80 | 20 | 6 | 13 | 33 |
| WaMu | 73 | 27 | 8 | 19 | 29 |
| **Total Bank Sample** | **72%** | **28%** | **11%** | **17%** | **39%** |

NOTES: From Clayton Trending Reports. Numbers may not add due to rounding.
SOURCE: Clayton Holdings

64.     Documents produced in the FCIC investigation also showed that Bank of America

waived in 60% of the loans Clayton had rejected in the seven 2006 and 2007 MBS deals presented in

the investigation.

65.     As noted above, many of the banks employed Clayton to perform reviews which the

banks then disregarded in large measure. For example, Clayton discovered that 42% of Citigroup's

pool of loans did not meet standards and Citigroup disregarded those findings for nearly a third of

those loans. Thus, even though these banks and their officers had actual knowledge that a large

percentage of the MBS portfolio reviewed by Clayton failed to conform, they included many of

these same loans in securitizations. Moreover, Clayton reviewed only a sample of the loans, leading

defendants invariably to the conclusion that there were thousands of additional defective loans which

Clayton had not reviewed. Defendants concealed the information provided by Clayton about non-

compliance and sold the MBS to investors, including Union Central, who were unaware of the failure of many of the loans to conform to standards. In fact, the only use defendants appear to have had for Clayton's findings was to use the results as a negotiating point to reduce defendants' costs of the loans. Nothing was disclosed to the ultimate MBS certificate investors about Clayton's findings.

66.     Certain of the Prospectus Supplements identified Clayton as providing services to the defendants but concealed the exceptions Clayton identified and the fact that the defendants had largely disregarded the findings.

**Appraisal Manipulation**

67.     The FCIC Report also included testimony showing intentional manipulation of appraisal results by lenders in order to get more loans closed:

> Some real estate appraisers had also been expressing concerns for years. From 2000 to 2007, a coalition of appraisal organizations circulated and ultimately delivered to Washington officials a public petition; signed by 11,000 appraisers and including the name and address of each, it charged that lenders were pressuring appraisers to place artificially high prices on properties. According to the petition, lenders were "blacklisting honest appraisers" and instead assigning business only to appraisers who would hit the desired price targets. "The powers that be cannot claim ignorance," the appraiser Dennis J. Black of Port Charlotte, Florida, testified to the Commission.
>
> The appraiser Karen Mann of Discovery Bay, California, another industry veteran, told the Commission that lenders had opened subsidiaries to perform appraisals, allowing them to extract extra fees from "unknowing" consumers and making it easier to inflate home values. The steep hike in home prices and the unmerited and inflated appraisals she was seeing in Northern California convinced her that the housing industry was headed for a cataclysmic downturn. In 2005, she laid off some of her staff in order to cut her overhead expenses, in anticipation of the coming storm; two years later, she shut down her office and began working out of her home.

(Footnotes omitted.)

**Deteriorating Mortgage Practices**

68.     The FCIC also noted the deteriorating mortgage practices of several originators, many of whom originated loans in the Trusts as alleged herein:

In 2005, examiners from the Fed and other agencies conducted a confidential "peer group" study of mortgage practices at six companies that together had originated $1.3 trillion in mortgages in 2005, almost half the national total. In the group were five banks whose holding companies were under the Fed's supervisory purview – Bank of America, Citigroup, Countrywide, National City, and Wells Fargo – as well as the largest thrift, Washington Mutual. The study "showed a very rapid increase in the volume of these irresponsible loans, very risky loans," Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation, told the FCIC. A large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated.

(Footnotes omitted.)

69.     The FCIC noted that one of the most aggressive originators was New Century. Morgan Stanley and Credit Suisse First Boston Mortgage Securities Corp. were some of the most eager buyers of New Century's mortgage loans, purchasing billions of dollars of New Century's mortgage loans prior to the market meltdown.

70.     The FCIC also obtained testimony of key players in the securitization process. One such witness was Richard M. Bowen, III ("Bowen"), who was Senior Vice President and Chief Underwriter for Correspondent and Acquisitions for Citifinancial Mortgage and during 2006 and 2007 was Business Chief Underwriter for Correspondent Lending and charged with the underwriting responsibility for over $90 billion annually of residential mortgage production. Bowen was responsible for over 220 professional underwriters. Bowen testified:

My underwriting function was responsible to ensure that these mortgages met the credit standards required by Citi credit policy.

*     *     *

In mid-2006 I discovered that over 60% of these mortgages purchased and sold were defective. Because Citi had given reps and warrants to the investors that the mortgages were not defective, the investors could force Citi to repurchase many billions of dollars of these defective assets. This situation represented a large potential risk to the shareholders of Citigroup.

26

I started issuing warnings in June of 2006 and attempted to get management to address these critical risk issues. These warnings continued through 2007 and went to all levels of the Consumer Lending Group.

We continued to purchase and sell to investors even larger volumes of mortgages through 2007. And defective mortgages increased during 2007 to over 80% of production.

*    *    *

During 2006 and 2007 I witnessed many changes to the way the credit risk was being evaluated for these pools during the purchase processes. These changes included the Wall Street Chief Risk Officer's reversing of large numbers of underwriting decisions on mortgage loans from "turn down" to "approved." And variances from accepted Citi credit policy were made. Subprime mortgage pools, many over $300 million, were purchased even though the minimum credit-policy-required-criteria was not met.

Beginning in 2006 I issued many warnings to management concerning these practices, and specifically objected to the purchase of many identified pools. I believed that these practices exposed Citi to substantial risk of loss.

## RECKLESS ORIGINATION PRACTICES WERE USED TO GENERATE LOANS INCLUDED IN THE SECURITIZATIONS

71.    The defendants and their originators engaged in reckless if not fraudulent lending practices which were certain to lead to defaults by homeowners and losses for MBS investors. In addition to the suspect origination practices used by subsidiaries or affiliates of the Depositor Defendants, the defendants also included loans in the pools generated by some of the most aggressive loan originators in the business, including DLJ Mortgage, Bank of America ("BofA"), Countrywide Home Loans, Inc. ("Countrywide"), Wells Fargo, GreenPoint Mortgage Funding ("GreenPoint"), SunTrust Mortgage, Inc. ("SunTrust Mortgage"), CitiMortgage, IndyMac Bank, F.S.B. ("IndyMac"), American Home Mortgage Corp. ("American Home"), PHH Mortgage Corporation ("PHH"), ABN AMRO Mortgage Group, Inc. ("ABN AMRO"), National City Mortgage Co. ("National City"), GMAC Mortgage Corporation ("GMAC"), Wachovia Mortgage Corporation ("Wachovia") and WMMSC.

72.     The practices employed by these originators and/or their brokers included encouraging borrowers to inflate their income levels in stated-income loans, concealing known situations where the home would not be owner occupied, and manipulating the appraisal process such that LTV ratios were false and misleading.  These practices were so widespread that the Depositor Defendants were at a minimum reckless in continuing to include non-compliant loans in the portfolios.  When Clayton provided information to the banks, many *known* problems were actually ignored.  And some banks' internal procedures for avoiding problematic loans were ignored.

73.     In October 2010, Wells Fargo paid $24 million to end an investigation by eight states into whether lenders acquired by the bank made risky mortgages to consumers without disclosing their risks.  The loans, known as option adjustable-rate loans, or pick-a-payment mortgages, allowed borrowers to defer some interest payments and add them to the principal balance.  The loans were made by Wells Fargo's subsidiaries,Wachovia Corporation and World Savings Bank in Arizona, Colorado, Florida, Illinois, Nevada, New Jersey, Texas and Washington State.

74.     The improper practices of the originators are highlighted below:

**CSFB (DLJ Mortgage)**

75.     DLJ Mortgage was an originator of mortgage loans in the following Trust:

Adjustable Rate Mortgage Trust Series 2005-7

76.     CSFB's statements about DLJ Mortgage's underwriting standards and appraisal practices were false due to its disregard of findings of improper lending practices by Clayton.

77.     For CSFB, Clayton found that 37% of the 56,300 loans it reviewed failed to conform to standards.  CSFB disregarded these findings and still included a third of those loans found to have defects in the securitizations.

**BofA**

78.     BofA was an originator of mortgage loans in the following Trusts:

28

GSR Mortgage Loan Trust 2006-9F
MASTR Asset Securitization Trust 2005-1

79.    Defendants' statements about BofA's underwriting standards and appraisal practices

were false due to BofA's poor practices with respect to its mortgage lending. As the FCIC Report

noted:

> Similarly, in examining Bank of America in 2007, its lead bank regulator, the
> Office of the Comptroller of the Currency (OCC), sampled 50 mortgages and found
> 16 with "quality assurance referrals" for suspicious activity for which no report had
> been filed with FinCEN. All 16 met the legal requirement for a filing.

80.    While BofA's MBS portfolio of Countrywide-originated loans is well known, loans

originated by BofA prior to the acquisition of Countrywide were also problematic. While

announcing settlement agreements with mortgage giants Freddie Mac and Fannie Mae, Fannie Mae

CEO Michael Williams said it was continuing to work to resolve other claims, including ones related

to BofA-originated loans.

**Countrywide**

81.    Countrywide was an originator of mortgage loans in the following Trusts:

Citigroup Mortgage Loan Trust 2007-10
GSR Mortgage Loan Trust 2006-7F
GSR Mortgage Loan Trust 2006-9F
Morgan Stanley Mortgage Loan Trust 2005-5AR

82.    Defendants' statements about Countrywide's underwriting standards and appraisal

practices were false due to Countrywide's lending practices.

83.    Countrywide was issuing or acquiring mortgages with limited documentation and/or

excessive LTV ratios even where compensating factors were not demonstrated. Some borrowers

with "No Doc" mortgage loans were wage earners who could have provided employment, income

and asset verification, but were not required to do so because their actual income and assets would

29

have been insufficient for the mortgage amounts. As Countrywide reported increasing foreclosures and delinquencies, analysts who follow Countrywide closely indicated they were not surprised given Countrywide's past practices. As *MarketWatch* reported on February 15, 2008:

> Analysts were not surprised to see the increases, pointing to past lending practices popularized by the lending industry during the height of the housing boom as an underlying problem that will continue to play out in 2008.

> "It is certainly not a big surprise that we are seeing more [delinquencies], as many of these loans came about because of poor underwriting practices," Gary Gordon, an analyst for Portales Partners who has been following Countrywide for almost two decades.

> Gordon said he expected the number to rise throughout this year as many borrowers crack under the pressure of paying off loans for which they should not [sic] originally received.

> "The delinquencies for these kinds of loans are then likely to come out early in the lifecycle of the loan, which is happening now," he said.

84.    Countrywide's appraisals were frequently inflated, reckless, contained predetermined values or were otherwise unreliable, which caused the LTV ratios to be misstated. This caused mortgages to be issued for borrowers with higher debt-to-income ratios than was purportedly allowed.

85.    Additionally, non-traditional mortgage loans were increasingly being widely used by Countrywide and its brokers where the LTV ratios were over the stated limit due to "silent second" liens. In fact, for the mortgage loans generated under Countrywide's Streamlined Documentation Program, appraisals were not obtained at all, even though the mortgage loans obtained did, in fact, exceed 80% of the actual value of the subject property. The importance of legitimate appraisals was even more important under Countrywide's Expanded Underwriting Guidelines because these mortgage loans provided for loan amounts which reached 90%, 95% or even 100% in some cases. Given the inflated appraisals frequently provided, the undisclosed risk of mortgages exceeding home values was extreme. Countrywide's appraisal practices were intended to inflate the property value

so that loans would close. Countrywide was subsequently sued for inflated appraisals in connection with Countrywide's joint venture with KB Homes.

**Wells Fargo**

86. Wells Fargo was an originator of mortgage loans included in the following Trusts:

> Citigroup Mortgage Loan Trust 2007-10
> Wells Fargo Mortgage Backed Securities 2005-13 Trust
> Wells Fargo Mortgage Backed Securities 2005-15 Trust
> Wells Fargo Mortgage Backed Securities 2005-AR9 Trust
> Wells Fargo Mortgage Backed Securities 2005-AR11 Trust
> Wells Fargo Mortgage Backed Securities 2006-1 Trust
> Wells Fargo Mortgage Backed Securities 2006-9 Trust
> Wells Fargo Mortgage Backed Securities 2006-20 Trust
> Wells Fargo Mortgage Backed Securities 2006-AR14 Trust
> Wells Fargo Mortgage Backed Securities 2007-3 Trust

87. Wells Fargo Asset's and the other defendants' statements about Wells Fargo's underwriting standards and appraisal practices were false due to Wells Fargo's disregard of findings of improper lending practices. As the FCIC Report noted:

> Darcy Parmer, a former quality assurance and fraud analyst at Wells Fargo, the second largest mortgage lender from 2004 through 2007 and the largest in 2008, told the Commission that "hundreds and hundreds and hundreds of fraud cases" that she knew were identified within Wells Fargo's home equity loan division were not reported to FinCEN. And, she added, at least half the loans she flagged for fraud were nevertheless funded, over her objections.

(Footnote omitted.)

88. Wells Fargo had so many problematic loans that in 2009 and 2010, Freddie Mac put back $1.2 billion in loans to Wells Fargo and from 2007 to 2010, Fannie Mae put back $2.3 billion in loans to Wells Fargo.

31

**GreenPoint**

89.     GreenPoint was an originator of mortgage loans in the following Trust:

Citigroup Mortgage Loan Trust 2007-10

90.     Defendants' statements about GreenPoint's underwriting standards and appraisal practices were false due to GreenPoint's lending practices.

91.     Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

92.     Deficiencies in GreenPoint's income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels. Appraisers knew if they appraised under certain levels they would not be hired again.

93.     GreenPoint did not verify the income of borrowers as represented in the Registration Statements but had a reputation in the industry for cutting corners on underwriting. As a result of GreenPoint's poor underwriting practices, GreenPoint's parent, Capital One, subsequently took an $860 million charge for its loan portfolio.

**SunTrust Mortgage**

94.     SunTrust Mortgage was an originator of mortgage loans in the following Trusts:

32

> Citigroup Mortgage Loan Trust 2007-10
> GSR Mortgage Loan Trust 2006-9F
> MASTR Asset Securitization Trust 2006-1
> RALI Series 2006-QS6 Trust

95.    Defendants' statements about SunTrust Mortgage's underwriting standards and appraisal practices were false due to SunTrust Mortgage's lending practices.

96.    SunTrust Mortgage did not limit alternative documentation situations to those where "acceptable compensating factors" existed.  In fact, SunTrust Mortgage's practice of granting a relatively high level of stated-income and low documentation mortgage loans attracted mortgage brokers, correspondents and borrowers who were more inclined to misrepresent income levels of borrowers.  SunTrust Mortgage contributed to the problem further by requiring only minimal data to approve new mortgage brokers and then doing little monitoring on an ongoing basis of the thousands of approved mortgage brokers and the mortgage brokers' practices for originating mortgage loans.  Moreover, SunTrust Mortgage emphasized speeding up the origination process and cutting costs – using technology to get more Alt-A mortgage loans approved at a faster rate.  This de-emphasized the quality control and due diligence of the loan origination process.  SunTrust Mortgage compensated its loan officers based primarily on the volume of mortgage loans produced, which discouraged significant due diligence which would have protected Certificate holders.  SunTrust Mortgage was also extremely aggressive in granting pay-option adjustable rate mortgages ("Payment Option ARMs"), which were much more likely to default.

**CitiMortgage**

97.    CitiMortgage was an originator of mortgage loans in the following Trusts:

> Citicorp Mortgage Securities Trust, Series 2007-5
> Citicorp Mortgage Securities Trust, Series 2007-8

33

98.    CMSI's statements about CitiMortgage's underwriting standards for its loans and the

loans it acquired and its appraisal practices were false due to CitiMortgage's disregard of findings of

improper lending practices by Clayton.

99.    As the FCIC noted, top management of defendant Citigroup was notified

contemporaneously of the problems in the origination process:

> At Citigroup, meanwhile, Richard Bowen, a veteran banker in the consumer
> lending group, received a promotion in early 2006 when he was named business
> chief underwriter. He would go on to oversee loan quality for over $90 billion a year
> of mortgages underwritten and purchased by CitiFinancial. These mortgages were
> sold to Fannie Mae, Freddie Mac, and others. In June 2006, Bowen discovered that
> as much *as 60% of the loans that Citi was buying were defective. They did not meet
> Citigroup's loan guidelines* and thus endangered the company – if the borrowers
> were to default on their loans, the investors could force Citi to buy them back.
> Bowen told the Commission that he tried to alert top managers at the firm by "email,
> weekly reports, committee presentations, and discussions"; but though they
> expressed concern, it "never translated into any action." Instead, he said, "there was
> a considerable push to build volumes, to increase market share." Indeed, Bowen
> recalled, Citi began to loosen its own standards during these years up to 2005:
> specifically, it started to purchase stated-income loans. "So we joined the other
> lemmings headed for the cliff," he said in an interview with the FCIC.
>
> He finally took his warnings to the highest level he could reach – Robert
> Rubin, the chairman of the Executive Committee of the Board of Directors and a
> former U.S. treasury secretary in the Clinton administration, and three other bank
> officials. He sent Rubin and the others a memo with the words "URGENT – READ
> IMMEDIATELY" in the subject line. Sharing his concerns, *he stressed to top
> managers that Citi faced billions of dollars in losses if investors were to demand
> that Citi repurchase the defective loans*.
>
> Rubin told the Commission in a public hearing in April 2010 that Citibank
> handled the Bowen matter promptly and effectively. "I do recollect this and that
> either I or somebody else, and I truly do not remember who, but either I or somebody
> else sent it to the appropriate people, and I do know factually that that was acted on
> promptly and actions were taken in response to it." According to Citigroup, the bank
> undertook an investigation in response to Bowen's claims and the system of
> underwriting reviews was revised.
>
> Bowen told the Commission that after he alerted management by sending
> emails, he *went from supervising 220 people to supervising only 2, his bonus was
> reduced*, and he was *downgraded* in his performance review.

(Footnotes omitted.)

100.    As noted above, Clayton discovered that 42% of Citigroup's pool of loans in its sample did not meet standards and Citigroup disregarded those findings for nearly a third of those loans.

**IndyMac**

101.    IndyMac was the originator of mortgage loans in the following Trust:

IndyMac IMJA Mortgage Loan Trust 2007-A1

102.    IndyMac MBS's statements about IndyMac's underwriting standards and appraisal practices were false due to IndyMac's lending practices.

103.    IndyMac was formed in 1985 by Countrywide executives David Loeb and Angelo Mozilo  and was originally called Countrywide Mortgage Investment. It was built to collateralize Countrywide mortgage loans that were too large to be sold to Fannie Mae or Freddie Mac. In 1997, when Countrywide spun off Countrywide Mortgage Investment, it was renamed IndyMac. IndyMac specialized in Alt-A loans. These Alt-A loans were intended to be offered to buyers who had good credit scores but could produce little or no proof of income or assets besides the house they were planning on buying. However, as time went on and IndyMac was anxious to grow its business, the Alt-A loan concept was widely expanded to those borrowers who did not fit these guidelines. IndyMac also aggressively offered reverse mortgages without adequately verifying the collateral which made such mortgages feasible.

104.    IndyMac would make loans without regard to a borrower's ability to pay. IndyMac used a wide array of nontraditional mortgage loan products to qualify more borrowers for loans. This was done not so much to account for unusual situations with borrowers who could repay but to qualify those who likely could not.

105.     IndyMac's aggressive practices ultimately led to the collapse of IndyMac which was taken over by the FDIC.

**American Home**

106.     American Home was an originator of mortgage loans in the following Trust:

Citigroup Mortgage Loan Trust 2007-10

107.     Defendants' statements about American Home's underwriting standards and appraisal practices were false due to American Home's lending practices.

108.     In order to post desired loan production, American Home was as a matter of course granting exceptions even where "compensating factors" did not exist. American Home's business was dependent on continually increasing volume. Thus, it became even more aggressive in early 2007 when American Home made $16.7 billion in mortgage loans. A third of its mortgages were Payment Option ARMs which allowed borrowers to make payments which were *less than the interest amount accruing on the loan*, resulting in the difference being added to the principal balance each month. American Home granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own balance sheet. In fact, American Home went bankrupt in August 2007, after loan volumes dropped.

109.     American Home's loans were particularly popular with speculators who would not occupy the homes, which would decrease the borrowers' "willingness" to pay the debt if home prices did not appreciate to the borrowers' expectations. American Home subsequently suffered losses itself when borrowers whose incomes American Home had not verified began to default on little-money-down loans at an accelerated pace.

36

110.    The strategy of granting loans under stated-income applications relied significantly on accurate appraisals, which American Home did not obtain. While American Home did much of its business in areas where prices were rapidly appreciating, it also did business in states with lower appreciation, and in 2005-2006 had suffered itself from faulty appraisals in both Texas and Illinois, when loans defaulted and appraisals were shown to be inflated. The frequency of problematic appraisals in these states did not bode well for appraisals in states such as California and Florida. Moreover, the credit scores upon which the strategy relied could also be manipulated by borrowers either becoming an approved user on another person's card who had better credit or by complaining without basis to the credit score companies.

**PHH**

111.    PHH was an originator of mortgage loans in the following Trust:

GSR Mortgage Loan Trust 2006-9F

112.    Defendants' statements about PHH's underwriting standards and appraisal practices were false due to PHH's lending practices.

113.    PHH, which was spun-off from Cendant Corporation in 2005, was a private label mortgage provider which was the lender behind certain realtors that offered mortgage loans. PHH acquired loans from these realtors, but did not routinely perform the thorough review represented. The lack of a thorough review was critical since the structure of the arrangement was that the real estate agents were pushing both the home and the mortgage on the borrower. Real estate agents would always push valuations in order to get the deal done and have the deal look attractive to the actual lender. PHH looked the other way on inflated real estate values in order to keep its big corporate clients happy. PHH was extremely aggressive in making loans, promising same-day loan decisions and a best-price guarantee wherein it would beat any lender's price or pay the borrower

37

$500. The mortgage loans PHH held on to had suffered declines in value by late 2007 with many of the declines related to loans with origination flaws.

**ABN AMRO**

114.    ABN AMRO was an originator of mortgage loans in the following Trust:

Citicorp Mortgage Securities Trust, Series 2007-5

115.    Defendants' statements about ABN AMRO's underwriting standards and appraisal practices were false due to ABN AMRO's lending practices.

116.    Citigroup acquired ABN AMRO in January 2007. ABN AMRO had a reputation as an extremely aggressive lender and had settled litigation regarding fraudulently inflated appraisals used to close residential mortgage loans. Before the collapse of the housing market and the risky lending practices came to light, ABN AMRO offered a "Fastest Loan Yet" program, which allowed select brokers to approve loans on their own with much less documentation than more traditional loans.

**National City**

117.    National City was an originator of mortgage loans in the following Trusts:

Citigroup Mortgage Loan Trust 2007-10
GSR Mortgage Loan Trust 2006-9F
RALI Series 2006-QS6 Trust
RALI Series 2006-QS2 Trust
RALI Series 2006-QS18 Trust

118.    Defendants' statements about National City's underwriting standards and appraisal practices were false due to National City's lending practices.

119.    National City was notorious for getting into subprime lending. As the *bnet.com* blog noted on October 27, 2008:

The pattern is too familiar. Two profitable, respected banks with limited exposure to mortgages get greedy and try to cash in on the subprime craze. Both end up ready to go out of existence.

That's the case with National City Bank of Cleveland and Wachovia of Charlotte, N.C.

Not that long ago, National City was a pillar of the Cleveland business society. Founded in 1845, the bank reliably loaned money and took in deposits. Mortgages brought in a small 5 percent of total profit. Then in the latter boom years of the late 1990s, National City wanted to put its profits on afterburner. So in 1999, it bought California subprime lender First Franklin. Within a few years, mortgages were half of National City's profit and the bank was the country's sixth biggest housing lender.

*     *     *

By 2005, it was obvious the subprime initiative had become toxic. But the bank did nothing to correct what would prove a fatal mistake.

120.   Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted so that the borrower could qualify even without compensating factors. National City acquired many loans from mortgage brokers but did little verification of information in applications, and brokers were able to get loans approved that were inconsistent with National City's underwriting guidelines. In January 2008, National City would end up getting out of purchasing loans from brokers.

**GMAC**

121.   GMAC was the originator of mortgage loans in the following Trust:

RALI Series 2006-QS6 Trust

122.   GMAC is an affiliate of Residential Funding. Defendants' statements about GMAC's underwriting standards and appraisal practices were false due to the actual practices GMAC used to generate mortgage loans.

39

123.    GMAC was a huge player in Payment Option ARM loans, one of the excesses of the mortgage boom and bust.  Payment Option ARMs let borrowers make smaller monthly payments than they owed, with the shortfall getting tacked onto the principal balance.

**Wachovia**

124.    Wachovia was an originator of mortgage loans in the following Trusts:

> MASTR Asset Securitization Trust 2005-1
> Morgan Stanley Mortgage Loan Trust 2005-5AR
> RALI Series 2006-QS18 Trust

125.    Defendants' statements about Wachovia's underwriting practices were false due to Wachovia's lending practices.

126.    Wachovia, on its own, and through its 2006 acquisition of Golden West Financial (World Savings), generated some of the riskiest residential mortgage loans in the industry.  Golden West had specialized in Payment Option ARMs, marketed under the name "Pick-A-Pay."  These essentially became negative amortizing loans. Pick-A-Pay loans were recast when either the unpaid balance reached a certain percentage of the original loan (110%-125% of the original amount) or a number of years had elapsed.  Once this trigger occurred, the borrower was required to make the fully amortized payment at the then-prevailing adjustable interest rate.  Given the profile of many borrowers, this would be impossible.  Nevertheless, these loans were offered to generate volume. Wachovia even began to allow borrowers to make monthly payments tied to an annual interest rate of just 1% in order to increase origination volume.

127.    Golden West's (World Savings') practices were the subject of a *60 Minutes* segment in 2009:

> [Former World Savings employee Paul] Bishop says the kind of lending practices he saw were leading to a world of trouble that would ultimately result in billions in losses and a federal investigation.

What does Paul Bishop say he told executives at World Savings, three years before the crash?

"We're breaking the law, okay? We're breaking the law. You know we're breaking the law. I know we're breaking the law. What the hell do you think is going on here? You know, you're granting too many people loans who simply can't qualify," Bishop told 60 Minutes correspondent Scott Pelley.

Bishop's story is a rare inside look at forces that tore the economy apart, as seen by a plain-spoken loan salesman who is now suing World Savings, claiming that he was fired for telling executives what they didn't want to hear.

"I definitely talked to him about Enron. I said, 'We're sitting on an Enron.' This is bigger than Enron. I mean, we're doing four billion a month in loans. If housing drops, housing value drops, people start to default, you know? This is a nightmare. These people will not survive it," Bishop told Pelley.

128.    Wachovia's appraisal process was also manipulated through its use of GreenLink LLC, an affiliate, to handle appraisal work. The appraisal fees were so low, an appraiser could not economically perform an adequate appraisal. Appraisers were motivated to appraise to a certain level (the required amount for the loan) with little real analysis.

**WMMSC**

129.    WMMSC was the originator of mortgage loans in the following Trust:

> Washington Mutual Mortgage Pass-Through Certificates,
> WMALT Series 2005-3 Trust

130.    Defendants' statements about WMMSC's underwriting practices were false due to WMMSC's lending practices.

131.    WMMSC did not focus so much on whether the borrower could repay the loan and did not exert much control, if any, over brokers who did loans for WMMSC. In fact, WMMSC was particularly aggressive in providing yield-spread premium "buy-ups" to compensate the brokers even more. Considering that WMMSC was known in the industry for offering subprime mortgages up to 100% on low, teaser-rate ARMs, it was very easy (and profitable) for brokers to originate loans for

WMMSC even if the borrowers were not good credit risks. A credit risk manager which later performed an investigation into WMMSC loans quickly found "fraud, errors, misrepresentations, or gross negligence that took place on the part of WMMSC." This resulted in the loan-to-value ratio exceeding 100% at origination. Also, at origination certain documents were missing from the loan file. In 38% of the sample, there was unreasonable stated income and/or misrepresentation of income and/or employment by borrowers. WMMSC could have easily discovered these problems through simple due diligence.

132. Washington Mutual's Chief Credit Officer during 1999-2005 recently testified before the Senate Subcommittee on investigations, stating:

- Causes of the residential credit crisis included "self interest, failure to adhere to lending policies . . . [and] untested product innovation."

- "[R]apidly increasing housing prices masked the risks of a changing product mix and deteriorating underwriting . . . until 2007."

- In 2004, Washington Mutual's advertising tagline was "The Power of Yes" implying that Washington Mutual would "find some way to make a loan."

- A "continual" problem at Washington Mutual was that "line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."

133. The appraisals done on properties securing loans originated by brokers working for WMMSC were not thorough enough to confirm the property characteristics described. As a result, given the lax underwriting by WMMSC, the lack of valid appraisals meant that many of WMMSC's originations were in trouble from the origination time.

### DEFENDANTS' FALSE STATEMENTS ABOUT
### LOAN UNDERWRITING GUIDELINES

134. The defendants made numerous false statements about the origination of mortgage loans included in the Trusts which concealed the information described above.

42

135.    The Prospectus Supplement for Adjustable Rate Mortgage Trust Series 2005-7, for

which DLJ Mortgage was the principal originator, stated the following with respect to loan

underwriting standards:

**Underwriting Standards**

\*       \*       \*

Based on the data provided in the application and certain verification (if
required), a determination is made by the original lender that the mortgagor's
monthly income (if required to be stated) will be sufficient to enable the mortgagor to
meet its monthly obligations on the mortgage loan and other expenses related to the
property such as property taxes, utility costs, standard hazard insurance and other
fixed obligations other than housing expenses.

\*       \*       \*

The adequacy of the mortgaged property as security for repayment of the
related mortgage loan will generally have been determined by an appraisal in
accordance with pre-established appraisal procedure guidelines for appraisals
established by or acceptable to the originator. All appraisals conform to the Uniform
Standards of Professional Appraisal Practice adopted by the Appraisal Standards
Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae
and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator
or independent appraisers selected in accordance with pre-established appraisal
procedure guidelines established by the originator. The appraisal procedure
guidelines generally will have required the appraiser or an agent on its behalf to
personally inspect the property and to verify whether the property was in good
condition and that construction, if new, had been substantially completed. The
appraisal generally will have been based upon a market data analysis of recent sales
of comparable properties and, when deemed applicable, an analysis based on income
generated from the property or a replacement cost analysis based on the current cost
of constructing or purchasing a similar property. Under some reduced documentation
programs, the originator may rely on the original appraised value of the mortgaged
property in connection with a refinance by an existing mortgagor.

136.    These statements about the underwriting standards and appraisal practices were false

due to the practices described above and the omission of due diligence findings which contradicted

the representations about underwriting practices.

137.    The Prospectus Supplement for Citigroup Mortgage Loan Trust 2007-10, which

included loans originated by American Home, CitiMortgage, Countrywide, GreenPoint, National

43

City, SunTrust Mortgage and Wells Fargo, stated the following with respect to loan underwriting

practices:

*Underwriting Criteria*

The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting guidelines and its Alt-A underwriting guidelines.

\*     \*     \*

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. ***Exceptions to the underwriting standards may be permitted where compensating factors are present.*** In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home underwrites a borrower's creditworthiness based ***solely*** on information that American Home believes is indicative of the applicant's ***willingness and ability to pay the debt they would be incurring***.

\*     \*     \*

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, ***each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter***.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a

property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and *exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception*.

*     *     *

*Underwriting Standards*

    *General*

*     *     *

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

*     *     *

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. *The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.*

*     *     *

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

138.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

139.    The Prospectus Supplement for Citicorp Mortgage Securities Trust, Series 2007-8 stated the following with respect to loan underwriting practices:

Some mortgage loans acquired by CitiMortgage from other organizations and included in the pools may have been originated by these organizations, and some may have been purchased by these organizations from other persons. *CitiMortgage believes that these organizations' underwriting procedures for the mortgage loans included in this series, whether originated or purchased by these organizations, are not materially different from CitiMortgage's own underwriting procedures for similar loans.*

*       *       *

**Mortgage loan underwriting**

Mortgage loan underwriting assesses a prospective borrower's ability and willingness to repay, and the adequacy of the property as collateral for, a requested loan.

*Procedures of affiliated originators*

Each affiliated originator's real estate lending process for one- to four-family residential mortgage loans follows a standard procedure, established to comply with federal and state laws and regulations. For some residential mortgage loans, the affiliated originators have contracted with or delegated the underwriting process to unaffiliated third parties.

*       *       *

*Lending guidelines*

Once the employment verification and credit reports are received, the affiliated originator decides

• whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses as well as the prospective borrower's other financial obligations and monthly living expenses, and

• if the loan is for the purchase of the mortgaged property, whether the prospective borrower has enough liquid assets to acquire the mortgaged property and make the initial monthly mortgage payments, taking into account, among other things, proceeds from the sale of a prior residence (required since April 1991). This decision may be made from evidence such as a contract for sale of a prior residence and bank statements supplied by the prospective borrower.

Often, other credit considerations may cause a loan underwriter to depart from the guidelines, and a *loan underwriter may require additional information or verification to compensate for the departure*.

140.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

141.    The Prospectus Supplement for GSR Mortgage Loan Trust 2006-7F, which included loans originated by Countrywide, stated the following with respect to loan underwriting standards:

47

**Representations and Warranties Regarding the Mortgage Loans**

\* \* \*

VIII.   *No Fraud.*  All the documents executed in connection with the Mortgage Loan including, but not limited to, the mortgage note and the Mortgage, are free of fraud and any misrepresentation, are signed by the persons they purport to be signed by, and witnessed or, as appropriate, notarized by the persons whose signatures appear as witnesses or notaries, and each such document constitutes the valid and binding legal obligation of the signatories and is enforceable in accordance with its terms;

\* \* \*

XXXIII.   *The Appraisal.*  The Mortgage Loan documents contain an appraisal of the related mortgaged property by an appraiser who had no interest, direct or indirect, in the mortgaged property or in any loan made on the security thereof; and whose compensation was not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and/or the appraiser satisfy the applicable requirements or minimum qualifications of FIRREA, Fannie Mae or Freddie Mac, as applicable . . . .

142.   The Prospectus Supplement for GSR Mortgage Loan Trust 2006-9F, which included loans originated by BofA, National City, Countrywide, PHH and SunTrust Mortgage, stated the following with respect to loan underwriting standards:

**Bank of America, National Association Underwriting Guidelines**

\* \* \*

*General Underwriting Standards*

The Application and Use of Credit Scoring. Regardless of the channel in which the loan was originated, a mortgage application is completed containing information that assists in evaluating the mortgagor's credit standing, capacity to repay the loan and adequacy of the mortgaged property as collateral for the loan.

\* \* \*

Each mortgage application is evaluated by either an automated underwriting decision engine and/or a human underwriter to determine the appropriate credit decision and documentation requirements for the loan transaction. The automated underwriting decision engine may be an engine developed by an outside company and updated by Bank of America risk management personnel to facilitate automated

decisions on Bank of America loan transactions. Alternatively, it may be an external decision engine such as Fannie Mae's Desktop Underwriter or Freddie Mac's Loan Prospector decision engines. If the loan is not automatically approved or declined by the automated underwriting decision engine, it is directed to an underwriter who evaluates the application against a set of specific criteria. The underwriter may be an employee of the lender or may be an individual performing underwriting on a contract basis through a third party firm such as a mortgage insurance company.

\*     \*     \*

As part of the underwriting evaluation, the applicant's "Debt-to-Income Ratio" is calculated as the amount of the monthly debt obligations (including the proposed new housing payment and related expenses such as property taxes and hazard insurance) to his or her gross monthly income. Bank of America's Debt-to-Income Ratio guidelines are based on the loan instrument, loan term, Credit Score, loan-to-value ratio, property type, and occupancy characteristics of the subject loan transaction. Bank of America permits ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income.

143.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

144.    The Prospectus Supplement for MASTR Asset Securitization Trust 2005-2, which included loans originated by Wachovia, stated the following with respect to the loan underwriting standards:

**General**

The Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section " – General," or one of the following sections pertaining to a particular Loan Seller and related Loans.

49

*     *     *

Certain of the Loans have been originated under alternative documentation, streamlined documentation, reduced documentation, "lite" documentation, stated income, low/limited or "Express" documentation, no stated income, no ratio, "NIV" or no documentation programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a streamlined documentation program, a borrower's income and assets that have been previously documented are re verified, and any additional documentation and verification is limited. Under a reduced documentation program, verification of either a borrower's stated income or stated assets, but not both, is undertaken by the originator. Under a "lite" documentation, "stated income" or "NIV" program, a borrower is required to state both their income and assets, but the originator only undertakes to verify such borrower's assets. Under a low/limited or "Express" documentation program, the amount of documentation required to document a borrower's income and assets is limited. Under a no stated income program or a no ratio program, certain borrowers *with acceptable payment histories* will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no documentation program, the borrower is not required to state either their income or assets, and accordingly no verification of such borrower's income or assets is undertaken by the originator. The underwriting for such Loans may be *based primarily or entirely on other factors, such as an appraisal of the mortgaged property, the LTV Ratio at origination and the borrower's credit score and previous mortgage payment history*.

The adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator. The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property.

145.    These statements about the underwriting standards and appraisal practices were false

due to the practices described above and the omission of due diligence findings which contradicted

the representations about underwriting practices.

146.    The Prospectus Supplement for MASTR Asset Securitization Trust 2006-1, which

included loans originated by SunTrust Mortgage, stated the following with respect to the loan

underwriting standards:

> Generally, each borrower will have been required to complete an application
> designed to provide to the original lender pertinent credit information concerning the
> borrower. As part of the description of the borrower's financial condition, the
> borrower will have furnished information with respect to its assets, liabilities, income
> (except as described below), credit history, employment history and personal
> information, and furnished an authorization to apply for a credit report which
> summarizes the borrower's credit history with local merchants and lenders and any
> record of bankruptcy. The borrower may also have been required to authorize
> verifications of deposits at financial institutions where the borrower had demand or
> savings accounts. In the case of investment properties and two to four unit dwellings,
> income derived from the mortgaged property may have been considered for
> underwriting purposes, in addition to the income of the borrower from other sources.
> With respect to mortgaged properties consisting of vacation or second homes, no
> income derived from the property generally will have been considered for
> underwriting purposes. In the case of certain borrowers with acceptable payment
> histories, no income will be required to be stated (or verified) in connection with the
> loan application.

\*       \*       \*

> The adequacy of the mortgaged property as security for repayment of the
> related Loan will generally have been determined by an appraisal in accordance with
> pre-established appraisal procedure standards for appraisals established by or
> acceptable to the originator. All appraisals conform to the Uniform Standards of
> Professional Appraisal Practice adopted by the Appraisal Standards Board of the
> Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie
> Mac. Appraisers may be staff appraisers employed by the originator or independent
> appraisers selected in accordance with pre-established appraisal procedure standards
> established by the originator. The appraisal procedure standards generally will have
> required the appraiser or an agent on its behalf to personally inspect the property and
> to verify whether the property was in good condition and that construction, if new,
> had been substantially completed. The appraisal generally will have been based upon
> a market data analysis of recent sales of comparable properties and, when deemed
> applicable, an analysis based on the current cost of constructing or purchasing a
> similar property.

51

*      *      *

**SunTrust Mortgage, Inc.**

*      *      *

SunTrust underwriting guidelines generally follow standard Fannie Mae guidelines. They are designed to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing and cash reserves, and to evaluate the acceptability and marketability of the property to be used as collateral. ***SunTrust may consider a loan to have met underwriting guidelines where specific criteria or documentation are not met if, upon analyzing the overall qualitative evaluation of the loan package, there are acceptable compensating factors that can be used.*** SunTrust continuously updates and enhances its underwriting guidelines to comply with secondary market investor guidelines and to reflect changes required for new mortgage products.

147.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

148.    The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2005-5AR, which included loans originated by Countrywide, National City and Wachovia, stated the following with respect to the loan underwriting standards:

**Loan Purchasing Guidelines – Morgan Stanley Mortgage Capital Inc.**

The standards applicable to the purchase of mortgage loans by Morgan Stanley Mortgage Capital Inc. typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by FNMA or FHLMC primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of FNMA and FHLMC, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, ***certain exceptions to the loan purchasing guidelines described herein are made in the event that compensating factors are demonstrated by a prospective borrower.***

*      *      *

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in

52

accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. *All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to FNMA and/or FHLMC*. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

149.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

150.    The Prospectus Supplement for RALI Series 2006-QS6 Trust, which included loans originated by National City, SunTrust Mortgage and GMAC, stated the following with respect to the loan underwriting standards:

**Underwriting Standards**

All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under "– The Program" in this prospectus supplement. Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase as described under "The Trusts – Underwriting Policies – Automated Underwriting" in the prospectus.

\*       \*       \*

The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance. In fact, some states where the mortgaged properties may be located have "antideficiency" laws requiring, in general, that lenders providing credit on single family property look solely to the property for repayment in the event of foreclosure. See "Certain Legal Aspects of Mortgage Loans and Contracts." Any of these factors could change nationwide or merely could affect a locality or region in

which all or some of the mortgaged properties are located. However, declining values of real estate, as experienced periodically in certain regions, or increases in the principal balances of some mortgage loans, such as GPM Loans and negative amortization ARM loans, could cause the principal balance of some or all of these mortgage loans to exceed the value of the mortgaged properties.

151.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

152.    The Prospectus Supplement for RALI Series 2006-QS18 Trust, which included loans originated by GMAC, National City, SunTrust Mortgage and Wachovia, stated the following with respect to the loan underwriting standards:

> Certain of the mortgage loans have been originated under "reduced documentation" or "no stated income" programs, which require less documentation and verification than do traditional "full documentation" programs. Generally, under a "reduced documentation" program, no verification of a mortgagor's stated income is undertaken by the originator. Under a "no stated income" program, *certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.* Under a "no income/no asset" program, no verification of a mortgagor's income or assets is undertaken by the originator. The underwriting for those mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator.

> Prior to assigning the mortgage loans to the depositor, *Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner*

***generally consistent with the underwriting standards described in the Seller Guide.*** With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review.

*    *    *

**Underwriting Policies**

*    *    *

*General Standards*

In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated, or verified, in connection with the loan application.

*    *    *

The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "–Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income

55

generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

153.    These statements and similar statements in the other RALI Trust Prospectus Supplements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

154.    The Prospectus Supplement for Wells Fargo Mortgage Backed Securities 2005-13 Trust stated the following with respect to the loan underwriting standards:

**Mortgage Loan Underwriting**

The Mortgage Loans were generally originated in conformity with the underwriting standards described in the prospectus under the heading "The Mortgage Loan Programs – Mortgage Loan Underwriting – Wells Fargo Bank Underwriting" (the "Underwriting Standards"). In certain instances, exceptions to the Underwriting Standards may have been granted by Wells Fargo Bank. See "The Mortgage Loan Programs – Mortgage Loan Underwriting" in the prospectus. Certain of the Mortgage Loans may have been purchased by Wells Fargo Bank in bulk purchase transactions and may have been underwritten using underwriting standards which may vary from the Underwriting Standards (the "Bulk Purchase Underwritten Loans"). However, *Wells Fargo Bank has in each case reviewed the underwriting standards applied for such Bulk Purchase Underwritten Loans and determined that such standards were not materially different than the Underwriting Standards.*

\*      \*      \*

*General Standards.* Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

\*      \*      \*

In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

\*      \*      \*

Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%. However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-Value Ratios at origination in excess of 95% may be included in the related Trust Estate. The "Loan-to-Value Ratio" is the ratio, expressed as a percentage, of the principal amount of the Mortgage Loan at origination to the lesser of (i) the appraised value of the related Mortgaged Property, as established by an appraisal obtained by the originator generally no more than four months prior to origination (or, with respect to newly constructed properties, no more than twelve months prior to origination), or (ii) the sale price for such property. In some instances, the Loan-to-Value Ratio may be based on an appraisal that was obtained by the originator more than four months prior to origination, provided that (i) an appraisal update is obtained and (ii) the original appraisal was obtained no more than twelve months prior to origination. For the purpose of calculating the Loan-to-Value Ratio of any Mortgage Loan that is the result of the refinancing (including a refinancing for "equity take out" purposes) of an existing mortgage loan, the appraised value of the related Mortgaged Property is generally determined by reference to an appraisal obtained in connection with the origination of the replacement loan. In connection with certain of its mortgage originations, Wells Fargo Bank currently obtains appraisals through Value Information Technology, Inc., an entity jointly owned by Wells Fargo Bank and an unaffiliated third party.

155.    The Prospectus Supplement for Wells Fargo Mortgage Backed Securities 2005-15

Trust stated the following with respect to the loan underwriting standards:

### Wells Fargo Bank Underwriting

The following is a summary of Wells Fargo Bank's "general" underwriting standards and the substantially less restrictive underwriting criteria applicable to Wells Fargo Bank's "retention program."

*General Standards*. Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property

57

as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

*       *       *

Verifications of employment, income, assets or mortgages may be used to supplement the loan application and the credit report in reaching a determination as to the applicant's ability to meet his or her monthly obligations on the proposed mortgage loan, as well as his or her other mortgage payments (if any), living expenses and financial obligations. A mortgage verification involves obtaining information regarding the borrower's payment history with respect to any existing mortgage the applicant may have. This verification is accomplished by either having the present lender complete a verification of mortgage form, evaluating the information on the credit report concerning the applicant's payment history for the existing mortgage, communicating, either verbally or in writing, with the applicant's present lender or analyzing cancelled checks provided by the applicant. Verifications of income, assets or mortgages may be waived under certain programs offered by Wells Fargo Bank, but Wells Fargo Bank's underwriting guidelines require, in most instances, a verbal or written verification of employment to be obtained. In some cases, employment histories may be obtained through V.I.E., Inc., an entity jointly owned by Wells Fargo Bank and an unaffiliated third party, that obtains employment data from state unemployment insurance departments or other state agencies. In addition, the loan applicant may be eligible for a loan approval process permitting reduced documentation. The above referenced reduced documentation options and waivers limit the amount of documentation required for an underwriting decision and have the effect of increasing the relative importance of the credit report and the appraisal. . . .

In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying. These calculations are based on

the amortization schedule and the interest rate of the related loan, with the ratio being computed on the basis of the proposed monthly mortgage payment.

\*      \*      \*

Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%. However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-Value Ratios at origination in excess of 95% may be included in the related Trust Estate. The "Loan-to-Value Ratio" is the ratio, expressed as a percentage, of the principal amount of the Mortgage Loan at origination to the lesser of (i) the appraised value of the related Mortgaged Property, as established by an appraisal obtained by the originator generally no more than four months prior to origination (or, with respect to newly constructed properties, no more than twelve months prior to origination), or (ii) the sale price for such property. In some instances, the Loan-to-Value Ratio may be based on an appraisal that was obtained by the originator more than four months prior to origination, provided that (i) an appraisal update is obtained and (ii) the original appraisal was obtained no more than twelve months prior to origination. For the purpose of calculating the Loan-to-Value Ratio of any Mortgage Loan that is the result of the refinancing (including a refinancing for "equity take out" purposes) of an existing mortgage loan, the appraised value of the related Mortgaged Property is generally determined by reference to an appraisal obtained in connection with the origination of the replacement loan. In connection with certain of its mortgage originations, Wells Fargo Bank currently obtains appraisals through Value Information Technology, Inc., an entity jointly owned by Wells Fargo Bank and an unaffiliated third party.

156.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

157.    The Prospectus Supplement for Wells Fargo Mortgage Backed Securities 2006-20 Trust stated the following with respect to the loan underwriting standards:

*General Standards*

Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower

59

or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

*     *     *

A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant, with particular emphasis on the applicant's financial health (assets, liabilities, income and expenses), the property being financed and the type of loan desired. A self-employed applicant may be required to submit his or her most recent signed federal income tax returns. With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders. Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant. The credit review process generally is streamlined for borrowers with a qualifying Mortgage Score.

*     *     *

In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

*     *     *

Wells Fargo Bank originates mortgage loans with Loan-to-Value Ratios in excess of 80% either with or without the requirement to obtain primary mortgage insurance. In cases for which such primary mortgage insurance is obtained, the percentage of the unpaid principal balances of the mortgage loan as set forth in the following table (the "Coverage Percentage") will be covered by primary mortgage insurance (subject to certain standard policy exclusions for default arising from, among other things, fraud or negligence in the origination or servicing of a Mortgage Loan, including misrepresentation by the mortgagor or other persons involved in the origination thereof) from an approved primary mortgage insurance company, typically until the unpaid principal balance of the Mortgage Loan is reduced to an amount that will result in a Loan-to-Value Ratio less than or equal to 80%.

158.    The Prospectus Supplement for Wells Fargo Mortgage Backed Securities 2007-3

Trust stated the following with respect to the loan underwriting standards:

*General Standards*

Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

\*       \*       \*

Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented ***compensating factors*** for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income.

159.    These statements and similar statements in the other Wells Fargo Trust Prospectus

Supplements about the underwriting standards and appraisal practices were false due to the practices

described above and the omission of due diligence findings which contradicted the representations

about underwriting practices.

160.    The Prospectus Supplement for IndyMac IMJA Mortgage Loan Trust 2007-A1,

which included loans originated by IndyMac, stated the following with respect to the loan

underwriting standards:

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the Property as collateral. Most lenders offer a number of different underwriting programs. Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the Property as collateral. The most comprehensive of the programs emphasize both.

\*     \*     \*

In determining the adequacy of the Property as collateral, an appraisal is made of each property considered for financing. Except as described in the applicable prospectus supplement, an appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home.

Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Property such as property taxes and hazard insurance). The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.

161.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

162.    The Prospectus Supplement for Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3, which included loans originated by WMMSC, stated the following with respect to the loan underwriting standards:

The Mortgage Loans to be included in each Mortgage Pool will be subject to the various credit, appraisal and underwriting standards described herein. The Company's credit, appraisal and underwriting standards with respect to certain Mortgage Loans will generally conform to those published in the Company's Selling Guide (together with the Company's Servicing Guide, the "Guide", as modified from time to time). The credit, appraisal and underwriting standards as set forth in the

62

Guide are continuously revised based on opportunities and prevailing conditions in the residential mortgage market and the market for the Company's mortgage pass-through certificates. The Mortgage Loans may be underwritten by the Company or by designated third parties.

\*       \*       \*

The credit, appraisal and underwriting standards utilized in negotiated transactions and the credit, appraisal and underwriting standards of insurance companies issuing certificates may vary substantially from the credit, appraisal and underwriting standards set forth in the Guide. All of the credit, appraisal and underwriting standards will provide an underwriter with sufficient information to evaluate the borrower's repayment ability and the adequacy of the Mortgaged Property as collateral. . . .

The Company's underwriting standards are intended to evaluate the prospective Mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed Mortgaged Property as collateral. In the loan application process, prospective Mortgagors will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective Mortgagor will also provide an authorization to apply for a credit report which summarizes the Mortgagor's credit history.

163.    These statements about the underwriting standards and appraisal practices were false due to the practices described above and the omission of due diligence findings which contradicted the representations about underwriting practices.

## DISCLOSURES EMERGE ABOUT THE PROBLEMS UNDERLYING THE LOANS

164.    Years and months after Plaintiffs made purchases of the Certificates, the credit rating agencies began to lower ratings on certain of the Certificates.  Many of the Certificates were downgraded by the credit rating agencies from "investment grade" to "junk" status.

165.    The ratings action represents only a partial picture of the rapid deterioration of the Certificates issued pursuant to the Trusts, as other performance measures of the Certificates showed substantial decay.  No further interest or principal payments will be received on some of Union Central's Certificates.

166.    Note the current pricing and current ratings (compared to original ratings) with

respect to the Certificates purchased by Plaintiffs:

| | Current Trading Price as a Percentage of Par[1] | Original Rating | Current Rating |
|---|---|---|---|
| Adjustable Rate Mortgage Trust Series 2005 7 CB1 | 2% | AA | D |
| Citigroup Mortgage Loan Trust 2007-10 1B1 | 11% | AA | CCC |
| Citicorp Mortgage Securities Trust, Series 2007-5 B1 | 6% | AA | CC |
| Citicorp Mortgage Securities Trust, Series 2007-8 B1 | 10% | AA | CC |
| IndyMac IMJA Mortgage Loan Trust 2007-A1 B1 | 0% | AA | D |
| GSR Mortgage Loan Trust 2006-7F M1 | 1% | AA+ | C |
| GSR Mortgage Loan Trust 2006-9F M1 | 5% | AA+ | C |
| MASTR Asset Securitization Trust 2005-1 B3 | 2% | BBB | C |
| MASTR Asset Securitization Trust 2005-2 B1 | Sold at 30% | AA | CCC |
| MASTR Asset Securitization Trust 2006-1 B1 | 3% | AA | D |
| Morgan Stanley Mortgage Loan Trust 2005-5AR B1 | Sold at 4% | AA | D |
| RALI Series 2005-QA9 Trust M1 | 0% * | AA | D |

---

[1]    Per *Bloomberg*, April 2011

| | Current Trading Price as a Percentage of Par | Original Rating | Current Rating |
|---|---|---|---|
| • RALI Series 2005-QS7 Trust M3 | 0% * | BBB | D |
| • RALI Series 2005-QS9 Trust M3 | 0% * | BBB | D |
| • RALI Series 2005-QS14 Trust 1M1 | 18% | AA | D |
| • RALI Series 2005-QA5 Trust M3 | 0% * | BBB | C |
| • RALI Series 2006-QS6 Trust 2M1 | 4% | AA | D |
| • RALI Series 2006 QS18 Trust 2M1 | 0% | AA | D |
| • RALI Series 2006-QS18 Trust 2M2 | 0% * | A | D |
| • RALI Series 2006 QS18 Trust 2M3 | 0% * | BBB | D |
| • RALI Series 2006-QS2 Trust 2M1 | 7% | AA | D |
| • Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 B3 | 0% * | BBB | D |
| • Wells Fargo Mortgage Backed Securities 2005-13 Trust B3 | 74% | BBB | BB |
| • Wells Fargo Mortgage Backed Securities 2005-15 Trust B3 | 28% | BBB | CCC |
| • Wells Fargo Mortgage Backed Securities 2005-AR9 Trust B3 | 3% | BBB | CC |
| • Wells Fargo Mortgage Backed Securities 2005-AR11 Trust 2B3 | Sold at 17% | BBB | CC |

|   | Current Trading Price as a Percentage of Par | Original Rating | Current Rating |
|---|---|---|---|
| • Wells Fargo Mortgage Backed Securities 2006-1 Trust B1 | 57% | AA | CC |
| • Wells Fargo Mortgage Backed Securities 2006-1 Trust B2 | 13% | A | CC |
| • Wells Fargo Mortgage Backed Securities 2006-9 Trust B1 | Sold at 18% | AA+ | CC |
| • Wells Fargo Mortgage Backed Securities 2006-20 Trust B1 | 61% | AA | CCC |
| • Wells Fargo Mortgage Backed Securities 2006-20 Trust B2 | 14% | A | CC |
| • Wells Fargo Mortgage Backed Securities 2006-20 Trust B3 | Sold at 19% | BBB | C |
| • Wells Fargo Mortgage Backed Securities 2006-AR14 Trust CRB1 | 2% | AA | D |
| • Wells Fargo Mortgage Backed Securities 2007-3 Trust 3B1 | Sold at 20% | AA | C |

\*    No further interest or principal payments will be received on these Certificates.

167.    However, even as problems in the mortgage loan portfolio became apparent, investors were not aware of defendants' intentional conduct until the findings of the FCIC investigation were revealed in part in 2010 and 2011.

168.    Defendants' disregard of Clayton's findings and their own failure to investigate properly the assets they were richly compensated to underwrite and sell has harmed Union Central.

## COUNT I

### For Common Law Fraud Against All Defendants

169.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

66

170.    This is a claim for common law fraud against all defendants.

171.    Defendants made materially inaccurate written representations and omissions in materials distributed to Plaintiffs with respect to the documents and trusts for which defendants were responsible.

172.    The false and misleading statements are identified above.

173.    The Individual Defendants are liable for the false statements made in connection with the Trusts for which they served as directors or officers.

174.    The Underwriter Defendants and the other defendants made the false and misleading statements about the quality of the collateral underlying the MBS.

175.    Such statements and the reasons why they are false and misleading are set forth with particularity above.

176.    Defendants knew or recklessly disregarded the false and misleading nature of their representations and omissions.  The bases for defendants' knowledge or reckless disregard are set forth with particularity above.

177.    Defendants made the materially misleading statements and omissions for the purpose of inducing Union Central to buy and retain the Certificates.

178.    Union Central justifiably relied on defendants' materially misleading statements and omissions, as they went to the core of Union Central's investment decision on the Certificates: the risk attending such notes and the determination of whether the interest adequately compensated investors.  The Certificates would not have issued and would have been unmarketable but for defendants' misleading statements and omissions.

179.    Defendants' misrepresentations and omissions went to the credit quality of the Certificates and the underlying collateral assets.  The value of the Certificates has subsequently

collapsed. Later, when the FCIC findings began to be disclosed, Union Central had reason to learn it had been defrauded.

180.    Defendants continued throughout the relevant time period to conceal information about the credit quality of the Certificates and the collateral assets acquired by Union Central.

181.    Defendants undertook to sell billions of dollars in Certificates to investors. Having elected to make representations to investors in order to sell Certificates to them, defendants owed such investors a duty to disclose all material information, including adverse information.

182.    Defendants were in a superior position to investors in the Certificates as a consequence of their selling and trading of assets, such as collateral assets. Knowing that investors entrusted hundreds of millions of dollars to defendants and knowing that such investors were sold Certificates that were represented to be secure and stable investments, defendants had a duty to report to investors that the due diligence reporting had found material exceptions to the loans which defendants had disregarded.

183.    Union Central has been injured as its Certificates are worthless or severely impaired.

## COUNT II

### Claim for Negligent Misrepresentation
### Against All Defendants

184.    Union Central repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

185.    This is a claim for negligent misrepresentation against all defendants.

186.    Defendants' materially inaccurate written representations and omissions relating to the Trusts for which defendants were responsible were in written materials distributed to Union Central.

187.   The Registration Statements and other documents distributed by defendants told investors to rely upon them.  Defendants expected investors to rely upon them.

188.   The Registration Statements and other documents contained materially false and misleading statements and omissions as alleged above.

189.   Plaintiffs did rely upon these documents.

190.   It was Plaintiffs' reasonable expectation – as is common industry practice and sound business practice – that defendants would update the Prospectus Supplements to reflect material changes in the quality of the mortgages included in the Trusts.  Plaintiffs relied on the lack of changes to the documents as to the quality of the mortgages in making decisions to purchase and/or retain the Certificates.

191.   Defendants had a special duty of care to accurately and completely represent all material facts to the investors because:

   (a)   they owed such investors a fiduciary duty as alleged above; and

   (b)   they made an undertaking in the Registration Statements to provide updates to reflect significant changes in the credit quality of the MBS portfolios.

192.   Defendants were responsible for distributing information to Plaintiffs.  Defendants therefore knew or should have known that investors would act or refrain from taking action on the basis of information they provided.

193.   Plaintiffs took action and refrained from taking action on the basis of defendants' negligent statements and omission, as:

   (a)   if defendants had accurately reported in the Registration Statements the defects in the mortgages and the actual risk assumed by Union Central, Union Central would not have purchased the Certificates; and

(b)     if defendants had properly updated the Registration Statements consistent with their duties and undertakings, Union Central would have protected its investment capital by (i) insuring against the increased risk; or (ii) selling its MBS to less risk-averse investors, such as distressed asset investors.

194.    Union Central has suffered damages as a result of defendants' negligent misrepresentation.

## COUNT III

### Claim for Unjust Enrichment
### Against the Underwriter Defendants

195.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

196.    This is a claim for unjust enrichment against the Underwriter Defendants.

197.    The Underwriter Defendants received substantial compensation for selling the Certificates to investors. On information and belief, these fees were derived from the volume of Certificates sold to Union Central and other investors. Thus, the more Certificates sold from the Trusts, the larger the Underwriter Defendants' fees. This economic incentive to sell the Certificates, even in the face of undisclosed, adverse information as to the quality of the loan underwriting, explains but does not justify the Underwriter Defendants' failure to accurately report information about the collateral.

198.    The Underwriter Defendants directly contributed to the destruction of millions of dollars in investment value as a result of their structuring, rating and doing business with the Trusts. The Underwriter Defendants stood in conflicted positions relative to the Certificates. The Underwriter Defendants failed to exercise reasonable care in conducting their specific oversight roles with respect to the MBS, but were paid substantial profits and fees from the securitizations.

199.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is one of the leading financial centers in the world.  The Underwriter Defendants' ill-gotten gains should be disgorged in favor of Plaintiffs in order to protect and promote this public policy.

## COUNT IV

### Claim for Aiding and Abetting
### Against All Defendants

200.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

201.    This is a claim against defendants for aiding and abetting the other defendants' violations of law alleged herein.

202.    This claim is alleged in the alternative to each Count against defendants to the extent such claim does not proceed.

203.    Defendants knew of each of the other defendants' violations of laws and substantially assisted in such violations.

204.    Plaintiffs were damaged thereby.

## COUNT V

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 as to the Trusts Listed in Exhibit 2 Against Defendants CMLT, CMSI, GSMSC, IndyMac MBS, Residential Accredit, Wells Fargo Asset, Sparks, Moskowitz, Costa, Krueger and Paradis

205.    Union Central repeats and realleges the allegations above as they relate to the Trusts listed in Exhibit 2, as if fully set forth herein.

206.    This claim is brought under §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against defendants CMLT, CMSI, GSMSC, IndyMac MBS, Residential Accredit, Wells Fargo Asset, Sparks, Moskowitz, Costa,

Krueger and Paradis (collectively the "§10(b) Defendants") as to the Trusts listed in Exhibit 2 in which these defendants played a role as described above. The §10(b) Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Union Central, in violation of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

207.    The §10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the securitizations for which they were responsible from Union Central, as reflected in the misrepresentations and omissions set forth above.

208.    The §10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

209.    As a result of the §10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Union Central was misled into believing that the Certificates were more creditworthy investments than they actually were.

210.    Union Central purchased the Certificates without knowing that the §10(b) Defendants had misstated or omitted material facts about the securitizations in which the §10(b) Defendants played a role. In purchasing the Certificates, Union Central relied directly or indirectly on false and misleading statements made by the §10(b) Defendants, and/or an absence of material adverse information that was known to the §10(b) Defendants or recklessly disregarded by them but not

72

disclosed in the §10(b) Defendants' public statements or their communications with Union Central. Union Central was damaged as a result of its reliance on the §10(b) Defendants' false statements and misrepresentations and omissions of material facts.

211. At the time of the §10(b) Defendants' false statements, misrepresentations and omissions, Union Central was ignorant of their falsity and believed them to be true. Union Central would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

212. Union Central is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Union Central's claim, and within five years after the violations with respect to Union Central's investments in the Trusts listed in Exhibit 2.

213. By virtue of the foregoing, the §10(b) Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

214. As a direct and proximate result of the §10(b) Defendants' wrongful conduct, Union Central has suffered damages in connection with the purchase and subsequent decline in value or default of the Certificates.

### COUNT VI

### For Violation of §20(a) of the 1934 Act as to the Trusts Listed in Exhibit 2
### Against Defendants Citigroup, GSMC,
### Wells Fargo, Sparks, Moskowitz, Costa, Krueger and Paradis

215. Union Central repeats and realleges the allegations above as they relate to the Trusts listed in Exhibit 2, as if fully set forth herein.

216. Each of the §10(b) Defendants is liable as a direct participant and primary violator with respect to the wrongdoing discussed herein. Defendants Citigroup, GSMC, Wells Fargo, Sparks, Moskowitz, Costa, Krueger and Paradis (the "§20(a) Defendants"), by reason of their status

as parent companies or senior executive officers, controlled other parties, including the §10(b) Defendants, and directly or indirectly controlled the conduct of the §10(b) Defendants' business and their representations to Union Central, within the meaning of §20(a) of the 1934 Act. The §20(a) Defendants directly or indirectly controlled the content of the Registration Statements and Prospectus Supplements for the Trusts listed in Exhibit 2 within the meaning of §20(a) of the 1934 Act. Therefore, the §20(a) Defendants are jointly and severally liable for the other defendants' fraud, as alleged herein.

217. The §20(a) Defendants controlled and had the authority to control the content of certain of the documents issued in connection with the relevant Trusts listed in Exhibit 2, including the offering documents. Because of their involvement in the everyday activities of defendants, and because of their wide-ranging supervisory authority, the §20(a) Defendants reviewed or had the opportunity to review those documents prior to their issuance and therefore knew or should have known that those documents contained misrepresentations. The §20(a) Defendants reviewed or could have reviewed these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

218. The §20(a) Defendants knew or recklessly disregarded the fact that the other defendants' representations were materially false and misleading and/or omitted material facts when made. In so doing, the §20(a) Defendants did not act in good faith.

219. The §20(a) Defendants had the power to control or influence the particular transactions giving rise to the securities violation alleged herein, as set forth more fully above.

220. As set forth above, the §10(b) Defendants each violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the §20(a) Defendants are also liable pursuant to §20(a) of the 1934 Act.

221.    As a direct and proximate result of defendants' wrongful conduct, including the wrongful conduct of the §20(a) Defendants, Union Central suffered damages in connection with the purchase and subsequent decline in value or default of the Certificates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.    Awarding statutory damages; and

D.    Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: April 28, 2011                ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                     SAMUEL H. RUDMAN
                                                     DAVID A. ROSENFELD

                                                          SAMUEL H. RUDMAN

                                                 58 South Service Road, Suite 200
                                                 Melville, NY  11747
                                                 Telephone:  631/367-7100
                                                 631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
ARTHUR C. LEAHY
STEVEN W. PEPICH
THOMAS E. EGLER
SCOTT H. SAHAM
JOHN J. STOIA, JR.
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

C:\Documents and Settings\kstadelmann\Local Settings\Temporary Internet Files\OLKD\Cpt Union Central_MBS 2.doc

**Exibit 1**
**Plaintiffs' Certificates Purchased**

| Description | Issuing Entity | Issue Date | Purchase Date | Original Face Value |
|---|---|---|---|---|
| ARMT 05-7 CB1 | Adjustable Rate Mortgage Trust 2005-7 | 6/1/2005 | 11/30/2005 | 10,000,000 |
| CMLTI 07-10 1B1 | Citigroup Mortgage Loan Trust 2007-10 | 10/1/2007 | 01/22/2008 | 2,378,000 |
| CMSI 07-5 B1 | Citicorp Mortgage Securities Trust, Series 2007-5 | 6/1/2007 | 12/19/2007 | 5,860,000 |
| CMSI 07-8 B1 | Citicorp Mortgage Securities Trust, Series 2007-8 | 9/1/2007 | 10/03/2007 | 5,372,000 |
| GSR 06-7F M1 | GSR Mortgage Loan Trust 2006-7F | 7/1/2006 | 02/27/2007 | 6,712,000 |
| GSR 06-9F M1 | GSR Mortgage Loan Trust 2006-9F | 10/1/2006 | 02/27/2007 | 6,726,000 |
| IMJA 07-A1 B1 | Indymac IMJA Mortgage Loan Trust 2007-A1 | 6/1/2007 | 09/17/2007 | 3,807,000 |
| MASTR 05-1 B3 | MASTR Asset Securitization Trust 2005-1 | 5/1/2005 | 6/10/2005 | 961,000 |
| MASTR 06-1 B1 | MASTR Asset Securitization Trust 2006-1 | 3/1/2006 | 4/6/2006 | 7,338,000 |
| MASTR 2005-2 B1 | MASTR Asset Securitization Trust 2005-2 | 10/1/2005 | 11/8/2005 | 4,747,000 |
| MSM 2005-5AR B1 | Morgan Stanley Mortgage Loan Trust 2005-5AR | 8/1/2005 | 9/22/2005 | 12,152,000 |
| RALI 05-QS14 1M1 | RALI Series 2005-QS14 Trust | 9/1/2005 | 11/13/2007 | 2,881,400 |
| RALI 05-QS9 M3 | RALI Series 2005-QS9 Trust | 6/1/2005 | 7/19/2005 | 1,854,900 |
| RALI 06-QS18 2M1 | RALI Series 2006-QS18 Trust | 12/1/2006 | 01/09/2007 | 1,876,200 |
| RALI 06-QS2 2M1 | RALI Series 2006-QS2 Trust | 2/1/2006 | 11/13/2007 | 3,090,300 |
| RALI 06-QS6 2M1 | RALI Series 2006-QS6 Trust | 6/1/2006 | 11/13/2007 | 2,879,900 |
| RALI 2005-QA5 M3 | RALI Series 2005-QA5 Trust | 4/1/2005 | 9/27/2005 | 2,176,500 |
| RALI 2005-QA9 M1 | RALI Series 2005-QA9 Trust | 8/1/2005 | 9/9/2005 | 14,189,000 |
| RALI 2005-QS7 M3 | RALI Series 2005-QS7 Trust | 6/1/2005 | 7/14/2005 | 1,849,900 |
| RALI 2006-QS18 2M2 | RALI Series 2006-QS18 Trust | 12/1/2006 | 1/9/2007 | 416,900 |
| RALI 2006-QS18 2M3 | RALI Series 2006-QS18 Trust | 12/1/2006 | 1/9/2007 | 312,600 |
| WAMMS 05-3 B3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 | 4/1/2005 | 4/29/2005 | 4,322,000 |
| WFMBS 05-13 B3 | Wells Fargo Mortgage Backed Securities 2005-13 Trust | 10/1/2005 | 10/28/2005 | 591,000 |
| WFMBS 05-15 B3 | Wells Fargo Mortgage Backed Securities 2005-15 Trust | 11/1/2005 | 11/29/2005 | 336,000 |
| WFMBS 05-AR9 B3 | Wells Fargo Mortgage Backed Securities 2005-AR9 Trust | 4/1/2005 | 5/31/2005 | 6,774,000 |
| WFMBS 06-1 B1 | Wells Fargo Mortgage Backed Securities 2006-1 Trust | 2/1/2006 | 03/06/2006 | 4,955,000 |
| WFMBS 06-1 B2 | Wells Fargo Mortgage Backed Securities 2006-1 Trust | 2/1/2006 | 03/06/2006 | 901,000 |
| WFMBS 06-20 B1 | Wells Fargo Mortgage Backed Securities 2006-20 Trust | 11/1/2006 | 11/30/2006 | 2,303,000 |
| WFMBS 06-20 B2 | Wells Fargo Mortgage Backed Securities 2006-20 Trust | 11/1/2006 | 11/30/2006 | 400,000 |
| WFMBS 06-AR14 CRB1 | Wells Fargo Mortgage Backed Securities 2006-AR14 Trust | 9/1/2006 | 10/2/2006 | 10,000,000 |
| WFMBS 2005-AR11 2B3 | Wells Fargo Mortgage Backed Securities 2005-AR11 Trust | 5/1/2005 | 6/14/2005 | 477,000 |
| WFMBS 2006-20 B3 | Wells Fargo Mortgage Backed Securities 2006-20 Trust | 11/1/2006 | 11/30/2006 | 401,000 |
| WFMBS 2006-9 B1 | Wells Fargo Mortgage Backed Securities 2006-9 Trust | 7/1/2006 | 7/31/2006 | 10,000,000 |
| WFMBS 2007-3 3B1 | Wells Fargo Mortgage Backed Securities 2007-3 Trust | 3/1/2007 | 12/4/2007 | 4,664,000 |

**EXHIBIT 2**

RALI Series 2006-QS2 Trust

RALI Series 2006-QS6 Trust

RALI Series 2006-QS18 Trust

Citigroup Mortgage Loan Trust 2007-10

Citicorp Mortgage Securities Trust, Series 2007-5

Citicorp Mortgage Securities Trust, Series 2007-8

GSR Mortgage Loan Trust 2006-7F

GSR Mortgage Loan Trust 2006-9F

IndyMac IMJA Mortgage Loan Trust 2007-A1

Wells Fargo Mortgage Backed Securities 2006-9 Trust

Wells Fargo Mortgage Backed Securities 2006-20 Trust

Wells Fargo Mortgage Backed Securities 2006-AR14 Trust

Wells Fargo Mortgage Backed Securities 2007-3 Trust