UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| THE UNION CENTRAL LIFE INSURANCE COMPANY, AMERITAS LIFE INSURANCE CORP. and ACACIA LIFE INSURANCE COMPANY, | Civil Action No. 11-cv-02890-GBD |
| Plaintiffs, | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND NEW YORK COMMON LAW FRAUD |
| vs. | |
| ALLY FINANCIAL, INC., RESIDENTIAL FUNDING SECURITIES, LLC, RESIDENTIAL CAPITAL LLC, RESIDENTIAL FUNDING COMPANY LLC, RESIDENTIAL ACCREDIT LOANS, INC., CITIGROUP, INC., CITIGROUP GLOBAL MARKETS INC., CITIMORTGAGE, INC., CITIGROUP GLOBAL MARKETS REALTY CORP., CITIGROUP MORTGAGE SECURITIES, INC., CITIGROUP MORTGAGE LOAN TRUST INC., DEUTSCHE BANK SECURITIES INC., GOLDMAN, SACHS & CO., GS MORTGAGE SECURITIES CORP., GOLDMAN SACHS MORTGAGE COMPANY, HSBC SECURITIES (USA) INC., INDYMAC RMBS, INC , MORGAN STANLEY, MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY CAPITAL I INC., RBS SECURITIES, INC. SUNTRUST CAPITAL MARKETS, INC., UBS AG, UBS SECURITIES LLC, MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC., WAMU CAPITAL CORP., WASHINGTON MUTUAL MORTGAGE SECURITIES CORP., RANDAL COSTA, DOUGLAS R. KRUEGER, BRUCE J. PARADIS and DANIEL L. SPARKS, | DEMAND FOR JURY TRIAL |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ...................................................................................1

II.   JURISDICTION AND VENUE ..............................................................................7

III.  PARTIES ................................................................................................................8

    A.    Plaintiffs ....................................................................................................8

    B.    Defendants .................................................................................................8

        1.    WaMu .............................................................................................8

        2.    Citi .................................................................................................9

        3.    Goldman .......................................................................................11

        4.    IndyMac ........................................................................................12

        5.    Morgan Stanley .............................................................................12

        6.    RALI .............................................................................................13

        7.    UBS ...............................................................................................15

        8.    HSBC .............................................................................................16

        9.    SunTrust ........................................................................................16

        10.   Deutsche Bank ..............................................................................17

        11.   RBS ...............................................................................................17

        12.   Defendant Groups .........................................................................17

IV.   DEFENDANTS WERE CRITICAL PARTICIPANTS IN INDUSTRY-WIDE
     MISCONDUCT .....................................................................................................18

    A.    Residential Mortgage Loan Borrowers ....................................................18

    B.    The Secondary Market ..............................................................................20

    C.    Securitizations ..........................................................................................23

    D.    Financial Crisis Inquiry Commission .......................................................26

**Page**

E.      Clayton Holdings ......................................................................................26

F.      Appraisal Manipulation .............................................................................28

G.      Deteriorating Mortgage Lending Practices ...............................................30

H.      The Offering Materials Contained Detailed Information Regarding the
        Quality of the Loan Underlying the Certificates.......................................31

        1.      Underwriting Standards .................................................................32

        2.      Appraisals and Loan-to-Value Ratios ...........................................33

        3.      Debt-to-Income Ratios ..................................................................34

        4.      Owner-Occupancy Rates ...............................................................34

        5.      Ratings ...........................................................................................35

I.       Loans Included in the Securitizations Were Generated Through Fraudulent
         and Reckless Origination Practices...........................................................35

        1.      BofA...............................................................................................36

        2.      Countrywide...................................................................................37

        3.      Greenpoint......................................................................................42

        4.      SunTrust Mortgage ........................................................................44

        5.      CitiMortgage..................................................................................44

        6.      IndyMac .........................................................................................45

        7.      American Home .............................................................................45

        8.      PHH................................................................................................46

        9.      ABN AMRO...................................................................................47

        10.     National City ..................................................................................48

        11.     GMAC Mortgage ..........................................................................49

        12.     HomeComings ...............................................................................50

**Page**

13. Argent ....................................................................................................50

V. DEFENDANTS KNOWINGLY MADE FALSE AND MISLEADING
STATEMENTS REGARDING THE CERTIFICATES THEY WERE SELLING
TO UNION CENTRAL ...................................................................................52

A. Washington Mutual ................................................................................52

1. WaMu's Securitizations .............................................................52

2. False and Misleading Statements in WaMu's Offering Materials .............53

a. False and Misleading Statements About Compliance with
Underwriting Standards ..................................................53

b. False and Misleading Statements About Appraisals and
LTV Ratios ......................................................................54

c. False and Misleading Statements About Debt-to-Income
Ratios ..............................................................................55

d. False and Misleading Statements About Owner-Occupancy .........55

e. False and Misleading Statements About Ratings ...........................56

3. WaMu's Statements Were Knowingly False and Misleading .................56

a. Underwriting Standards Had Been Abandoned ..........................56

(1) Skyrocketing Default Rates Are Evidence of
Abandoned Underwriting ....................................57

(2) Appraisals and LTV Ratios Were Inflated .......................58

(3) Owner-Occupancy Rates Were Falsified .........................59

(4) Ratings Were False .............................................60

b. WaMu Knew that Underwriting Standards Were Being
Abandoned .......................................................................60

(1) WaMu Had Actual Knowledge of the Defective
Loans They Were Securitizing .........................72

(2) WaMu Knew that Ratings Were False ...............................73

705280_1

**Page**

4.    WaMu Capital Corp.'s Liability as an Underwriter of the WaMu
        Certificate ....................................................................................................74

B.    Citi ..........................................................................................................................75

    1.    Citi's Securitizations .....................................................................................75

    2.    False and Misleading Statements in Citi's Offering Materials ................76

        a.    False and Misleading Statements About Compliance with
                Underwriting Standards ..........................................................................76

            (1)    CMSI 2007-5 Trust and CMSI 2007-8 Trust ....................76

                (i)      American Home ....................................................78

                (ii)     Argent .....................................................................79

                (iii)    Countrywide ...........................................................79

                (iv)    PennFed ...................................................................80

        b.    False and Misleading Statements About Appraisals and
                LTV Ratios ...............................................................................................80

        c.    False and Misleading Statements About Debt-to-Income
                Ratios ........................................................................................................82

        d.    False and Misleading Statements About Owner-Occupancy .........84

        e.    False and Misleading Statements About Ratings ...........................84

    3.    Citi's Statements Were Knowingly False and Misleading ......................86

        a.    Citi Knew that Underwriting Standards Had Been
                Abandoned ...............................................................................................86

        b.    Citi's CEO Knew and Condoned Citi's Issuance of RMBS
                with Defective Loans ..............................................................................88

    4.    Citi Knew the Problems in the Mortgages Underlying the RMBS ...........88

        a.    Citi Securitized Imprudent Loans to Get Them Off Its
                Books and to Avoid the Risk of Default .......................................91

Page

b.   Other Employees Confirm Citi's Lack of Adequate Due
     Diligence ................................................................92

c.   Skyrocketing Default Rates Are Further Evidence of
     Abandoned Underwriting................................................93

d.   Appraisals and LTV Ratios Were Inflated....................................94

e.   Citi Knew that Appraisals Purposefully Overstated Home
     Values to Hit Sponsors' Targets ....................................96

f.   Citi Falsified Debt-to-Income Ratios............................................96

     (1)   CMSI 2007-8 ....................................................97

     (2)   CMLT 2007-10 ....................................................98

g.   Owner-Occupancy Rates Were Falsified......................................98

5.   Citi Knew that Underwriting Standards Were Being Abandoned ..........100

a.   Citi Had a Company-Wide Practice of Securitizing Loans
     that Had Not Been Properly Underwritten..................................101

b.   Based on Its Own Review of the Underlying Loans, Citi
     Defendants Had Actual Knowledge of the Defective Loans
     They Securitized ................................................................101

c.   Based on a Third-Party Review, Citi Had Actual
     Knowledge of the Defective Loans They Were Securitizing ......102

d.   Citi Used Its Knowledge of Defective Loans to Secure
     Further Profits for Itself at the Expense of Investors..................103

e.   Citi Willfully Abandoned Prudent Loan Underwriting to
     Increase Profits and Grow Its Business ....................................105

f.   Citi Admitted to Underwriting Quality Control Failures in a
     Settlement with the Government ..............................................107

g.   Citi Sought to Profit from Lack of Proper Underwriting by
     Shorting Related RMBS ....................................................109

705280_1

                                                                           **Page**

6.    Citigroup Global Markets Inc.'s Liability as an Underwriter of the
      Citi Certificate ..................................................................109

7.    UBS's Liability as an Underwriter of the Citi Certificate ......................111

C.    Goldman Sachs ........................................................................112

1.    Goldman's Securitizations ....................................................112

2.    False and Misleading Statements in Goldman's Offering Materials .......112

      a.    False and Misleading Statements About Compliance With
            Underwriting Standards ...........................................112

            (1)    Bank of America ...........................................112

            (2)    Countrywide................................................113

            (3)    National City...............................................113

            (4)    SunTrust Mortgage .......................................114

            (5)    Washington Mutual.......................................114

            (6)    Statements Regarding Goldman's Review of
                   Underwriting Standards .................................115

      b.    False and Misleading Statements About Appraisals and
            LTV Ratios.........................................................115

      c.    False and Misleading Statements About Debt-to-Income
            Ratios ..............................................................116

      d.    False and Misleading Statements About Owner-Occupancy.......118

      e.    False and Misleading Statements About Ratings.......................118

3.    Goldman's Statements Were Knowingly False and Misleading ............119

      a.    Goldman Knew that Underwriting Standards Had Been
            Abandoned .......................................................119

            (1)    Skyrocketing Default Rates Are Evidence of
                   Abandonment of Underwriting Standards ....................121

Page

(2)    Appraisals and LTV Ratios Were Inflated......................121

(3)    Debt-to-Income Ratios Were Falsified ...........................123

(4)    Owner-Occupancy Rates Were Falsified........................125

b.    Goldman Knew that Underwriting Standards Were Being Abandoned ..................................................................................126

(1)    Goldman Had Actual Knowledge of the Defective Loans They Were Securitizing.........................................126

(2)    Goldman Used Its Knowledge of Defective Loans to Secure Further Profits for Itself at the Expense of Investors ..................................................................128

(3)    Goldman Shorted the Very RMBS It Was Selling to Its Clients ...................................................................130

(4)    Government Investigation..................................................133

4.    Goldman, Sachs & Co.'s Liability as an Underwriter of the Goldman Certificates ...............................................................135

D.    IndyMac .............................................................................................136

1.    The IndyMac Securitization....................................................136

2.    False and Misleading Statements in IndyMac's Offering Materials .......137

a.    False and Misleading Statements About Compliance with Underwriting Standards ...............................................137

b.    False and Misleading Statements About Appraisals and LTV Ratios...........................................................137

c.    False and Misleading Statements About Debt-to-Income Ratios ..........................................................138

d.    False and Misleading Statements About Owner-Occupancy.......139

e.    False and Misleading Statements About Ratings........................139

3.    Defendants' Statements Were Knowingly False and Misleading............139

**Page**

a.      Underwriting Standards Had Been Abandoned ..........................140

    (1)      Skyrocketing Default Rates Are Evidence of
Abandoned Underwriting....................................141

    (2)      Appraisals and LTV Ratios Were Inflated.....................141

    (3)      Debt-to-Income Ratios Were Falsified ...........................143

b.      Defendants Knew that Underwriting Standards Were Being
Abandoned ..................................................................................145

    (1)      IndyMac Had Actual Knowledge of the Defective
Loans They Were Securitizing.........................................145

    (2)      The Office of Thrift Supervision Specifically
Warned IndyMac that It Was Securitizing Defective
Loans ................................................................................146

4.      UBS's Liability as an Underwriter of the IndyMac Certificates ............147

5.      HSBC's Liability as an Underwriter of the IndyMac Certificates..........148

E.      Morgan Stanley.................................................................................150

1.      Morgan Stanley's Securitizations .........................................................150

2.      False and Misleading Statements in Morgan Stanley's Offering
Materials ...............................................................................................151

a.      False and Misleading Statements About Compliance With
Underwriting Standards .......................................................151

    (1)      Morgan Stanley..................................................................151

    (2)      Countrywide.......................................................................152

    (3)      National City .....................................................................153

b.      False and Misleading Statements About Appraisals and
LTV Ratios..........................................................................154

c.      False and Misleading Statements of Borrowers' Debt-to-
Income Ratios ......................................................................155

Page

          d.       False and Misleading Statements About Owner-Occupancy.......156

          e.       False and Misleading Statements About Ratings........................157

    3.      Morgan Stanley's Statements Were Knowingly False and
Misleading...................................................................................157

          a.       Underwriting Standards Had Been Abandoned..........................158

               (1)     Skyrocketing Default Rates Are Evidence of
Abandoned Underwriting...................................................160

               (2)     Appraisals and LTV Ratios Were Inflated......................160

               (3)     Debt-to-Income Ratios Were Falsified ...........................162

               (4)     Owner-Occupancy Rates Were Falsified.......................164

               (5)     Ratings Were False .........................................................164

          b.       Morgan Stanley Knew that Underwriting Standards Were
Being Abandoned....................................................................165

               (1)     Morgan Stanley Had Actual Knowledge of the
Defective Loans They Were Securitizing .......................165

               (2)     Morgan Stanley Knew that Ratings Were False .............166

               (3)     Reports of Former Employees Show that Morgan
Stanley Knew Its Statements Were False .......................169

               (4)     Other Actions Against Morgan Stanley Confirm the
Former Employees' Accounts..........................................174

    4.      Morgan Stanley & Co.'s Liability as an Underwriter of the Morgan
Stanley Certificate.......................................................................176

F.    RALI ...................................................................................................177

    1.      Description of the RALI Certificates ......................................................177

    2.      False and Misleading Statements in RALI's Offering Materials.............178

          a.       RALI Issued False and Misleading Statements About
Compliance with Underwriting Standards..................................178

Page

(1)     RALI's Expanded Criteria Program ................................180

b.     RALI Issued False or Misleading Statements About
       Appraisals and LTV Ratios ........................................181

c.     RALI Issued False and Misleading Statements about the
       Underlying Borrowers' Ability to Support the Loans ................183

d.     RALI Issued False and Misleading Statements About
       Owner Occupancy ..................................................184

e.     RALI Issued False and/or Misleading Statements About the
       Removal of Mortgages ............................................184

f.     RALI Issued False and/or Misleading Statements
       Regarding the Ratings of its Trusts .............................185

3.     Defendants' Statements Were Knowingly False and Misleading ...........187

a.     RALI Abandoned Its Underwriting Standards ...........................187

b.     The Skyrocketing Default Rates on RALI Trusts Are
       Evidence of Abandoned Underwriting ..............................188

c.     RALI Used Inflated Appraisals and LTV Ratios ......................189

d.     RALI Falsified Debt-to-Income Ratios ..............................191

(1)     RALI 2005-QA9 .................................................192

(2)     RALI 2005-QS7 .................................................193

(3)     RALI 2005-QS9 .................................................193

(4)     RALI 2006-QS18 ...............................................194

e.     RALI Falsified Owner-Occupancy Rates ..............................195

f.     RALI Knew that Its Originators Violated Underwriting
       Guidelines ......................................................196

g.     RALI Knew that Its In-House Originator Participated in
       Discriminatory/Predatory Lending ................................198

- x -

Page

h.    RALI Purposefully Loosened Its Underwriting Standards to Grow Its Warehouse Lending Program ........................................200

(i)    Government Investigations Confirm that RALI Failed to Properly Underwrite the Mortgages in the RMBS ...................................201

4.    Residential Funding's Liability as an Underwriter of the RALI Certificates ........................................................................202

5.    UBS's Liability as an Underwriter of the RALI Certificates .................203

6.    Citigroup Global Markets, Inc's Liability as an Underwriter of the RALI Certificates ........................................................................204

7.    Deutsche Bank's Liability as an Underwriter of the RALI Certificates ........................................................................205

8.    RBS'S Liability as an Underwriter of the RALI Certificates .................209

G.    UBS ........................................................................................213

1.    UBS's Securitizations ........................................................213

2.    False and Misleading Statements in UBS' Offering Materials ...............213

a.    False and Misleading Statements About Compliance with Underwriting Standards ............................................213

b.    False and Misleading Statements About Appraisals and LTV Ratios ........................................................214

c.    False and Misleading Statements About Debt-to-Income Ratios ........................................................215

d.    False and Misleading Statements About Owner-Occupancy.......216

e.    False and Misleading Statements About Ratings.......................217

3.    Defendants' Statements Were Knowingly False and Misleading...........217

a.    Underwriting Standards Had Been Abandoned..........................218

- xi -

Page

(1)    Skyrocketing Default Rates Are Evidence of
Abandoned Underwriting...................................................218

(2)    Appraisals and LTV Ratios Were Inflated......................219

(3)    Debt-to-Income Ratios Were Falsified ..........................221

(4)    Owner-Occupancy Rates Were Falsified.......................221

(5)    Defendants Knew that Underwriting Standards
Were Being Abandoned ..................................................222

b.    UBS Had Actual Knowledge of the Defective Loans They
Were Securitizing.....................................................................222

(1)    UBS Succumbed to Competitive Pressure to
Securitize Bad Loans .....................................................223

(2)    UBS's Financial Incentives for Securitizing
Defective Loans .............................................................225

(3)    UBS's Internal Investigation into Loan
Securitization Practices..................................................226

4.    UBS's Liability as an Underwriter of the UBS Certificate....................227

5.    SunTrust's Liability as an Underwriter of the UBS Certificates ............228

VI.    DISCLOSURES EMERGE ABOUT THE PROBLEMS UNDERLYING THE
LOANS .................................................................................................................230

VII.    UNION CENTRAL'S RELIANCE ON DEFENDANTS' FALSE AND
MISLEADING STATEMENTS.........................................................................233

## I.      NATURE OF THE ACTION

1.      The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company (collectively, "Plaintiffs" or "Union Central") bring this action to recover losses suffered as a result of Defendants' fraudulent misconduct whereby they sold to Plaintiffs asset-backed securities (the "Certificates") pursuant to materially false and misleading statements made in Registration Statements and Prospectus Supplements filed with the United States Securities and Exchange Commission ("SEC") (collectively, the "Registration Statements").

2.      The Certificates were supported by pools of residential mortgage loans generally secured by first or second liens on residential properties.  The Registration Statements and other statements disseminated to Union Central (the "Offering Materials") were false and misleading in that they included false statements and/or omissions about the processes and practices used to select the pools of mortgage loans and the quality of those loans.

3.      During 2005 through 2007 the sponsoring Defendants (collectively, "Defendants") established the trusts identified and listed in Exhibit 1 attached hereto (the "Trusts") to issue billions of dollars worth of certificates that were backed by mortgage loans they deposited in the Trusts.  In selling these residential mortgage-backed securities ("RMBS") to Plaintiffs, Defendants who are the sponsors, depositors and underwriters for these RMBS, affirmatively and materially misrepresented the quality of the loans backing the Trusts, the procedures that had been used to review and screen those loans, the adequacy of the collateral supporting the loans and financial capacity and willingness of borrowers to repay the loans.  Because the relevant safeguards had not been utilized and were not present, the loans deposited in the Trusts were materially different from the type Defendants had represented were being securitized and sold to Plaintiffs as properly secured and highly rated investments.

- 1 -

4.      Defendants also concealed important information, including that outside firms that Defendants had hired to evaluate the loans had found a large percentage of their mortgage loans included in RMBS offerings during this time period did not conform to standards which the Defendants represented to investors had been used to originate the loans.  As a result, Defendants actually knew about these deficiencies prior to securitization, yet they failed to require replacement loans for large numbers of the bad loans.  They concealed this adverse information from Union Central and other investors.  Defendants intended for Union Central to believe that Defendants' underwriting and due diligence procedures were being used to identify and exclude problem loans, not to simply waive through problem loans even when identified.

5.      Defendants engaged in this concerted course of conduct while promoting a "race to the bottom" in the quality of loan origination because they were competing with each other for this profitable business.  The Senate Permanent Subcommittee on Investigations ("Senate PSI") has found that banks, such as Defendants, were "the driving force behind the structured finance products that provided a steady stream of funding for lenders originating high risk, poor quality loans and that magnified risk throughout the U.S. financial system.  The investment banks that engineered, sold, traded, and profited from mortgage related structured finance products were a major cause of the financial crisis."  *See U.S. Senate Permanent Subcommittee or Investigations, Wall Street & The Financial Crisis:  Anatomy of a Financial Collapse* (April 13, 2011) (the "Senate PSI Report").

6.      The Senate PSI case study of defendant Washington Mutual's practice of abandoning proper loan underwriting found it to be typical of other banks in the mortgage securitization industry:

> Washington Mutual was not the only mortgage lender to fail during the financial crisis.  Nor was its high risk lending practices unusual.  To the contrary, the Subcommittee investigation indicates that Washington Mutual was emblematic of practices at a number of financial institutions that originated, sold, and securitized high risk home loans from 2004 to 2008.

- 2 -

7.      As alleged herein, Defendants willfully abandoned prudent loan underwriting standards, while representing to Plaintiffs that the loans backing the Trusts had been properly underwritten with standards and procedures to verify the quality of the loans.  Unbeknownst to Plaintiffs, Defendants were actually fueling the erosion of proper underwriting standards with their insatiable appetite for more mortgages to securitize and sell to investors.  In the pursuit of higher profits, Defendants employed, financed, facilitated and accepted improper lending practices while abandoning the very loan underwriting guidelines they falsely represented to Plaintiffs were being utilized for the loans they securitized and sold to them.

8.      The *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* prepared by the Financial Crisis Inquiry Commission ("FCIC Report") also concluded that financial institutions, such as Defendants here, were the driving force behind deteriorating loan underwriting standards when improperly securitizing bad loans and selling them to investors.  As the FCIC Report put it: "We conclude collapsing mortgage-lending standards and the mortgage securitization pipeline lit and spread the flame of contagion and crisis."  The FCIC Report's conclusion is consistent with the detailed factual allegations set forth herein that show Defendants knowingly promoted the abandonment of proper loan underwriting in connection with the securitizations sold to Plaintiffs.

9.      There was essential agreement between members of the FCIC that financial institutions, such as Defendants, ignored credit quality standards for mortgages they securitized. Three dissenting commission members explained in their separate Dissenting Statement: "There was a steady deterioration in mortgage underwriting standards (enabled by securitizers that lowered the credit quality of the mortgages they would accept, and credit rating agencies that overrated the subsequent securities and derivatives)."  The Dissenting Statement continued:

- 3 -

> Mortgage originators took advantage of these lower credit quality securitization standards and the easy flow of credit to relax the underwriting discipline in the loans they issued. As long as they could resell a mortgage to the secondary market, they didn't care about its quality.

As alleged herein, Defendants engaged in this very same misconduct in connection with the RMBS Certificates they sold to Plaintiffs, while also concealing and failing to disclose this misconduct.

10.     As loan originators, financiers of loan originators, loan securitizers and sellers of securitized loans, Defendants had the ability and power to influence and control the underwriting standards they employed and accepted in connection with the loan securitizations they sold to Plaintiffs. Defendants were the only parties to these RMBS transactions who not only had access to the loan files and other inside information, but who, through their investigations and practices, actually knew about the poor quality of the underwriting that had been used to make the loans.

11.     Instead of diligently executing and complying with their responsibility as gatekeepers at each stage of the securitization process so as to enforce proper underwriting and accurately evaluate prospective borrowers' willingness and ability to repay the mortgage loans, Defendants knowingly securitized bad loans in order to increase the supply of loans needed to continue their profitable securitization business.

12.     Those Defendants who were direct loan originators received many reports and were well aware that their loan officers and employees were not complying with the stated underwriting standards, and they frequently received internal reports, which were ignored or brushed aside, that loan officers and underwriters were approving defective loans and waiving underwriting requirements without a valid basis for doing so.

13.     Defendants' due diligence, monitoring and investigations performed on the loan pools that they were originating and/or acquiring for securitization also conclusively demonstrated to them that prudent underwriting standards had been widely abandoned with respect to the loans in the

- 4 -

Trusts.  As alleged below, a substantial percentage of loans that Defendants sampled and reviewed in connection with securitizations revealed the loans had not been properly underwritten and had been made to borrowers who would be unable to repay them.

14.    Defendants did not disclose this extremely adverse information, which was only recently published in connection with the FCIC Report.  Thus, in 2010, the truth began to be revealed to the public regarding Defendants' actual knowledge at the time of the securitizations of defects in the mortgage pools that supported the Certificates.  After spending more than a year examining the causes of the financial crisis, in late 2010 the FCIC began disclosing its findings.

15.    Defendant did not use their inside information, special knowledge and ability to halt the making and securitizing of bad loans by enforcing proper underwriting standards.  Nor did they discontinue funding originators who engaged in wrongful loan origination practices.  Rather, Defendants utilized their inside knowledge of the true conditions to gain additional economic advantage at the expense of investors such as Plaintiffs.  For example, Defendants presented information regarding poor quality loans to the originators of the defective loans they were purchasing – not to fix the problem – but in order to negotiate reduced prices for loans they were depositing in the RMBS Trusts, thereby increasing their profits while leaving loans that were internally known to be defective in the trust they were selling to investors.

16.    In other instances, Defendants used their inside information regarding defective loans in RMBS Trusts to take short positions regarding the underlying mortgages, and thereby profiting when the loans went into default and generated losses for RMBS purchasers.  These Defendants were betting the value of the trust certificates would decline due to the poor quality of the underlying loans at the same time they were selling similar RMBS to Plaintiffs without disclosing what they knew about abandonment of the underwriting standards.

- 5 -

17.     Plaintiffs would not have purchased these RMBS Certificates if Defendants had revealed the true conditions.  When purchasing the Certificates, Plaintiffs sought investments that were conservative but also generated a reasonable yield.  In purchasing the subject RMBS Plaintiffs relied upon Defendants' representations regarding the loan underwriting standards that had purportedly been applied and utilized to ensure quality loans were in the Trusts.  Plaintiffs and their advisors relied on information presented in term sheets, Registration Statements and other statements Defendants provided to Plaintiffs regarding the mortgages and the underwriting standards, appraisals, loan-to-value ratios ("LTV"), debt-to-income ("DTI") ratios, owner-occupancy rates and ratings.  These representations were material to Plaintiffs' investment decisions.

18.     Because Defendants concealed their widespread abandonment of prudent loan underwriting, Plaintiffs were unaware of the substantially increased likelihood the subject loans would soon become non-performing and generate substantial losses flowing through the RMBS Trusts to Plaintiffs.  And this is precisely what happened.  Plaintiffs have not been compensated for the high level of concealed risk, which has now been actualized, that the Certificates actually posed.

19.     Union Central has suffered large losses on its investments in the Certificates as a very high percentage of the loans have defaulted.  Due to the lack of proper loan underwriting many of the Certificates have defaulted and are now worthless.  The remainder of the Certificates have dropped significantly in value since the time of Union Central's purchases due to defects in the underlying mortgage loans.  The Certificates still held by Union Central are no longer marketable at prices anywhere near the prices paid, as it is now clear that the Certificates were exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Defendants' statements represented.

- 6 -

20.     As further alleged below, Defendants committed egregious fraud with their materially false and misleading representations, and when omitting key information that would have been highly material to Union Central's decision to invest.  Defendants recklessly or knowingly made these false and misleading statements and omissions as described below.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331.  Certain claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].  Jurisdiction is conferred by §27 of the 1934 Act and venue is proper pursuant to §27 of the 1934 Act.

22.     This Court also has jurisdiction over the common law claims of fraud and aiding and abetting pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367(a).

23.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     Venue is proper in this District because the violations of law complained of herein occurred in part in this District, including the dissemination of the materially false and misleading statements complained of herein, and Defendants conduct business in this District.  The depositors of the mortgage loans for many of the Trusts had principal offices in New York, New York.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

705280_1

III.    PARTIES

    A.    **Plaintiffs**

26.    Plaintiffs are The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company.  Plaintiffs are indirect, fully owned subsidiaries of UNIFI Mutual Holding Company, which offers its clients a wide array of financial and insurance services.  The Union Central Life Insurance Company and Ameritas Life Insurance Corp. are both Nebraska companies, with home offices in Lincoln, Nebraska.  Acacia Life Insurance Company is a District of Columbia company, with home offices in Bethesda, Maryland.

27.    Plaintiffs acquired Certificates in reliance on Defendants' false statements, including those in the Registration Statements and Prospectus Supplements, and have been damaged thereby. Plaintiffs purchased Certificates as described in Exhibit 1 attached hereto.

    B.    **Defendants**

        1.    **WaMu**

28.    All of the Washington Mutual-affiliated Defendants described in §III.B.1. are referred to collectively as "WaMu."  WaMu pooled mortgage loans and sold Certificates for the following Trust:

> Washington Mutual Mortgage Pass-Through Certificates,
> WMALT Series 2005-3 Trust
> ("WMALT 2005-3 Trust")

29.    Defendant Washington Mutual Mortgage Securities Corp. ("WMMSC"), was incorporated in Delaware and headquartered in Illinois. WMMSC was a wholly owned subsidiary of

Washington Mutual, Inc. ("WMI"), which in 2007, the last year it filed a Form 10-K with the SEC, recorded a net loss of $67 million.[1]  WMMSC acted as the depositor for the WMALT 2005-3 Trust.

30.     Defendant WaMu Capital Corp. ("WCC") is incorporated and headquartered in Washington and is a subsidiary of J.P. Morgan Chase & Co.  WCC was a subsidiary of WMI.  It is a registered broker-dealer with the SEC.  WCC acted as underwriter in the sale of the Certificates for the WMALT 2005-3 Trust and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

        **2.      Citi**

31.     All of the Citigroup-affiliated Defendants described in §III.B.2. are referred to collectively as "Citi."  Citi pooled mortgage loans and sold Certificates for the following Trusts (collectively, "Citi Trusts"):

| |
|---|
| Citicorp Mortgage Securities Trust, Series 2007-5 ("CMSI 2007-5 Trust") |
| Citicorp Mortgage Securities Trust, Series 2007-8 ("CMSI 2007-8 Trust") |
| Citigroup Mortgage Loan Trust 2007-10 ("CMLT 2007-10 Trust") |

32.     Defendant Citigroup Inc. ("Citigroup") is a global diversified financial services holding company, incorporated under the laws of Delaware, and headquartered in New York. Citigroup does business in more than 160 countries and manages approximately 200 million customer accounts.  All of the Citigroup-related Defendants are direct or indirect subsidiaries of Citigroup.

---

[1]      WMI's collapse in 2008 is considered the largest bank failure in U.S. history. (Source: *Wall Street Journal*, Sept. 26, 2008.)  After the government seized WMI, J.P. Morgan Chase & Co. bought the crumbling bank for $1.9 billion.

33.    Defendant Citigroup Global Markets Inc. ("CGMI") is a New York-incorporated and -headquartered company.  As an SEC-registered broker-dealer, it is the brokerage and securities arm of defendant Citigroup.  CGMI provides investment banking services to corporate, institutional, government, and retail clients.  CGMI acted as underwriter in the sale of the Certificates for the Citi Trusts and in doing so drafted and disseminated certain of the Offering Materials, including but not limited to the Supplemental Prospectus.

34.    As an active market-maker, CGMI's deals were not limited to Citi transactions.  In addition, CGMI underwrote the RALI Series 2005-QS7 Trust and the RALI Series 2005-QS14 Trust, which are also at issue in this action.  *See* §V.F.

35.    Defendant CitiMortgage, Inc. ("CitiMortgage") is a New York corporation whose principal offices are in Connecticut and with major operations in Missouri.  As the mortgage lending unit of Citigroup, it originated many of the mortgages in the CMSI 2007-5 and the CMSI 2007-8 Trusts.  It also was the servicer for all three Citi Trusts and the sponsor for the CMSI 2007-5 and CMSI 2007-8 Trusts.

36.    Defendant Citicorp Mortgage Securities, Inc. ("CMSI") is a Delaware corporation headquartered in Missouri.  It is a wholly-owned subsidiary of CitiMortgage. CMSI acted as the depositor for the CMSI 2007-5 and CMSI 2007-8 Trusts.

37.    Defendant Douglas R. Krueger ("Krueger") was President and a director of CMSI. Defendant Krueger signed the Form S-3 comprising part of the Registration Statements pursuant to the offerings of the CMSI 2007-5 and CMSI 2007-8 Trusts.

38.    Defendant Citigroup Global Markets Realty Corp. ("CGMR") is a New York corporation headquartered in New York.  It is an affiliate of defendant CGMI, the Citi Trusts' underwriter.  CGMR acted as sponsor for the CMLT 2007-10 Trust.

- 10 -

705280_1

39.     Defendant Citigroup Mortgage Loan Trust Inc. ("CMLT") is a Delaware corporation headquartered in New York.   It is an affiliate of defendant CGMR.   CMLT engaged in the securitization of mortgage loans acquired by the Trust's sponsor, CGMR.   CMLT acted as the depositor for the CMLT 2007-10 Trust.

40.     Defendant Randall Costa ("Costa") was President and a director of CMLT during the relevant time period.   Defendant Costa signed the Form S-3 comprising part of the Registration Statements pursuant to the offerings of the CMLT 2007-10 Trust.

### 3.     Goldman

41.     All of the Goldman-affiliated Defendants described in §III.B.3. are referred to collectively as "Goldman."   Goldman pooled mortgage loans and sold Certificates for the following Trusts (collectively, "Goldman Trusts"):

| GSR Mortgage Loan Trust 2006-7F<br>("GSR 2006-7F Trust") |
| --- |
| GSR Mortgage Loan Trust 2006-9F<br>("GSR 2006-9F Trust") |

42.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a full service investment banking and securities firm.   Goldman Sachs is a New York partnership formed by Goldman Sachs Group, Inc., which is incorporated in Delaware and headquartered in New York, and Goldman Sachs & Co., LLC, whose sole member is Goldman Sachs Group, Inc.   Goldman Sachs acted as underwriter in the sale of the Certificates for the Goldman Trusts and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited, to the Prospectus Supplement.

43.     Defendant Goldman Sachs Mortgage Company ("GSMCo.") is a New York limited partnership.   Its general partner is Goldman Sachs Real Estate Funding Corp., which is incorporated and headquartered in New York, and its limited partner is The Goldman Sachs Group, Inc., which is

- 11 -

incorporated in Delaware and headquartered in New York.  GSMCo. was the sponsor for the Goldman Trusts.

44.     Defendant GS Mortgage Securities Corp. ("GSMS") is a Delaware corporation headquartered in New York.  It is a wholly-owned subsidiary of GSMCo.  GSMS acquired mortgage loans and acted as the depositor for the Goldman Trusts.

45.     Defendant Daniel L. Sparks ("Sparks") was Chief Executive Officer ("CEO") and a director of GSMS. during the relevant time period.  Defendant Sparks signed the Form S-3 comprising part of the Registration Statements pursuant to the offerings of the Goldman Trusts.

### 4.     IndyMac

46.     Defendant IndyMac RMBS, Inc. ("IndyMac RMBS"), a Delaware corporation headquartered in California, was the wholly-owned subsidiary of IndyMac Bank, F.S.B. ("IndyMac Bank"), which was closed by the Federal Deposit Insurance Corporation ("FDIC") on July 11, 2008. IndyMac RMBS and its failed parent, IndyMac Bank, are referred to collectively as "IndyMac." IndyMac RMBS acquired mortgage loans and acted as the depositor for IndyMac IMJA Mortgage Loan Trust 2007-A1 ("IMJA 2007-A1 Trust").

### 5.     Morgan Stanley

47.     All of the Morgan Stanley-affiliated Defendants described in §III.B.3. are referred to collectively as "Morgan Stanley."  Morgan Stanley pooled mortgage loans and sold Certificates for the Morgan Stanley Mortgage Loan Trust 2005-5AR ("MSM 2005-5AR Trust")

48.     The Morgan Stanley parent, defendant Morgan Stanley ("MS") is incorporated in Delaware and headquartered in New York.  MS is a global financial service firm that reported net revenues of $32.4 billion for 2011.  All of the Morgan Stanley-related Defendants are direct or indirect subsidiaries of MS.

705280_1

49.     Defendant Morgan Stanley & Co. Incorporated ("MS&Co.") is an SEC-registered broker-dealer incorporated in Delaware and headquartered in New York.  MS&Co. acted as underwriter in the sale of the Certificates for the MSM 2005-5AR Trust and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

50.     Defendant Morgan Stanley Capital I Inc. ("MSCII"), a Delaware corporation headquartered in New York, is a wholly-owned subsidiary of defendant MS&Co.  MSCII acted as the depositor for the MSM 2005-5AR Trust.

## 6.     RALI

51.     All of the RALI-affiliated Defendants described in §III.B.6. are referred to collectively as "RALI."  RALI pooled mortgage loans and sold Certificates for the following Trusts (collectively, "RALI Trusts"):

| RALI Series 2005-QA9 Trust |
| --- |
| RALI Series 2005-QS7 Trust |
| RALI Series 2005-QS9 Trust |
| RALI Series 2005-QS14 Trust |
| RALI Series 2005-QA5 Trust |
| RALI Series 2006-QS2 Trust |
| RALI Series 2006-QS6 Trust |
| RALI Series 2006-QS18 Trust |

52.     Defendant Ally Financial, formerly known as GMAC, Inc. ("Ally") is a financial services company incorporated in Delaware and headquartered in Michigan.  It maintains its longstanding relationship providing auto financing to automotive dealers and customers of General Motors Company, of which it had been a subsidiary.  In its 2011 annual filing with the SEC, it reported that it was one of the largest residential mortgage companies in the United States.  All of the RALI-related Defendants are direct or indirect subsidiaries of Ally.

705280_1

53.     Defendant Residential Capital LLC, formerly known as Residential Capital Corporation ("ResCap") is an indirect wholly owned subsidiary of Ally.  ResCap is a Delaware limited liability company headquartered in Minnesota.  As a real estate finance company, ResCap's business focused on the residential real estate market.  From 2005 to 2006, according to *Inside Mortgage Finance*, it grew from being the fifth largest to the third largest issuer of non-conforming mortgage-backed securities in the United States, issuing more than $65 billion in securities.  It was also ranked the sixth and seventh largest producer of residential mortgage loans in the United States in 2005 and 2006, respectively.

54.     Defendant Residential Funding Securities, LLC ("RFS"), now known as Ally Securities LLC and also referred to in the Offering Materials as GMAC RFC Securities, is a Delaware limited liability company registered as a broker-dealer with the SEC.  Its principal place of business is in New York.  Prior to 2007, it was known as Residential Funding Securities Corporation.  RFS acted as underwriter for all of the RALI Trusts, except for RALI Series 2005-QA9, and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

55.     Defendant Residential Funding Company, LLC, formerly known as Residential Funding Corporation ("RFC") is a Delaware-organized limited liability company with its principal place of business in Minnesota.  RFC was a subsidiary of ResCap, as well as the sole owner of HomeComings Financials, LLC ("HomeComings"), formerly known as HomeComings Financials Network, Inc., which originated many of the mortgages underlying the RALI Trusts.  RFC acted as master servicer for the RALI Trusts.

56.     Defendant Residential Accredit Loans, Inc. ("Residential Accredit") is a Delaware corporation with its principal place of business in Minnesota.  It is also an indirect wholly-owned

- 14 -

subsidiary of ResCap and RFC.  Residential Accredit acquired mortgage loans from RFC and acted as the depositor for the RALI Trusts.

57.     Defendant Bruce J. Paradis ("Paradis") was President, CEO and a director of Residential Accredit during the relevant time period.  Defendant Paradis signed the Forms S-3 comprising part of the Registration Statements pursuant to the offerings of the RALI Trusts.

### 7.     UBS

58.     All of the MASTR-affiliated Defendants described in §III.B.7. are referred to collectively as "UBS."  UBS pooled mortgage loans and sold Certificates for the following Trusts (collectively, "MASTR Trusts"):

| MASTR Asset Securitization Trust 2005-1 ("MASTR 2005-1") |
| --- |
| MASTR Asset Securitization Trust 2005-2 ("MASTR 2005-2") |
| MASTR Asset Securitization Trust 2006-1 ("MASTR 2006-1") |

59.     Defendant UBS AG is a Swiss-organized bank with a global presence.  UBS AG specializes in wealth management and investment banking.  All of the MASTR-related Defendants are direct or indirect subsidiaries of UBS AG.

60.     Defendant UBS Securities LLC ("UBS Securities") is a Delaware-registered limited liability company that engages in a nationwide securities business as a broker-deal registered with the SEC.  UBS Securities' principal place of business is located in New York.  Its members are UBS Americas Inc., which is incorporated in Delaware and headquartered in Connecticut, and UBS AG.  UBS Securities acted as underwriter in the sale of the Certificates for the MASTR Trusts and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

- 15 -

61.     As an active market-maker, UBS Securities' deals were not limited to MASTR transactions.  In addition, UBS Securities underwrote the following Trusts:

| CMSI 2007-5 Trust |
|---|
| IMJA 2007-A1 Trust |
| RALI 2005-QA9 Trust |
| RALI 2005-QS7 Trust |
| RALI 2005-QS9 Trust |

62.     Defendant Mortgage Asset Securitization Transactions, Inc. ("Mortgage Asset"), a Delaware corporation with its principal place of business in New York, is a wholly-owned limited purpose finance subsidiary of UBS Americas Inc.  Mortgage Asset acted as the depositor for the MASTR Trusts.

### 8.     HSBC

63.     Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is an investment banking firm that provides financial advisory services and is incorporated in Delaware and headquartered in New York.  HSBC Securities and its parent, HSBC Holdings plc, are referred to collectively as "HSBC."  HSBC Securities acted as underwriter in the sale of the Certificates for the IMJA 2007-A1 Trust and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

### 9.     SunTrust

64.     Defendant SunTrust Capital Markets, Inc. ("SCM"), now known as SunTrust Robinson Humphrey, Inc., is an SEC-registered broker-dealer that provides investment banking services.  SCM is a Tennessee corporation whose headquarters are in Georgia.  SCM is an affiliate of SunTrust Mortgages, Inc.  ("SunTrust Mortgage"), an originator of mortgage loans.  SCM, SunTrust Mortgage and their parent, SunTrust Banks, Inc., are referred to collectively as "SunTrust."  SCM acted as underwriter in the sale of the Certificates for the MASTR 2006-1 Trust and in doing so,

- 16 -

drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

### 10.   Deutsche Bank

65.   Defendant Deutsche Bank Securities Inc. ("DB Securities") is a Delaware-incorporated investment bank that provides security brokerage services and is based in New York.  It is a registered broker-dealer with the SEC.  DB Securities and its parent, Deutsche Bank AG, are referred to collectively as "Deutsche Bank."  DB Securities acted as underwriter in the sale of the Certificates for the RALI 2006-QS2 and RALI 2006-QSI8 Trusts and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

### 11.   RBS

66.   Defendant RBS Securities, Inc. ("RBS Securities"), a subsidiary of Greenwich Capital Holdings, Inc., was formerly known as Greenwich Capital Markets, Inc. and later changed its name to RBS Securities, Inc. in April 2009.  It is incorporated in Delaware and headquartered in Connecticut.  RBS Securities and its parent, The Royal Bank of Scotland Group plc, are referred to collectively as "RBS."  RBS Securities acted as underwriter in the sale of the Certificates for the RALI 2005-QS14 and RALI 2006-QS6 Trusts and in doing so, drafted and disseminated certain of the Offering Materials, including, but not limited to, the Prospectus Supplement.

### 12.   Defendant Groups

67.   The Defendants identified in ¶¶35, 36, 38, 39, 43, 44, 46, 50, 56, 62 are referred to herein as the "Depositor Defendants" or "Sponsor Defendants."

68.   The Defendants identified in ¶¶33, 42, 49, 54, 60 are referred to herein as the "Affiliated Underwriter Defendants."

- 17 -

705280_1

69.     The Defendants identified in ¶¶63-66 are referred to herein as the "Unaffiliated Underwriter Defendants."

70.     The Defendants identified in ¶¶37, 40, 45, 57 are referred to herein as the "Individual Defendants."  The Individual Defendants each held positions of responsibility with the respective Depositor Defendants and/or Underwriter Defendants.  Each had control over other personnel employed within their organizations and affiliated organizations and involved in the issuance of their respective RMBS and each Individual Defendant had control over the contents of the respective Prospectus Supplements for those RMBS offerings.

71.     The Affiliated Underwriter Defendants, Unaffiliated Underwriter Defendants and the Individual Defendants aided and abetted and/or participated with and/or conspired with the Depositor Defendants in connection with their respective RMBS underwriting and loan securitization activities at issue herein and in furtherance of the wrongful acts and course of conduct that caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this complaint.

## IV.     DEFENDANTS WERE CRITICAL PARTICIPANTS IN INDUSTRY-WIDE MISCONDUCT

### A.     Residential Mortgage Loan Borrowers

72.     Borrowers who require funds to finance the purchase of a house or to refinance an existing mortgage apply for residential mortgage loans with a loan originator.  These loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score.  Borrowers with higher FICO scores were able to receive loans with less documentation during the approval process, as well as higher LTV ratios.  Based in part on a person's FICO score, a loan originator assesses a borrower's risk

profile to determine the interest rate for the loan, the amount of the loan, and the general structure of the loan.

73.     A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health.  Borrowers who are issued "prime" mortgage loans are deemed to be the most creditworthy and receive the best rates and structure on mortgage loans.

74.     If a borrower has the required credit score for a "prime" mortgage loan, but does not supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a "low-doc" or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower.  Low doc or Alt-A loans are appropriate for borrowers who are self-employed or have large income streams that are frequently uneven and not subject to regular documentation.

75.     A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt-to-equity ratio.  Borrowers that have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger than average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.  None of the Trusts were represented to have included subprime loans, while in fact many of the loans in the Trusts were made to borrowers who would not have qualified for even subprime loans if proper, diligent and prudent underwriting had actually been in place and utilized.

**B.    The Secondary Market**

76.    Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan.  The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation.  Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan.  As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

77.    Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages.  As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market.  As discussed below, these innovations altered (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender, and (2) the risks normally associated with mortgage loans.

78.    Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages.  Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution.  By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages.  The mortgages sold into the financial markets are

- 20 -

typically pooled together and securitized into what are commonly referred to as RMBS. In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default – that risk is transferred with the mortgages to investors who purchase the RMBS.

79.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of RMBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



80.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the RMBS certificates in order of priority based on the specific tranche held by the RMBS investors. The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.

81.     In this RMBS structure, the senior tranches receive the highest investment rating by the rating agencies, usually AAA. After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds. In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the rating agencies.

- 21 -

82.    The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within an RMBS comprised of residential mortgages (often referred to as a residential mortgage-backed securities or RMBS:



(Source:  *The Wall Street Journal*)

83.    As illustrated below, in the typical securitization transaction, participants in the transaction are (1) the servicer of the loans to be securitized, often called the "sponsor," (2) the depositor of the loans in a trust or entity for securitization, (3) the underwriter of the RMBS, (4) the entity or trust responsible for issuing the RMBS, often called the "trust," and (5) the investors in the RMBS.

84.    The securitization process begins with the sale of mortgage loans by the sponsor – the owner of the mortgages that it either originated or acquired – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, and in exchange, the trust issues certificates to the depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors:

- 22 -



85.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors.  After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the RMBS certificates.

**C.     Securitizations**

86.     The Depositor Defendants acquired mortgage loan pools either from affiliated originators or unrelated third parties and transferred the mortgage pools to the Trusts in exchange for the Certificates.  Many of the Certificates purchased by Union Central were issued by New York trusts.  Each of the Trusts issued hundreds of million of dollars worth of certificates pursuant to the Registration Statements.

87.     The Underwriter Defendants acquired the certificates from the Depositor Defendants and sold them to the investing public pursuant to the Registration Statements.

88.     The Certificates were sold pursuant to Prospectus Supplements that were issued pursuant to Form S-3 Registration Statements, which were created as "shelf" registrations under Rule 415 of the Securities Act of 1933 ("1933 Act").  These shelf registration statements allowed

- 23 -

Defendants to rapidly access the capital markets with offerings of RMBS to investors, including Plaintiffs. Plaintiffs purchased Certificates arranged by the following depositors pursuant to Registration Statements:

(a)    Defendant CMLT was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Citicorp Mortgage Securities Trust Series 2007-5 | June 25, 2007 | 333-130333 |
| Citicorp Mortgage Securities Trust Series 2007-8 | September 26, 2007 | 333-130333 |

(b)    Defendant CMSI was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Citigroup Mortgage Loan Trust 2007-10 | October 31, 2007 | 333-138237 |

(c)    Defendant GSMSC was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| GSR Mortgage Loan Trust 2006-7F | July 27, 2006 | 333-132809 |
| GSR Mortgage Loan Trust 2006-9F | October 26, 2006 | 333-132809 |

(d)    Defendant Mortgage Asset was the depositor for the following Trusts:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| MASTR Asset Securitization Trust 2005-1 | May 25, 2005 | 333-106982 |
| MASTR Asset Securitization Trust 2005-2 | October 25, 2005 | 333-124678 |
| MASTR Asset Securitization Trust 2006-1 | March 28, 2006 | 333-124678 |

(e)    Defendant MSCI was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2005-5AR | August 29, 2005 | 333-125593 |

(f)    Defendant Residential Accredit was the depositor for the following Trusts:

- 24 -

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| RALI Series 2005-QA5 Trust | May 3, 2005 | 333-107959 |
| RALI Series 2005-QA9 Trust | August 26, 2005 | 333-126732 |
| RALI Series 2005-QS7 Trust | June 27, 2005 | 333-107959 |
| RALI Series 2005-QS9 Trust | June 27, 2005 | 333-107959 |
| RALI Series 2005-QS14 Trust | September 28, 2005 | 333-126732 |
| RALI Series 2006-QS2 Trust | February 27, 2006 | 333-126732 |
| RALI Series 2006-QS6 Trust | June 27, 2006 | 333-131213 |
| RALI Series 2006-QS18 Trust | December 27, 2006 | 333-131213 |

(g)    Defendant WMMSC was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 | April 21, 2005 | 333-103345 |

(h)    Defendant IndyMac RMBS was the depositor for the following Trust:

| Trust | Prospectus Date | Registration Statement No. |
|---|---|---|
| IndyMac IMJA Mortgage Loan Trust 2007-A1 | June 28, 2007 | 333-132042 |

89.    The Defendants also filed various documents with the SEC, including Form 8-K and Form 10-K reports subsequent to the issuances.  Those documents were incorporated by reference into and along with the Prospectus Supplements which comprise certain of the Registration Statements.

90.    The Registration Statements that were filed with the SEC purport to describe the assets supporting the Certificates.  Accurate information about the composition of the asset pool – including, importantly, the manner in which it was created – is the cornerstone of the disclosure required under the securities laws to enable investors to make informed decisions about the Certificates.  Complete and accurate information is even more important in the context of selling

- 25 -

"asset-backed securities" such as the Certificates, because the performance of the Certificates is based almost entirely upon the quality of the assets the Depositor Defendants sold to the Trusts.

### D.     Financial Crisis Inquiry Commission

91.     The FCIC was created to examine the causes of the recent financial and economic crisis in the United States.  The FCIC spent more than a year examining the causes, with 19 days of public hearings, interviews of more than 700 witnesses and the review of millions of pages of documents.  The FCIC released some findings in mid-2010 and issued its final Report in January 2011.  The FCIC's findings revealed much of the intentional conduct which caused the crisis.

### E.     Clayton Holdings

92.     Clayton Holdings, Inc.  ("Clayton"), a Connecticut-based firm that analyzes home mortgages for banks, hedge funds, monoline insurance companies and government agencies, played an important role in the securitization process in that investment banks hired Clayton to analyze a subsection of the home mortgage loans to be securitized.  Clayton performed this role and did find defects.  However, Clayton's findings were largely ignored.

93.     In late September 2010, Clayton  provided its data to the FCIC.  The FCIC held its last public hearing in Sacramento, where top Clayton executives testified under oath about the firm's role in the mortgage securitization chain.  Note the following chart prepared as part of the FCIC inquiry, mentioning Clayton's findings with regard to many of the Defendants named herein:

## Rejected Loans Waived in by Selected Banks

*From January 2006 through June 2007, Clayton rejected 28% of the mortgages it reviewed. Of these, 39% were waived in anyway.*

| Financial Institution | A<br>ACCEPTED LOANS<br>*(Event 1 & 2)/*<br>*Total pool of loans* | B<br>REJECTED LOANS<br>*(Event 3)/*<br>*Total pool of loans* | C<br>REJECTED LOANS WAIVED IN BY FINANCIAL INSTITUTIONS | D<br>REJECTED LOANS AFTER WAIVERS<br>*(B–C)* | E<br>FINANCIAL INSTITUTION WAIVER RATE<br>*(C/B)* |
|---|---|---|---|---|---|
| Citigroup | 58% | 42% | 13% | 29% | 31% |
| Credit Suisse | 68 | 32 | 11 | 21 | 33 |
| Deutsche | 65 | 35 | 17 | 17 | 50 |
| Goldman | 77 | 23 | 7 | 16 | 29 |
| JP Morgan | 73 | 27 | 14 | 13 | 51 |
| Lehman | 74 | 26 | 10 | 16 | 37 |
| Merrill | 77 | 23 | 7 | 16 | 32 |
| UBS | 80 | 20 | 6 | 13 | 33 |
| WaMu | 73 | 27 | 8 | 19 | 29 |
| **Total Bank Sample** | **72%** | **28%** | **11%** | **17%** | **39%** |

NOTES:  From Clayton Trending Reports. Numbers may not add due to rounding.
SOURCE: Clayton Holdings

94.     As noted above, many of the banks employed Clayton to perform reviews which the banks then disregarded in large measure.  For example, Clayton discovered that 42% of Citigroup's pool of loans did not meet standards and Citigroup disregarded those findings for nearly a third of those loans.  Thus, even though these banks and their officers had actual knowledge that a large percentage of the RMBS portfolio reviewed by Clayton failed to conform, they included many of these same loans in securitizations.  Moreover, Clayton reviewed only a sample of the loans, leading Defendants invariably to the conclusion that there were thousands of additional defective loans which Clayton had not reviewed.  Defendants concealed the information provided by Clayton about non-compliance and sold the RMBS to investors, including Union Central, who were unaware of the failure of many of the loans to conform to standards.  In fact, the only use Defendants appear to have

705280_1

had for Clayton's findings was to use the results as a negotiating point to reduce Defendants' costs of acquiring the loans.  Nothing was disclosed to the ultimate RMBS certificate investors about Clayton's findings.

95.     Certain of the Prospectus Supplements identified Clayton as providing services to the Defendants but concealed the exceptions Clayton identified and the fact that the Defendants had largely disregarded Clayton's findings.

F.     **Appraisal Manipulation**

96.     The FCIC Report also included testimony showing intentional manipulation of appraisal results by lenders in order to get more loans closed:

> Some real estate appraisers had also been expressing concerns for years. From 2000 to 2007, a coalition of appraisal organizations circulated and ultimately delivered to Washington officials a public petition; signed by 11,000 appraisers and including the name and address of each, it charged that lenders were pressuring appraisers to place artificially high prices on properties. According to the petition, lenders were "blacklisting honest appraisers" and instead assigning business only to appraisers who would hit the desired price targets. "The powers that be cannot claim ignorance," the appraiser Dennis J. Black of Port Charlotte, Florida, testified to the Commission.
>
> The appraiser Karen Mann of Discovery Bay, California, another industry veteran, told the Commission that lenders had opened subsidiaries to perform appraisals, allowing them to extract extra fees from "unknowing" consumers and making it easier to inflate home values. The steep hike in home prices and the unmerited and inflated appraisals she was seeing in Northern California convinced her that the housing industry was headed for a cataclysmic downturn. In 2005, she laid off some of her staff in order to cut her overhead expenses, in anticipation of the coming storm; two years later, she shut down her office and began working out of her home.

97.     In written testimony before the United States House of Representatives Committee on Financial Services, Alan Hummel, Senior Vice President and Chief Appraiser of Forsythe Appraisals, LLC, testified about an independent study conducted in December 2006 by the October Research Corporation:

- 28 -

705280_1

This study found that 90 percent of appraisers were pressured by mortgage brokers, lenders, realty agents, consumers and others to raise property valuations to enable deals to go through.  This was nearly double the abuse findings of a similar study three years ago.  Moreover, the survey found that 75 percent of appraisers reported "negative ramifications" if they did not cooperate, alter their appraisal, to provide an artificial valuation.

*        *        *

Unfortunately, these parties with a vested interest in the transaction are often the same people managing the appraisal process within many financial institutions, and therein is a terrible conflict of interest.  In this situation our members experience systemic problems with coercion.  Appraisers are ordered to doctor their reports or else never see work from those parties again.

98.    Similarly, Richard Bitner, a former executive of a subprime lender for fifteen years, testified in April 2010 before the FCIC that "the appraisal process [was] highly susceptible to manipulation," and that the rise in property values was in part due to "the subprime industry's acceptance of overvalued appraisals."  New Century's Patricia Lindsay, a former wholesale lender, stated in her testimony to the FCIC on April 7, 2010 that appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony to the FCIC on April 23, 2009 that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again. . . .  [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"

99.    The FCIC's January 2011 Report recounts the similar testimony of Dennis J. Black, an appraiser with 24 years of experience who held continuing education services across the country.  "He heard complaints from the appraisers that they had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems.  Black told the FCIC, 'The story I have heard

- 29 -

most often is the client saying he could not use the appraisal because the value was [not] what they

needed.'  The client would hire somebody else."

### G.    Deteriorating Mortgage Lending Practices

100.    The FCIC also noted the deteriorating mortgage practices of several originators, many

of whom originated loans in the Trusts as alleged herein:

> In 2005, examiners from the Fed and other agencies conducted a confidential
> "peer group" study of mortgage practices at six companies that together had
> originated $1.3 trillion in mortgages in 2005, almost half the national total.  In the
> group were five banks whose holding companies were under the Fed's supervisory
> purview – Bank of America, Citigroup, Countrywide, National City, and Wells
> Fargo – as well as the largest thrift, Washington Mutual.  The study "showed a very
> rapid increase in the volume of these irresponsible loans, very risky loans," Sabeth
> Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking
> Supervision and Regulation, told the FCIC.  A large percentage of their loans issued
> were subprime and Alt-A mortgages, and the underwriting standards for these
> products had deteriorated.

101.    The FCIC also obtained testimony of key players in the securitization process.  One

such witness was Richard M. Bowen, III ("Bowen"), who was Senior Vice President and Chief

Underwriter for Correspondent and Acquisitions for Citifinancial Mortgage, an affiliate of Citi, and

during 2006 and 2007 was Business Chief Underwriter for Correspondent Lending in the Consumer

Lending Group and charged with the underwriting responsibility for over $90 billion annually of

residential mortgage production.  Bowen was responsible for over 220 professional underwriters.

Bowen testified:

> My underwriting function was responsible to ensure that these mortgages met the
> credit standards required by Citi credit policy.
>
> *       *       *
>
> In mid-2006 I discovered that over 60% of these mortgages purchased and
> sold were defective. Because Citi had given reps and warrants to the investors that
> the mortgages were not defective, the investors could force Citi to repurchase many
> billions of dollars of these defective assets. This situation represented a large
> potential risk to the shareholders of Citigroup.

- 30 -

I started issuing warnings in June of 2006 and attempted to get management to address these critical risk issues. These warnings continued through 2007 and went to all levels of the Consumer Lending Group.

We continued to purchase and sell to investors even larger volumes of mortgages through 2007. And defective mortgages increased during 2007 to over 80% of production.

\*      \*      \*

During 2006 and 2007 I witnessed many changes to the way the credit risk was being evaluated for these pools during the purchase processes. These changes included the Wall Street Chief Risk Officer's reversing of large numbers of underwriting decisions on mortgage loans from "turn down" to "approved." And variances from accepted Citi credit policy were made. Subprime mortgage pools, many over $300 million, were purchased even though the minimum credit-policy-required-criteria was not met.

Beginning in 2006 I issued many warnings to management concerning these practices, and specifically objected to the purchase of many identified pools. I believed that these practices exposed Citi to substantial risk of loss.

**H.    The Offering Materials Contained Detailed Information Regarding the Quality of the Loan Underlying the Certificates**

102.    The Offering Materials for each of the Trusts contained information and data regarding, for example, the particular features of the Certificates, the structure of the Trusts, the entities involved in the issuance, and the loans underlying the Certificates. The Offering Materials for the Certificates contained disclosures regarding, *inter alia*: (a) the underwriting standards pursuant to which the loans were originated; (b) the appraisal process for the underlying loans and LTV ratios based on such appraisals; (c) DTI ratios or standards acceptable for borrowers; (d) owner-occupancy rates for the subject collateral; and (e) credit ratings for the Certificates.

103.    This data allowed investors, such as Union Central, to evaluate the quality of the Certificates. Investors, including Union Central, relied on the accuracy of this information in making their investment decisions to purchase the Certificates. Indeed, Union Central rejected over

90% of the Certificates that they reviewed and closely scrutinized these disclosures to ensure that the Certificates were of satisfactory quality.

104.   So too, the credit rating agencies relied on the accuracy of this data in rating the Certificates.  Even small changes to LTV ratios and owner-occupancy rates, for example, could materially alter the risk profile.  Defendants were all well aware of how the rating agencies evaluated the Certificates and what kinds of loan pools would produce the desired ratings that were necessary to issue the Certificates.

105.   The following paragraphs describe some of the essential metrics and standards that were included in all of the Offering Materials and were material to reasonable investors, including Union Central.

### 1.   Underwriting Standards

106.    The fundamental basis upon which RMBS are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the loans' collateral should the borrower default. If the borrowers cannot pay, and the collateral is insufficient, the investors incur losses. For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the Certificates, and the representations in the Offering Materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

107.   The Offering Materials contained umbrella underwriting guidelines which would be applicable to all the loans underlying the Certificates, as well as more specific guidelines applicable to certain originators from whom the loans were purchased.  These underwriting standards described the types of information collected from borrowers, the due diligence and verifications conducted on the borrower, as well as the acceptable credit standards for originating a loan.  In the case of reduced

- 32 -

705280_1

documentation or no documentation loans, the underwriting standards described compensating factors that were evaluated and/or restrictions on borrowers to whom such loans could be issued.

108.    For each Certificate, the Offering Materials represented that underwriting standards were applied to ensure that a borrower had the capacity to repay the loan at issue.

### 2.    Appraisals and Loan-to-Value Ratios

109.    As represented in the Offering Materials, the underwriting and approval process for loans pooled in the Trusts required obtaining appraisals that generally complied with the Uniform Standards of Professional Appraisal Practices ("USPAP").  Accurate appraisal reports were one of the most important parts of a loan file because they supported the underwriter's determination of whether sufficient and appropriate collateral to back the mortgage transaction.  If the appraiser overvalued the property, the loan amount would have been larger than it should be, and the investor's risk of loss in the event of foreclosure would be much greater.

110.    An accurate appraisal is also critical to the determination of an LTV ratio.  The LTV ratio affects the degree of risk involved in the loan – both the risk of default and the risk of loss in the event of a default.  Borrowers are less likely to default on loans with low LTVs.  A borrower who makes a large down-payment has a substantive investment in the property, and will therefore try harder to avoid foreclosure.  When foreclosure is necessary, the investor is more likely to recover the entire debt if the LTV is lower.  For these reasons, the Offering Materials described the LTV ratios of the loans underlying the Certificates, and generally described the LTV limits used in the underwriting of the loans.

111.    The FCIC Report, as well as other recent reports, have revealed an industry-wide practice by which appraisals were manipulated in order to ensure that loans could be underwritten

- 33 -

regardless of the actual value of the property which was supposed to serve as collateral of the subject loan.

### 3.    Debt-to-Income Ratios

112.    DTI ratios are critical metrics in evaluating whether a borrower will be able to repay the contemplated loan.  If a borrower has very high levels or debt, or low levels of income, or both, it is less likely that he or she will be able to repay the loan.  This relationship is described best by the borrower's DTI ratio.

113.    According to past industry norms, DTI ratios over 50% to 55% were considered excessive and high risk.  Fannie Mae and Freddie Mac targeted DTI ratios at only 38%.

114.    If a borrower misstates his or her income, or fails to disclose known debts, such misrepresentations will lead to understated DTI ratios, thus making a loan appear to be less risky than it really was.

### 4.    Owner-Occupancy Rates

115.    The Offering Materials contained aggregate information about the occupancy status of the loans underlying the Certificates.  Occupancy status refers to whether the property securing the mortgage is the primary residence of the borrower, a second home, or an investment property.

116.    The statements about occupancy status were material to investors' decisions to invest in the Certificates because occupancy status serves as an important indicator of the credit risk associated with a mortgage loan and the securities that the loan collateralizes.  Borrowers who reside in mortgaged properties have more incentive to avoid default than borrowers who purchase homes as second homes or investment properties and live elsewhere.  These borrowers are more likely to care for the primary residence to keep up the property's value by attending to maintenance and purchasing insurance.  Thus, the percentage of loans in the collateral group of a securitization that

- 34 -

are not securitized by mortgage loans on owner-occupied residents is an important measure of the risk of the certificates sold in that securitization. Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

### 5. Ratings

117.   Each of the tranches in the Certificates was assigned a rating from either Standard & Poor's Ratings Services ("S&P") or Fitch Ratings ("Fitch"). In determining how to rate each tranche, the rating agencies considered, *inter alia*: (i) the structure of the Certificate; (ii) the level of credit protection available to each tranche; and (iii) the quality of the loans underlying the Certificates.

118.   The Defendants understood how the rating agencies assigned ratings, and specifically structured the Certificates so that each tranche would receive the desired ratings. Indeed, the Certificates' issuance was conditioned on obtaining the rating Defendants expected.

119.   The rating agencies relied on the accuracy of the information Defendants provided in order to assign ratings to the Certificates. Since Defendants provided the rating agencies false and misleading information about the loans underlying the Certificates, the rating agencies would assign ratings that did not accurately reflect the risk of loss associated with such investments.

### I. Loans Included in the Securitizations Were Generated Through Fraudulent and Reckless Origination Practices

120.   Defendants and their originators engaged in fraudulent lending practices that were certain to lead to defaults by homeowners and losses for RMBS investors. In addition to the suspect origination practices used by subsidiaries or affiliates of the Depositor Defendants, the Defendants

- 35 -

705280_1

also deposited into the Trust loans generated by some of the most aggressive loan originators in the business, including Bank of America ("BofA"), Countrywide Home Loans, Inc. ("Countrywide"), Greenpoint Mortgage Funding ("Greenpoint"), SunTrust Mortgage, Inc. ("SunTrust Mortgage"), CitiMortgage, IndyMac Bank, American Home Mortgage Corp. ("American Home"), PHH Mortgage Corporation ("PHH"), ABN AMRO Mortgage Group, Inc. ("ABN AMRO"), National City Mortgage Co. ("National City"), GMAC Mortgage Corporation ("GMAC Mortgage"), HomeComings Financial, LLC ("HomeComings") and Argent Mortgage Company, LLC ("Argent").

121.   The practices employed by these originators and/or their brokers included encouraging borrowers to inflate their income levels in stated-income loans, concealing known situations where the home would not be owner occupied, and manipulating the appraisal process such that LTV ratios were false and misleading.   These practices were so widespread that the Depositor Defendants were at a minimum reckless in continuing to include non-compliant loans in the portfolios.   When Clayton provided information to the banks, many *known* problems were actually ignored.   And some banks' internal procedures for avoiding problematic loans were ignored.

122.   The improper practices of the originators are highlighted below:

**1.   BofA**

123.   BofA was an originator of mortgage loans in at least the following Trusts:

| GSR Mortgage Loan Trust 2006-9F |
| MASTR Asset Securitization Trust 2005-1 |

124.   Defendants' statements about BofA's underwriting standards and appraisal practices were false due to BofA's poor practices with respect to its mortgage lending.   As the FCIC Report noted:

> Similarly, in examining Bank of America in 2007, its lead bank regulator, the Office of the Comptroller of the Currency (OCC), sampled 50 mortgages and found

16 with "quality assurance referrals" for suspicious activity for which no report had been filed with FinCEN.  All 16 met the legal requirement for a filing.

125.    While BofA's RMBS portfolio of Countrywide-originated loans is well known, loans originated by BofA prior to the acquisition of Countrywide were also problematic.   When announcing settlement agreements between certain originators and mortgage giants Freddie Mac and Fannie Mae, Fannie Mae CEO Michael Williams said it continued to work to resolve other claims, including ones related to BofA-originated loans.

126.    Documents produced in the FCIC investigation also showed that Bank of America waived in 60% of the loans Clayton had rejected in the seven 2006 and 2007 RMBS deals presented in the investigation.

### 2.    Countrywide

127.    Countrywide was an originator of mortgage loans in at least the following Trusts:

| Citigroup Mortgage Loan Trust 2007-10 |
| Citigroup Mortgage Loan Trust 2006-7F |
| GSR Mortgage Loan Trust 2006-9F |
| Morgan Stanley Mortgage Loan Trust 2005-5AR |

128.    Defendants' statements about Countrywide's underwriting standards and appraisal practices were false due to Countrywide's lending practices that abandoned all prudent loan underwriting practices.   Countrywide was issuing or acquiring mortgages with limited documentation and/or excessive LTV ratios even where compensating factors were not demonstrated.  Some borrowers with "No Doc" mortgage loans were wage earners who could have provided employment, income and asset verification, but were not required to do so because their actual income and assets would have been insufficient for the mortgage amounts.

- 37 -

129.    Countrywide's appraisals were frequently inflated, reckless, contained predetermined values or were otherwise unreliable, which caused the LTV ratios to be misstated.  This caused mortgages to be issued for borrowers with higher DTI ratios than was purportedly allowed.

130.    Additionally, Countrywide and its brokers increasingly used non-traditional mortgage loans where the LTV ratios were over the stated limit due to "silent second" liens.  In fact, for the mortgage loans generated under Countrywide's Streamlined Documentation Program, appraisals were not obtained at all, even though the mortgage loans obtained did, in fact, exceed 80% of the actual value of the subject property.  The importance of legitimate appraisals was even more important under Countrywide's Expanded Underwriting Guidelines because these mortgage loans provided for loan amounts which reached 90%, 95% or even 100% in some cases.  Given the inflated appraisals frequently provided, the undisclosed risk of mortgages exceeding home values was extreme.  Countrywide's appraisal practices were intended to inflate the property value so that loans would close.

131.    Numerous government reports and investigations have described rampant underwriting failures at Countrywide throughout the period of the Trusts at issue here.  In addition, those reports and investigations have led to disclosures of admissions and acknowledgments made by top Countrywide executives of the abandonment of adherence to underwriting guidelines.  In addition, the FCIC Report singled out Countrywide for its role in the financial crisis and specifically identified Countrywide in the Report's summary conclusions discussing the systemic breakdown in accountability and ethics:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities.  As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in

- 38 -

foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

132.     Courts, including the federal court that presided over a civil action that the SEC brought against Countrywide's former leaders, have considered allegations that Countrywide failed to comply with underwriting guidelines and abandoned accurate representations in their registration statements offering RMBS. These courts have found that the claims against Countrywide are facially valid and raise genuine issues of material fact.

133.     On June 4, 2009, the SEC filed a complaint in the U.S. District Court for the Central District of California against Mozilo, Sambol and Sieracki for their fraudulent disclosures relating to Countrywide's purported adherence to conservative loan origination and underwriting guidelines, as well as insider trading by Mozilo. *See* Complaint, *SEC v. Mozilo*, No. 09-03994 (C.D. Cal. June 4, 2009) (Dkt. No. 1). On September 16, 2010, the District Court rejected the Defendants' motion for summary judgment, finding that the SEC had raised genuine issues of fact as to, among other things, whether the Defendants had misrepresented the quality of Countrywide's underwriting processes. In its decision, the court stated:

> The SEC has presented evidence that these statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading in light of Defendants' failure to disclose, *inter alia*, that: (1) As a consequence of Countrywide's "matching strategy," Countrywide's underwriting "guidelines" would end up as a composite of the most aggressive guidelines in the market. . . . and (2) Countrywide routinely ignored its official underwriting guidelines, and in practice, Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market.
>
> For example, Countrywide's Chief Risk Officer, John McMurray, explained in his deposition that Countrywide mixed and matched guidelines from various lenders in the industry, which resulted in Countrywide's guidelines being a composite of the most aggressive guidelines in the industry . . . .
>
> SEC has also presented evidence that Countrywide routinely ignored its official underwriting to such an extent that Countrywide would underwrite **any** loan it could sell into the secondary mortgage market. According to the evidence

- 39 -

> presented by the SEC, Countrywide typically made four attempts to approve a loan. . . .  As a result of this process, a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines. . . .  In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines, that Countrywide would originate any loan it could sell, and therefore that the statements regarding the quality of Countrywide's underwriting and loan production were misleading.

*SEC v. Mozilo*, No. 09-03994-JFW MANx, 2010 WL 3656068, at *10, *12-*14 (C.D. Cal. Sept. 16, 2010) (emphasis in original).  After this decision was rendered, Messrs. Mozilo, Sambol, and Sieracki settled with the SEC, agreeing to pay substantial fines.  *See* Press Release, "SEC, Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest Ever Financial Penalty Against a Public Company's Senior Executive" (Oct. 15, 2010).

134.   The SEC action surfaced internal Countrywide reports and e-mails among Countrywide employees that provide contemporaneous documentation of Countrywide's routine failure to comply with its underwriting guidelines.  Emails from CEO Mozilo himself admitted Countrywide's lack of compliance with its own underwriting guidelines.  *See* Ex. 28 at 1 to Declaration of Lynn M. Dean in Support of Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion for Summary Judgment or Adjudication ("Dean Decl."): Part 4, *SEC v. Mozilo*, No. 09-03994 (C.D. Cal. Aug. 16, 2010) (Dkt. No. 230-2).  In early 2006, HSBC had begun to contractually force Countrywide to buy back loans that did not comply with underwriting guidelines.  In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that his company had originated the HSBC loans "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation."  Ex. 16 at 2 to Dean Decl.: Part 3, *SEC v. Mozilo*, No. 09-03994 (C.D. Cal. Aug. 16, 2010) (Dkt. No. 227-5).  Mozilo further stated, "I have personally observed a serious lack of compliance within our

origination system as it relates to documentation and generally a deteri[or]ation in the quality of loans originated versus the pricing of those loan[s]." *Id*.

135.    In addition to the SEC action, Countrywide has been sued in numerous state enforcement actions for abandoning underwriting standards and engaging in unfair and deceptive practices in connection with loan origination.

136.    In *People v. Countrywide Financial Corp.*, the Attorney General for the State of California filed a civil action on behalf of Countrywide borrowers in California against Countrywide and its senior executives.   Countrywide faces statutory claims for false advertising and unfair competition based on a plan to increase the volume of mortgage loans for securitization without regard to borrower creditworthiness.   Complaint, *People v. Countrywide Financial Corp.*, No. LC081846 (Cal. Super. Ct., L.A. County June 25, 2008) (Dkt. No. 3).

137.    In *People v. Countrywide Financial Corp.*, the Attorney General for the State of Illinois filed a civil suit on behalf of Illinois borrowers against Countrywide and Mozilo.   Asserting state consumer protection and unfair competition statutory claims, the Illinois Attorney General alleged that, beginning in or around 2004, Countrywide engaged in unfair and deceptive practices, including loosening underwriting standards, structuring unfair loan products with risky features and engaging in misleading marketing and sales practices.   Complaint, *People v. Countrywide Financial Corp.*, No. 08CH22994 (Ill. Cir. Ct. Ch. Div., Cook County June 25, 2008).

138.    In *Connecticut v. Countrywide Financial Corp.*, the Connecticut Insurance Commissioner commenced a civil action asserting that Countrywide violated state unfair and deceptive practices law by deceiving consumers into obtaining mortgage loans for which they were not suited and could not afford.   Complaint, *Connecticut v. Countrywide Financial Corp.*, No. 1207 (Conn. Super. Ct., Hartford July 28, 2008).

- 41 -

139.    In *Florida v. Countrywide Financial Corp.*, the Florida Attorney General commenced a civil action asserting unfair practices claims against Countrywide and Mozilo.  The Florida Attorney General alleged that, since January 2004, Countrywide conducted a scheme to originate subprime mortgage loans to unqualified borrowers and relatedly engaged in securities law violations. The Attorney General further alleged that Countrywide violated state statutory lender laws by falsely representing that Countrywide had originated each mortgage loan in accordance with its underwriting guidelines and that each borrower had the ability to repay the mortgage loan. Complaint, *Florida v. Countrywide Financial Corp.*, No. 08-30105 (Fla. Cir. Ct. 17th Judicial Circuit June 30, 2008).

140.    In *Indiana v. Countrywide Financial Corp.*, the State of Indiana filed a civil action asserting that Countrywide violated the state's unfair and deceptive practices law from 2005 through 2008 by deceiving consumers into obtaining mortgage loans for which they were not suited and could not afford.  Complaint, *State of Indiana, County of Steuben v. Countrywide Financial Corp.*, No. 76C01-0808-PL-0952 (Ind. Cir. Ct. Aug. 22, 2008).

141.    On October 6, 2008, these states, plus 23 others, all joined in a settlement with Bank of America, pursuant to which Bank of America (as the successor-in-interest to the Countrywide Defendants) agreed to pay $150 million for state foreclosure relief programs and loan modifications for borrowers totaling $8.4 billion.  *See* Press Release, "Securities and Exchange Commission, Bank of America Agrees in Principle to ARS Settlement" (Oct. 8, 2008).

142.    This is but a small subset of the many civil actions filed by investors, government entities, insurers, trustees and other parties that have sued Countrywide for similar conduct.

### 3.    Greenpoint

143.    Greenpoint was an originator of mortgage loans in at least the following Trust:

- 42 -

Citigroup Mortgage Loan Trust 2007-10

144.    Defendants' statements about Greenpoint's underwriting standards and appraisal practices were false due to Greenpoint's lending practices that systematically ignored such underwriting standards.

145.    Greenpoint was the nation's seventh largest originator of Alt-A mortgages. Greenpoint routinely granted guidelines exceptions – even where compensating factors did not exist and the borrower could not qualify.  Many of the loans were granted by the over 18,000 brokers who were approved to transact with Greenpoint – a large enough number that Greenpoint could not exercise any realistic degree of control.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the mortgage's first 90 days of being approved.

146.    According to one Greenpoint sales manager, Greenpoint's philosophy was "if we can sell it, we will originate it."  To that end, Greenpoint originated loans whose attributes diverged significantly from underwriting guidelines.  Greenpoint had a practice of allowing its staff and outside brokers to inflate appraisal values, thereby distorting the LTV ratios referred to in the Prospectus Supplement.  According to a former Greenpoint senior review appraiser, whose job was to evaluate  the appraisers' appraisal reports, the appraiser received bonuses if they exceeded their quotas – resulting in "many crummy appraisals."  The former senior review appraiser recalled being under continual pressure to approve appraisal reports because compensation increased for the mortgage brokers, account executives, branch sales representatives, and branch office managers for each loan that closed.

147.    Further, Greenpoint did not verify the income of borrowers as represented in the Registration Statements but had a reputation in the industry for cutting corners on underwriting.  In

- 43 -

fact, a former Greenpoint broker service representative supervisor recalled that ascertaining whether the borrower could repay the loan was unnecessary for Greenpoint's loan program, and that it was "fairly common" for mortgage loans to be approved where the borrower would not be able to repay. The supervisor recounted instances where if a loan failed to gain approval, an account executive would improperly re-open the application with a new loan number as stated income loan. On other occasions, according to the supervisor, to hide that fact that a borrower had previously submitted an application that failed, the account executive would alter the social security number by one digit or misspell the name by one letter, and then correct the errors after the loan was approved.

148.    The Office of the Comptroller of the Currency ("OCC") later ranked Greenpoint as the thirteenth worst subprime originator in the country for mortgages originated from 2005 to 2007, according to its "Worst Ten in the Worst Ten" analysis.

### 4.    SunTrust Mortgage

149.    SunTrust Mortgage was an originator of mortgage loans in at least the following Trusts:

| |
| --- |
| Citigroup Mortgage Loan Trust 2007-10 |
| GSR Mortgage Loan Trust 2006-9F |
| MASTR Asset Securitization Trust 2006-1 |

150.    Defendants' statements about SunTrust Mortgage's underwriting standards and appraisal practices were false due to SunTrust Mortgage's lending practices. Plaintiffs hereby incorporate by reference the allegations regarding SunTrust's abandonment of underwriting guidelines as set forth in §V.G.5.

### 5.    CitiMortgage

151.    CitiMortgage was an originator of mortgage loans in at least the following Trusts:

| |
| --- |
| Citicorp Mortgage Securities Trust, Series 2007-5 |

> Citicorp Mortgage Securities Trust, Series 2007-8
> Citigroup Mortgage Loan Trust, Series 2007-10

152.    Citi's statements about CitiMortgage's underwriting standards for its loans and the loans it acquired, as well as its appraisal practices were false due to CitiMortgage's systematic disregard of underwriting standards, corroborated by Clayton's findings of improper lending practices.  Plaintiffs hereby incorporate by reference the allegations regarding Citi's abandonment of underwriting guidelines as set forth in §V.B.

### 6.    IndyMac

153.    IndyMac was the originator of mortgage loans in at least the following Trust:

> IndyMac IMJA Mortgage Loan Trust 2007-A1

154.    IndyMac RMBS's statements about IndyMac's underwriting standards and appraisal practices were false due to IndyMac's actual lending practices.  Plaintiffs hereby incorporate by reference the allegations regarding IndyMac's abandonment of underwriting guidelines as set forth in §V.D.

### 7.    American Home

155.    American Home was an originator of mortgage loans in at least the following Trust:

> Citigroup Mortgage Loan Trust 2007-10

156.    Defendants' statements about American Home's underwriting standards and appraisal practices were false due to American Home's actual lending practices.

157.    In order to post desired loan production, American Home was as a matter of course granting exceptions even where "compensating factors" did not exist.  American Home's business was dependent on continually increasing volume.  Thus, it became even more aggressive in early 2007 when American Home made $16.7 billion in mortgage loans.  A third of its mortgages were

- 45 -

Payment Option ARMs which allowed borrowers to make payments that were less than the interest amount accruing on the loan, resulting in the difference being added to the principal balance each month.  American Home granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own balance sheet.

158.    A former American Home operations manager confirmed that American Home rarely if ever verified income before closing a loan and emphasized that the borrower's ability to repay the loan was not a consideration at American Home.

159.    Moreover, granting loans under stated-income applications relied significantly on accurate appraisals, which American Home did not obtain.  A former vice president at American Home, whose job was overseeing the mortgage loans' appraisals, said that appraisal fraud was a common problem at American Home and recalled that loan officers pressured appraisers to come up with the "right number."

160.    American Home's loans were particularly popular with speculators who would not occupy the homes, which would decrease the borrowers' "willingness" to pay the debt if home prices did not appreciate to the borrowers' expectations.  American Home subsequently suffered losses itself when borrowers whose incomes American Home had not verified began to default on little-money-down loans at an accelerated pace.

161.    The OCC subsequently ranked American Home as the eleventh worst subprime originator for the years 2005 through 2007 according to its "Worst Ten in the Worst Ten" analysis.

### 8.    PHH

162.    PHH was an originator of mortgage loans in at least the following Trust:

| GSR Mortgage Loan Trust 2006-9F |
| --- |

- 46 -

163.    Defendants' statements about PHH's underwriting standards and appraisal practices were false due to PHH's lending practices.

164.    PHH, which was spun-off from Cendant Corporation in 2005, was a private label mortgage provider which was the lender behind certain realtors that offered mortgage loans. PHH acquired loans from these realtors, but did not routinely perform the thorough review represented. The lack of a thorough review was critical since the structure of the arrangement was that the real estate agents were pushing both the home and the mortgage on the borrower. Real estate agents would always push valuations in order to get the deal done and have the deal look attractive to the actual lender. PHH looked the other way on inflated real estate values in order to keep its big corporate clients happy. PHH was extremely aggressive in making loans, promising same-day loan decisions and a best-price guarantee wherein it would beat any lender's price or pay the borrower $500. The mortgage loans PHH held on to had suffered declines in value by late 2007 with many of the declines related to loans with origination flaws.

### 9.    ABN AMRO

165.    ABN AMRO ("AAMG") was an originator of mortgage loans in at least the following Trust:

| Citicorp Mortgage Securities Trust, Series 2007-5 |
| --- |

166.    Defendants' statements about ABN AMRO's underwriting standards and appraisal practices were false due to ABN AMRO's lending practices.

167.    Citigroup acquired ABN AMRO in January 2007. ABN AMRO had a reputation as an extremely aggressive lender and had settled litigation regarding fraudulently inflated appraisals used to close residential mortgage loans. Before the collapse of the housing market and the risky lending practices came to light, ABN AMRO offered a "Fastest Loan Yet" program, which allowed

- 47 -

select brokers to approve loans on their own with much less documentation than more traditional loans.

### 10.    National City

168.    National City was an originator of mortgage loans in at least the following Trusts:

| |
|---|
| Citigroup Mortgage Loan Trust 2007-10 |
| GSR Mortgage Loan Trust 2006-9F |
| RALI Series 2005-QS7 Trust |
| RALI Series 2005-QS9 Trust |
| RALI Series 2005-QS14 Trust |
| RALI Series 2006-QS6 Trust |
| RALI Series 2006-QS2 Trust |
| RALI Series 2006-QS6 Trust |
| RALI Series 2006-QS18 Trust |

169.    Defendants' statements about National City's underwriting standards and appraisal practices were false due to National City's actual lending practices that abandoned underwriting standards.

170.    National City's strategy intended to take advantage of the interest rate spread on subprime mortgages which could be sold to third parties at a premium to their origination cost. Thus, National City sought to originate mortgages at an increasing rate, heedless of underwriting standards.  As the *bnet.com* blog noted on October 27, 2008:

> The pattern is too familiar. Two profitable, respected banks with limited exposure to mortgages get greedy and try to cash in on the subprime craze. Both end up ready to go out of existence.

> That's the case with National City Bank of Cleveland and Wachovia of Charlotte, N.C.

> Not that long ago, National City was a pillar of the Cleveland business society. Founded in 1845, the bank reliably loaned money and took in deposits. Mortgages brought in a small 5 percent of total profit. Then in the latter boom years of the late 1990s, National City wanted to put its profits on afterburner. So in 1999, it bought California subprime lender First Franklin. Within a few years, mortgages

- 48 -

were half of National City's profit and the bank was the country's sixth biggest housing lender.

*      *      *

By 2005, it was obvious the subprime initiative had become toxic. But the bank did nothing to correct what would prove a fatal mistake.

171.    National City granted exceptions to guidelines in many circumstances – not just where compensating factors existed.  The exceptions were granted so that the borrower could qualify even without compensating factors.  National City acquired many loans from mortgage brokers but did little verification of information in applications, and brokers were able to get loans approved that were inconsistent with National City's underwriting guidelines.   In January 2008, National City stopped purchasing loans from brokers.  PNC Financial Services purchased the struggling company in October 2008 with TARP funds.

### 11.    GMAC Mortgage

172.    GMAC Mortgage was the originator of mortgage loans in at least the following Trusts:

| RALI Series 2006-QS2 Trust |
|---|
| RALI Series 2006-QS6 Trust |
| RALI Series 2006-QS18 Trust |

173.    GMAC Mortgage is an affiliate of defendant RFC and an indirect, wholly owned subsidiary of defendant Ally.  Defendants' statements about GMAC Mortgage's underwriting standards and appraisal practices were false due to the actual practices GMAC Mortgage used to generate mortgage loans.

174.    Plaintiffs hereby incorporate by reference the allegations regarding RALI's abandonment of underwriting guidelines as set forth in §V.F.

### 12.    HomeComings

175.    HomeComings was the originator of mortgage loans in at least the following Trusts:

| |
|---|
| RALI Series 2005 QA5 Trust |
| RALI Series 2005 QA9 Trust |
| RALI Series 2005-QS7 Trust |
| RALI Series 2005-QS9 Trust |
| RALI Series 2005-QS14 Trust |
| RALI Series 2006-QS2 Trust |
| RALI Series 2006-QS6 Trust |
| RALI Series 2006-QS18 Trust |

176.    HomeComings is a subsidiary of defendant RFC and an indirect, wholly-owned subsidiary of defendant Ally.  Defendants' statements about HomeComings' underwriting standards and appraisal practices were false due to the actual practices HomeComings used to generate mortgage loans.  Plaintiffs hereby incorporate by reference the allegations regarding RALI abandonment of underwriting guidelines as set forth in §V.F.

### 13.    Argent

177.    Argent was the originator of mortgage loans in at least the following Trust:

| |
|---|
| Citigroup Mortgage Loan Trust 2007-10 |

178.    Defendants' statements about Argent's underwriting standards and appraisal practices were false due to Argent's actual lending practices that systematically abandoned underwriting standards.  The OCC named Argent as the third worst subprime originator for the years 2005 through 2007, according to its "Worst Ten in the Worst Ten" analysis.  Once a unit of Ameriquest Mortgage Co, it was taken over by CitiMortgage in August 2007, and according to a much later *New York Times* article, the purchase was likened internally by Citi bankers to "catching a falling knife."

179.    The FCIC Report related that an Argent Vice President Orson Benn ("Benn") was at the center of a "criminal ring scamming homeowners in the Tampa area."  The scheme involved

- 50 -

trolling neighborhoods looking for elderly homeowners who they thought likely had substantial equity in their homes.  After duping the homeowners into filling out forms, the perpetrators would use the information to take out false home equity loans in the homeowners' names.

180.    The Miami Herald reported on December 7, 2008 that Benn also "tutor[ed] Florida mortgage brokers in the art of fraud," including teaching brokers "how to doctor credit reports, coach[ing] them to inflate income on loan applications, and help[ing] them invent phantom jobs for borrowers."  In all, Benn's network approved more than $550 million in Florida home loans and helped Argent to become the nation's largest provider of mortgages for low-credit score borrowers. Benn went to prison for his role in the fraud.  In his court testimony, he stated that at Argent, "[t]he accuracy of loan applications was not a priority" since "Argent made money bundling the mortgages and selling them to investors on Wall Street."

181.    Mortgage fraud permeated Argent's underwriting practices.  In 2011, Cuyahoga County Prosecutor in Ohio indicted former Argent managers, supervisors, and underwriters for falsifying nearly 13 million dollars worth of mortgage loans in the Cleveland area.  On loans for 100 houses, Argent falsified the mortgage loan documents that had not met Argent's standards such that they could be approved.

182.    During an interview for an article entitled "The Subprime House of Cards" now published on *Cleveland.com* on May 11, 2008, Jacqulyn Fishwick recalled that during her two years employed at an Argent loan processing center near Chicago, she "'saw some stuff I didn't agree with.'"  She stated she witnessed "account managers remove documents from files and create documents by cutting and pasting them."

183.    In an article entitled "Silencing the Whistle-blowers" for *The Investigative Fund* on May 10, 2010, Steve Jernigan told his experience working as a fraud investigator for Argent in its

- 51 -

California headquarters.  He sent an appraiser to Indiana to check on a subdivision that Argent had made loans on.  The appraiser reported back to Jernigan: "'I'm standing in the middle of a cornfield.'"  The loan applications, in other words, had been made up.  When Jernigan pulled the loan files for the subdivision's properties, he found that each original appraisal report had attached a photo of the same house.

184.    Jernigan continued to find problems within Argent.  Ultimately, his investigation "led him higher up Argent's food chain, to a senior executive who had been 'pretty much turning a blind eye' to whether the loans were on the up-and-up."  At that point, Jernigan said, upper management made it clear he had gone too far.  He recalled that he "'was pulled into an office'" where a supervisor "'looked me straight in the eye and said: "You've got to stop."'"

## V.    DEFENDANTS KNOWINGLY MADE FALSE AND MISLEADING STATEMENTS REGARDING THE CERTIFICATES THEY WERE SELLING TO UNION CENTRAL

185.    The Offering Materials pursuant to which each of the Certificates were sold contained knowingly false statements about the underlying mortgage loans, including the underwriting standards through which the loans were originated, the appraisals used, the owner-occupancy statistics, and the DTI ratios.  The Offering Materials also included false statements about the credit ratings these Certificates merited.  Union Central relied to its detriment on these representations.

### A.    Washington Mutual

#### 1.    WaMu's Securitizations

186.    Union Central purchased a Certificate sponsored by WaMu on April 29, 2005, representing an investment of approximately $4.3 million:

| CUSIP | Description | Issuing Entity | Issue Date | Purchase Date |
|-------|-------------|----------------|------------|---------------|
| 9393365Q2 | WMALT 2005-3 B3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 | 4/1/2005 | 4/29/2005 |

187.     Washington Mutual Mortgage Pass-Through Certificates, WMALT 2005-3 was a $533 million deal comprising 2,448 fixed rate mortgages with mostly 30-year terms.

**2.     False and Misleading Statements in WaMu's Offering Materials**

**a.     False and Misleading Statements About Compliance with Underwriting Standards**

188.     In addition to WaMu-originated loans, WMMSC deposited into the WMALT 2005-3 Trust loans that had been acquired from mortgage brokers and other originators.  WaMu's Offering Materials represented that "each Lender must have experience in originating and servicing conventional residential mortgages and must have a net worth acceptable to the Company."  In order to be approved as a seller, WaMu evaluated "certain criteria, including the Lender's depth of mortgage origination experience, servicing experience and financial stability."

189.     Unbeknownst to Plaintiffs, WaMu deposited and securitized loans into the WMALT 2005-3 Trust even though the loans had been issued to borrowers regardless of their willingness and ability to repay them – loans that were often based on false verification of employment, overstated income, inflated appraisals, understated debt to loan ratios and/or exceptions to underwriting criteria that had no valid justification.

190.     The Offering Materials represented that the mortgage loans owned by the Trust were originated in accordance with WaMu's underwriting standards:

The Mortgage Loans to be included in each Mortgage Pool will be subject to the various credit, appraisal and underwriting standards described herein.  The Company's credit, appraisal and underwriting standards with respect to certain

- 53 -

Mortgage Loans will generally conform to those published in the Company's Selling Guide . . . .

191.    The Offering Materials assured investors that underwriting standards were enacted to ensure that a borrower's ability to repay the debt could be meaningfully evaluated:

> All of the credit, appraisal and underwriting standards will provide an underwriter with sufficient information to evaluate the borrower's repayment ability and the adequacy of the Mortgaged Property as collateral. . . .
>
>     The Company's underwriting standards are intended to evaluate the prospective Mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed Mortgaged Property as collateral. . . .
>
>     The Company's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac.

192.    The Offering Materials made material misrepresentations regarding the purported processes used to screen loans in the Trust and directly relating to the purported quality of the loan in the Trust.  For instance, WaMu represented:

> The Mortgage Loans to be purchased by Washington Mutual Mortgage Securities Corp. (the 'Company') for inclusion in a Mortgage Pool will be screened and underwritten in accordance with the standards set forth herein under 'The Company – Mortgage Purchase Program' and ' – Credit, Appraisal and Underwriting Standards.'  The Mortgage Loans in each Mortgage Pool will be originated by or purchased from lending institutions which meet the requirements set forth under 'The Company – Mortgage Purchase Program' (such institutions, 'Sellers').

### b.    False and Misleading Statements About Appraisals and LTV Ratios

193.    The Offering Materials represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.

194.    The Offering Materials for the Certificates represented that WaMu required and relied upon independent appraisals to determine the adequacy of the underlying collateral.  For example, the Offering Materials stated:

- 54 -

In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property

195.     The Prospectus also contains representations concerning the LTV ratios of the mortgage loans underlying each securitization. Specifically, the weighted average original LTV ratio was disclosed as being 71%.

**c.     False and Misleading Statements About Debt-to-Income Ratios**

196.     The Offering Materials stated that in the course of the loan application process, borrowers were generally required to provide information regarding their assets, liabilities and income in order to determine the borrowers' ability to repay the debt.

197.     Where provided, such information was converted in DTI ratios, which were a material part of the underwriting process, and specific DTI ratios for the loans underlying the Certificates were utilized by the rating agencies to determine the ratings for the Certificates in the Trust.

**d.     False and Misleading Statements About Owner-Occupancy**

198.      The WaMu Defendants' Offering Materials contained specific disclosures about the occupancy status of the loans underlying the Certificates.

199.     The Offering Materials stated that 1,954 out of the 2,448 loans were for owner-occupied primary properties.  The remaining 494 loans were purportedly second homes or non-owner occupied properties.

- 55 -

### e.      False and Misleading Statements About Ratings

200.    WaMu represented that the ratings of the Certificates as set forth in the Offering

Materials was a condition to their issuance, and that the ratings reflected the likelihood that investors

would receive the distributions to which they were entitled:

> The offered certificates are required to receive the ratings from Standard &
> Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and
> Moody's Investors Service, Inc. indicated under 'Certificate Ratings' in this
> prospectus supplement.  The ratings on the offered certificates address the likelihood
> of the receipt by holders of the offered certificates of all distributions on the
> underlying mortgage loans to which they are entitled.

201.    The Offering Materials also set forth the specific ratings for the Certificate purchased

by Union Central.  The Certificate was rated BBB by S&P and Baa2 by Moody's Investors Service,

Inc. ("Moody's").

### 3.      WaMu's Statements Were Knowingly False and Misleading

202.    WaMu knew, or was reckless in not knowing, that the statements identified above

were materially false and misleading and/or omitted material facts necessary to make the statements

made not misleading.  As set forth herein, WaMu had actual knowledge that the stated underwriting

guidelines were not being adhered to.

### a.      Underwriting Standards Had Been Abandoned

203.    While the Offering Materials set forth detailed underwriting guidelines that were

supposed to be applied in evaluating borrowers and loans, in fact the stated underwriting guidelines

had been abandoned by the loan originators.

204.    WaMu's statements about loan underwriting practices for the mortgage loans in the

WMALT 2005-3 Trust were materially false and misleading because the relevant lending practices

for those loans were designed to increase new loan volume with little or no consideration for

whether the borrower could repay the loan.  In addition, WaMu did not exert much control, if any,

over loan officers and others who did the loans included in the WMALT 2005-3 Trust. WaMu effectively waived through loans that were internally known to be fraudulent. A high percentage of the underlying mortgage loans never should have been made because borrowers lacked the willingness and ability to repay them.

205. Further, WaMu knew that the originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default. Instead, the originators approved loans they knew were based on falsified information and that did not comply with any of the stated underwriting guidelines.

### (1)   Skyrocketing Default Rates Are Evidence of Abandoned Underwriting

206. The Certificates purchased by Union Central was supposed to be a stable, long-term investment backed by investment-grade credit ratings. However, the extraordinary default rates on the mortgage loans underlying Union Central's Certificate is prima facie evidence that the stated underwriting standards and loan characteristics represented in the Offering Materials were materially false and misleading.

207. The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as well as collateral cumulative losses, for the Certificates purchased by Union Central as of June 2009:

| Certificate | Original Deal Size | Delinquent, Bankruptcy Foreclosure, REO Actual Bal. | Collateral Cumulative Losses |
|---|---|---|---|
| WMALT 2005-3 | $533,527,878 | $40,853,692 | $3,444,628 |

208. Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of

delinquency, bankruptcy and foreclosure and cumulative losses would be far lower than the current rates.  Indeed, Moody's highest expected collateral rate for the life of the Trust was $3.8 million.

209.    The defaults and related drop in value of the Certificate are due to WaMu's wrongdoing, and not because of the general change in economic conditions. Economic studies confirm this common-sense conclusion.  For instance, BasePoint Analytics LLC, a recognized fraud analytics and consulting firm, analyzed over three million loans originated between 1997 and 2006 (the majority being 2005-2006 vintage), including 16,000 examples of non-performing loans that had evidence of fraudulent misrepresentation in the original applications.  Their research found that as much as 70% of early payment default loans contained fraud misrepresentations on the application.

### (2)    Appraisals and LTV Ratios Were Inflated

210.    The descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.  Undisclosed in the Offering Materials, and in violation of any legitimate appraisal standards, many of the loans underlying the Certificates had been approved through the use of manipulated appraisals that guaranteed that the collateral property would be valued at a price sufficient to support the loan.

211.    For instance, the plaintiffs in *FHFA v. JP Morgan Stanley, et al.*, No. 11-CV-06188-PKC (S.D.N.Y. Sept. 2, 2011), conducted an automated valuation model ("AVM") analysis of a sample of the property underlying the WaMu offerings at issue in that litigation.  *FHFA v. JP Morgan* Complaint (Dkt. No. 1), ¶¶348-353.  AVM's are routinely used in the industry as a way of valuing properties during prequalification, origination portfolio review and servicing.

212.    The Federal Housing Finance Agency's ("FHFA") analysis demonstrates that the valuation of the loans underlying the Certificates were materially and consistently inflated, and

therefore that the stated LTV ratios were materially overstated, which in turn greatly increased the risk of default for the loans underlying the Certificates. The FHFA analyzed twenty-four WaMu securitizations issued between 2005 and 2007, including securitizations bearing substantially similar characteristics as the Certificate purchased by Plaintiffs. For example, two of the transactions analyzed by the FHFA which were similar to Plaintiffs' securitization, the WMALT 2005-9 and WMALT 2005-10 Trusts, represented that 89.08% and 94.88%, respectively, of the loans had LTV ratios of less than 80%. However, the FHFA's analysis showed the true percentage of loans having LTV ratios of 80% or less was a mere 77.70% and 72.62%. While none of the certificates were supposed to contain loans that had an LTV ratio over 100%, the FHFA's analysis found that a significant number of loans had LTV ratios of over 100% – in other words, the value of the loan was more than the value of the property. With respect to the WMALT 2005-9 and WMALT 2005-10 Trusts, the FHFA found LTV ratios greater than 100% in 3.72% and 6.39% of the loans, respectively.

213. The FHFA's analysis of similar WaMU Trusts issued in the same time period as WAMU 2005-3 reflect the WaMu Defendants' wrongful practice of accepting inflated appraisals in connection with their loan securitizations. As alleged below, Washington Mutual's internal documents confirm the WaMu Defendants abandoned prudent loan underwriting which would have halted such practices.

### (3)     Owner-Occupancy Rates Were Falsified

214. The FHFA loan-level analysis of thousands of loans securitized by WaMu at the same time as the Certificates at issue here, confirm that WaMu's RMBS Offering Materials routinely misstated the owner-occupancy rates of the loans underlying the Certificates. The *FHFA v. JP Morgan* plaintiffs undertook a sophisticated analysis to determine whether a given borrower actually

occupied the property as claimed. *FHFA v. JP Morgan* Complaint, ¶¶340-347. For each offering, the *FHFA v. JP Morgan* plaintiffs analyzed tax records, credit records, bills, property records and lien records, to determine whether a borrower was actually living in the property subject to the loan.

215.    The results of the *FHFA v. JP Morgan* plaintiffs' analysis is further indication that the percentage of owner-occupied properties disclosed by WaMu in their Offering Materials was false and that the true rate was much lower. For each of the WaMu Trusts at issue in the *FHFA v. JP Morgan* action, the percentage of owner-occupied properties was overstated by between 6% and 14%.

### (4)    Ratings Were False

216.    When assigning ratings to the securities the rating agencies relied on the accuracy of the information provided by WaMu, including the descriptions of the underwriting standards and the data concerning DTI ratios, LTV ratios and owner-occupancy statistics. However, because the information supplied by WaMu was materially false and misleading, the ratings assigned to the certificates did not provide an accurate evaluation of the risk of default.

217.    In 2009, Moody's downgraded WMALT 2005-3 tranche B3 to junk status with a "C" rating, explaining the downgrade was "triggered by rapidly increasing delinquencies, higher severities, slower prepayments and mounting losses in the underlying collateral." Currently this B-3 tranche is not rated by Moody's because it has defaulted entirely.

### b.    WaMu Knew that Underwriting Standards Were Being Abandoned

218.    WaMu had actual knowledge that the mortgage loans underlying the Certificates it sold to Union Central did not comply with the stated underwriting guidelines contained in the Offering Materials. Further, WaMu knew that the quantitative and qualitative data contained in the Offering Materials was materially false and misleading.

- 60 -

219.    The Senate PSI issued a case study of the WaMu Defendants' misconduct, which it described as "how one bank's strategy for growth and profit led to the origination and securitization of hundreds of billions of dollars in poor quality mortgages that undermined the U.S. financial system." The Senate PSI Report noted that WaMu "engaged in a host of shoddy lending practices that contributed to a mortgage time bomb."

220.    Washington Mutual Inc.'s Chief Credit Officer during 1999-2005, James G. Vanasek ("Vanasek"), testified before the Senate PSI, stating:

- Causes of the residential credit crisis included "self interest, failure to adhere to lending policies [and] untested product innovations."

- "[R]apidly increasing housing prices masked the risks of a changing product mix and deteriorating underwriting . . . until . . . 2007."

- In 2004, Washington Mutual's advertising tagline was "'The power of yes'" implying that Washington Mutual would "find some way to make a loan."

- A "continual problem" at Washington Mutual was that "line managers, particularly in the mortgage area, not only authorized but encouraged policy exceptions."

221.    The Senate PSI case study concluded that these wrongful loan origination and mortgage securitization practices were caused in part by a compensation structure that rewarded employees for this conduct. This rewarding of employees for making bad loans extended to the top executives with WaMu. In this regard, the Senate PSI case study concluded that WaMu CEO Kerry K. Killinger ("Killinger") received $100 million in compensation during 2003-2008 as a result of overseeing practices that created a "Mortgage Time Bomb."

222.    The Senate PSI made specific findings in its case study of "Washington Mutual Practices That Created a Mortgage Time Bomb," including the following findings of improper practices that are directly contrary to the representations made to Plaintiffs in connection with their purchase of the WMALT 2005-3 Trust Certificates:

- 61 -

705280_1

- Targeting Higher Risk Borrowers

- Steering Borrowers to Higher Risk Home Loans

- Increasing Sales of High Risk Home Loans to Wall Street

- Qualifying Borrowers By Ability to Make Initial Low Payments

- Ignoring Signs of Fraudulent Borrower Information

- Presuming Rising Home Prices When Approving Loans

- Making Loans that Are Dependent on Refinancing to Work

- Using Lax Controls Over Loan Approvals

- Offering Higher Pay for Making Higher Risk Home Loans

- Rewarding Employees for Loan Volume over Loan Quality

- Securitizing Home Loans Identified as Likely to Fail

- Securitizing Home Loans Identified as Fraudulent

223.   WaMu's December 21, 2004 Board of Directors Discussion materials entitled "Asset Allocation Initiative: Higher Risk Lending Strategy and Increased Credit Risk Management" explained that the business plan was to originate and acquire more loans made to higher risk borrowers.  This high risk strategy was based on "'Expanded Criteria'" for loan approval, utilizing "higher loan to value ratios" and "'"No Income" loan documentation type.'"  The Board presentation recognized that such diminishing of loan underwriting standards would present "'Higher uncertainty about ability to pay or "stated income" documentation type'" and "'[H]igher uncertainty about willingness to pay or collateral value.'"  More than 75% of the loans that WMMSC deposited into the WMALT 2005-3 Trust were these reduced documentation or no documentation loans.

224.   WaMu's January 2005 Board of Directors Finance Committee Discussion materials entitled "Higher Risk Lending Strategy – 'Asset Allocation Initiative'" similarly discussed the strategy of abandoning prudent underwriting standards: "'In order to generate more sustainable,

- 62 -

consistent, higher margins within Washington Mutual, the 2005 Strategic Plan calls for a shift in our mix of business, increasing our Credit Risk tolerance while continuing to mitigate our Market and Operational Risk positions."'  Its substantial increase in "Credit Risk tolerance" allowed for WaMu's origination of higher risk loans as well as riskier loans "purchased through our Specialty Mortgage Finance [SMF] program."

225.    WaMu understood the anticipated negative impact from effectively foregoing prudent loan underwriting standards, as noted in a January 2005 Washington Mutual Board of Directors Discussion presentation entitled "Higher Risk Lending Strategy and Increased Credit Risk Management:"

> Although we expect the Higher Risk Lending strategy to result in increased financial returns, owing to wider loan pricing spreads, actual performance is subject to notable credit risks:
>
> •    The potential for unexpected high credit-related losses increases roughly in proportion to the increase in expected credit-related losses.
>
> •    Additional capital will need to be set aside for the higher potential for unexpected losses.  If actual performance is worse than expected, the measured potential for unexpectedly high losses would increase further, and additional capital would need to be held.

226.    On March 10, 2005 WaMu's CEO, Killinger, sent an e-mail to Vanasek, highlighting the declining underwriting standards in the face of a housing bubble:

> I suspect the toughest thing for us will be to navigate through a period of high home prices, ***increased competitive conditions for reduced underwriting standards***, and our need to grow the balance sheet.  I have never seen such a high risk housing market as market after market thinks they are unique and for whatever reason are not likely to experience price declines.  This typically signifies a bubble.

227.    Vanasek responded to Killinger's March 10 e-mail by acknowledging the seriousness of the bubble that was being fueled by reckless loan origination practices and the ongoing loan securitization process:

- 63 -

I could not agree more.  All the classic signs are there and the likely outcome is probably not great.  We would all like to think the air can come out of the balloon slowly but history would not lean you in that direction.

228.    Notwithstanding their awareness of the industry-wide race to the bottom with respect to the abandonment of prudent loan underwriting standards, WaMu continued to securitize and sell bad loans to the public, including the WMALT 2005-3 Trust sold to Union Central in April 2005.

229.    An April 27, 2006 e-mail from Steve Rotella ("Rotella") (WaMu Bank COO) to Killinger admitted that "much of the paper [*i.e.*, loans] we originated in the 05 growth spurt was low quality."  These are the same bad loans securitized in the WMALT 2005-3 Trust whose Certificates Plaintiffs purchased.

230.    As Michael Liu, a Washington Mutual Portfolio Analyst/Trader reported in his February 14, 2007 e-mail analyzing Option ARM loan delinquencies, "Loans originated in 2004 and 2005 represent the highest amount of 3 PPD and nonaccrual."

231.    In an effort to protect itself from the increased credit risk resulting from the abandonment of prudent loan underwriting standards, WaMu securitized and sold the bad high risk loans to the investing public, including Plaintiffs.  WaMu's "Higher Risk Lending Strategy 'Asset Allocation Initiative'" directed the Credit Policy Committee to "[u]tilize approved credit risk management tactics when necessary, including NPL [non-performing loan] sales or other credit enhancements."  The WaMu Defendants directly participated in these "credit risk management tactics" by securitizing bad loans in the WMALT 2005-3 Trust whose Certificates they then marketed and sold to Plaintiffs in April 2005.

232.    WaMu securitized and sold improperly-underwritten loans to investors in order to get those problem loans off WaMu's balance sheet.  As recounted in Bethany McLean & Joe Nocera, *All the Devils Are Here – The Hidden History of the Financial Crisis* 217 (2010): "In a 2005 memo

- 64 -

about Washington Mutual, the FDIC summed up the prevailing sentiment: 'Management believes, however, that the impact on WMB [of a housing downturn] would be manageable, since the riskiest segments of production are sold to investors, and that these investors will bear the brunt of a bursting housing bubble.'" By placing high risk, bad loans in the WMALT 2005-3 Trust, WaMu Defendants wrongfully saddled Plaintiffs with that burden.

233.    The Senate PSI case study similarly concluded that WaMu knew of deficiencies in their loan origination and securitization practices, since those operations had been subject to repeated internal and governmental criticisms:

> Over the years, both Long Beach and Washington Mutual were repeatedly criticized by the bank's internal auditors and reviewers, as well as its regulators, OTS and the FDIC, for deficient lending and securitization practices.

234.    The Senate PSI found that WaMu knowingly securitized delinquency-prone and fraudulent loans without disclosing this adverse information to investors:

> At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

235.    This highly improper conduct was ongoing at the very time when WaMu securitized bad loans in the WMALT 2005-3 Trust and then sold Trust Certificates to Plaintiffs on April 29, 2005.

236.    A November 17, 2005 WaMu internal memo from Nancy Gonseth to Vanasek, Cheryl Feltgen (Division Executive, Chief Risk Officer – Home Loans) and others recounts the "sustained history of confirmed fraud findings over the past three years:"

> Due to a ***sustained history of confirmed fraud findings over the past three years from the Emerging Markets and Retail Broker Program*** areas, the Home Loans Risk Mitigation Team recently conducted a targeted review of the loans originated in two Southern California Community Fulfillment Centers (CFCs). . . .

- 65 -

The purpose of the review was to establish a factual basis for determination as to whether or not a broad, systemic pattern of mortgage fraud was present in the Emerging Markets and Retail Broker Loan programs . . . .

Based on this targeted review program, an extensive level of loan fraud exists in the Emerging Markets CFCs, virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review.  Of the 129 detailed loan reviewed that have been conducted to date, *42% of the loans reviewed contained suspected activity or fraud, virtually all of it attributable to some sort of employee malfeasance or failure to execute company policy.  In terms of employee activity enabling this perpetration of fraud, the following categories of activity appeared most frequently: inconsistent application of credit policy, errors or negligence, process design flaws, intentional circumvention of established processes, and overriding automated decisioning recommendations*.  (Emphasis in original.)

237.    An earlier August 30, 2005 internal WaMu e-mail chain between Ann Tierney (Washington Mutual Credit Risk Management) and Vanasek and others recounted the improper loan underwriting practices used by those responsible for originating home loans within WaMu's operations.  One sample of 83 loans showed that 58% of those loans "contained confirmed fraud findings."  Forty percent of these loans "involve[d] employment and/or income misrepresentation."  In a second sample of 48 loans "83% of total loans reviewed contained confirmed fraud findings."  Thirty-five percent of these loans also contained "employment and/or income misrepresentation."

238.    WaMu's awareness of the systematic abandonment of prudent loan underwriting practices is confirmed by their corporate documents.  The January 2005 Washington Mutual Board of Director Discussion entitled "Higher Risk Lending Strategy and Increased Credit Risk Management" discussed problems in the Specialty Mortgage Finance unit that acquired loans from third party loan originators for securitization and sale to investors: "The SMF management team is small and hence lacks depth; analytical/portfolio credit functions also are understaffed."  The presentation explained the Specialty Mortgage Finance unit needed better technology to ensure proper oversight of loan underwriting: "SMF could benefit from more advanced technology in the

- 66 -

areas of underwriting due diligence, servicing oversight, and portfolio financial and credit risk management."

239.    As the Senate PSI case study found, WaMu securitized and sold bad loans acquired from third parties.  WaMu likewise originated bad loans for securitization:

> In addition to problems with its subprime lending, Washington Mutual suffered from lending and securitization deficiencies related to its own mortgage activities.  It received, for example, repeated criticisms for unsatisfactory underwriting procedures, loans that did not meet credit requirements, and loans subject to fraud, appraisal problems and errors.  For example, a 2005 internal investigation found that loans originated from two top loan producing offices in southern California contained an extensive level of fraud caused primarily by employees circumventing bank policies.  Despite fraud rates in excess of 58% and 83% at those two offices, no steps were taken to address the problems, and *no investors who purchased loans originated by those offices were notified in 2005 of the fraud problem*.

240.    More than 26% of the aggregate principle balance of the loans that WMMSC deposited in the WMALT 2005-3 Trust were from California.  Rather than disclose its ongoing practice of having its California loan officers make fraud-tainted loans to securitize for sale to investors, WaMu sold the WMALT 2005-3 Trust Certificates to Plaintiffs in April 2005, while concealing this extremely adverse information.  As alleged above, WaMu stated just the opposite when telling Plaintiffs the loans in the WMALT 2005-3 Trust had been properly screened and underwritten.

241.    Instead of taking serious steps to correct these improper loan origination and securitization practices by employing proper loan underwriting practices to stamp out the internally known fraud-tainted loans, WaMu took steps to reduce and further abandon prudent underwriting standards to increase the production of high risk loans, as alleged above.

242.    An internal WaMu power-point presentation entitled Retail Fraud Risk Overview dated November 16, 2005, identified numerous failures to adopt, follow and enforce proper loan

- 67 -

underwriting practices.  This report noted: "Fraud findings do not differ between the retail broker and retail lending programs and principally relate to misrepresentation of loan qualifying data."  The report stated that on average, "78% of the funded retail broker loans reviewed were found to contain fraud," while "[o]n average 67% of the retail funded loans reviewed contain fraud, however, YTD finding indicate a rising trend."  Specific examples of bad loans were also discussed, including loans where "[t]he credit package was found to be completely fabricated.  Throughout the process, red flags were over-looked, process requirements were waived, and exceptions to policy were granted."  Another sampled loan file contained an appraisal report that "appears to contain false data regarding the subject property's site and building sizes.  This information significantly influenced the final statement of appraised value, and the resulting maximum loan amount on this cash out refinance."  Many of the sampled loan files contained misrepresentations of the borrower income, including a file where "Borrower's qualifying income was inflated $1200 per month, with notes that this decision is consistent with WaMu's credit policy."  This report also identified numerous "Process and Control Weaknesses," including "Inconsistent application of credit policy," "Process design flaws," Intentional circumvention of established processes," "Overriding automated decisioning recommendations," and "Technology (Optis) limitations."

243.    WaMu made no serious effort to correct the widespread practice of failing to properly screen loans before securitizing and selling them to investors.  Rather, they lowered the underwriting standards, thereby institutionalizing a company-wide policy that essentially ignored and disregarded prudent loan underwriting standards and practices.

244.    Even years later WaMu had still failed to correct these problems.  An August 2007 WaMu internal memo entitled "Home Loans Wholesale Specialty Lending – FPD [First Payment Defaults] 2007 Targeted Review" that was distributed to Killinger (Chairman  & CEO), Rotella

- 68 -

(President & COO), David Schneider (President Home Loans), and numerous other high-ranking Washington Mutual executives, noted that "[t]he overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk," and two "high" priority causes for this long-standing situation were noted:

- (High)  Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud.  Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly" suspect.  This issue is a repeat finding with CCR [Corporate Credit Review]

- (High) Weak credit infrastructure impacting credit quality.  Credit weakness and underwriting deficiencies is a repeat finding with CCR. . . .  Findings from the CCR FPD review in relation to credit quality:

  - 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit

  - 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income

  - 87 files (47%) exceeded program parameters in place at the time of approval

  - 133 (71%) had credit evaluation or loan decision errors present

  - 25 (13%) had title report issues that were not addressed

  - 28 (14%) had income calculations errors and 35 (19%) had income documentation errors

  - 58 (31%) had appraisal discrepancies or issues that raised concerns that the value was not supported

245.    WaMu knew they were securitizing and selling loans that had not passed minimal loan underwriting procedures to weed out borrowers who lacked the willingness and ability to pay back the loans.  Years after WaMu had consciously abandoned prudent loan underwriting practices in order to take on additional credit risk, Rotella wrote to Killinger on August 23, 2007, acknowledging "we sure made some mistakes."  Rotella's e-mail went on to explain:

- 69 -

I said the other day that HLs [*i.e.*, Washington Mutual internal Home Loan unit] (the original prime only) was the worst managed business I had seen in my career.

\*       \*       \*

I would also note that the credit staff and infrastructure of HL was poor and has had to be rebuilt almost from the ground up.  EDE [*i.e.*, Enterprise Decision Engine which was to supposed to have standardized and centralized decision strategies and increased risk management control over strategy execution] was not working well.  Mark Hillis was a part time and ineffective chief credit officer, and most credit authority was held at the center including underwriting and appraisal.  Cheryl arrived on the scene around early 2006 and huge strides have been made.  ***But we are still not close to where we need to be*** and accountability is not clear between center and line.

\*       \*       \*

The lesson here, as above, is that the ***lack of strong credit staff and analytics contributed to spotty underwriting discipline*** and a lack of insights into possible policy changes as we moved into HL production.  ***Without beating a dead horse, Tom and I worried about our stated desire to take on more credit risk and the weak staff and infrastructure in ERM*** [*i.e.*, Enterprise Risk Management which was supposed to have provided oversight to insure prudent lending] (center and business) if a credit downturn occurred.

246.    Because WaMu had drastically lowered its own loan underwriting standards at the same time that its underwriting and monitoring of third-party loan underwriting was essentially non-existent, WaMu knew, or was grossly reckless in not knowing, that the loans securitized and sold to Plaintiffs in the WMALT 2005-3 Trust were – to a very high degree – destined to fail because they had not been properly screened or underwritten.

247.    Similar loan underwriting deficiencies existed at WaMu's affiliate Long Beach Mortgage Company ("Long Beach Mortgage"), which during the relevant time period was a wholly-owned subsidiary of WaMu Bank.  On January 14, 2004 the FDIC reported to WaMu on its visitation to Long Beach Mortgage and the "unsatisfactory underwriting practices" that existed there.  The FDIC Report discussed a review of approximately 4,000 Long Beach Mortgage loans where it was found that more than 76% of them were deficient – 800 of the loans were found to be

- 70 -

"unsaleable" and 2250 of the sampled loans "contained deficiencies requiring remediation prior to sale." The president of Long Beach Mortgage explained to the FDIC investigators "that the problems were largely attributable to management's decision to integrate LBMC's sub prime loan origination and servicing operations into WMI's prime home lending program." Yet, the problems with Long Beach Mortgage's improper loan screening practices continued unabated until that business was essentially dead. In an August 21, 2007 e-mail COO Rotella responded to yet another internal analysis showing that "Long Beach Mortgage Loan Origination & Underwriting (REQUIRES IMPROVEMENT)" by saying: "This seems to me to be the ultimate in bayonetting the wounded, if not the dead. Not only do we already have a MRBA from the OTS on this, but the [Long Beach Mortgage] business is essentially gone."

248. WaMu's systemic failure to adopt, implement, or enforce proper loan underwriting practices constituted "business as usual" throughout the period 2004 to 2008. An April 4, 2008 Washington Mutual report to the OTC confirmed allegations by AIG/UG regarding fraudulent loan origination practices in connection with 25 loans made between 2004 and 2007, while specifically conceding: "CFI verified that the AIG reported elements of loan fraud did occur within [Washington Mutual's] Montebello CFC loan origination process."

249. A July 22, 2008 OTS Exam Summary for WaMu further confirmed the existence of these long-standing failures to implement proper loan underwriting procedures. The OTS found for WaMu's loan screening operations: "Lack of Income Reasonableness Guidance and Controls," "Lack of Income Analysis Procedures for Stated Income Loans," "Measures to address reasonableness of stated income were not implemented in home equity originations," and "WaMu (non appraisal) employees were able to inappropriately influence values of appraisals." As the above evidence reflects, these problems were known for years internally by WaMu, but no proper

- 71 -

steps were ever taken to address and change them.  And proper corrective action would never occur, because two months later the FDIC took over WaMu Bank due to its ongoing loss of billions of dollars stemming from the conduct alleged herein.  In September 2008, the FDIC sold WaMu Bank to JP Morgan Chase Bank, further evidencing the intractable loan underwriting and loan acquisition problems within WaMu's operations throughout this period.

250.    The Senate PSI case study concluded that WaMu's improper loan origination, acquisition and securitization practices were typical of other financial institutions, such as the many Defendants in this case, who also engaged in these wrongful practices.

### (1)    WaMu Had Actual Knowledge of the Defective Loans They Were Securitizing

251.    Documents recently released by Clayton confirm that there were rampant underwriting violations in the loan pools contained in the Certificates.  As the FCIC described, in the internal Clayton "Trending Report" made public by the Government in conjunction with testimony given in September 2010, WaMu received regular reports regarding defective loans, and 19% of the loans Clayton reviewed for WaMu "failed to meet guidelines."  These loans were not subject to any proper "exceptions," as they did not have any "compensating factors."  Rather, these loans were plainly defective.

252.    Despite such a high level of nonconforming loans, WaMu nevertheless continued utilizing, and indeed funding, the same originators who had placed the nonconforming loans in the pools and "waived in" to its pools 29% of those toxic loans that Clayton had identified as being outside the guidelines.  Such waivers were never disclosed to Union Central or any of the investors who purchased WaMu certificates.

253.    Clayton's data demonstrates that underwriting guidelines were being routinely violated, and that WaMu was informed of such violations.  The hidden "waiver" of rejected loans

- 72 -

that were not subject to any compensating factors was an omission that rendered the WaMu

Defendants' disclosures regarding their underwriting and due diligence processes materially

misleading.  As the FCIC Report concluded:

> [M]any prospectuses indicated that the loans in the pools either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 Event loans were waived in.

*       *       *

> [O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans. Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

(2)      WaMu Knew that Ratings Were False

254.     The Certificate purchased by Plaintiffs received a BBB credit rating from S&P and a

Baa2 rating from Moody's, indicating the rating agencies' view of its risk profile.  The ratings were

material to reasonable investors, including Union Central, because the ratings provided additional

assurances that investors would receive the expected interest and principal payments.  The

Certificates would have been unmarketable to investors like Union Central and would not have been

issued but for the provision of these ratings.  As the Offering Materials stated:

> It is a condition to the issuance of the offered certificates that they receive ratings from S&P and Moody's as indicated.

255.     The Offering Materials represented that the rating agencies conducted an analysis

designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools and

issued ratings accordingly.  The Offering Materials stated:

> The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation.

- 73 -

256.   These representations were false.  The ratings given to the Certificate by S&P and Moody's were based on the loan profiles supplied to the agencies by WaMu.  But as discussed above, most (if not all) of the key components of that data were false because WaMu failed to enforce and adhere to the disclosed underwriting standards and permitted and accepted manipulated appraisals of the properties underlying the mortgage pools.  As such, WaMu essentially pre-determined the ratings by feeding inaccurate information into the ratings system.  WaMu failed to disclose that the ratings would be based entirely on unreliable information provided by WaMu itself.

### 4.   WaMu Capital Corp.'s Liability as an Underwriter of the WaMu Certificate

257.   WCC made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by WCC in the sale of certificates to investors.

258.   As underwriter, WCC edited, drafted and controlled the content of the WMALT 2005-3 Trust's Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, WCC received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.  As underwriter, WCC then used and disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

259.   WCC, as a subsidiary within WaMu, had knowledge that WaMu, as alleged in §V.A, failed to adhere to underwriting standards when it pooled mortgage loans for its RMBS, including for the WMALT 2005-3 Trust, and provided distorted information to the rating agencies that was purposefully manipulated to meet the targeted rating.  Further, WCC, knew or was reckless in not knowing, of the defective loans in the WMALT 2005-3 Trust as a result of its due diligence

- 74 -

performed as an underwriter for the WMALT 2005-3 Trust. WCC had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans WaMu deposited in the WMALT 2005-3 Trust had a practice of routinely and systematically disregarding the stated underwriting standards.

260.    WCC also knew that mortgage loans deposited into the WMALT 2005-3 Trust were not properly underwritten because WCC was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged herein. In addition to the WMALT 2005-3 Trust, WCC underwrote and sold many other such WaMu RMBS to investors and had in that context gained inside knowledge of the poor quality loan underwriting.

### B.    Citi

#### 1.    Citi's Securitizations

261.    In 2007, Union Central purchased Certificates from the three Citi Trusts. For the CMSI 2007-5 and CMSI 2007-8 Trusts, Citi issued RMBS backed by fixed-rate, non-conforming, prime, residential first-mortgage loans that defendant CitiMortgage either both originated and purchased from others. For the CMLT 2007-10 Trust, Citi issued RMBS backed by fixed-rate and adjustable-rate mortgage residential first-mortgage loans, while the Group 1 loans, which supported the Certificates that Union Central bought, were fixed-rate mortgages.

262.    The CMSI 2007-5 Trust was a $342.9 million deal; the CMSI 2007-8 Trust was a $296.1 deal; and the CMLT 2007-10 Trust was a $1.12 billion deal.

263.    CGMI underwrote the Certificates from CMSI and CMLT and sold them to the Union Central pursuant to the Registration Statements.

| Trust | Registration Statement No. | Registration Statement Date |
|---|---|---|
| CMSI 2007-5 | 333-130333 | December 15, 2005 |

- 75 -

| | | |
|---|---|---|
| CMSI 2007-8 | 333-130333 | December 15, 20015 |
| CMLT 2007-10 | 333-138237 | October 25, 2006 |

264.    The following purchases made by Union Central represent a total investment of over

$13.6 million:

| CUSIP | Certificate | Issuing Entity | Depositor | Underwriter(s) | Issue Date | Purchase Date |
|---|---|---|---|---|---|---|
| 17312KAT9 | CMSI 2007-5 B1 | Citicorp Mortgage Securities Trust, Series 2007-5 | CMSI | CGMI and UBS Securities LLC | 6/1/2007 | 12/19/2007 |
| 17312DAL2 | CMSI 2007-8 B1 | Citicorp Mortgage Securities Trust, Series 2007-8 | CMSI | CGMI and Banc of America Securities LLC | 9/1/2007 | 10/3/2007 |
| 17313QAC2 | CMLT 2007-10 B1 | Citigroup Mortgage Loan Trust 2007-10 | CMLT | CGMI | 10/1/2007 | 1/22/2008 |

## 2.    False and Misleading Statements in Citi's Offering Materials

### a.    False and Misleading Statements About Compliance with Underwriting Standards

265.    Citi originated and acquired from other originators the underlying mortgages for the

Citi Trusts.  The Offering Materials represented that each of the mortgage sellers and originators

applied underwriting standards that were designed to ensure that the borrower could repay the loan,

and thus an investor like Union Central would see a full return on its investment.

### (1)    CMSI 2007-5 Trust and CMSI 2007-8 Trust

266.    The Prospectus Supplements for both CMSI Trusts represented that the subject

"[m]ortgage loan underwriting assesses a prospective borrower's ability and willingness to repay,

and the adequacy of the property as collateral for, a requested loan."

- 76 -

267.    Defendant CitiMortgage originated approximately 48% of the CMSI 2007-5 Trust, AAMG originated approximately 39%.[2]

268.    The CMSI 2007-5 Offering Materials represented: "These [third-party] organizations originated the mortgage loans under guidelines that are substantially in accordance with CitiMortgage's guidelines for its own originations."  Further, "CitiMortgage believes that AAMG's, Provident Funding's and SIRVA Mortgage's underwriting procedures for the mortgage loans included in this series are not materially different from CitiMortgage's own underwriting procedures for similar loans."

269.    For the CMSI 2007-8 Trust, CitiMortgage originated and sold to the Trust 70% of the underlying mortgages.  Third-party organizations originated the remainder.

270.    Citi represented in its CMSI 2007-8 Offering Materials that "[t]hese [third-party] organizations originated the mortgage loans under guidelines that are substantially in accordance with CitiMortgage's guidelines for its own originations."  Further, "[s]ome mortgage loans acquired by CitiMortgage from other organizations and included in the pools may have been originated by these organizations, and some may have been purchased by these organizations from other persons. CitiMortgage believes that these organizations' underwriting procedures for the mortgage loans included in this series, whether originated or purchased by these organizations, are not materially different from CitiMortgage's own underwriting procedures for similar loans."

271.    For both the CMSI 2007-5 and CMSI 2007-8 Trusts, the Offering Materials also represented: "Third-party originators must be experienced in originating mortgage loans of the types in the pool in accordance with accepted practices and prudent guidelines."

---

[2]    As of March 1, 2007, AAMG became a wholly-owned subsidiary of CitiMortgage.

272.     Citi also represented that its own review of the third-party originations would ensure the capacity of the borrower to repay the loan and the adequacy of the collateral:

> The underwriting policies and guidelines of third-party originators (which for purposes of this prospectus includes AAMG) may differ from those of the affiliated originators. In purchasing third-party loans, CitiMortgage will review a sample of the loans to determine whether they generally conform to CitiMortgage's underwriting standards. CitiMortgage will fully or partly credit score or re-underwrite the third-party loans to determine whether the original underwriting process adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on CitiMortgage's underwriting standards.

273.     With respect to the loans in the CMLT 2007-10 Trust, Citi represented that:

> All mortgage loans will have been subject to underwriting standards acceptable to the depositor and applied as described below.  Each mortgage loan seller, or another party on its behalf, will represent and warrant that mortgage loans purchased by or on behalf of the depositor from it have been originated by the related originators in accordance with such underwriting standards.

> Unless otherwise specified in the related prospectus supplement, the underwriting standards are applied by the originators to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.

274.     Citi represented in its CMLT 2007-10 Trust's Offering Materials that American Home, Argent, Countrywide, and PennFed originated the majority of the underlying mortgages, while the other third-party originators listed sold them less than 20%.  Citi represented in its Offering Materials that the third parties from whom it bought the mortgages each had applied underwriting standards designed to ensure that the borrower could repay the loan.

### (i)       American Home

275.     The Offering Materials described the underwriting guidelines American Home used to originate the loans that it sold to the Trust.  According to the Offering Materials, American Home's underwritings were designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

- 78 -

705280_1

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present.

*       *       *

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

### (ii)       Argent

276.   The Offering Materials described the underwriting guidelines Argent used to originate the loans that it sold to the Trust. According to the Offering Materials, Argent's underwritings were designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

The mortgage loans originated by Argent Mortgage Company, LLC (the "Argent Mortgage Loans") were originated generally in accordance with the underwriting standards described below (the "Argent Underwriting Guidelines"). The Argent Underwriting Guidelines are primarily intended to evaluate: *(1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral*. On a case-by-case basis, Argent may determine that, based upon compensating factors, a loan applicant warrants an exception to the requirements set forth in the Argent Underwriting Guidelines. Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the mortgage pool will represent such underwriting exceptions.

### (iii)       Countrywide

277.   The Offering Materials described the underwriting guidelines Countrywide used to originate the loans that it sold to the Trust. According to the Offering Materials, Countrywide's underwritings were designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

- 79 -

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

*     *     *

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(iv)      PennFed

278.    The Offering Materials described the underwriting guidelines PennFed used to originate the loans that it sold to the Trust.  According to the Offering Materials, PennFed's underwritings were designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

> These mortgage loans were underwritten generally using Freddie Mac and Fannie Mae guidelines, although loan amounts might have exceeded agency limits.  The Company's non-conforming underwriting guidelines were similar to those of Freddie Mac and Fannie Mae, but exceptions might have been permitted where compensating factors were present. . . .   The Company evaluated the borrower's ability to make monthly payments, past credit history and the value of the property securing the loan.

**b.      False and Misleading Statements About Appraisals and LTV Ratios**

279.    The Offering Materials represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals, conducted in accordance with pre-established guidelines.

280.    Each securing property was to be appraised by a qualified and diligent appraiser, and each appraisal was required to satisfy that the property value can support the principal balance of the

- 80 -

mortgage loan.  In general, appraisals were to be in conformity with USPAP, as adopted by the

Appraisal Standards Board of the Appraisal Foundation.

281.   The CMSI 2007-5 and 2007-8 Trusts represented that the appraisals of the third-party

originated loans had to be independent:

> Each appraisal is conducted by an independent fee appraiser. The appraiser
> personally visits the property and estimates its market value on the basis of
> comparable properties. . . .  The independent appraisers do not receive any
> compensation dependent upon either the amount of the loan or its consummation.

282.   The CMLT 2007-10 Trust Offering Materials stated: "In determining the adequacy of

the property as collateral, an appraisal is made of each property considered for financing, except in

the case of new manufactured homes, as described under 'The Trust Funds.'"  Each appraiser is

selected in accordance with predetermined guidelines established for appraisers.  The appraiser is

required to inspect the property and verify that it is in good condition and that construction, if new,

has been completed."

283.   The Offering Materials for the CMLT 2007-10 also contained representations

pertaining to the primary originators' appraisals.

284.   Regarding American Home, Citi's Offering Materials represented:

> Every mortgage loan is secured by a property that has been appraised by a
> licensed appraiser in accordance with the Uniform Standards of Professional
> Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site
> inspections of the property and report on the neighborhood and property condition in
> factual and specific terms. Each appraisal contains an opinion of value that represents
> the appraiser's professional conclusion based on market data of sales of comparable
> properties and a logical analysis with adjustments for differences between the
> comparable sales and the subject property and the appraiser's judgment. In addition,
> each appraisal is reviewed for accuracy and consistency by American Home's vendor
> management company or an underwriter of American Home or a mortgage insurance
> company contract underwriter.

285.   Regarding Argent, Citi's Offering Materials represented:

- 81 -

The Argent Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of Argent or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property.

286.    Regarding Countrywide, Citi's Offering Materials represented:

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

287.    Regarding PennFed, Citi's Offering Materials represented: "Properties securing real estate loans were appraised by a licensed in-house appraiser or independent appraisers, all of whom were approved by the Company's Board of Directors."

288.    Citi's Offering Materials also provided specific information regarding the weighted average LTV ratios of the loans underlying the Certificates:

| Certificates | LTV Ratio |
|---|---|
| CMSI 2007-5 | 69.60% |
| CMSI 2007-8 | 70.48% |
| CMLT 2007-10 | 68.02% |

c.    **False and Misleading Statements About Debt-to-Income Ratios**

289.    Citi's Offering Materials for the Citi Trusts contained numerous statements regarding the evaluation of DTI ratios for the borrowers whose loans comprised the Trusts.   Absent

- 82 -

compensating factors, the Offering Materials described the manner in which the loan originators evaluated DTI ratios for borrowers.

290.    Citi represented in the Offering Materials for the CMSI 2007-5 and 2007-8 Trusts that the originators for the underlying mortgages would decide as part of their lending guidelines "whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses as well as the prospective borrower's other financial obligations and monthly living expenses."  The CMLT 2007-10 made substantially the same representation.

291.    Additionally, the CMLT 2007-10 Trust provided additional details for some of the loan originators practices regarding DTI.

292.    For example, Citi represented that loans originated by American Home, "the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense."  Similarly, Argent-originated loans required, according to the Citi Offering Materials, that "[d]uring the underwriting process, Argent review[] and verif[y] the loan applicant's sources of income (except under certain stated income documentation programs such information may not be independently verified), calculate[] the amount of income from all such sources indicated on the loan application, [and] calculate[] the debt-to-income ratio to determine the applicant's ability to repay the loan," among other procedures.  PennFed purportedly "evaluated the borrower's ability to make monthly payments."

293.    The CMLT 2007-10 Offering Materials provided even greater detail for loans originated by Countrywide:

> [A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. . . .  The maximum acceptable debt-to-

- 83 -

income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.

*　　　*　　　*

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

*　　　*　　　*

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

### d.　False and Misleading Statements About Owner-Occupancy

294.　Citi specifically disclosed owner-occupancy statuses for the underlying mortgages in the Offering Materials because it is an indicator of the borrowers' likelihood to stay current with their payments, passed through to investors.

295.　The following chart provides the Trusts' disclosures:

| Certificate | Owner-Occupied/Primary Residence | Secondary Residence/ Vacation Home | Investor |
|---|---|---|---|
| CMSI 2007-5 | 94.11% | 5.89% | 0% |
| CMSI 2007-8 | 94.21% | 5.67% | 0.12% |
| CMLT 2007-10 | 95.31% | 4.67% | 0.02% |

### e.　False and Misleading Statements About Ratings

296.　The Offering Materials for each Citi Trust stated that the ratings of the Certificates as set forth in the Prospectus was a condition to their issuance, and that the ratings reflected the likelihood that investors would receive the distributions to which they were entitled.

297.　The CMSI 2007-5 and CMSI 2007-8 Trusts represented:

- 84 -

The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown [in the Prospectus].

\*       \*       \*

The ratings of Standard & Poor's Ratings Services (*S&P*) on mortgage pass-through certificates address the likelihood of the receipt by certificate holders of timely payments of interest and the ultimate return of principal. S&P's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make payments required under the certificates. . . .

The ratings of Moody's Investors Service, Inc. (*Moody's*) on mortgage pass-through certificates address (1) the likelihood of the receipt by certificate holders of all distributions to which they are entitled and (2) the structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of any credit support provider. . . .

The ratings assigned by Fitch Ratings (*Fitch*) to mortgage pass-through certificates address the likelihood of the receipt by certificate holders of timely payments of interest and the ultimate return of principal. Fitch's ratings reflect its analysis of the riskiness of the underlying mortgage loans and the structure of the transaction as described in the operative documents.

298.    The information given to the rating agencies was critical in determining, among other items, the Trusts' rating.  The Citi Offering Materials disclose: "Once CitiMortgage agrees to sell a mortgage loan pool to an underwriter for securitization, the underwriter, in conjunction with the rating agencies for the series, determines the size, interest rates, and payment order for the classes of certificates comprising the series."

299.    Likewise, the CMLT 2007-10 Trust represented:

It is a condition to the issuance of the Offered Certificates that the Offered Certificates receive not lower than the ratings [listed in the Prospectus] from Fitch Ratings, or Fitch and Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or S&P.

\*       \*       \*

The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which the certificateholders are entitled. The rating process addresses structural and legal

- 85 -

aspects associated with the certificates, including the nature of the underlying mortgage loans.

300.   The Offering Materials also set forth the specific ratings for the Certificates that Union Central purchased:

| Certificate | Rating |
|---|---|
| CMSI 2007-5 B1 | AA |
| CMSI 2007-8 B1 | AA |
| CMLT 2007-10 B1 | AA |

301.   In obtaining these ratings for the subject Certificates, Citi concealed the adverse information alleged herein from the rating agencies.  Had the rating agencies known the true value of the loans underlying the Certificates, the Certificates would have been rated significantly lower, or not at all.

### 3.   Citi's Statements Were Knowingly False and Misleading

302.   Citi knew, or was reckless in not knowing, that the statements identified above were materially false and misleading and/or omitted material facts necessary to make the statements made not misleading.   As set forth herein, Citi had actual knowledge that the stated underwriting guidelines were not being adhered to and rather than provide truthful information and disclosures to Union Central and other investors, used such knowledge to reap massive profits for itself by betting against the very products they were selling investors.

### a.   Citi Knew that Underwriting Standards Had Been Abandoned

303.   While the Offering Materials set forth detailed underwriting guidelines that were supposed to be applied in evaluating borrowers and loans, in fact as Citi was aware, the stated underwriting guidelines had been abandoned by the loan originators and by Citi when depositing the loans in the Trusts.

- 86 -

304.    The originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default.  Instead, the originators, using Citi's own financing and encouraged by Citi and other investment banks' insatiable appetite for acquiring loans regardless of their quality, approved loans which they knew were based on falsified information and which did not comply with any of the stated underwriting guidelines.

305.    CitiMortgage had abandoned all prudent underwriting practices with respect to the loans that it had originated and included in the subject Trusts, as alleged herein.

306.    AAMG had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.9.

307.    American Home had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.7.

308.    Argent had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.13,

309.    Countrywide had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.2.

310.    Greenpoint had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.3.

311.    National City had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.10.

- 87 -

312. SunTrust Mortgage had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Citi for inclusion in the subject Trusts, as alleged above at §IV.I.4.

**b.    Citi's CEO Knew and Condoned Citi's Issuance of RMBS with Defective Loans**

313. Charles Prince ("Prince") served as CEO of Citigroup from 2003 to 2007, and he admitted in his testimony before the FCIC, that Citi's "[s]ecuritization could be seen as a factory line." He conceded that mortgages of "lower and lower quality" went into the securitization process. The result he explained was that since "the raw material going into it was actually bad quality, it was toxic quality, and that is what ended up coming out the other end of the pipeline." Plaintiffs suffered substantial damages coming out of the other end of the pipeline as a result this factory line Citi used to securitize toxic loans sold to unknowing investors.

314. On March 7, 2008, Prince testified to Congress that "lending patterns began to deteriorate pretty significantly in 2006." By the spring of 2007, when reports reached the CEO that almost 20% of the borrowers in some of the securitized pools of mortgages had defaulted on their first payment, the CEO admitted that "most of the damage had already been done." Despite knowledge of the severely deteriorated loan standards, Citi continued to package loans for securitization to investors such as Union Central.

**4.    Citi Knew the Problems in the Mortgages Underlying the RMBS**

315. In the fallout of the financial crisis, Prince was not the only Citi executive to admit to Citi's defective RMBS practices. Bowen was Citi's Senior Vice President and Chief Underwriter for Correspondent and Acquisitions for Citifinancial Mortgage from 2002 through 2005, and in 2006 was promoted to Business Chief Underwriter for Correspondent Lending in the Consumer Lending

Group.  In his position he was charged with overseeing the underwriting of over $90 billion a year of residential mortgage production by over 220 professional underwriters, giving him first-hand knowledge of Citi's underwriting practices.

316.    The mortgages Bowen's group underwrote originally came through correspondent channels.  Thus, their underwriting responsibility was to ensure that the third-party originators' credit standards met Citi's requirements.[3]  But as Bowen detailed in testimony to the FCIC on April 7, 2010, Citi increasingly approved mortgages that Citi's underwriting standards should have barred.

317.    According to Bowen's FCIC testimony, in mid-2006 he discovered that over 60% of the mortgages purchased and sold to investors were defective.  Beginning in June 2006, Bowen repeatedly informed Citi's management by "weekly reports, emails, and discussions," but his warnings went ignored.  Bowen told the FCIC that by 2007 "defective mortgages increased . . . to over 80% of production."  These were the toxic loans that Citi securitized and sold to Plaintiffs without properly disclosing Citi knew these loans had not been properly underwritten.

318.    Notwithstanding Citi's awareness that as high as 80% of the 2007 production consisted of defective mortgages, Citi securitized these loans and sold them to investors, including Plaintiffs.

319.    Susan Mills ("Mills"), the head of the Mortgage Finance group at CGMI, which was part of the team responsible for the securitization and underwriting of RMBS, told the FCIC in an interview that she had noticed increasing delinquencies in 2006.  She therefore installed a

---

[3]     Third-party originations made up 52% of the mortgages in the CMSI 2007-5 Trust, 30% of the CMSI 2007-8 Trust, and 100% of the CMLTI 2007-10 Trust.

surveillance group to track the loans that her team purchased.  Nevertheless, from 2005 to 2007, Mills reported to the FCIC, early payment default rates nearly tripled from 2% to around 6%.

320.    Citi waived through bad loans that did not meet prudent underwriting guidelines.  For loans intended for Wall Street, Bowen testified that during 2006 and 2007 he "witnessed many changes to the way the credit risk was being evaluated for these pools during the purchase process." Notably, "[t]hese changes included the Wall Street Chief Risk Officer's reversing of large numbers of underwriting decisions on mortgage loans from 'turn down' to 'approved.'"

321.    Bowen's testimony is consistent with an e-mail he sent to Citi's senior officers on November 3, 2007.  He attached this e-mail to his written testimony.  His e-mail warned that mortgage loans securitized and sold to investors often are "either outside of policy criteria or have documentation missing from the files," while explaining that during "2006-7 there were pools of mortgage loans aggregating $10 billion which were purchased from large mortgage companies with significant numbers of files identified as 'exceptions' (higher risk and substantially outside of our credit policy criteria)."

322.    Bowen explained that for approximately $50 billion of mortgage loans originated through the correspondent channel by third parties, the underwriting was delegated to the third-party originator.  Citi's Quality Assurance department, which reported to Bowen, was supposed to sample these loans to ascertain whether the third-party's underwriting "agreed" with what would have been the result had Citi underwrote the loan.  But Bowen testified that "Citi policy require[d] that a minimum of 95% of the loans purchased" through this channel "must be assigned the 'agree' decision."  In fact, over half of the files reported as "agree" were missing policy-required documents, such as proof of income documentation.

- 90 -

323.    Bowen's testimony to the FCIC is confirmed by Sherry A. Hunt, a Citi whistleblower with first-hand knowledge of Citi's defective mortgage underwriting.  In Hunt's whistleblower letter to the SEC dated May 24, 2011, which was attached to her *qui tam* complaint, she wrote:

> The position I accepted with CitMortgage [sic] in November 2004 was as Chief Underwriter and Vice President over the correspondent channel.  The move proved to be disastrous to my career. . . .
>
> I will not go into all of the details here, but one would just need to watch the testimony of Richard Bowen III to the Financial Crisis Inquiry Commission in April 2010 and know that what he is stating is the truth, and that truth came from me alerting him to the issues.  He was my manager.

*See United States of America, ex rel, Sherry A. Hunt, v. Citigroup, Inc., et al.*, No. 1:11-cv-05473 (S.D.N.Y.) (Dkt. No. 19).

324.    Citi systematically securitized loans originated by third parties that did not meet prudent underwriting standards and had been initially declined for this reason – before these toxic loans were waived through the factory line system.  As Bowen explained in his November 3, 2007 e-mail, "[t]hese exceptions were approved by the Wall Street Channel Chief Risk Officer, many times over underwriting objections and with the files having been turned down by underwriting."  Citi waived through these defective loans, allowing them to continue on Citi's securitization factory line.

a.    **Citi Securitized Imprudent Loans to Get Them Off Its Books and to Avoid the Risk of Default**

325.    In August 2005, according to Bill Beckmann ("Beckmann"), president and COO of CitiMortgage Inc., there was a Citi initiative to transition the company to a broader origination strategy.  Citi brought under one "silo" its three mortgage businesses, which represented prime, subprime and home equity.  Carl Levinson, who was appointed president and CEO of the Consumer Finance Group, was placed at the head of the merged mortgage companies.  The upshot of the merger, explained Beckmann, was that Citi dispensed with the distinctions it had made among the

- 91 -

processing of its various types of mortgages.  "Especially as the traditional prime market gets smaller," Beckmann said "we're beginning to see those lines blur."

326.    As another managing director at CitiMortgage, Bradley J. Brunts, explained, Citi shifted its strategy toward making and acquiring more high risk loans by no longer viewing the nonprime business as a "niche business" but rather as one that was increasingly a "volume business." With the integration of these businesses, higher risk loans such as Alt-A mortgages grew from nil to 25% of CitiMortgage's overall business.  As Beckmann put it, "our absolute focus for growth is alt-A" in 2006.

327.    Citi was able to reduce the credit risk it faced from this shift in strategy by securitizing and selling these higher risk loans that it did not want to hold on its books.  Thus, CitiMortgage's Alt-A loans would "go to market" through defendant CGMI, who would pool loans rejected by CitiMortgage into RMBS to be sold to investors.  As Beckmann admitted, "[t]here are loans that maybe we wouldn't feel comfortable with [putting] in our portfolio, but the Street is happy with."

328.    Beckmann further elaborated that defendant CitiMortgage's alliance with defendant CGMI was especially useful when making bulk purchases from a correspondent.  In the past, he explained, if Citi only offered to purchase $70 million of a pool of $100 million from a correspondent, the correspondent would take its business to another customer who had offered to purchase $90 million of the pool.  Because CGMI pushed the loans off on investors of RMBS trusts, "Citi can bid more robustly and not get stuck with the kicks – the loans we didn't want to take."

**b.    Other Employees Confirm Citi's Lack of Adequate Due Diligence**

329.    Citi knew the goal was to approve as many mortgages as possible for the mortgage pools, to the detriment of credit quality.  To that end, witnesses such as a former senior underwriter

for CitiMortgage said "conventional lending ideas went out the window." Former Citi employees described Citi's underwriting standards as "too loose" and "too easy-going," allowing for "very aggressive" lending practices.

330.    For example, a former regional sales manager for Citigroup's wholesale mortgage loan division described the steady deterioration in credit quality that started around 2005. He said he witnessed the increasing prevalence of interest-only, stated income, and 100% LTV mortgages. A former senior underwriter also remembered maximum LTV ratios at 100%. Another former senior underwriter, noted that in the spring of 2007, Citi even permitted mortgages for borrowers with FICO scores as low as 500, confirmed by a different senior underwriter who recalled that even in late 2007, minimum FICO scores were still around 580. The result, according to a former senior underwriter was that "almost anything would pass."

331.    If the loose underwriting standards did not let the mortgages waive through, Citi's policy was to lean on its underwriters. Underwriters described the pressure they were under to approve mortgages. One former senior underwriter explained that if she found a loan to be problematic, the response from her "team lead" was to tell her to "look at it again." Underwriters understood, she said, that we should "find a way to accept it."

### c.    Skyrocketing Default Rates Are Further Evidence of Abandoned Underwriting

332.    The Certificates sold to Union Central were supposed to be stable, long-term investments backed by investment-grade credit ratings. However, the extraordinary defaults on the mortgage loans underlying Union Central's Certificates is prima facie evidence that the stated underwriting standards and loan characteristics represented in the Offering Materials were materially false and misleading.

- 93 -

333.    The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as well as collateral cumulative losses, for each of the Certificates purchases by Union Central as of June 2010:

| Certificate | Original Deal Size | Delinquent, Bankruptcy, Foreclosure, REO Actual Balance | Collateral Cumulative Loss |
|---|---|---|---|
| CMSI 2007-5 | $342,935,690 | $16,139,620 | $997,385 |
| CMSI 2007-8 | $296,050,563 | $13,326,153 | $1,877,023 |
| CMLT 2007-10 | $206, 824,470 | $7,308,254 | $657,223 |

334.    Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of delinquency, bankruptcy and foreclosure would be far lower than the current rates.  Indeed, Moody's maximum expected collateral losses for the life of the CMSI 2007-5 Certificate was only $1.55 million.  Moody's maximum expected collateral losses for the life of the CMSI 2007-8 Certificate was $1.49 million.

### d.    Appraisals and LTV Ratios Were Inflated

335.    The descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.  Undisclosed in the Offering Materials, and in violation of any legitimate appraisal standards, many of the loans underlying the Certificates had been approved through the use of manipulated appraisals that guaranteed that the collateral property would be valued at a price sufficient to support the loan.  Citi's practices have been confirmed through modeling by other parties whose data demonstrates that appraisals used in connection with Citi securitizations in 2006 were routinely inflated.

336.    For instance, the plaintiffs in *Allstate Ins. Co., et al. v. CitiMortgage, Inc., et al.*, Index No. 650432/2011 (Sup. Ct. N.Y. Feb. 17, 2011), conducted a sophisticated loan-level analysis

- 94 -

using AVM technology to parse over 9,000 mortgages underlying trusts that were substantially similar to the Citi offerings at issue in that litigation. *Allstate v. CitiMortgage* Complaint (Dkt. No. 2), ¶¶121, 130-137. AVM's are routinely used in the industry as a way of valuing properties during pre-qualification, origination portfolio review and servicing.

337.    The *Allstate v. CitiMortgage* plaintiffs' analysis demonstrates that the valuation of the loans underlying their certificates were materially and consistently inflated, and therefore that the stated LTV ratios were materially overstated, which in turn greatly increased the risk of default for the loans underlying those certificates. The chart below summarizes their findings:

| Trust | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| CMLTI 2006-4 | 70.30% | 73.91% | 3.61% |
| CMALT 2006-A7 | 70.65% | 82.03% | 11.38% |
| CRMSI 2007-02 | 79.04% | 93.30% | 14.26% |
| CRMSI 2006-03 | 78.08% | 90.53% | 12.45% |
| CRMSI 2007-01 | 79.39% | 87.61% | 8.22% |

338.    Even worse, while none of the certificates were supposed to contain loans that carried an LTV ratio over 100%, Allstate's analysis found that a significant number of loans indeed had LTV ratios of over 100% - in other words, the value of loan was more than the value of the property.

| Trust | Percentage of Loans Represented to Have LTVs greater than 100% | Actual Percentage of Loans with LTVs Greater than 100% |
|---|---|---|
| CMLTI 2006-4 | 0.00% | 9.25% |
| CMALT 2006-A7 | 0.00% | 12.36% |
| CRMSI 2007-02 | 0.00% | 36.61% |
| CRMSI 2006-03 | 0.00% | 32.28% |
| CRMSI 2007-01 | 0.00% | 31.36% |

- 95 -

339.    The FHFA also performed a similar AVM review to determine the accuracy of the reported LTV ratios in the Citi securitizations at issue in its case.  The FHFA's review confirms that for every Citi securitization analyzed, the percentage of loans with LTV ratios of 80% or less was overstated.  Further, the percentage of loans with LTVs of over 100% ranged from 5.61% to as high as 16.71%.  *FHFA* Complaint, ¶¶113-118

<b>e.    Citi Knew that Appraisals Purposefully Overstated<br>Home Values to Hit Sponsors' Targets</b>

340.    Citi knew that appraisers overstated property valuations, thereby decreasing stated LTV ratios, through the manipulation of the appraisals conducted on the underlying properties.  Instead of conducting appraisals designed to accurately value the subject property in compliance with the USPAP or the practices set forth herein, many of the appraisals conducted on the underlying properties, if they were conducted at all, were designed to hit valuation targets that would allow loans to be funded and sold in RMBS.

341.    As set forth in §§IV.F. and IV.H.2., Citi was a participant in the defendant-wide practice of pressuring appraisers to misstate appraisals in order to ensure that loans were funded regardless of the quality of the underlying collateral.

<b>f.    Citi Falsified Debt-to-Income Ratios</b>

342.    The statements contained in the Offering Materials regarding the acceptability and evaluation of DTI ratios, as well as many of the specific DTI ratios disclosed, were materially false and misleading.  In fact, Citi and its originators knew that borrowers routinely falsified their stated incomes in order to have loans approved.

343.    In the case of stated income loans, for example, Citi and its originators knew that many borrowers claimed incomes that did not come anywhere near a reasonable level for their stated occupations.

- 96 -

344.     Plaintiffs have examined certain of the loans contained in the CMSI 2007-8 and the CMLT 2007-10 Trusts and found numerous examples of loans where Citi accepted falsified DTI ratios and where obvious signs of fraud or misrepresentations were ignored.

## (1)     CMSI 2007-8

345.     The CMSI 2007-8 Trust included a $480,000 loan to purchase a primary residence in Casa Grande, Arizona in June 2007.  Public records indicate that the borrower's DTI ratio was over 160%, rather than the 47.52% listed in the loan schedule.  According to public records, the borrower did not occupy the property, contrary to what was listed in the loan schedule.  Furthermore, the borrower failed to disclose another property purchase in the month preceding the note's completion for the mortgage in the CMSI 2007-8 Trust.

346.     Another mortgagor in this Trust refinanced for $100,000 a primary residence in Temple City, CA.  The loan schedule listed the borrower's DTI as 33.75%, but in fact, it was 73%. Within just five months of completing the refinancing, the borrowers entered into a third lien loan, and then shortly thereafter filed for bankruptcy.

347.     The CMSI 2007-8 Trust also contained a cash-out refinance loan dated August 2007 on a $568,000 first mortgage of a primary residence in Poulsbo, Washington.  This borrower's stated DTI was 65.21%, which is extremely high where the industry norm considers 50%-55% to be excessive.  But even this was an understatement, because public records reveal that the borrower's DTI should have been listed as over 100%.

348.     In another example, the CMSI 2007-8 Trust included a mortgage for the purchase in September 2007 of a $545,000 home in Houston, Texas.  The borrower was a driver for a satellite parking company at an airport.  Before the mortgage was in the Trust, the borrower had purchased three other homes.  Though his DTI should have been in excess of 600%, the loan schedule

- 97 -

accompanying the Trust listed this borrower's DTI as 38.95%. Also diverging from the representation in the loan schedule was the fact that the property was not owner-occupied.

### (2)    CMLT 2007-10

349.    The CMLT 2007-10 Trust contained a cash-out refinance mortgage for $600,000 originated by National City Mortgage in February 2007 in Dallas, Texas. Incredibly, the borrowers had completed other cash-out/refinance transactions during the years of 2001, 2002, 2003, 2004, and 2005. Within four months of completing this loan, the borrowers filed for bankruptcy, which filing revealed that the borrowers were involved in litigation concerning outstanding debts for the borrowers' businesses. Nevertheless, Citi allowed this mortgage to pass its underwriting review. The listed DTI on the loan schedule was 45.23%; in fact, the borrowers' DTI should have been listed between 68%-89%.

350.    Another loan originated by National City Mortgage in the CMLT 2007-10 Trust was for a cash-out/refinance of a property in Lake Almanor, California in February 2007. The property had undergone a series of refinancings in the previous years to the subject loan. The borrower was elderly and subsisted on social security. The listed DTI was overstated by almost 100% – what should have been at least 84% was listed as 42.32% in the loan schedule.

### g.    Owner-Occupancy Rates Were Falsified

351.    In addition to the examples above demonstrating that the Offering Materials misrepresented the owner-occupancy rates of subject properties underlying Citi Trusts, other parties' loan-level analysis of thousands of loans Citi securitized at the same time as the Certificates at issue here, further confirm Citi's practice of routinely permitting and using misstated owner-occupancy rates for loans underlying its RMBS Certificates.

- 98 -

352.    In addition to their LTV analysis, the *Allstate v. CitiMortgage* plaintiffs undertook a sophisticated analysis to determine whether a given borrower actually occupied the property as claimed. *Allstate v. CitiMortgage* Complaint, ¶¶118-129. As part of the *Allstate v. CitiMortgage* plaintiffs' analysis of over 9,000 mortgage loans underlying their Certificates, they reviewed tax records, credit records, bills, property records and lien records, to determine whether a borrower was actually living in the property subject to the loan. The results of the *Allstate v. CitiMortgage* plaintiffs analysis demonstrates that the percentage of owner-occupied properties disclosed by Citi in their prospectuses was consistently false and that the true rate was much lower. The following chart shows the results of their analysis:

| Trust | Percentage of Owner-Occupied Properties Represented in Prospectus | Estimated Actual Percentage of Owner-Occupied Properties in the Pool | Prospectus Overstatement |
|---|---|---|---|
| CMLT 2006-04 | 69.6% | 57.7% | 11.9% |
| CMLT 2007-WFHE2 | 94.2% | 81.8% | 12.3% |
| CMALT 2006-A7 | 88.4% | 75.2% | 13.2% |
| CRMSI 2007-02 | 98.7% | 93.7% | 5.0% |
| CRMSI 2006-03 | 98.6% | 96.0% | 2.6% |
| CRMSI 2007-01 | 99.2% | 96.1% | 3.1% |

353.    In addition to Allstate, Citi has been sued by the FHFA. *FHFA, et al. v. Citigroup, Inc., et al.*, No. 1:11-cv-06196 (S.D.N.Y. Sept. 2, 2011).

354.    The FHFA performed a similar analysis to determine whether the owner-occupancy rates disclosed in the prospectuses for Citi securitizations at issue there were accurate. According to the FHFA's review, most of the Citi securitizations understated the percentage of non-owner-occupied properties (*FHFA v. Citigroup* Complaint (Dkt. No. 1), ¶¶109-112):

- 99 -

| Trust (with Supporting Loan Group) | Reported Percentage of Non-Owner Occupied Properties | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Understatement of Non-Owner Occupied Properties |
|---|---|---|---|
| CMLT 2005-10 (Group 1-3) | 27.65% | 39.98% | 11.73% |
| CMLT 2005-7 (Group 1-2) | 14.95% | 30.32% | 15.37% |
| CMLT 2005-HE3 (Group 1) | 7.92% | 21.17% | 13.25% |
| CMLT 2005-HE4 (Group 1) | 14.65% | 27.94% | 13.29% |
| CMLT 2006-AR2 (Group I-1) | 11.25% | 25.25% | 14.01% |
| CMLT 2006-AR5 (Group 1-2) | 10.74% | 27.43% | 16.69% |
| CMLT 2006-WF1 (Group I) | 41.92% | 48.17% | 6.25% |
| CMLT 2006-WF2 (Group I) | 39.90% | 47.45% | 7.55%` |
| CMLT 2007-AR7 (Group 2) | 63.77% | 68.80% | 5.03% |

### 5.    Citi Knew that Underwriting Standards Were Being Abandoned

355.    Citi had actual knowledge that the loans it securitized in the Trusts sold to Union Central did not comply with the stated underwriting guidelines contained in the Offering Materials, and that the quantitative and qualitative data contained in the Offering Materials was materially false and misleading.  Indeed, Citi used this knowledge to profit from the defective loans it securitized by taking short positions on securities sold to its clients, and by pocketing discounts on defective loans sold by the very originators whose operations Citi sustained through its warehouse funding.

- 100 -

> **a.**   **Citi Had a Company-Wide Practice of Securitizing Loans that Had Not Been Properly Underwritten**

356.   Unbeknownst to Plaintiffs, Citi had a company-wide practice of originating and acquiring home loans without using proper underwritten practices to determine whether the borrower had the willingness and intent to repay the loans.  Citi's CEO during the relevant time period subsequently admitted to the FCIC that Citi employed a factory line system to securitize toxic mortgages.  Similarly, other high-ranking executives have now admitted that Citi was aware during the relevant time period that 80% of its loans were not properly underwritten.  Indeed, it was Citi's business strategy to securitized these high risk loans to get them off its books to avoid the risk of default, but it failed to disclose to investors that these loans had never been properly underwritten.

> **b.**   **Based on Its Own Review of the Underlying Loans, Citi Defendants Had Actual Knowledge of the Defective Loans They Securitized**

357.   Citi's Offering Materials represented that Citi reviewed the adequacy of the loan seller's underwriting guidelines, including its mortgage loan origination processes, systems and quality control procedures.  Citi represented that its "[t]hird-party originators must be experienced in originating mortgage loans of the types in the pool in accordance with accepted practices and prudent guidelines." In addition to the originators' own review of acquired loans, the Offering Materials also stated that Citi would re-underwrite sample pools of the loans it purchased to determine whether they were originated in compliance with applicable underwriting guidelines:

> For mortgage loans acquired in a bulk purchase from a financially sound mortgage loan originator, the affiliated originator will review the selling originator's underwriting policies and procedures for compliance with the affiliated originator's or Fannie Mae/Freddie Mac underwriting standards and will credit score each loan. The affiliated originator will also conduct a limited mortgage loan file review. . . .
>
>         . . . In purchasing third-party loans, CitiMortgage will review a sample of the loans to determine whether they generally conform to CitiMortgage's underwriting standards. CitiMortgage will fully or partly credit score or re-underwrite the third-

party loans to determine whether the original underwriting process adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on CitiMortgage's underwriting standards.

358.    Citi had knowledge that at least two of its regular third-party originators failed to adhere to underwriting standards.  In 2007 Citi acquired Argent and Ameriquest Mortgage Co.  Due diligence in these acquisition processes would have alerted Citi to the deteriorated standards used by these two companies, which the OCC later ranked as the third and ninth worst originators, respectively, for the period of 2005 through 2007.  Argent originated more than 20% of the mortgage loans in the CMLTI 2007-10 Trust.

           **c.**      **Based on a Third-Party Review, Citi Had Actual Knowledge of the Defective Loans They Were Securitizing**

359.    The FCIC received testimony and reports from Clayton, a third-party due diligence firm hired "to identify, among other things, whether the loans met the originator's stated underwriting guidelines."  Documents recently released by Clayton, including its internal "Trending Report" released by the government in conjunction with testimony given in September 2010, confirm that there were rampant underwriting violations in the loan pools contained in the Certificates.  These documents reveal that from January 2006 through June 2007, Citi received regular reports from Clayton regarding its defective loans, and 42% of the loans Clayton reviewed for Citi "failed to meet guidelines."  These loans were not subject to any proper "exceptions," as they did not have any "compensating factors."  Rather, these loans were plainly defective.  Nevertheless, Citi knowingly waived in 31% – almost a third  of these defective loans into its RMBS trusts.  Such waivers were never disclosed to Union Central or any of the investors who purchased Citi Certificates, and Citi continued using, and indeed, funding these originators.

- 102 -

360.     Moreover, since Clayton reviewed only a sample of the loans, the invariable conclusion for Defendants was that there were thousands of additional defective loans which Clayton had not reviewed.  Yet Citi purposefully concealed the information provided by Clayton from investors while, at the same time, it used the Clayton information about the defective loans to force loan originators to accept lower prices for the loan pools.  Thus, Clayton's underwriting analyses were not used for the benefit of the investors, but exploited by Citi for greater profits at investors' expense.

361.     That Citi waived through almost a third of the loans that Clayton's analyses said should be rejected is significant evidence that Citi was aware of the deteriorated quality of the loans and the underwriting for its RMBS trusts.  Clayton's data demonstrates that underwriting guidelines were being routinely violated, and that Citi was well aware this was occurring.

362.     Indeed, Citi conducted due diligence on all the originators from which it purchased loans, and on the loans included in the offerings, reviewed compliance with the approved underwriting guidelines.  The results of these reviews the originators would have confirmed that the loan originators were routinely violating the stated underwriting standards and that a large number of the loans Citi securitized did not comply with the stated underwriting standards.

### d.     Citi Used Its Knowledge of Defective Loans to Secure Further Profits for Itself at the Expense of Investors

363.     Citi's due diligence reviews were not used to protect investors from defective loans. Rather, Citi forced loan originators to accept lower prices for the loan pools, therefore providing further profit for Citi.  According to the September 2010 FCIC testimony of Clayton's former president, D. Keith Johnson, the investment banks would use the exception reports to force a lower price for itself, and not to benefit investors at all:

- 103 -

I don't think that we added any value to the investor, the end investor . . . to get down to your point. I think only our value was done in negotiating the purchase between the seller and securitizer. Perhaps the securitizer was able to negotiate a lower price, and could maximize their buying but we added no value to the investor and to the rating agencies.

364.    Citi continued purchasing bad loans from originators as part of its massive, profit-generating RMBS machine.  One profit center was Citi's warehouse lending channel, where it provided "warehouse" lines of credits to lenders who would use these funds to originate loans that Citi would then acquire from the warehouse lender.

365.    Because Citi would only be paid back on its warehouse lines of credit if the warehouse lenders monetized the loans they were originating, Citi would acquire these loans from the warehouse lenders and then securitized them so as to monetize the transaction.  This incentive structure created a system whereby Citi needed to purchase and securitize the loans it acquired in the warehouse channel in order for it to be repaid on its lines of credit, regardless of the quality of the loans being originated by the warehouse lenders.

366.    Citi needed to accept these loans with little or no objection to keep the warehouse channel supplied with capital to pay fees and interest owed on the lines of credit.  Citi also wanted to protect its business relationships with the recipients of the warehouse credit lines in order to ensure a steady flow of loans for securitization.  In addition, mortgage originators would not maintain a relationship with a bank that consistently kicked out large numbers of loans.  As a result, Citi accepted loans from originators in the warehouse channel regardless of the quality of those loans.

367.    Citi's position as a source of "warehouse" lines of credit gave it unique knowledge of the conditions under which mortgage loans were originated.  The lines of credit allowed Citi to control the origination practices of these lenders and gave Citi an inside look into the true quality of the loans they originated.  As one industry publication explained, warehouse lenders like Citi have

- 104 -

"detailed knowledge of the lender's operations." Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (Nov. 2007).

e.  **Citi Willfully Abandoned Prudent Loan Underwriting to Increase Profits and Grow Its Business**

368.   According to Bowen, Citi engaged in these wrongful practices in order to accomplish Citi management's mandate for increased growth and market share of the its real estate lending segment.

369.   CitiMortgage was one of Citi's primary in-house mortgage originators who originated mortgages in the subject Trusts. Beckmann, President and COO of CitiMortgage, told *Mortgage Banking Magazine* in December 2006 that in a single quarter in 2006, CitiMortgage grew from "fifth-largest to third-largest [mortgage banking company] in the rankings," surpassing Chase Home Loans and Washington Mutual. He exclaimed, "We are growing at double-digit growth rates in an industry that is contracting a bit." To accomplish this extraordinary growth in the RMBS market, Citi actively abandoned prudent loan underwriting and due diligence practices.

370.   Meanwhile, as Citi pushed for greater volumes of mortgage loans, it "dramatically reduce[d] the number of employees" in the name of efficiency, resulting in what Bowen described as a "challenging underwriting environment."

371.   Citi's forsaken loan quality in its aggressive drive for growth is confirmed by the assessment of the Federal Reserve Bank of New York. In its annual report of inspection for 2007 sent to Citi's Board of Directors on April 15, 2008, the Federal Reserve downgraded Citi's performance from satisfactory to fair. Among other criticisms, it found that "senior management at the firm allowed its drive for additional revenue growth to eclipse proper management of risk, while Risk Management failed to serve as an effective check against these decisions."

372. Citi's former CEO Prince admitted his unease with the abandonment of proper underwriting practices.[4] In a memoir, former Treasury Secretary Hank Paulson detailed the account of a dinner party held in June 2007 with several captains of Wall Street, including Jamie Dimon of J.P. Morgan, Lloyd Blankfein of Goldman Sachs and Prince. Paulson wrote: "All were concerned with excessive risk taking in the markets and appalled by the erosion of underwriting standards." But it was Prince who "asked whether, given the competitive pressures, there wasn't a role for regulators to tamp down some of the riskier practices." As the former Treasury secretary put it, "[b]asically, [Prince] asked: 'Isn't there something you can do to order us not to take all of these risks?'"

373. Abandonment of prudent loan underwriting would result in substantial damages to investors once the bubble burst – a bubble that was being fueled by the systemic lack of proper loan underwriting practices. Notwithstanding its awareness of the situation, Citi continued its wrongful loan origination and securitization practices because in the short run there was money to be made. Just prior to the ensuing financial meltdown brought about by these wrongful practices, Prince described Citi's strategy for its leveraged loan business: "When the music stops, in terms of liquidity, things will be complicated. But as long as the music is playing, you've got to get up and dance. We're still dancing." Citi reaped enormous profits applying this cavalier strategy to its structured finance business, including the RMBS that Plaintiffs purchased.

374. For years Citi's securitization "factory" was a boon to the bottom line of many of its different businesses. For example, CMLTI and CMSI, as depositors, received as payment a

---

[4] Citi's CEO Prince received a $38 million severance package following the announcement that Citi's total subprime exposure was $55 billion – $42 billion more than it had told investors just three weeks earlier – and for which Citi would have to post an $8 to $11 billion loss.

- 106 -

percentage of the total dollar amount in the securitized trust offering.  CGMI, as underwriter, received a commission based on the amount of Certificates sold to investors.  Meanwhile, Citigroup increased its earnings.

375.    When the music stopped, however, Citi's wrongful abandonment of prudent loan underwriting caused serious and widespread financial damage to Plaintiffs and other investors. Indeed, Citi's loan underwriting practices were so atrocious and widespread that even Citi itself still held a significant number of bad loans on its books that it had failed to securitize and sell to investors.  As a result, Citi itself had to write down $1.6 billion of these bad mortgage loans.

### f.    Citi Admitted to Underwriting Quality Control Failures in a Settlement with the Government

376.    Citi's abandonment of prudent loan underwriting was so widespread and ingrained within its corporate culture that it even engaged in these wrongful practices in connection with underwriting and originating mortgage loans that were insured by the U.S. Department of Housing and Urban Development ("HUD"), even through it owed a fiduciary duty to HUD.

377.    The U.S. government brought an action against Citi on behalf of HUD relating to Citi's longstanding practice of failing to conduct proper due diligence in connection with its mortgage loan practices.  Thus, the federal government alleged in *United States of America ex rel. Sherry A. Hunt v. Citigroup, Inc., et al.*, No. 11-cv-05473 (S.D.N.Y. Feb. 15, 2012) (Dkt. No. 12), that starting in 2004, when Citi moved its quality control department "in-house," and lasting at least until 2011, Citi failed to conduct adequate reviews of mortgages it had originated that were insured by the Federal Housing Administration ("FHA"), an entity of HUD.

378.    In the government's case against Citi, the government allegations drew on the experiences and statements of Sherry A. Hunt, a Citi whistleblower with first-hand knowledge:

Citi's quality control reports became – and remain – a battleground within Citi, with those in Citi's business production units applying what they describe as 'brute force' to pressure Citi's quality control managers to downgrade their findings. Indeed, Citi's own director of quality control described the business personnel's conduct as 'nothing short of abuse and bordering on fraudulent actions.'

379.    That the business production units pressured the quality control department to ignore poorly underwritten loans meant Citi failed to maintain an adequate self-reporting system for fraud or other material underwriting violations, as required by HUD. Thus, as the government alleged, its records showed that "[f]rom 2005 to 2010, Citi failed to report even a *single loan* that it had originated or underwritten itself. Instead, in the rare cases where Citi did actually self-report a loan, the loan was always one that Citi had purchased from another lender" (emphasis in original).

380.    The U.S. government further alleged that Citi's quality control program failed to prevent reckless lending and pressured quality-control managers to change negative reviews of a poorly underwritten mortgage. In particular, it alleged:

Since 2004, Citi has endorsed nearly 30,000 mortgages for FHA insurance, totaling more than $4.8 billion in underlying principal obligations. Of those loans, 9,363 (or more than 30% percent [sic]) have defaulted. Citi's default rate soared to more than 47% for loans originated in 2006 and 2007. In other words, nearly every other loan Citi endorsed for FHA insurance in the critical years leading up to the financial crisis defaulted, resulting in foreclosures and evictions and ultimately depressed real estate values, all to the detriment of the national housing market and the national economy. Moreover, of the loans Citi originated in 2007, over 10.5% went into early payment default. HUD has already paid nearly $200 million in insurance claims on loans that Citi originated or underwrote since 2004. A substantial percentage of those claims resulted from loans that were ineligible for FHA insurance and never should have been insured.

381.    In February 2012, Citi settled with the government for $158.3 million. As part of the settlement, Citi admitted that during the period January 1, 2004 to the date the settlement was signed, "CitiMortgage failed to comply fully with all HUD-FHA requirements with respect to certain loans" and "CitiMortgage endorsed for FHA mortgage insurance . . . certain loans that did not meet underwriting requirements contained in HUD's handbooks and mortgagee letters, and therefore were

- 108 -

not eligible for FHA mortgage insurance." Citi's admitted underwriting failures in regards to FHA loans are representative of its firm-wide conduct and practice of abandoning prudent loan underwriting.

### g.   Citi Sought to Profit from Lack of Proper Underwriting by Shorting Related RMBS

382.   Citi sought to further profit from its knowledge that mortgage loans it had securitized or packaged into securities were likely to default because they had not been properly underwritten. Based on Citi's inside knowledge of these wrongful practices, it secretly sold short the very same securities it was selling to investors without disclosing it was taking a short position in these investments because it was expected that they would decline in value once the underlying poorly underwritten loans began to go into default.

383.   Based on this wrongful conduct, the SEC brought a complaint against Citi on October 19, 2011 which details Citi's practice of creating collateralized debt obligation ("CDO") securities that were backed by residential mortgages, where Citi expected these mortgages to default, and Citi was secretly shorting these securities in order to profit from this undisclosed adverse information. The SEC alleges Citi's "marketing materials failed to disclose to investors that Citigroup had exercised significant influence over the selection of $500 million of the assets in the . . . investment portfolio, and that Citigroup had retained a short position in those assets." By effectively shorting mortgages it knew were poorly underwritten, Citi knowingly stacked the deck in its favor so it could gain hundreds of millions of dollars when the bad mortgages ultimately flopped.

### 6.   Citigroup Global Markets Inc.'s Liability as an Underwriter of the Citi Certificate

384.   CGMI made the false and misleading statements alleged above, which were contained in the Prospectus Supplements endorsed and used by CGMI in the sale of certificates to investors.

385.    As underwriter, CGMI edited, drafted and controlled the content of the Citi Trusts'

Offering Materials, including with respect to the material misstatements and omissions alleged

above.  In connection with its due diligence conducted in connection with the offering of the

Certificates to Plaintiffs, CGMI received, considered and understood the adverse information alleged

above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.  As

underwriter, CGMI then used and disseminated these false and misleading Offering Materials to

Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

386.    CGMI, an affiliate of the other Citi Defendants, engaged in the concerted action of

issuing RMBS, and had knowledge that Citi, as alleged herein, failed to adhere to underwriting

standards when it pooled mortgage loans for its RMBS, including for the Citi Trusts.  It also

participated in providing distorted information to the rating agencies that was purposefully

manipulated to meet the targeted rating.  Further, CGMI, knew or was reckless in not knowing, of

the defective loans in the Citi Trusts as a result of its due diligence performed as an underwriter for

the Citi Trusts.  CGMI had access to the detailed loan tapes and actual loan files, and its review of

these materials showed it (or it was reckless in not understanding) that originators of the loans Citi

deposited in the Citi Trusts had a practice of routinely and systematically disregarding the stated

underwriting standards.

387.    CGMI also knew that mortgage loans deposited into the Citi Trusts were not properly

underwritten because CGMI was a knowledgeable insider in the mortgage securitization industry

who, unlike Plaintiffs, was privy to Citi's corporate-wide abandonment of prudent loan underwriting

practices in connection with the securitization of loans, as alleged herein.  In addition to the Citi

Trusts, CGMI underwrote and sold many other Citi RMBS to investors and had in that context

gained inside knowledge of the poor quality loan underwriting.

- 110 -

### 7.   UBS's Liability as an Underwriter of the Citi Certificate

388.   UBS Securities was also a maker of the false and misleading statements alleged above regarding the CMSI 2007-5 Trust, which were contained in the Prospectus Supplement endorsed and used by UBS Securities in the sale of certificates to Union Central.

389.   As underwriter, UBS Securities edited, drafted and controlled the content of the CMSI 2007-5 Trust Offering Materials, including with respect to the material misstatements and omissions alleged above in §V.B.   In connection with its due diligence on the offering of the Certificates sold to Plaintiffs, UBS Securities received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.   As underwriter, UBS Securities then used and disseminated these false and misleading Offering Materials to plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

390.   UBS Securities also knew that mortgage loans deposited into the CMSI 2007-5 Trust were not properly underwritten because UBS Securities was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged in Section V.G.   In addition to the CMSI 2007-5 Trust, UBS Securities underwrote and sold many other defective RMBS to investors, as Plaintiffs allege below, and had in that context gained inside knowledge of the poor quality loan underwriting used in connection with the CMSI 2007-5 Trust.

C.      **Goldman Sachs**

1.      **Goldman's Securitizations**

391.    Union Central purchased Certificates sponsored by Goldman Sachs on February 27, 2007.  Union Central made the following two purchases representing a total investment of approximately $11 million:

| CUSIP | Description | Issuing Entity | Issue Date | Purchase Date |
|-------|-------------|----------------|------------|---------------|
| 36298NBZ6 | GSR 2006-7F M1 | GSR Mortgage Loan Trust 2006-7F | 7/1/2006 | 02/27/2007 |
| 3622X7AU0 | GSR 2006-9F M1 | GSR Mortgage Loan Trust 2006-9F | 10/1/2006 | 02/27/2007 |

392.    GSR Mortgage Loan Trust 2006-9F was a $1.31 billion deal comprising 2,539 purportedly fixed-rate mortgages with either 30-year or 15-year terms.  GSR Mortgage Loan Trust 2006-7F was a $606.9 million deal comprising 983 purportedly fixed-rate mortgages with primarily 30-year terms.

2.      **False and Misleading Statements in Goldman's Offering Materials**

a.      **False and Misleading Statements About Compliance With Underwriting Standards**

393.    As sponsor of the securitizations, Goldman either originated the underlying mortgages through its Conduit Program, or purchased the underlying mortgage loans from other originators, primarily Bank of America, Countywide, National City, SunTrust Mortgage and Washington Mutual.  The Offering Materials represented that each of the loan sellers applied underwriting standards which were designed to ensure that borrowers could repay their loans.

(1)     **Bank of America**

394.    The Goldman Offering Materials described the underwriting guidelines BofA used to originate the loans that it sold to the trust.  According to the Offering Materials, all origination

- 112 -

channels required borrowers to provide sufficient information to allow Bank of America to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

> Regardless of the channel in which the loan was originated, a mortgage application is completed containing information that assists in evaluating the mortgagor's credit standing, capacity to repay the loan and adequacy of the mortgaged property as collateral for the loan.

*     *     *

> Each mortgage loan underwritten to Bank of America's general underwriting standards is underwritten in accordance with guidelines established in Bank of America's Product and Policy Guides (the "Product Guides"). These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing, and the adequacy of the mortgage property as collateral for the mortgage loan. The underwriting standards as established in the Product Guides are continuously updated to reflect prevailing conditions in the residential market, new mortgage products, and the investment market for residential mortgage loans.

### (2)     Countrywide

395.     The Goldman Offering Materials described the underwriting guidelines Countrywide used to originate the loans that it sold to the trust.   According to the Offering Materials, Countrywide's loan underwriting was designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

### (3)     National City

396.     The Goldman Offering Materials described the underwriting guidelines National City used to originate the loans that it sold to the trust.   According to the Offering Materials, National City's loan underwriting was designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

National City's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

397.     The Goldman Offering Materials also described policies, procedures, and quality control programs in place at the bank to ensure compliance with National City's underwriting and other standards:

National City Mortgage utilizes comprehensive, detailed policies and procedures available to all employees through the company's Intranet. These policies and procedures consist of operations policies and procedures manuals, underwriting manuals, product guidelines, the index of credit policy statements and the company's responsible lending policy.

Corporate asset quality measures including statistical audits, targeted reviews, investor audits, quality and compliance reviews for branches with higher defect rates and production action plans are applied across the organization.

### (4)     SunTrust Mortgage

398.     The Goldman Offering Materials described the underwriting guidelines which SunTrust Mortgage used to originate the loans that it sold to the trust.  According to the Offering Materials, SunTrust Mortgage's loan underwriting was designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

SunTrust underwriting guidelines generally follow standard Fannie Mae guidelines. They are designed to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing and cash reserves for fully documented loans, and to evaluate the acceptability and marketability of the property to be used as collateral.

### (5)     Washington Mutual

399.     The Goldman Offering Materials described the underwriting guidelines which Washington Mutual used to originate the loans that it sold to the trust.  According to the Offering Materials, Washington Mutual's loan underwriting was designed to evaluate the capacity of the borrower to repay the loan and the adequacy of the collateral:

WaMu's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

- 114 -

(6)      **Statements Regarding Goldman's Review of Underwriting Standards**

400.    Goldman assured investors that it was an active and experienced securitization sponsor who since 2001 had successfully sponsored the securitization of approximately $130 billion of residential mortgage loans with various risk profiles.

401.    The Offering Materials stated that Goldman had conducted a thorough review of these loan sellers prior to acquiring any mortgage loans:

> Prior to acquiring any mortgage loans, GSMC will conduct a review of the related mortgage loan seller.  GSMC's review process consists of reviewing select financial information for credit and risk assessment and underwriting guideline review, senior level management discussion and background checks. The scope of the loan due diligence will depend on the credit quality of the mortgage loans.

402.    In addition, Goldman represented that it reviewed the adequacy of the loan seller's underwriting guidelines, including its mortgage loan origination processes, systems and quality control procedures:

> The underwriting guideline review considers mortgage loan origination processes and systems. In addition, such review considers corporate policy and procedures relating to the [Home Owner's Equity Protection Act] and state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and material investors.

**b.      False and Misleading Statements About Appraisals and LTV Ratios**

403.    The Goldman Offering Materials represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals, conducted in accordance with pre-established guidelines.

404.    Each securing property was to be appraised by a qualified, independent appraiser, and each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.  As required by Fannie Mae and Freddie Mac, and as represented

- 115 -

705280_1

by the underwriting standards set forth in certain of the Prospectus Supplements, the appraisals were to be in conformity with the USPAP, as adopted by the Appraisal Standards Board of the Appraisal Foundation.  The Registration Statements expressly stated that "All appraisals [must] conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation."

405.    As represented in the Goldman Offering Materials, the LTV ratio of a mortgage loan at any time is the fraction, expressed as a percentage, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value of the related mortgaged property.  The collateral value of a mortgage property, other than with respect to housing contracts and certain mortgage loans the proceeds of which are used to refinance an existing loan, is the lesser of: (a) the appraised value determined in an appraisal obtained by the originator at origination of such loan; or (b) the sales price for such property.

406.    The Goldman Prospectus Supplements also provided information regarding the weighted average LTV ratio of the loans underlying the Certificates.  The 2006-9F Prospectus Supplement stated that the weighted average original LTV ratio for all mortgage loans was 70.41%.  The 2006-7F Prospectus Supplement stated that the weighted average original LTV ratio for all mortgage loans was 73%.

            c.      **False and Misleading Statements About Debt-to-Income Ratios**

407.    The Goldman Offering Materials contained numerous statements regarding the evaluation of DTI ratios for the borrowers whose loans populated the trusts.  Absent compensating factors, the Offering Materials described the manner in which the loan originators evaluated DTI ratios for borrowers.

- 116 -

408.    For example, with respect to both Goldman Trusts, the Offering Materials described Countrywide's practices as follows:

> [A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.
>
> *       *       *
>
> Under its underwriting guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

409.    The Goldman Offering Materials described Bank of America's practices as follows:

> As part of the underwriting evaluation, the applicant's "Debt-to-Income Ratio" is calculated as the amount of the monthly debt obligations (including proposed new housing payment and related expenses such as property taxes and hazard insurance) to his or her gross monthly income. Bank of America's Debt-to-Income Ratio guidelines are based on the loan instrument, loan term, Credit Score, loan-to-value ratio, property type, and occupancy characteristics of the subject loan transaction.

410.    The Goldman Offering Materials described Washington Mutual's practices as follows:

> In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio").

411.    The DTI ratios were a material part of the underwriting process, and specific DTI ratios for the loans underlying the Goldman Certificates were set forth in their Offering Materials.

705280_1

### d.    False and Misleading Statements About Owner-Occupancy

412.    The Offering Materials contained specific disclosures about the occupancy-rate status of the loans underlying the Certificates.

413.    The Series 2006-7F Offering Materials stated that 912 out of the 983 loans, or 92.7% of the aggregate principal balance of the mortgage loans, were for owner-occupied properties.  The remaining 71 loans were purportedly for second homes.  No loans were described being for investment properties.

414.    The Series 2006-9F Offering Materials stated that 2,136 out of the 2,359 loans, or 90.93% of the aggregate principal balance of the mortgage loans, were for owner-occupied properties.  171 of the remaining loans were for second homes and 52 were for investment.

### e.    False and Misleading Statements About Ratings

415.    The Offering Materials for both Trusts stated that the issuance of the Certificates was conditioned on obtaining the ratings as set forth in the Prospectus Supplement.  Further, the ratings reflected the likelihood that investors would receive the distributions to which they were entitled:

> It is a condition to the issuance of the securities of each series offered by this prospectus and by the related prospectus supplement that the nationally recognized statistical rating agency or agencies specified in the prospectus supplement shall have rated the securities in one of the four highest rating categories.
>
> Ratings on mortgage-backed securities address the likelihood of receipt by securityholders of all distributions on the underlying mortgage loans or other assets. These ratings address the structural, legal and issuer-related aspects associated with such securities, the nature of the underlying mortgage loans or other assets and the credit quality of the guarantor, if any.

416.    The Offerings Materials also set forth the specific ratings for the Certificates purchased by Union Central.  Both certificates were rated AA+ by Fitch.

417.    In obtaining these ratings for the subject Certificates, Goldman concealed the adverse information alleged herein from the rating agencies.  Had the rating agencies known the true value of

- 118 -

705280_1

the loans underlying the Certificates, the Certificates would have been rated significantly lower, or not at all.

### 3.    Goldman's Statements Were Knowingly False and Misleading

418.    Goldman knew, or was reckless in not knowing, that the statements identified above were materially false and misleading and/or omitted material facts necessary to make the statements made not misleading.  As set forth herein, the Goldman Defendants had actual knowledge that the stated underwriting guidelines were not being adhered to and, rather than provide truthful information and disclosures to Union Central and other investors, it used that knowledge to reap massive profits for itself by betting against the very home mortgage securities Goldman was selling to investors.

### a.    Goldman Knew that Underwriting Standards Had Been Abandoned

419.    While the Offering Materials set forth detailed underwriting guidelines which were supposed to have been used to evaluate borrowers, the value of the underlying property and whether to make the loans, in fact the stated underwriting guidelines had been abandoned by the loan originators.

420.    The originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default.  Instead, the originators, using Goldman's own financing and encouraged by Goldman and other investment banks' insatiable appetite for acquiring loans regardless of their quality, approved loans which they knew were based on falsified information and which did not comply with any of the stated underwriting guidelines.

421.   Countrywide had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Goldman for inclusion in the subject Trusts, as alleged above at §IV.I.2.

422.   Washington Mutual had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Goldman for inclusion in the subject Trusts, as alleged above at §V.A.

423.   SunTrust had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Goldman for inclusion in the subject Trusts, as alleged at §V.G.5.

424.   National City had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Goldman for inclusion in the subject Trusts, as alleged above at §IV.I.10.

425.   Other parties who have had access to the actual loan files in Goldman loan securitization from the relevant time period have confirmed that improperly underwritten loans were routinely securitized by Goldman during this period.  A review of Goldman origination standards in connection with a similar 2007 home equity trust, issued by Goldman around the same time as those sold to Plaintiffs in this case, reflects Goldman's wrongful practice of including loans in securitizations regardless of whether they met the required quality levels that would have been maintained if originators had used proper loan underwriting practices.  In 2011, CIFG Assurance North America, Inc. sued Goldman for fraud and breach of contract.  *CIFG Assurance N.Am. v. Goldman, Sachs & Co.*, Index No. 652286/2011 (Sup. Ct. N.Y. Aug. 16, 2011) (Dkt. No. 1-1).  Generally, CIFG alleges that Goldman made numerous false and misleading statements in connection with an RMBS for which CIFG provides insurance.  CIFG hired an outside consultant to conduct an analysis of 491 non-performing loans within the loan portfolio.  The consultant

- 120 -

determined that approximately 80% of the loans in the sample "did not comply with [Goldman's] representations and warranties."

### (1)    Skyrocketing Default Rates Are Evidence of Abandonment of Underwriting Standards

426.    The Certificates purchased by Union Central were supposed to be stable, long-term investments backed by investment-grade credit ratings.   However, the extraordinary number of defaults on the mortgage loans underlying Union Central's Certificates is prima facie evidence that the stated underwriting standards and loan characteristics represented in the Offering Materials were materially false and misleading.

427.    The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as well as collateral cumulative losses, for the Certificates purchased by Union Central as of June 2010:

| Certificate | Original Deal Size | Delinquent, Bankruptcy Foreclosure, REO Actual Bal. | Collateral Cumulative Losses |
|---|---|---|---|
| **2006-7F** | $609,955,387 | $84,657,748 | $6,429,957 |
| **2006-9F** | $1,397,058,850 | $115,003,783 | $10,713,540 |

428.    Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of delinquency, bankruptcy and foreclosure would be far lower than the current rates.  Indeed, Moody's maximum expected collateral losses for the life of the GSR 2006-7F Certificate was only $2.44 million.  Moody's maximum expected collateral losses for the life of the GSR 2006-9F Certificate was $5.52 million.

### (2)    Appraisals and LTV Ratios Were Inflated

429.    The descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.  Undisclosed in the Offering Materials, and in

- 121 -

705280_1

violation of any legitimate appraisal standards, many of the loans underlying the Certificates had been approved through the use of manipulated appraisals that guaranteed that the collateral property would be valued at a price sufficient to support the loan.  Such practices have been confirmed through modeling by other parties who experienced similar Goldman RMBS issued in the same time period as Plaintiffs, and it demonstrates that appraisals used in connection with Goldman securitizations in 2006 were routinely inflated.

430.   For instance, the plaintiffs in *Allstate Ins. Co. v. Goldman, Sachs & Co., et al.*, Index No. 652273/2011 (Sup. Ct. N.Y. Aug. 15, 2011), conducted an AVM analysis of a sample of the property underlying the Goldman offerings at issue in that litigation.  *Allstate v. Goldman* Complaint (Dkt. No. 1), ¶¶100-111.  The *Allstate v. Goldman* plaintiffs' analysis demonstrates that the valuation of the loans underlying the certificates were materially and consistently inflated, and therefore that the stated LTV ratios were materially overstated, which in turn greatly increased the risk of default for the loans underlying the certificates.  For example, the loan pools at issue in that case, *i.e.*, GSAA 2006-13, GSAMP 2006-HE7 and GSAMP 2006-HE5, were issued around the same time as those sold to plaintiffs and they similarly contained false representations regarding the loans' LTV ratios.  Specifically, the GSAA 2006-13, GSAMP 2006-HE7 and GSAMP 2006-HE5 trusts were represented to have weighted average LTV ratios of 74%, 77% and 80.5% respectively.  However, the *Allstate v. Goldman* plaintiffs' analysis showed the actual weighted average LTV ratios were significantly higher at 82%, 89% and 88.3% respectively.

431.   Similarly, while none of the certificates where supposed to contain loans that had a LTV ratio over 100%, the *Allstate v. Goldman* plaintiffs' analysis found that a significant number of loans had LTV ratios of over 100% – in other words, the value of the loan was more than the value of the property.  With respect to the  GSAA 2006-13, GSAMP 2006-HE7 and GSAMP 2006-HE5

- 122 -

certificates, the *Allstate v. Goldman* plaintiffs found LTV ratios greater than 100% in 7.6%, 24.6%, 20.6% of the loans in those respective trusts.

432.    Consistent with *Allstate v. Goldman*'s analysis showing Goldman Defendants routine practice of securitizing loans with misstated LTV ratios, the FHFA performed a similar review to determine if the LTV ratios disclosed in the forty Goldman securitizations at issue in its case against Goldman were accurate. *FHFA v. Goldman Sachs & Co., et al.*, No. 11-CV-6198 (S.D.N.Y. Sept. 2, 2011). The FHFA found that for every securitization they analyzed, the percentage of loans having LTV ratios 80% or less was overstated. Further, the percentage of loans having LTV's of over 100% ranged from 2% to as high as 23%. *FHFA v. Goldman* Complaint (Dkt. No. 1), ¶¶113-118

433.    As alleged above, Goldman had inside knowledge regarding the lack of proper underwriting practices, including that its loan originators used flawed appraisals that overstated property values in order to meet the targeted loan amount regardless of true valuation considerations.

434.    Many of the loans in the subject Trusts had overstated property valuations, thereby decreasing stated LTV ratios, as a result of the manipulation of the appraisals conducted on the underlying properties. Instead of conducting appraisals designed to accurately value the subject property in compliance with the USPAP, Goldman accepted appraisals conducted on the underlying properties that, if they were conducted at all, were designed to hit valuation targets to allow loans to be funded and sold in RMBS.

### (3)    Debt-to-Income Ratios Were Falsified

435.    The statements contained in the Offering Materials regarding the acceptability and evaluation of DTI ratios, as well as many of the specific DTI ratios disclosed, were materially false and misleading. In fact, Goldman and the originators knew that borrowers routinely falsified their stated incomes in order to have loans approved.

- 123 -

436.    In the case of stated income loans, for example, Goldman and the originators knew that many borrowers claimed incomes that did not come anywhere near a reasonable level for their stated occupations.

437.    Plaintiffs have examined certain of the loans contained in the 2007-7F and 2006-9F Trusts and found numerous examples of loans where DTI ratios were falsified and where obvious signs of fraud or misrepresentations were either accepted or ignored.

438.    The 2006-7F Trust included a $560,000 loan to refinance a primary residence in Modys, Maryland in May 2006. Prior to the refinancing, the borrower had competed three cash-out transactions in 2001, 2003 and then 2004. While the 2006-7F securitization reported a DTI ratio for this borrower of 38%, the borrower's DTI was in fact no less than 142%.

439.    The 2006-7F Trust included a $617,250 loan for a primary residence in Aledo, Texas in May 2006. The property in question was disclosed as being a primary residence, in spite of the fact that the borrower had purchased two separate properties in the three months prior to Aledo property and obtained loans for over $1 million for the two prior properties. Public records indicate that the borrower was a 23-year old with a high school education residing in Maryland. All three properties had early payment defaults and had to be sold in foreclosure.

440.    The 2006-7F Trust included a $700,000 loan for a cash-out refinance on a primary residence in Santa Clarita, California in May 2006. The 2006 cash-out refinance was the third cash-our transaction completed by the borrowers since 2002. The refinancings appear to have been attempts to prop up a failing business which reported losses of over $125,000 in 2006, the year that the loan was originated. Given the borrowers' negative income, their DTI ratio would have been infinite.

### (4)     Owner-Occupancy Rates Were Falsified

441.    In addition to the examples above relating to Goldman's misrepresentations regarding the owner-occupancy rates of subject properties underlying the Trusts, the *Allstate v. Goldman* plaintiffs' loan-level analysis of thousands of loans securitized by Goldman at the same time as the loan securitizations at issue here, further reveals Goldman's widespread practice of including loans in its securitizations without accurately disclosing the true owner-occupancy rates with respect to the underlying loans.

442.    The *Allstate v. Goldman* plaintiffs undertook a sophisticated analysis to determine whether a given borrower actually occupied the property as claimed.   *Allstate v. Goldman* Complaint, ¶¶90-99.  For each offering, the *Allstate v. Goldman* plaintiffs "analyzed between 1,444 and 1,600 randomly-selected loans from within the collateral pool."  They then analyzed tax records, credit records, bills, property records and lien records, to determine whether a borrower was actually living in the property subject to the loan.

443.    The results of the *Allstate v. Goldman* plaintiffs' analysis demonstrates that the percentage of owner-occupied properties disclosed by Goldman in their prospectuses was consistently false and that the true rate was much lower.  The following chart shows the results of their analysis:

| Certificate | % Represented in Prospectus | Actual % | Overstatement |
|---|---|---|---|
| GSAMP 2006-HE7 | 91.9% | 82.2% | 9.7% |
| GSAMP 2006-HE5 | 92.2% | 82.1% | 10.1% |
| GSAMP 2006-S4 | 88.0% | 75.3% | 12.7% |
| GSAMP 2006-S3 | 94.0% | 81.6% | 12.4% |
| GSAA 2006-13 | 77.8% | 69.5% | 8.3% |

- 125 -

444.    In addition to *Allstate*, Goldman has been sued by the FHFA.  *FHFA v. Goldman*, No. 11-CV-6198 (S.D.N.Y.).

445.    The FHFA performed a similar analysis to determine whether the owner-occupancy rates disclosed in the Prospectuses for the forty Goldman securitizations at issue there were accurate. According to the FHFA's review, most of the Goldman securitizations understated the percentage of owner-occupied properties by approximately 8%-12%.

### b.     Goldman Knew that Underwriting Standards Were Being Abandoned

446.    Goldman had actual knowledge that the loans it securitized in the Trusts sold to Union Central did not comply with the stated underwriting guidelines contained in the Offering Materials, and that the quantitative and qualitative data contained in the Offering Materials was materially false and misleading.   Indeed, Goldman utilized this knowledge to profit from the defective loans it securitized by taking short positions on securities sold to its clients, and by pocketing discounts on defective loans sold by the very originators whose operations Goldman sustained through its warehouse funding.

### (1)    Goldman Had Actual Knowledge of the Defective Loans They Were Securitizing

447.    Documents recently released by Clayton confirm that there were rampant underwriting violations in the loan pools contained in the Goldman Certificates.  As the FCIC described, in the internal Clayton "Trending Report" made public by the government in conjunction with testimony given in September 2010, Goldman Sachs received regular reports regarding defective loans, and 23% of the loans Clayton reviewed for Goldman "failed to meet guidelines." These loans were not subject to any proper "exceptions," as they did not have any "compensating factors."  Rather, these loans were plainly defective.

- 126 -

448.    Despite such a high level of nonconforming loans, Goldman nevertheless continued utilizing, and indeed funding, the same originators who had supplied these defective loans for Goldman's securitizations and it "waived in" to its pools 29% of those toxic loans that Clayton had identified as being outside the guidelines.  These baseless waivers were never disclosed to Union Central or any of the investors who purchased Goldman certificates.

449.    Clayton's data demonstrates that underwriting guidelines were being routinely violated, and that Goldman was informed of such violations.  Indeed, Goldman conducted due diligence on all the originators from whom it purchased loans, and for loans included in the offerings, to determine whether there was compliance with the approved underwriting guidelines. The results of these reviews confirmed that the loan originators were routinely violating the stated underwriting standards and that a large number of the loans Goldman securitized did not comply with the stated underwriting standards.

450.    The Offering Materials stated that Goldman conducted due diligence on the lenders who originated the loans, and reviewed their underwriting standards:

> Prior to acquiring any mortgage loans, GSMC will conduct a review of the related mortgage loan seller. GSMC's review process consists of reviewing select financial information for credit and risk assessment and underwriting guideline review, senior level management discussion and background checks. The scope of the loan due diligence will depend on the credit quality of the mortgage loans.

451.    In addition, the Offering Materials represented that Goldman reviewed the adequacy of the loan seller's underwriting guidelines, including its mortgage loan origination processes, systems and quality control procedures:

> The underwriting guideline review considers mortgage loan origination processes and systems. In addition, such review considers corporate policy and procedures relating to HOEPA and state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and material investors.

- 127 -

452.    The Offering Materials also stated that Goldman would re-underwrite sample pools of the loans it purchased to determine whether they were originated in compliance with applicable underwriting guidelines.  For example, in both Prospectus Supplements, Goldman explained that it had the option to re-underwrite a sample of the RMBS loan pool:

> We may, in connection with the acquisition of mortgage loans, re-underwrite the mortgage loans based upon criteria we believe are appropriate depending to some extent on our or our affiliates' prior experience with the lender and the servicer, as well as our prior experience with a particular type of loan or with loans relating to mortgaged properties in a particular geographical region. A standard approach to re-underwriting will be to compare loan file information and information that is represented to us on a tape with respect to a percentage of the mortgage loans we deem appropriate in the circumstances.

453.    The Senate PSI Report confirms that Goldman routinely conducted due diligence on the mortgage loan pools that it purchased and securitized.  Specifically, it noted: "Goldman, either directly or through a third party due diligence firm, routinely conducted due diligence review of the mortgage loan pools it bought from lenders or third party brokers for use in its securitizations." These reviews revealed to Goldman that its loan originators Countrywide, Washington Mutual, SunTrust and others had abandoned prudent loan underwriting practices.

> **(2)    Goldman Used Its Knowledge of Defective Loans to Secure Further Profits for Itself at the Expense of Investors**

454.    Goldman did not use its due diligence reviews to protect investors from defective loans.  Rather, Goldman used its knowledge that loans in its securitization were of extremely poor quality due to the lack of proper underwriting to force loan originators to accept lower prices for the loan pools, thereby providing itself even greater profits when it sold the defective loan pools to investors such as Plaintiffs.  According to the September 2010 FCIC testimony of Clayton's former president, D. Keith Johnson, the investment banks would use the exception reports to force a lower price for itself, and not to benefit investors at all:

- 128 -

> I don't think that we added any value to the investor, the end investor . . . [t]o get
> down to your point. . . . I think only our value was done in negotiating the purchase
> between the seller and securitizer.  Perhaps the securitizer was able to negotiate a
> lower price, and could maximize their buying but we added no value to the investor
> and to the rating agencies.

FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), *available at*

http://fcic.law.stanford.edu/resource/interviews; *see also* Senate PSI Report at 484  n.2036

("Goldman or a third party due diligence firm it hired typically examined a sample of the loans.

Based on the number of problem loans found in the sample, Goldman or the due diligence firm

extrapolated the total percentage of problem loans likely to be contained in the pool. This

information was then factored into the price Goldman paid for the pool.").

455.     Despite the large number of defective loans Goldman knew were being produced by

its originators, Goldman continued purchasing loans from such originators as part of its massive

RMBS machine that generated records profits for Goldman.   Indeed, Goldman provided

"warehouse" lines of credits to many originators which were used to fund the defective loans which

were ultimately sold to Goldman.  Such warehouse loans were repaid when the originator's loan

pool was sold to Goldman for securitization.  As the FCIC discussed:

> Under Paulson's leadership, Goldman Sachs had played a central role in the
> creation and sale of mortgage securities. From 2004 through 2006, the company
> provided billions of dollars in loans to mortgage lenders; most went to the subprime
> lenders Ameriquest, Long Beach, Fremont, New Century, and Countrywide through
> warehouse lines of credit, often in the form of repos.  During the same period,
> Goldman acquired $53 billion of loans from these and other subprime loan
> originators, which it securitized and sold to investors.

456.     Goldman's position as a source of "warehouse" lines of credit gave it unique

knowledge of the conditions under which mortgage loans were originated.  The lines of credit

allowed Goldman to control the origination practices of these lenders and gave Goldman an inside

look into the true quality of the loans they originated.  As one industry publication explained,

- 129 -

705280_1

warehouse lenders like Goldman have "detailed knowledge of the lender's operations." Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (Nov. 2007).

457.    Such warehouse lines gave Goldman the inside knowledge regarding the loans that were generated using Goldman funds.  Because of its financial arrangements with warehouse lenders, Goldman was incentivized to buying the loans that secured its warehouse lines regardless of their quality and the results of Goldman's due diligence.  Indeed, Goldman needed to purchase the loans with little or no objection to keep the lenders supplied with capital to pay fees and interest owed on the lines of credit.  It was also important to Goldman that it protect its business relationships with warehouse lenders in order to ensure a steady flow of loans for securitization.

458.    According to a former Goldman Sachs Client Relationship Manager, who from 2005 to 2008 served as a liaison between Goldman personnel who bought loans for securitization and the loan originators, Goldman freely purchased loans for securitization that they knew were "bad loans." According to this former employee, Goldman did so because they knew they would be able to pass the risk of default or non-payment to the buyers of the certificates, thereby making a profit while avoiding the risk.

### (3)    Goldman Shorted the Very RMBS It Was Selling to Its Clients

459.    Goldman's scienter is also demonstrated by the way in which it treated the financial products it sold to investors such as Union Central.  The FCIC Report found that Goldman used a variety of pejorative terms to describe the products it sold to its customers, including characterizing certain deals as "junk," "dogs," "big old lemons," and "monstrosities."  Indeed, putting its money where its mouth was, Goldman began an aggressive campaign to profit from the failure of the toxic RMBS it sold to investors such as Union Central.

- 130 -

705280_1

460.    In 2006, Goldman began to take an increasingly negative view of the housing market. Goldman's sophisticated and powerful proprietary models analyzed trends in the performance of hundreds of thousands of mortgages that collateralized its RMBS, and those models and the superior access to data regarding the underlying mortgage positions on its books gave Goldman unique knowledge that those securities were not as safe as their offering materials and ratings represented to investors.  In fact, Goldman's models and data showed that the RMBS [would] decline up to 70 percent from their face amounts.  In his book, *Money and Power: How Goldman Sachs Came to Rule the World,* 494-95 (2011) William D. Cohan explained:

> [Goldman's RMBS] model could analyze all the underlying mortgages and value the cash flows, as well as what would happen if interest rates changed, if prepayments were made, or if the mortgages were refinanced. The model could also spit out a valuation if defaults suddenly spiked upward . . . .  [Goldman's] proprietary model was telling [Goldman] that it would not take much to wipe out the value of tranches of a mortgage-backed security that had previously looked very safe, at least in the estimation of the credit-rating agencies that had been paid (by Wall Street) to rate them investment grade. . . . By tweaking the various assumptions based on events that seemed increasingly likely, [Goldman's] models were showing a marked decrease in the value of mortgage-related securities. "[Goldman's] models said even if you don't believe housing prices are going to go down, even if we apply low-probability scenarios about it going negative . . . there's no way this stuff can be worth anywhere near one hundred [cents on the dollar]". . . . [Goldman's] models had them pegged anywhere between 30 cents and 70 cents.

461.    According to a former Goldman employee, these models as well as other information in Goldman's exclusive possession showed "the writing on the wall in this market as early as 2005," Gretchen Morgenson & Louise Story, "Banks Bundled Bad Debt, Bet Against It and Won," *N.Y. Times*, Dec. 24, 2009, and into the "the early summer of 2006," Senate PSI Report at 398.  Goldman exploited its asymmetric access to, and possession of, information about the weakness in the mortgage loans collateralizing the Certificates it marketed and sold.

462.    To reduce its massive financial exposure to the subprime mortgage market, Goldman began looking for ways to short the market (*i.e.*, to make investments which would rise in value

- 131 -

and/or make payments to Goldman as the subprime mortgage market declined).   Its shorting strategies included the purchase of credit default swap protection on the very RMBS positions it sold into the market.   Goldman bet that the RMBS would decline in value and/or default, thereby requiring its swap counterparty to pay Goldman.

463.   As a recent magazine article explained, "Goldman was like a car dealership that realized it had a whole lot full of cars with faulty brakes.   Instead of announcing a recall, it surged ahead with a two-fold plan to make a fortune: first, by dumping the dangerous products on other people, and second, by taking out life insurance against the fools who bought the deadly cars."   Matt Taibbi, "The People vs. Goldman Sachs, *Rolling Stone*, May 26, 2011, *available at* http://www.rollingstone.com/politics/news/the-people-vs-goldman-sachs-20110511.

464.   As the Senate PSI Report explained, throughout 2006 and 2007, Goldman used its shorting strategy as a way to reduce its own mortgage risk while continuing to create and sell mortgage-related products to its clients.   In 2006, Goldman made a massive $9 billion bet that a similar mortgage-backed asset it sold to investors like Union Central would collapse.   Senate PSI Report at 419.   The $9 billion short bet was placed in 2006 by Goldman's mortgage department. Goldman's net short position in 2007 rose as high as $13.9 billion.   *Id.* at 430.   Goldman "sold RMBS and CDO securities to its clients without disclosing its own net short position against the subprime market or its purchase of CDS contracts to gain from the loss in value of some of the very securities it was selling to its client."

465.   For example, on March 9, 2007, Goldman's Sparks wrote: "Our current largest needs are to execute and sell our new issues – CDOs and RMBS – and to sell our other cash trading positions. . . .   I can't overstate the importance to the business of selling these positions and new issues."   A leading structured finance expert reportedly called Goldman's practice "the most cynical

- 132 -

use of credit information that I have ever seen," and compared it to "buying fire insurance on someone else's house and then committing arson." FCIC Report; Senate PSI Report. As the Senate PSI found and stated in their Report, Goldman "sold RMBS securities to customers at the same time it was shorting the securities and essentially betting that they would lose value."

466. According to the FCIC Report, Goldman's mortgage business earned a record $266 million in the first quarter of 2007, "driven primarily by short positions, including a $10 billion short position on the bellwether ABX BBB index, whose drop the previous November had been the red flag that got Goldman's attention."

### (4)    Government Investigation

467. Goldman has been the subject of numerous criminal and regulatory probes related to its mortgage securitization and securities underwriting practices. *See* Susan Pulliam, Kara Scannell, Aaron Lucchetti, Serena Ng, "Wall Street Probe Widens," *Wall St. J.*, May 13, 2010 at A1 (reporting on federal criminal and regulatory investigations of whether Goldman and others "misled investors about their roles in mortgage-bond deals"). These investigations further confirm that Goldman's misrepresentations were not mere isolated, innocent mistakes, but the result of the company's widespread corporate practices and policies that amounted to reckless or intentional misconduct.

468. For example, Goldman's misconduct prompted the Attorney General of Massachusetts to examine whether Goldman:

- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

- failed to take sufficient steps to avoid placing problem loans into securitization pools;

- failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan due

diligence and the pre-securitization process, as well as information concerning Goldman Sachs' practices in making repurchase claims relating to loans in and out of securitizations.

469.    Goldman settled with the Commonwealth of Massachusetts, paying it $60 million. In announcing the settlement, the Massachusetts Attorney General stated that Goldman did not take "sufficient steps to avoid placing problem loans in securitization pools." Goldman was also required to forgive all or portions of the balances on many loans it had bought and securitized, which resulted in tens of millions of dollars in additional expenses to Goldman for its wrongful practices.

470.    Similarly, the Senate PSI Report concluded that Goldman "knowingly sold high risk, poor quality mortgage products to clients around the world, saturating financial markets with complex, financially engineered instruments that magnified risk and losses when their underlying assets began to fail." The Senate PSI Report also found: "Goldman originated and sold RMBS securities that it knew had poor quality loans that were likely to incur abnormally high rates of default."

471.    On September 1, 2011, the Federal Reserve Board sanctioned Goldman Sachs for "a pattern of misconduct relating to deficient practices" in its former mortgage unit, Litton Loan Servicing LP. ("Litton"), including those involving "robo-signing" – a practice often necessitated by the failure to execute and transfer loan documents when depositing loans in RMBS Trusts. As a result of this sanction, Goldman must retain an independent consultant to review certain foreclosure proceedings initiated by Litton. The Federal Reserve has also announced that it believes monetary sanctions are appropriate against Goldman and plans to announce monetary penalties. Goldman's "pattern of misconduct" is further evidence that Goldman Sachs knew of the weakness in the mortgage loans collateralizing the securitizations and had both an ability and willingness to exploit it.

- 134 -

472.     On February 27, 2012, Goldman announced in a Form 10-K that it had received a Wells notice from the Securities and Exchange Commission, notifying it that the SEC intends to bring an enforcement action against them.  According to media reports, the Wells notice related to mortgage securitizations similar, if not identical, to the loan securitizations that Goldman sold to Plaintiffs.

### 4.     Goldman, Sachs & Co.'s Liability as an Underwriter of the Goldman Certificates

473.     Goldman Sachs made the false and misleading statements alleged above, which were contained in the Prospectus Supplements endorsed and used by Goldman Sachs in the sale of Certificates to investors.

474.     As underwriter, Goldman Sachs edited, drafted and controlled the content of the Goldman Trusts' Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, Goldman Sachs received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.  As underwriter, Goldman Sachs then used and disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

475.     Goldman Sachs, as a subsidiary within Goldman, had knowledge that Goldman, as alleged in §V.C:  (1) failed to adhere to underwriting standards when it pooled mortgage loans for its RMBS, including for the Goldman Trusts; and (2) provided distorted information to the rating agencies that was purposefully manipulated to meet the targeted rating.  Further, Goldman Sachs, knew or was reckless in not knowing, of the defective loans in the Goldman Trusts as a result of its due diligence performed as an underwriter for the Goldman Trusts.  Goldman Sachs had access to

- 135 -

the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans Goldman deposited in the Goldman Trusts had a practice of routinely and systematically disregarding the stated underwriting standards.

476.    Goldman Sachs also knew that mortgage loans deposited into the Goldman Trusts were not properly underwritten because Goldman Sachs was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with its securitization of loans, as alleged herein. In addition to the Goldman Trusts, Goldman Sachs underwrote and sold many other such RMBS to investors and had in that context gained inside knowledge of the poor quality loan underwriting being routinely employed and accepted by its affiliates.

D.    **IndyMac**

1.    **The IndyMac Securitization**

477.    Union Central purchased a Certificate sponsored by IndyMac on September 17, 2007. Union Central made the following purchase representing a total investment of approximately $3.8 million:

| CUSIP | Description | Issuing Entity | Issue Date | Purchase Date |
|-------|-------------|----------------|------------|---------------|
| 456652AM8 | IMJA 2007-A1 B1 | Indymac IMJA Mortgage Loan Trust 2007-A1 | 6/1/2007 | 9/17/2007 |

478.    IndyMac IMJA 2007-A1 was a $260 million deal comprising 407 purportedly conventional fixed-rate mortgages with 30-year terms.

- 136 -

### 2. False and Misleading Statements in IndyMac's Offering Materials

#### a. False and Misleading Statements About Compliance with Underwriting Standards

479. IndyMac stated in its Offering Materials for IMJA 2007-A1 that the majority of the Trust's loans with IMJA 2007-A1 Trust were originated through IndyMac's Conduit program, or were purchased from "Mortgage Professionals," who were required to comply with IndyMac's underwriting guidelines. The Offering Materials represented that all loan sellers were both initially and periodically reviewed thereby giving IndyMac direct notice of their practices:

> IndyMac Bank approves each mortgage loan seller prior to the initial transaction on the basis of the seller's financial and management strength, reputation and prior experience. Sellers are periodically reviewed and if their performance, as measured by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac Bank will cease doing business with them.

480. The Offering Materials described the underwriting guidelines which IndyMac utilized in originating and purchasing the loans that it deposited in the Trust:

> Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guideline.

> \*       \*       \*

> IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

#### b. False and Misleading Statements About Appraisals and LTV Ratios

481. The Offering Documents represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.

- 137 -

482.    The Offering Materials stated that appraisals were generally required to be made in accordance with the USPAP:

> To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount.

483.    As represented in the Offering Documents, the LTV ratio of a mortgage loan at any time is the fraction, expressed as a percentage, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value of the related mortgaged property.  The collateral value of a mortgage property, other than with respect to housing contracts and certain mortgage loans the proceeds of which are used to refinance an existing loan, is the lesser of: (a) the appraised value determined in an appraisal obtained by the originator at origination of such loan; or (b) the sales price for such property.

484.    The Prospectus Supplements also provided information regarding the weighted average LTV ratio of the loans underlying the Certificates.  The Offering Materials stated that the average original LTV ratio for all mortgage loans was 68.27%, and that all but one loan had an LTV ratio below 80%.

### c.    False and Misleading Statements About Debt-to-Income Ratios

485.    The Offering Materials specifically set forth the DTI ratios for each of the loans included in the IMJA 2007-A1 Trust.  With one exception, no borrowers were reported as having DTI ratios in excess of 50%.

- 138 -

### d. False and Misleading Statements About Owner-Occupancy

486. The IMJA 2007-A1 Offering Materials contained specific disclosures about the occupancy-rate status of the loans underlying the certificates.

487. The Offering Materials stated that 395 out of the 407 loans, or 96.5% of the aggregate principal balance of the mortgage loans, were for owner-occupied properties. Nine loans were purportedly for second homes. Three loans were described being for investment properties.

### e. False and Misleading Statements About Ratings

488. The Offering Materials for the Certificates stated that the ratings of the Certificates as set forth in the Prospectus was a condition for their issuance, and that the ratings reflected the likelihood that investors would receive the distributions to which they were entitled:

> It is a condition to the issuance of the Class B-1, Class B-2 and Class B-3 Certificates that they be rated at least AA, A and BBB, respectively, by S&P.
>
> The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the mortgage pool . . . .

489. The Offering Materials also set forth the specific ratings for the Certificates purchased by Union Central. The Certificates were rated AA by S&P.

### 3. Defendants' Statements Were Knowingly False and Misleading

490. IndyMac knew, or was reckless in not knowing, that the statements identified above were materially false and misleading and/or omitted material facts necessary to make the statements made not misleading. As set forth herein, IndyMac Defendant had actual knowledge that the stated underwriting guidelines were not being adhered to.

### a.     Underwriting Standards Had Been Abandoned

491.     While the Offering Materials set forth detailed underwriting guidelines that were supposed to be applied in evaluating borrowers and loans, in fact the stated underwriting guidelines had been abandoned by the loan originators.

492.     IndyMac abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default.  Instead, IndyMac approved loans which they knew were based on falsified information and which did not comply with any of the stated underwriting guidelines.  IndyMac's former CEO, Michael Perry ("Perry") admitted, according to a complaint filed by the FDIC, that IndyMac had failed to engage in '"common sense underwriting,"' instead relying on other underwriting methods that were open to rampant manipulation.

493.     According to the FDIC, Perry also admitted that IndyMac's loosening of credit guidelines and lending standards were to blame for IndyMac's spectacular decline in 2007 and 2008. "In an April 19, 2007 e-mail . . . . Perry confirmed: 'Yes, we loosened our credit guidelines too much over the past year or so . . . .'"  Complaint, *FDIC v. Michael Perry*, No. 11-5561 (C.D. Cal. July 6, 2011).

494.     The FDIC also describes a handwritten list by Perry of '"Big Mistakes'" made at IndyMac, further demonstrating the falsity of the Offering Materials statements.  The list of '"Big Mistakes,"' included "[g]iving up on documenting income," "[s]econdary selling loans that they knew did not meet our reps and warranties (in particular conduit)," "[c]onduit justifying not investing in basic infrastructure, controls [and] discipline through strong volumes and profits," and "[l]ittle to no overall command and control of credit risk."

- 140 -

### (1) Skyrocketing Default Rates Are Evidence of Abandoned Underwriting

495.    The IndyMac Certificates purchased by Union Central were supposed to be stable, long-term investments backed by investment-grade credit ratings.  However, the extraordinary default rates on the mortgage loans underlying those Certificates is prima facie evidence that the stated underwriting standards and loan characteristics represented in the IndyMac Offering Materials were materially false and misleading.

496.    The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as well as collateral cumulative losses, for the Certificates purchases by Union Central as of June 2010:

| Certificate | Original Deal Size | Delinquent, Bankruptcy Foreclosure, REO Actual Bal. | Collateral Cumulative Losses |
|---|---|---|---|
| **2007-1** | $262,509,068 | $25,498,892 | $5,460,863 |

497.    Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of delinquency, bankruptcy and foreclosure would be far lower than the current rates.

### (2) Appraisals and LTV Ratios Were Inflated

498.    The IndyMac Offering Materials' descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.  Undisclosed in those Offering Materials, and in violation of any legitimate appraisal standards many of the loans underlying the Certificates had been approved through the use of manipulated appraisals that falsely guaranteed that the collateral property would be valued at a price sufficient to support the loan.

499.    An Audit Report on the failure of IndyMac published by the Department of Treasury's Office of Inspector General found serious problems with IndyMac's auditing practices:

- 141 -

We also found weaknesses with property appraisals obtained to support the collateral on the loan. For example, among other things, we noted instances where IndyMac officials accepted appraisals that were not in compliance with the Uniform Standard of Professional Appraisal Practice (USPAP). We also found instances where IndyMac obtained multiple appraisals on a property that had vastly different values. There was no evidence to support, or explain why different values were determined. In other instances, IndyMac allowed the borrowers to select the appraiser. As illustrative of these problems, the file for one 80/20, $1.5 million loan we reviewed contained several appraisals with values ranging between $639,000 and $1.5 million. There was no support to show why the higher value appraisal was the appropriate one to use for approving the loan.

500.    A lawsuit filed against IndyMac further confirms that IndyMac violated its underwriting guidelines by artificially inflating the appraised values of properties. In *Cedeno v. IndyMac Bancorp, Inc.*, et al., No. 06-CV-6438 (JGK) (S.D.N.Y. July 20, 2007), the plaintiff, a residential home mortgage borrower, sued IndyMac and alleged that it had improperly and systematically selected and coerced various appraisal professionals so as to generate greater loan volumes. These appraisers would perform faulty and defective appraisal services that inflated the value of residential properties and thereby allowed IndyMac to complete more real estate transactions and obtain greater profits.

501.    Cedeno, in her Amended Class Action Complaint (filed on July 20, 2007), alleged, based on confidential witnesses, that "IndyMac threatened and retaliated against appraisers and management firms that failed to give in to pressure to meet the target appraisal values by IndyMac and to inflate the appraisal values." The practice of encouraging inflated appraisal values resulted in borrowers incurring more mortgage debt than necessary and/or more mortgage debt than the borrower could afford. In order to accomplish this, IndyMac had to override stated lending practices and internal/operational controls, as described in the *Cedeno* Complaint:

> Specifically, Defendants allowed Production Personnel to improperly influence Credit\Valuation Personnel. Production Personnel threatened and intimidated Credit\Valuation Personnel to approve inflated appraisals received from outside appraisal companies or appraisal management firms. Contrary to Defendants'

representations to Plaintiff and members of the Class, Defendants failed to provide the necessary insulation and separation between Production Personnel and Credit/Valuation Personnel.

According to a confidential witness, IndyMac executives, including the chief appraiser, were aware and allowed the improper influence Production Personnel placed on their own Credit\Valuation Personnel to choose appraisers and to approve appraisals obtained from third party appraisal companies or appraisal management firms willing to supply IndyMac with inflated appraisals.

Indeed, according to this confidential witness, Credit/Valuation Personnel at IndyMac were told not to reject inflated or otherwise improper appraisals and were threatened or told by Production Personnel that they would be terminated if they failed to do so.

According to another confidential witness, IndyMac was in fact operating its appraisal review department under pressure to make the values that IndyMac's loan officers and processing department were pushing. This confidential witness further stated that employees of IndyMac exerted pressure to make sure loans would be approved regardless of accurate appraisal values.

502.    As set forth in §§IV.F. and V.2.b., IndyMac was a party to the Defendant-wide practice of pressuring appraisers to misstate appraisals in order to ensure that loans were funded regardless of the quality of the underlying collateral.  Instead of conducting appraisals designed to accurately value the subject property in compliance with the USPAP, many of the appraisals conducted on the underlying properties in the IndyMac Trust were designed to hit valuation targets that would allow loans to be funded.

### (3)    Debt-to-Income Ratios Were Falsified

503.    The statements contained in the Offering Materials regarding the acceptability and evaluation of DTI ratios, as well as many of the specific DTI ratios disclosed, were materially false and misleading.  In fact, IndyMac knew that borrowers routinely falsified their stated incomes in order to have loans approved.

504.    Confidential witnesses cited in a securities class action complaint against IndyMac, *Tripp v. IndyMac*, No. 07-1635 (C.D. Cal. Feb. 16, 2010) confirm these IndyMac practices.

- 143 -

According to one confidential witness, "loan sales representatives solicited 'fraudulent' letters from CPAs in connection with the purported verification of customer income." This witness allegedly stated that "it was obvious that the letters were fraudulent, and that he/she repeatedly reported the fraud" to upper management and was ignored.

505.    Another confidential witness in the *Tripp* case described so-called "'Disneyland Loans,'" approved by IndyMac. The *Tripp* Complaint (Dkt. No. 227) alleges: "These loans were called Disneyland Loans, referring to a loan issued to a Disneyland cashier who claimed in his/her application that he/she earned $90,000 a year . . . . As another example of a particularly egregious 'Disneyland Loan,' [the confidential witness] related the story of a $500,000 loan that was issued for 'swamp lands' in Florida, to a 26 year old first time home buyer with a reported income of $26,000 per year and $15.00 in a bank account."

506.    Plaintiffs have examined certain of the loans contained in the 2007-A1 Trust and found numerous examples of loans where DTI ratios were falsified and where obvious signs of fraud or misrepresentations were ignored by IndyMac.

507.    The 2007-A1 Trust included a $550,040 loan to refinance a primary residence in Totowa, New Jersey in March 2007. While the 2007-A1 securitization reported a DTI ratio for this borrower of 44.7%, the borrower's DTI was in fact no less than 103%.

508.    The 2007-A1 Trust included a $644,040 loan to refinance a primary residence in Carlsbad, California in March 2007. While the 2007-A1 securitization reported a DTI ratio for this borrower of 34%, the borrower's DTI was in fact no less than 819% in 2007 and no less than 92% in 2006.

509.    The 2007-A1 Trust included a $575,500 loan to refinance a primary residence in Brooks, Georgia in March 2007. While the 2007-A1 securitization reported a DTI ratio for this

- 144 -

borrower of 29.8%, the borrower's DTI was in fact no less than 1457%. Further, while the mortgage loan schedule stated that the subject properties were to be owner occupied for one year, this borrower did not live in the subject property at the time the loan was issued or anytime thereafter.

510.     The IMJA 2007-A1 Trust included a $650,000 loan to refinance a primary residence in Gaithersburg, Maryland in May 2007. While the 2007-A1 securitization reported a DTI ratio for this borrower of 38.5%, the borrower's DTI was in fact no less than 237%. Further, while the mortgage loan schedule stated that the subject properties were to be owner occupied for one year, this borrower moved out of the subject property five months prior to the refinance.

> **b.     Defendants Knew that Underwriting Standards Were Being Abandoned**

511.     IndyMac had actual knowledge that the loans it securitized in the Trusts sold to Union Central did not comply with the stated underwriting guidelines contained in the Offering Materials, and that the quantitative and qualitative data contained in the Offering Materials was materially false and misleading.

> **(1)     IndyMac Had Actual Knowledge of the Defective Loans They Were Securitizing**

512.     IndyMac performed monthly quality control audits of its loan production, starting as early as 1994 and continuing through at least August 2007. Each month, IndyMac's Post Production Quality Control ("PPQC") unit selected samples of IndyMac's total loan production and assessed each loan to determine whether the borrower or a third party, such as the mortgage broker or appraiser, misrepresented information in obtaining the loans.

513.     A complaint filed by the SEC against IndyMac's former Executive Vice President and CFO, S. Blair Abernathy, provides significant detail about the operations of the PPQC. *SEC v. Abernathy*, No. 11-1308 (C.D. Cal. Feb. 11, 2011). According to the SEC, the PPQC identified

misrepresentations including the following categories: (1) occupancy; (2) appraisals; (3) income; (4) employment; (5) assets; (6) credit (undisclosed liabilities); and (7) transaction ("straw buyer").

514.    Before finding that a misrepresentation had been made, the PPQC would develop actual proof that the information provided on the loan application was false.  PPQC prepared monthly reports which were distributed within IndyMac.  According to the SEC, the report detailed (1) the sample's defect rate, which ranged from 10% to 22% from September 2005 through August 2007; (2) compared the defect rate to prior periods; (3) stated the percentage of loans that contained misrepresentations – which ranged from 12% to 18% from January 2007 through August 2007.  The PPCQ monthly reports also broke down the findings by business unit, including IndyMac's Conduit program.  Finally, the PPQC reports attached spreadsheets that provided loan-by-loan detail of the PPQC's findings.

515.    These PPQC reports provided IndyMac with actual knowledge that it had a widespread and systemic practice of making defective loans which did not comply with the underwriting standards set forth in the Offering Materials.

**(2)    The Office of Thrift Supervision Specifically Warned IndyMac that It Was Securitizing Defective Loans**

516.    IndyMac knew that loans originated through their Conduit program, which was the single largest source of loans for the IMJA 2007-A1 Certificates, were routinely defective.  A lawsuit filed by the FDIC against IndyMac's former CEO, Perry, describes a January 8, 2007, OTS Report of Examination, which Perry reviewed regarding serious problems in IndyMac's Conduit division.  In this report, the OTS found "significant internal control weaknesses with the Conduit Division.  These Weaknesses were well documented in the [Bank's] 2006 and 2007 internal audit reports."  The report stated:

705280_1

[R]equisite controls for loan production did not keep pace with growth, as evidenced by two consecutive "needs improvement internal audits. The Divisions lack of effective internal controls is well documented in the related 2006 and 2007 internal audits, with many repeat criticism noted.  Specifically the Conduit Division failed to: (1) adequately monitor sellers and related exposure; (2) obtain trading approvals according to Bank policy; (3) ensure seller agreements were reviewed by legal staff and properly executed; (4) document compensating factors supporting the purchase of loans not meeting IndyMac guidelines; (5) perform minimum due diligence on all loan pools purchased; and (6) resolve collateral deficiencies identified on a pre-funding basis in a timely manner."

517.    Indeed, IndyMac was aware in the period leading up to its sale of the Certificates to Union Central that loan delinquencies were skyrocketing.  According to the FDIC, the Bank's Thrift Financial Reports showed "substantial increases in first lien delinquencies on loans 30-89 days past due and still accruing, increasing 128% from the second to the **fourth** quarter of 2006" (emphasis in original).  "Further non-accrual loans also began to trend significantly upward indicated a low delinquency cure rate.  Non-performing assets as a percentage of total assets increased 73% between the fourth quarter of 2006 and the first quarter of 2007."

### 4.    UBS's Liability as an Underwriter of the IndyMac Certificates

518.    UBS Securities made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by UBS Securities in the sale of Certificates to Plaintiffs.

519.    As underwriter, UBS Securities edited, drafted and controlled the content of the IMJA 2007-A1 Trust's Offering Materials, including with respect to the material misstatements and omissions alleged above in §V.D.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, UBS Securities received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.  As underwriter, UBS Securities then used and disseminated these false and

misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

520.    UBS Securities also knew that mortgage loans deposited into the IMJA 2007-A1 Trust were not properly underwritten because UBS Securities was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged herein. In addition to the IMJA 2007-A1 Trust, UBS Securities underwrote and sold many other such RMBS to investors and had in that context gained inside knowledge of the poor quality loan underwriting.

### 5.    HSBC's Liability as an Underwriter of the IndyMac Certificates

521.    Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is an SEC-registered broker-dealer and an indirect wholly-owned subsidiary of HSBC Holdings Plc. ("HSBC").  It is incorporated in Delaware and its principal place of business is 425 Fifth Avenue New York, NY.

522.    HSBC Securities acted as the underwriter in the sale of Certificates from the IndyMac IMJA Mortgage Loan Trust 2007-A1.  As underwriter, it drafted and disseminated the IMJA 2007-A1 Offering Materials, which contained false and misleading statements about the quality of the underlying mortgages and the underwriting performed by IndyMac and its originators.

523.    HSBC Securities was privy to the defendant-wide practice of securitizing loans that had not been properly underwritten.  According to the FCIC, HSBC was the largest subprime lender in the United States.  The Dissenting Statement of three FCIC members included within the official FCIC Report reflects that HSBC and its affiliates engaged in the rampant practice of originating mortgage loans that borrowers could not repay:

Fueled by cheap credit, firms like Countrywide, Washington Mutual, Ameriquest, and HSBC Finance originated vast numbers of high-risk, nontraditional mortgages that were in some cases deceptive, in many cases confusing, and often beyond borrowers' ability to repay.

524.    Based upon knowledge of its own practices, as well as those of its competitors, and based on its due diligence investigation as an underwriter, HSBC Securities was well aware that the mortgage loans in the IMJA Mortgage Loan Trust 2007-A1 were defective because a large percentage of borrowers could not afford the subject loans which would not have been made if they had been properly underwritten.

525.    Indeed, at the same time that HSBC Securities was represented to Plaintiffs that the subject loans had been properly underwritten, HSBC was making provisions for writing down the bad loans that it held on its own books.  Based on HSBC Securities' knowledge of how those loans had been underwritten, it was internally aware that the widespread race to the bottom with respect to underwriting standards would result in substantial losses for whomever acquired the subject loans.

526.    HSBC Securities' knowledge of the abandonment of prudent loan underwriting is further evidenced by FHFA allegations that HSBC systematically underwrote and issued RMBS that HSBC knew contained mortgage loans that did not meet underwriting standards.  According to the *FHFA* Complaint, Fannie Mae and Freddie Mac purchased $6.2 billion RMBS put together by HSBC affiliates.  *FHFA v. HSBC North America Holdings Inc.*, No. 1:11-cv-06189 (S.D.N.Y. Sept. 2, 2011).  After conducting an AVM analysis, the FHFA found that HSBC understated the occurrence of non-owner occupied property by approximately 10% and for one trust HSBC understated owner-occupancy in as many as 13% of all the loans.  *FHFA v. HSBC* Complaint (Dkt. No. 1), ¶¶93-96.

527.    The FHFA's analysis found that HSBC understated the true percentage of loans with an LTV Ratio at 80% or less, often by twenty percentage points or more.  *Id.*, ¶100.  According to

- 149 -

the FHFA's analysis, HSBC understated the number of loans with LTV ratios over 100%.  Contrary to what had been represented, the FHFA's analysis found all of those HSBC-affiliated RMBS contained at least 9.41% LTVs over 100%, including one trust with 39.51%.  *Id.*, ¶¶98-101.

528.   HSBC Securities' affiliate HSBC Bank USA also appears to have been involved in the improper marketing of RMBS that contained defective loans.  It has been recently reported that HSBC Bank USA received subpoenas from the SEC and the U.S. Attorney's Office, Southern District of New York, as well as a Civil Investigative Demand from the Massachusetts State Attorney General, regarding its involvement in the issuance of RMBS.

529.   HSBC paid $5.25 million to settle NCUA's suit arising out of HSBC's sale of RMBS to five failed corporate credit unions.

530.   As a signatory to the Offering Materials, HSBC Securities represented that the statements in the IMJA 2007-A1 Trust Offering Materials were true.  But it had access to the loan tapes, both for IMJA 2007-A1 Trust, and as a result, it knew, or was reckless in not knowing, that the loan originators routinely and systematically disregarded underwriting standards for the loans that were pooled into this securitization.

E.   **Morgan Stanley**

1.   **Morgan Stanley's Securitizations**

531.   Union Central purchased a Certificate sponsored by Morgan Stanley on September 22, 2005, representing an investment of approximately $12.2 million:

| CUSIP | Description | Issuing Entity | Issue Date | Purchase Date |
|-------|-------------|----------------|------------|---------------|
| 61748HLS8 | MSM 2005-5AR B1 | Morgan Stanley Mortgage Loan Trust 2005-5AR | 8/1/2005 | 9/22/2005 |

532.   Morgan Stanley Mortgage Loan Trust 2005-5AR was a $1.49 billion deal comprising 4,637 purportedly hybrid adjustable rate mortgages with mostly 30-year terms.

- 150 -

2.      **False and Misleading Statements in Morgan Stanley's Offering Materials**

a.      **False and Misleading Statements About Compliance With Underwriting Standards**

533.    As sponsor of the securitizations, Morgan Stanley either originated the underlying mortgages through its Morgan Stanley Mortgage Capital, Inc. ("MSMC") and Morgan Stanley Credit Corporation ("MSCC") entities, or purchased the underlying mortgage loans from other originators, primarily Countrywide, National City and Wachovia Mortgage Loans ("Wachovia").

534.    The Offering Materials represented that all of the mortgage loans deposited in the Trusts were originated in accordance with MSMC, MSCC and National City's underwriting standards which were purportedly designed to ensure the soundness of the underlying loans and the willingness and ability of borrowers to repay them.

(1)      **Morgan Stanley**

535.    With respect to mortgages acquired from MSMC for deposit into the MSM 2005-5AR Trust, the Prospectus Supplement promised investors that the underwriting of those loans had collected various financial information about the borrowers to ensure that they could repay the loans:

> [E]ach mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.

536.    The Prospectus Supplement for the MSM 2005-5AR Trust also promised investors that only borrowers who could replay the loans had received them:

> Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's

- 151 -

monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.

537.    Further, the Offering Materials assured investors that all MSMC loans included in the securitization were issued in substantial compliance with the underwriting standards, and that any deviation from specific criteria was justified by sufficient compensation factors:  "[C]ertain exceptions to the loan purchasing guidelines described herein are made in the event that compensating factors are demonstrated by a prospective borrower."

538.    The Prospectus Supplement further represented that MSCC's loan underwriting had collected a variety of financial information about borrowers to ensure loans were only made to those who could repay them:

> [A] potential borrower may submit a written or telephone application which provides pertinent information about the applicant's ability to repay the proposed loan. Information supporting the potential borrower's assets, liabilities, income and expenses is required. Such information typically includes verification of income, deposits and mortgage payment history. Additionally, MSCC obtains and reviews a property appraisal, title policy, a credit bureau report of the applicant's credit history, analysis of income supporting repayment ability and proof of insurance coverage.

539.    The Prospectus Supplement for the MSM 2005-5AR Trust also promised investors that only borrowers who could repay the loans had received them:

> A potential borrower's ability to make the proposed loan payments is measured by the applicant's income, credit, residence stability and assets. One test to determine this ability is the debt-to-income ratio, which is the borrower's total monthly debt service divided by total monthly gross income. MSCC typically allows for a debt-to-income ratio of 45%. Debt-to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors.

### (2)    Countrywide

540.    Morgan Stanley's Prospectus Supplement stated that all loans originated by Countrywide had been originated in compliance with their underwriting guidelines as well as applicable federal and state law:

705280_1

All of the mortgage loans originated or acquired by Countrywide Home Loans, Inc. have been originated or acquired in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

541.    Further, the Prospectus Supplement stated that the Countrywide underwriting

standards were designed to evaluate a potential borrower's ability to repay the loan:

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt to income" ratios) are within acceptable limits.

### (3)    National City

542.    With respect to loans acquired from National City deposited in the Trust, the

Prospectus Supplement represented that the loan originators had collected a variety of financial

information about a borrower to ensure they could repay the loan:

Generally, each mortgagor will have been required to complete an application designed to provide to the lender pertinent credit information concerning the mortgagor. The mortgagor will have given information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and will have furnished the lender with authorization to obtain a credit report which summarizes the mortgagor's credit history.

543.    The Prospectus Supplement also stated that its National City's underwriting standards

were designed to ensure that borrowers could repay their loans, and that exceptions to those

underwriting standards were granted only when compensating factors were present:

The National City underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations. Exceptions to the underwriting standards are permitted where compensating factors are present.

- 153 -

### b. False and Misleading Statements About Appraisals and LTV Ratios

544.     The Offering Documents represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.

545.     Morgan Stanley's Offering Materials for the MSM 2005-5AR Trust represented that Morgan Stanley required and relied upon valid and accurate appraisals to determine the adequacy of the underlying collateral.  For example, with respect to loans originated by MSMC, the Offering Materials stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to FNMA and/or FHLMC.

546.     Similarly, the Morgan Stanley Offering Materials stated that "[t]he adequacy of the mortgaged property as security for the proposed mortgage loan will generally be determined by an appraisal acceptable to MSCC. Appraisals are conducted by independent appraisers acceptable to MSCC."

547.     With respect to Countrywide's appraisal standards, the Offering Materials stated:

> [Countrywide] obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

548.     With respect to National City's appraisal standards, the Offering Materials stated:

- 154 -

705280_1

Each National City mortgaged property has been appraised by a qualified independent appraiser. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.

549.    With respect to Wachovia's appraisal standards, the Offering Materials stated:

Appraisal reports must be ordered by Wachovia. Appraisals provided by the borrower or any other interested third party are not acceptable. Appraisals cannot be greater than 120 days old at closing. Any appraisal older than 120 days must be supported by a re-certification of value by the appraiser or by a new appraisal.

Underwriters review appraisals in accordance with stated guidelines. Appraisal guidelines for jumbo loans are generally very similar to appraisal guidelines for conforming loans, i.e. standard Fannie Mae/Freddie Mac guidelines.

Appraisals must be ordered from an appraiser who is approved by Wachovia. Underwriters must ensure that the appraisal has been provided by an appraiser on the approved appraiser list and that the appraiser does not appear on either the Wachovia Mortgage Corporation Watch or Suspended Appraiser List.

550.    Morgan Stanley's Prospectus Supplement also contains misrepresentations concerning the LTV ratios of the mortgage loans underlying each securitization. Specifically, the weighted average original LTV ratio for Loan Groups 2-4, which corresponded to Plaintiffs' Certificate, were disclosed as being between 73%-76% when in fact they were much higher than that due to the inflated appraisals.

### c.    False and Misleading Statements of Borrowers' Debt-to-Income Ratios

551.    Morgan Stanley's Offering Materials contained numerous statements regarding the evaluation of DTI ratios for the borrowers whose loans comprised the Trusts. Absent compensating

- 155 -

factors, the Offering Materials described the manner in which the loan originators evaluated DTI

ratios for borrowers.

552.    For example, the Morgan Stanley Offering Materials stated as follows:

A potential borrower's ability to make the proposed loan payments is measured by the applicant's income, credit, residence stability and assets. One test to determine this ability is the debt-to-income ratio, which is the borrower's total monthly debt service divided by total monthly gross income. MSCC typically allows for a debt-to-income ratio of 45%. Debt-to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors.

553.    The Offering Materials described Countrywide's practices as follows:

[A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt to income" ratios) are within acceptable limits.

*        *        *

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

554.    The DTI ratios were a material part of the loan underwriting process, and specific

DTI ratios for the loans underlying the Certificates were utilized by the rating agencies to determine

the ratings for the Certificates in the Trust.

### d.    False and Misleading Statements About Owner-Occupancy

555.    The Offering Materials contained specific disclosures about the occupancy-rate status

of the loans underlying the Certificates.  The Offering Materials stated that 1,234 out of the 1,660

loans, or 78.08% of the aggregate principal balance of the mortgage loans, were for owner-occupied

primary properties.  The remaining 426 loans were purportedly for second homes or investment

properties.

- 156 -

### e.  False and Misleading Statements About Ratings

556.  The Offering Materials for the Certificates stated that the ratings of the Certificates as set forth in the Prospectus was a condition to their issuance, and that the ratings reflected the likelihood that investors would receive the distributions to which they were entitled:

> It is a condition of the issuance of the Certificates that they receive the respective ratings set forth on page iii of this prospectus supplement by [S&P] and Moody's].

> The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the related Certificateholders under the agreements pursuant to which such certificates are issued. . . .  Such ratings take into consideration the credit quality of the related Mortgage Pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the Mortgage Pool is adequate to make the payments required by such certificates.

557.  The Offerings Materials also set forth the specific ratings for the Certificates purchased by Union Central.  The Certificates were rated AA by S&P and Aa2 by Moody's.

558.  In obtaining these ratings for the subject Certificates, Morgan Stanley concealed the adverse information alleged herein from the rating agencies.  Had the rating agencies known the true value of the loans underlying the Certificates, the Certificates would have been rated significantly lower, or not at all.

### 3.  Morgan Stanley's Statements Were Knowingly False and Misleading

559.  Morgan Stanley knew, or was reckless in not knowing, that the statements identified above were materially false and misleading and/or omitted material facts necessary to make the statements made not misleading.  As alleged herein, the Morgan Stanley Defendants had actual knowledge of widespread abandonment of prudent underwriting guidelines with respect to the mortgage loans deposited in the Trust.

- 157 -

### a.     Underwriting Standards Had Been Abandoned

560.     While the Offering Materials set forth detailed underwriting guidelines which were supposed to be applied in evaluating borrowers and loans, in fact the stated underwriting guidelines had been abandoned by the loan originators.

561.     Morgan Stanley knew that the originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default. Instead, the originators approved loans which they knew were based on falsified information and which did not comply with any of the stated underwriting guidelines.

562.     Countrywide had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Goldman for inclusion in the subject Trusts, as alleged above at §IV.I.2.

563.     National City had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to Goldman for inclusion in the subject Trusts, as alleged above at §IV.I.10.

564.     Morgan Stanley's practice of securitizing loans that did not meet the required underwriting standards has been confirmed by parties who have had direct access to the loan files for securitizations similar to and issued by Morgan Stanley at the same time as those sold to Plaintiffs. For example, MBIA is a New York-based monoline insurer that wrote insurance on a similar Morgan Stanley securitization, MSM 2007-9SL, covering any default of borrowers' payments of principal and interest on the loans in that Trust.   MBIA conducted an investigation into the underwriting practices by examining the loan files after it experienced a large number of borrower defaults covered by its MSM 2007-9SL insurance policy.   In carrying out its review of the

- 158 -

approximately 3,053 loan files, MBIA found that 96.6% of them did not comply with the required underwriting guidelines.

565.    MBIA found the following widespread departures from the required underwriting guidelines consistent with the Morgan Stanley Defendants' standard operating procedure during the relevant period of securitizing poorly underwritten and imprudently granted loans:

(a)    [DTI] ratio in excess of program guidelines;

(b)    [Combined LTV] ratio in excess of maximum permitted guidelines;

(c)    The credit score of the borrower does not meet program guidelines for [combined LTV] ratio and loan amount;

(d)    Unreasonable stated income in application, *i.e.*, the borrower's or co-borrower's salary is unreasonable on the face of the application and/or is not substantiated by the borrower's or co-borrower's credit/asset profile;

(e)    The appraisal conducted for the mortgaged property does not support the value of the property;

(f)    12 month seasoning requirements were not met, *i.e.*, the loan was not approved using the lower of the original purchase or appraised value of the property within the last 12 months;

(g)    The appraisal of the property was not contained in the file;

(h)    The borrower's full 12 month housing history was not verified;

(i)    A minimum of one year's mortgage or rental payment history was not documented in the file;

(j)    The credit report of the borrower was not contained in the file; and

(k)    Missing sufficient down payment funds, closing costs and/or reserves.

566.    Similar types of defects as those found by MBIA were also present in the Certificate purchased by Union Central, as has been confirmed by Plaintiffs' own investigation and as reflected by the pervasive nature of Morgan Stanley's misconduct during this period, as alleged herein.

(1)    **Skyrocketing Default Rates Are Evidence of**
**Abandoned Underwriting**

567.    The Certificate purchased by Union Central was supposed to be a stable, long-term investment backed by investment-grade credit ratings.  However, the extraordinary number of defaults of mortgage loans underlying Union Central's Certificate is prima facie evidence that Morgan Stanley's representations that the loans had been prudently underwritten were materially false and misleading.

568.    The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as well as collateral cumulative losses, for each of the Certificate purchases by Union Central as of June 2010:

| Certificate | Original Deal Size | Delinquent, Bankruptcy Foreclosure, REO Actual Bal. | Collateral Cumulative Losses |
|---|---|---|---|
| **MSM 2005-5AR** | $1,501,718,224 | $151,456,158 | $50,008,241 |

569.    Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of delinquency, bankruptcy and foreclosure and cumulative losses would be far lower than the current rates.  Indeed, Moody's maximum expected collateral losses for the life of the MSM 2005-5AR Certificate was only $15 million.

(2)    **Appraisals and LTV Ratios Were Inflated**

570.    The descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.  Undisclosed in the Offering Materials, and in violation of any legitimate appraisal standards, many of the loans underlying the Certificates had been approved through the use of manipulated appraisals that guaranteed that the collateral property would be valued at a price sufficient to support the loan.  Such practices have been confirmed by

- 160 -

705280_1

modeling performed by other litigants who experienced similar Morgan Stanley conduct, which demonstrates that appraisals used in connection with Morgan Stanley securitizations in 2006 were routinely inflated.  For instance, the plaintiffs in *FHFA. v. Morgan Stanley, et al*., Index No. 652440/2011 (Sup. Ct. N.Y. Sept. 2, 2011), conducted an AVM analysis of a sample of the property underlying the Morgan Stanley offerings at issue in that litigation.  *FHFA v. Morgan Stanley* Complaint (Dkt. No. 1), ¶¶98-102.

571.    The FHFA's analysis demonstrates that the valuation of the loans underlying the certificates were materially and consistently inflated, and therefore that the stated LTV ratios were materially overstated, which in turn greatly increased the risk from default on the loans underlying the certificates.  FHFA analyzed 33 Morgan Stanley securitizations issued between 2005 and 2007, including securitizations bearing substantially similar characteristics as the 2005-5AR Certificate purchased by Plaintiffs.  For example, two of the transactions analyzed by the FHFA which were similar to Plaintiffs' securitization, MSM 2005-7 and MSM 2005-10, included representations that 97.49% and 97.71% respectively of the loans in those trusts had LTV ratios of less than 80%.  However, FHFA's analysis showed the true percentage of loans having LTV ratios of 80% or less was a mere 56.29% and 64.07%.

572.    While none of those certificates where supposed to contain loans that had an LTV ratio over 100%, the FHFA's analysis found that a significant number of loans had LTV ratios of over 100% – in other words, the value of loan was more than the value of the property.  With respect to the MSM 2005-7 and MSM 2005-10 trusts, the FHFA found LTV ratios greater than 100% in 3.45% and 3.12% of the loans, respectively.

573.    The Massachusetts Attorney General found similar misconduct by Morgan Stanley with respect to loans originated by New Century.  In June 2010, the Massachusetts Attorney General

- 161 -

entered into an Assurance of Discontinuance ("AOD") with MS&Co. stemming from the Massachusetts' Attorney General's investigation into the financing, purchase, and securitization of residential mortgage loans by the Morgan Stanley Defendants and their affiliates during the period of late 2005 through early 2007. *In re Morgan Stanley & Co.*, No. 10-2538 (Mass. Dist. Cl. June 24, 2010). The Massachusetts Attorney General found that the Morgan Stanley Defendants partnered with one of the largest subprime lenders in the country, New Century, off-loading tens of thousands of loans the Morgan Stanley Defendants knew or should have known did not comply with their stated underwriting guidelines.

574.   The Massachusetts Attorney General found during its due diligence that "Morgan Stanley employed so-called broker price opinions or 'BPOs' to check the value of the properties. In a BPO, a local broker evaluates the property and provides an indicated value and some additional information." According to the Massachusetts Attorney General, based on the BPO-checked value, "31% of the New Century loans on properties checked via BPOs in the valuation diligence process and securitized by Morgan Stanley in 2006 and 2007 had CLTV ratios" greater than 100%.

575.   As set forth in §§IV.H.2. and IV.F., Morgan Stanley was a party to the Defendant-wide practice of pressuring appraisers to misstate appraisals in order ensure that loans were funded regardless of the quality of the underlying collateral.

### (3)   Debt-to-Income Ratios Were Falsified

576.   The statements contained in the Offering Materials regarding the acceptability and evaluation of DTI ratios, as well as many of the specific DTI ratios that were disclosed, were materially false and misleading. In fact, Morgan Stanley knew that borrowers routinely falsified their stated incomes in order to have loans approved, and this adverse information was readily

apparent from even a cursory review of the loan files – files that Plaintiffs did not have, and still do not have, direct access to.

577.    Plaintiffs have examined certain of the loans contained in the 2005-AR5 Trust and found numerous examples of loans where DTI ratios were falsified and where obvious signs of fraud or misrepresentations were ignored.

578.    The 2005-5AR Trust included a $288,800 loan for the purchase of a primary residence in Fair Oaks, California in May 2005.  While the 2005-5AR securitization reported a DTI ratio for this borrower of 43.4%, the borrower's DTI was in fact no less than 91%.

579.    The 2005-5AR Trust included a $400,000 loan for a cash-out refinance of a primary residence in Washington, DC. in July 2005.  While the 2005-5AR securitization reported a DTI ratio for this borrower of 27.81%, the borrower's DTI was in fact no less than 106%.

580.    The 2005-5AR Trust included a $460,000 loan for the purchase of a primary residence in Bloomfield, New Jersey in May 2005.  The borrower defaulted on the mortgage just four months later in October 2005.  While the 2005-5AR securitization reported a DTI ratio for this borrower of 41.3%, the borrower in fact had no income in 2005 therefore their DTI ratio was infinite.

581.    Plaintiffs' findings regarding the loans in the subject Trust are consistent with Morgan Stanley's practice during this time period of securitizing bad loans, and are consistent with the results of a Massachusetts Attorney General investigation.  As a result of its investigation, the Massachusetts Attorney General discovered that Morgan Stanley routinely accepted mortgage loans for inclusion in securitizations despite misrepresentations of the stated income for mortgages purchased by MS&Co. from New Century:

> In 2005, Morgan Stanley employees were aware that stated income loans were among the riskiest newly originated subprime loans Morgan Stanley purchased

and that such loans were among the most likely subprime loans to become delinquent or default. After rejecting a number of loans with overstated income in one New Century loan pool, one of Morgan Stanley's employees described the stated income method as overused to the point of abuse. Any inaccuracy in stated income, would affect the reported DTI ratios, because income is the denominator of the DTI ratio.

### (4)    Owner-Occupancy Rates Were Falsified

582.    The FHFA has also performed loan-level analysis of thousands of loans securitized by Morgan Stanley at the same time as it securitized loans for the Certificates at issue here, and found that Morgan Stanley's RMBS Offering Materials routinely misstated the owner-occupancy rates of the loans underlying the certificates.  In addition to their LTV analysis, the FHFA undertook a sophisticated analysis to determine whether a given borrower actually occupied the property as claimed.  *FHFA v. Morgan Stanley* Complaint, ¶¶94-97.  For each offering, the FHFA analyzed tax records, credit records, bills, property records and lien records, to determine whether a borrower was actually living in the property subject to the loan.

583.    The results of the *FHFA v. Morgan Stanley* plaintiffs' analysis further confirms that Morgan Stanley had a practice of securitizing loans where the owner-occupancy-rate was being misstated in the Offering Materials.  For each of the certificates at issue in the *FHFA v. Morgan Stanley* action, the percentage of owner-occupied properties was overstated by between 7% and 15%.  With respect to the MSM 2005-7 and MSM 2005-10 certificates, the FHFA found owner-occupancy rates were overstated by 11.45% and 14.35% respectively.

### (5)    Ratings Were False

584.    The rating agencies relied on the accuracy of the information provided by Morgan Stanley, including the underwriting standards and the data concerning DTI ratios, LTV ratios and owner-occupancy statistics, in assigned ratings to the securities.  However, because the information

- 164 -

supplied by Morgan Stanley was materially false and misleading, the ratings assigned to the Certificates did not provide an accurate evaluation of the risk of default.

585.     Indeed, as set forth below, Morgan Stanley knew that the ratings were materially false and misleading because they pressured the rating agencies to use outdated and inaccurate ratings models in order to ensure that the Certificates received the ratings they desired.

### b.     Morgan Stanley Knew that Underwriting Standards Were Being Abandoned

586.     As alleged above, Morgan Stanley had actual knowledge that the loans it securitized in the Trusts it sold to Union Central did not comply with the stated underwriting guidelines contained in the Offering Materials, and that the quantitative and qualitative data contained in the Offering Materials was materially false and misleading.  The Morgan Stanley Defendants had further knowledge that the underwriting standards were being abandoned for the loans in the subject Trust for the reasons alleged below.

### (1)     Morgan Stanley Had Actual Knowledge of the Defective Loans They Were Securitizing

587.     Documents recently released by Clayton confirm that there were rampant underwriting violations in the loan pools contained in the Morgan Stanley Certificates.  As the FCIC described in the internal Clayton "Trending Report" made public by the Government in conjunction with testimony given in September 2010, Morgan Stanley received regular reports regarding defective loans, and *37%* of the loans Clayton reviewed for Morgan Stanley "failed to meet guidelines." These loans were not subject to any proper "exceptions," as they did not have any "compensating factors." Rather, these loans were plainly defective.

588.     Despite such a high level of defective loans, Morgan Stanley continued utilizing, and indeed funding, the same originators who had placed the nonconforming loans in the pools.

- 165 -

Furthermore, Morgan Stanley "waived in" to its pools **56% of those toxic loans that Clayton had identified as being outside the guidelines**.   This practice of completely disregarding loan underwriting standards was never disclosed to Union Central or any of the investors who purchased Morgan Stanley Certificates.

589.   The Clayton data demonstrates that underwriting guidelines were being routinely violated, and that Morgan Stanley was informed of such violations.   Morgan Stanley's secret "waiver" of rejected loans into its RMBS Trust without any compensating factors was an omission that rendered the Morgan Stanley Defendants' disclosures regarding their underwriting and due diligence processes materially misleading.   As the FCIC Report concluded:

> [M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 Event loans were waived in.
>
> *          *          *
>
> [O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, at the same rate, as the sampled loans. Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

### (2)   Morgan Stanley Knew that Ratings Were False

590.   The Certificate purchased by Plaintiffs received a AA credit rating from S&P and a Aa2 rating from Moody's, indicating the rating agencies' view of its risk profile based on the information provided by Morgan Stanley.   The ratings were material to reasonable investors, including Union Central, because the ratings provided additional assurances that investors would receive the expected interest and principal payments.   The Certificates would have been unmarketable to investors like Union Central and would not have been issued but for the provision of these ratings.   As the Prospectus stated:

- 166 -

> It is a condition of the issuance of the Certificates that they receive the respective ratings set forth on page iii of this prospectus supplement by [S&P] and Moody's].

591.     The Offering Materials represented that the rating agencies conducted an analysis designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools and issued ratings accordingly.  The Morgan Stanley Offering Materials stated:

> The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the related Certificateholders under the agreements pursuant to which such certificates are issued. . . .  Such ratings take into consideration the credit quality of the related Mortgage Pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the Mortgage Pool is adequate to make the payments required by such certificates.

592.     These representations were false.   The ratings given to the Morgan Stanley Certificates by S&P and Moody's were based on the loan profiles supplied to the agencies by the Morgan Stanley Defendants.  But as discussed above, most (if not all) of the key components of that data were false because the Defendants failed to adhere to their disclosed underwriting standards and manipulated the appraisal of the properties underlying the mortgage pools.  As a result, Morgan Stanley essentially pre-determined the ratings by feeding inaccurate information into the ratings system.  This rendered misleading Morgan Stanley's representations concerning the ratings for the MSM 2005-5AR Trust because they failed to disclose that the ratings were based entirely on unreliable information provided by Morgan Stanley.

593.     In addition, the Senate PSI recently released documents from the internal files of the Morgan Stanley Defendants detailing how the Morgan Stanley Defendants manipulated the credit rating agencies to achieve their desired rating results. The Senate PSI reported that investment banks, including Morgan Stanley, "were pressuring [the rating agencies] to ease rating standards" on RMBS.  This included the banks' practice of blacklisting ratings analysts who refused to provide

- 167 -

favorable credit ratings to the toxic mortgage portfolios they were off-loading to investors such as

Union Central.

594.    One of the strategies employed by the Morgan Stanley Defendants was to leverage

past accommodations provided by the rating agencies to the Morgan Stanley Defendants arguing that

because the agencies had loosened their standards in the past, they must do so again.  As set forth in

the Senate PSI Report:

> An exception made one time often turned into further exceptions down the
> road. In August 2006, for example, an investment banker from Morgan Stanley tried
> to leverage past exceptions into a new one, couching his request in the context of
> prior deals:

> When you went from [model] 2.4 to 3.0, there was a period of time where
> you would rate on either model. I am asking for a similar 'dual option' window for a
> short period. I do not think this is unreasonable.

> A frustrated S&P manager resisted, saying: "You want this to be a
> commodity relationship and this is EXACTLY what you get." But even in the midst
> of his defense, the same S&P manager reminded the banker how often he had
> granted exceptions in other transactions: "How many times have I accommodated
> you on tight deals? Neer, Hill, Yoo, Garzia, Nager, May, Miteva, Benson, Erdman all
> think I am helpful, no?"

595.    The Senate PSI Report further details how the Morgan Stanley Defendants

stonewalled the rating agencies once the agencies determined their ratings models needed to be more

conservative and pressured the rating agencies not to apply more conservative standards to

previously issued securities.  The Senate PSI reported:

> Moody's and S&P updated their RMBS and CDO models with more
> conservative criteria in 2006, but then used the revised models to evaluate only new
> RMBS and CDO transactions, bypassing the existing RMBS and CDO securities that
> could have benefited from the new credit analysis. Even with respect to the new
> RMBS and CDOs, investment banks sought to delay use of the revised models that
> required additional credit enhancements to protect investment grade tranches from
> loss. For example, in May 2007, Morgan Stanley sent an email to a Moody's
> Managing Director with the following:

> "Thanks again for your help (and Mark's) in getting Morgan Stanley up-to-
> speed with your new methodology. As we discussed last Friday, please find below a

- 168 -

list of transactions with which Morgan Stanley is significantly engaged already (assets in warehouses, some liabilities placed). We appreciate your willingness to grandfather these transactions [under] Moody's old methodology."

596.    If the Morgan Stanley Defendants had not successfully delayed the implementation of the more stringent rating methodologies, investors such as Union Central would not have been misled into believing the securities they were purchasing were worthy of AA ratings. The delay caused damage not only to Union Central but to the entire financial system. As the Senate PSI reported:

> Instead [of applying the more stringent methodologies to previously issued securities when it became clear that those were the appropriate methodologies], the credit rating agencies waited until 2007, when the high risk mortgages underlying the outstanding RMBS and CDO securities incurred record delinquencies and defaults and then, based upon the actual loan performance, instituted mass ratings downgrades. Those sudden mass downgrades caught many financial institutions and other investors by surprise, leaving them with billions of dollars of suddenly unmarketable securities. The RMBS secondary market collapsed soon after, and the CDO secondary market followed.

597.    The Morgan Stanley Defendants' misconduct in the ratings process is currently subject to a criminal investigation by the New York Attorney General. The SEC is also reportedly investigating the matter.

### (3)    Reports of Former Employees Show that Morgan Stanley Knew Its Statements Were False

598.    Former employees of Morgan Stanley and its subsidiaries have provided further corroborating evidence that Morgan Stanley and its subsidiaries intentionally ignored signs of fraud and underwriting violations in the loans they securitized.

599.    According to a former MSMC employee who worked as both a Quality Control Analyst and a Pre-Funding Quality Control and Fraud Investigations Manager from 2003 into 2006, MSMC failed to comply with their loan purchasing guidelines. This former employee was responsible for reviewing loans that MSMC considered acquiring for securitization and then

- 169 -

preparing an audit report that provided detailed pre-purchase information about the loans – including flagging any potential fraud in the origination of the loan (such as a borrower providing a salary that was excessive for a given job title) or other indicators that the loan was unlikely to be repaid.

600.    According to the former employee, MSMC's automated due diligence system could examine many relevant data fields for potential red flags with respect to individual loans.  However, the former employee explained that senior management, including MSMC's co-heads Kevin Rodman and Steve Rudner, were choosing to "turn off" an increasing number of data fields, making the reports less detailed.  It also resulted in manipulating the percentage score issued by the automated system to make the loans look safer than they were.

601.    MSMC also purchased loans that were riskier, *i.e.*, less likely to be repaid, than MSMC's guidelines permitted, as the loans exceeded MSMC's limit for LTV ratios.  Further, loan originators presented MSMC with loans that the originator claimed to be Alt-A, but instead were riskier subprime loans disguised as Alt-A loans.  These loans were securitized and represented to be Alt-A loans when they in fact Morgan Stanley knew they were not.

602.    According to the former MSMC employee, MSMC was "production-based" and was more concerned with acquiring loans for securitization than whether borrowers could repay the loans.  Contrary to MSMC's stated loan purchasing guidelines, MSMC was not concerned with determining whether borrowers' income was sufficient to repay the loans.  In fact, MSMC failed to adhere to its loan purchasing guidelines in order to purchase as many loans as possible because it was worried that if MSMC did not purchase the loans a competitor would.

603.    Morgan Stanley failed to disclose that its approved loan originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage, such as:

- 170 -

(a)     Coaching borrowers to misstate their income on loan applications to qualify for larger mortgage loans under the underwriters' underwriting standards, including directing applicants to no-doc loan programs when their income was insufficient to qualify for full documentation loan programs;

(b)     Steering borrowers to loans that exceeded their borrowing capacity;

(c)     Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

(d)     Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable loan rate adjusted; and

(e)     Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for or determining the validity of such compensating factors.

604.    Further, Morgan Stanley failed to disclose that the originators of loans purchased by MSMC and the agents of these originators – such as mortgage brokers – were so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had openly altered the required documentation. Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the lenders' clerical staff typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources). Unbeknownst to investors, including Union Central, these undisclosed practices had the effect of dramatically increasing the risk profile of the Certificates.

605.    Similarly, those borrowers who were required to submit stated income applications would include income levels which were routinely inflated to extreme levels, relative to their stated job titles, in order to get the mortgage loans approved and funded. For instance, a former MSMC

- 171 -

employee recalled MSMC purchasing loans extended to people whose stated occupation could not possibly provide the income stated on the loan application.  The former MSMC employee provided a hypothetical but typical example of a borrower whose stated occupation was pre-school teacher but whose stated income was $200,000 per year.  According to the former MSMC employee, when red flags such as these were raised, MSMC would often fail to consider the information and purchase the loan anyway.  Indeed, the existence of this type of extreme stated income inflation was corroborated in a study cited by the Mortgage Asset Research Institute which found that almost all stated-income loans exaggerated the borrower's actual income by 5% or more, and more than half increased the amount by more than 50%.

606.    Morgan Stanley knew that its appraisals were false and that therefore the stated LTV ratios were also false.  According to the former MSMC employee, Morgan Stanley management ignored information indicating that the loans MSMC was considering for purchase were not originated pursuant to MSMC's stated loan purchasing guidelines.  For example, the former employee red-flagged a number of loans purportedly made for completed homes in Maricopa County, Arizona because the homes had been sold numerous times within a short time span for ever increasing sales prices.  When the former employee visited the purported location of these homes, she noted that there were no homes built there nor were there any other homes in the area.  The employee determined that the "sales" of these "homes" were merely transactions back and forth between builders to artificially inflate their value.  When the former employee notified her MSMC superiors of her findings, they failed to consider this information and purchased these bad loans (and many others) anyway.

607.    A former MSCC employee provided similar evidence regarding the underwriting process employed by MSCC.  According to a former MSCC Underwriter who worked at MSCC

- 172 -

from January 2006 to October 2007, an underwriter's role at MSCC was a "joke" because MSCC's goal for underwriters was to approve and close as many loans as possible rather than determine whether a borrower could repay the loan.  The former underwriter explained that because most of MSCC's applicants were already Morgan Stanley clients with assets invested in Morgan Stanley, MSCC was "bending over backwards" to make sure the clients' loans were approved.  MSCC was not concerned with the ability of these existing clients to repay their loans but merely wanted to retain them as clients.  According to the former underwriter, MSCC feared that if MSCC did not approve loan applications submitted by its existing clients, the clients would withdraw the assets they had invested with Morgan Stanley and put them with another company such as Lehman Brothers or Goldman Sachs.  Due to these concerns, MSCC was incredibly lax in its underwriting and did not scrutinize the prospective borrower's credit profile.

608.    MSCC's loan underwriting policies were very problematic, according to the former underwriter.  Once a loan application reached the underwriter, it was considered "unprofessional" to question the applicant's stated income relative to the applicant's stated job title.  Thus, far from scrutinizing a borrower's information, underwriters who had reservations about an applicant's stated income level remained quiet and did not even check the applicant's stated income against information contained in publicly available websites such as salary.com.  The former underwriter explained that stated income loans would close within three hours of application submission because there was nothing in the application to verify.

609.    To ensure that loans were approved, MSCC put its underwriters on a strict quota system.  According to the former underwriter, MSCC underwriters were expected to approve a certain number of loans each day, week and month.  If they did not, the underwriters would be terminated.  In addition, MSCC underwriters were incentivized to approve as many loans as possible

- 173 -

as opposed to detecting bad loans.  For instance, an underwriter who approved 25% more loans than required by his or her quota would receive a bonus equal to 25% of his or her salary.  Given this incentive system, the underwriters at MSCC rarely denied a loan application.

610.    Similarly, while MSCC stated that appraisals were conducted by independent appraisers, the former MSCC employee reported that there was a conflict of interest with the appraisals used by MSCC.  According to the MSCC employee, MSCC rarely required or paid for full appraisals, which are comprehensive and include a physical inspection of the interior and exterior of the home, as well as pictures.  The majority of the time MSCC only required FAVs (field asset verification) or EAVs (estimated appraisal value).  The MSCC employee explained that FAVs are also called "drive bys" because it only requires that a realtor drive by and look at the home from the outside and then make a comparison based upon other home values in the neighborhood.  The EAV is based only on a comparison of the values of other homes in the neighborhood and no human eyes look at the home.  The former employee reported that many of their appraisals were not performed by licensed appraisers, but rather by realtors who had an incentive to inflate the value of the appraisals to achieve higher commission on their future home sales.

### (4)    Other Actions Against Morgan Stanley Confirm the Former Employees' Accounts

611.    The reports from former employees discussed above are consistent with reports from former Clayton and Morgan Stanley employees set forth in other actions pending against Morgan Stanley.

612.    For example, plaintiffs in *Allstate Insurance Company et al. v. Morgan Stanley & Co. et al.*, Index No. 651840/2011 (Sup. Ct. N.Y. July 5, 2011), conducted interviews of several Clayton or Morgan Stanley employees whose statements provide additional evidence that the Morgan Stanley Defendants systematically disregarded their underwriting guidelines during the relevant period.

- 174 -

613.    The *Allstate v. Morgan Stanley* plaintiffs spoke to a former Clayton official who worked as a Clayton due diligence underwriter from 2003 through 2007 and conducted due diligence on loans for the Morgan Stanley Defendants.  This former Clayton official

> confirmed that Morgan Stanley made exceptions on loans with high DTIs, and purchased loans even though borrowers' DTI ratios were not based on the fully indexed rate, but on the initial teaser rate . . . .  Morgan Stanley did not consider the borrower's ability to pay the full rate after the initial teaser rate expired, and would purchase and securitize interest-only loans in which borrowers were qualified at the initial start rate.

614.    The *Allstate v. Morgan Stanley* plaintiffs also spoke to a former Morgan Stanley and Clayton employee with intimate knowledge of the Morgan Stanley Defendants' due diligence and loan purchasing practices who "confirmed that Morgan Stanley employees were well aware of the poor quality of loans Morgan Stanley purchased and securitized and said that Morgan Stanley transaction managers would discuss the impact of DTI levels at weekly meetings."  This employee witness provided detailed information to the *Allstate v. Morgan Stanley* plaintiffs regarding the depth of the Morgan Stanley Defendants' misconduct:

> Morgan Stanley would itself degrade the quality of the RMBS by turning "full documentation" loans – which require the borrower to validate the income and other information in the loan application – into "stated income" loans, where such proof of income is not required, in order to pay a lower price to acquire the loan and increase its own profit. . . .  [T]his was Morgan Stanley's way of exploiting the fact that it routinely purchased loans that never should have been originated in the first place, knowing that these originators would capitulate because they depended on Morgan Stanley's willingness to continue buying their product.  Similarly, when a full documentation loan showed that the borrower's income was insufficient, Morgan Stanley would shred the documentation, and tell the originator to get a new, "stated" income, that made the loan appear reasonable. . . .  Morgan Stanley did this to increase its own profits, which were dependent on the spread between what Morgan Stanley paid for a given loan pool and what it received from selling those loans into a securitization.

615.    The *Allstate* plaintiffs also interviewed a former Morgan Stanley employee who served as a distressed asset manager at Morgan Stanley from January 2007 to June 2008.  According

to this confidential witness, "all of the loans he looked at had some deficiencies."  This confidential witness was formerly director of risk and compliance at Lydian Trust Securities ("Lydian") from June 2003 to October 2005.  Lydian performed reviews of Morgan Stanley loans that were to be included in securitizations.  According to the *Allstate* plaintiffs, this confidential witness said that

> Morgan Stanley was not concerned with underwriting compliance because Morgan Stanley knew that the defectively originated loans could be sold to investors. . . . Morgan Stanley executives met with Lydian and made clear to Lydian that Morgan Stanley wanted loans; Morgan Stanley wanted fulfillment. As such, [this confidential witness] explained that while auditing loans for Morgan Stanley, reporting deficiencies and exceptions on loans was pointless because Morgan Stanley was willing to accept loans on an exception basis. . . .  [A]t least 80% of the loans that [this confidential witness] reviewed contained deficiencies and should not have been purchased.

### 4.   Morgan Stanley & Co.'s Liability as an Underwriter of the Morgan Stanley Certificate

616.   MS&Co. made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by MS&Co. in the sale of certificates to investors.

617.   As underwriter, MS&Co. edited, drafted and controlled the content of the MSM 2005-5AR Trust's Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, MS&Co. received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject trusts.  As underwriter, MS&Co. then used and disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

618.   MS&Co., as an affiliate of the other Morgan Stanley Defendants, had knowledge that Morgan Stanley, as alleged herein, (1) failed to adhere to underwriting standards when it pooled

- 176 -

mortgage loans for its RMBS, including for the MSM 2005-5AR Trust; and (2) provided distorted information to the rating agencies that was purposefully manipulated to meet the targeted rating. Further, MS&Co. knew, or was reckless in not knowing, of the defective loans in the MSM 2005-5AR Trust as a result of its due diligence performed as an underwriter for the MSM 2005-5AR Trust.  MS&Co. had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans Morgan Stanley deposited in the MSM 2005-5AR Trust had a practice of routinely and systematically disregarding the stated underwriting standards.

619.   MS&Co. also knew that mortgage loans deposited into the MSM 2005-5AR Trust were not properly underwritten because MS&Co. was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged herein.  In addition to the MSM 2005-5AR Trust, MS&Co. underwrote and sold many other RMBS sponsored by Morgan Stanley and had in that context gained inside knowledge of the Company-wide poor quality loan underwriting standards and practices.

F.   **RALI**

1.   **Description of the RALI Certificates**

620.   Union Central purchased Certificates on several occasions in 2005 and 2006 from various Trusts whose depositor was defendant Residential Accredit.

621.   The following purchases made by Union Central represent a total investment of over $31.5 million:

| CUSIP | Certificate | Issuing Entity | Depositor | Underwriter(s) | Issue Date | Purchase Date |
|---|---|---|---|---|---|---|
| 76110H5E5 | RALI 2005-QA5 M-3 | RALI Series 2005-QA5 Trust | Residential Accredit | RFS | 4/1/2005 | 9/27/2005 |
| 7661118FQ6 | RALI 2005-QA9 | RALI Series | Residential | UBS Securities | 8/1/2005 | 9/9/2005 |

- 177 -

| | M-1 | 2005-QA9 Trust | Accredit | LLC ("UBS"); | | |
|---|---|---|---|---|---|---|
| 761118AQ1 | RALI 2005-QS7 M-3 | RALI Series 2005-QS7 Trust | Residential Accredit | CGMI; RFS; UBS | 6/1/2005 | 7/14/2005 |
| 761118BK3 | RALI 2005-QS9 M-3 | RALI Series 2005-QS9 Trust | Residential Accredit | Bear, Stearns & Co. Inc; UBS; RFS | 6/1/2005 | 7/19/2005 |
| 761118JU3 | RALI 2005-QS14 I-M-1 | RALI Series 2005-QS14 Trust | Residential Accredit | Deutsche Bank Securities Inc. ("DB"); RFS; J.P. Morgan Securities Inc. | 9/1/2005 | 11/13/2007 |
| 761118VP0 | RALI 2006-QS2 II-M-1 | RALI Series 2006-QS2 Trust | Residential Accredit | (RBS) Greenwich Capital Markets, Inc. ("RBS"); RFS | 2/1/2006 | 11/13/2007 |
| 74922EBE8 | RALI 2006-QS6 II-M-1 | RALI Series 2006-QS6 Trust | Residential Accredit | DB; Lehman Brothers Inc.; RFS | 6/1/2006 | 11/13/2007 |
| 74922RBF6 | RALI 2006-QS18 II-M-1 | RALI Series 2006-QS18 Trust | Residential Accredit | RBS; RFS; CGMI | 12/1/2006 | 1/9/2007 |
| 74922RBG4 | RALI 2006-QS18 II-M-2 | RALI Series 2006-QS18 Trust | Residential Accredit | RBS; RFS; CGMI | 12/1/2006 | 1/9/2007 |
| 74922RBH2 | RALI 2006-QS18 II-M-3 | RALI Series 2006-QS18 Trust | Residential Accredit | RBS; RFS; CGMI | 12/1/2006 | 1/9/2007 |

## 2.   False and Misleading Statements in RALI's Offering Materials

### a.   RALI Issued False and Misleading Statements About Compliance with Underwriting Standards

622.   RALI falsely assured investors in each of the RALI Series Trusts' Offering Materials that it and its originators had complied with underwriting standards for the mortgages in the collateral pool.

623.   The RALI Offering Materials falsely represented that RALI expected its originators to comply with underwriting procedures consistent with applicable law:

> The depositor [*i.e.*, defendant Residential Accredit] expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.

- 178 -

624.    The Prospectuses also falsely represented the review done by the RFC, whose function was to gather the mortgages from the originators and sell them to the depositor (defendant Residential Accredit) to be placed in the collateral pool for the RMBS.

> The level of review by Residential Funding Corporation, if any, will vary depending on several factors. Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any. . . .  In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties.  Those procedures may consist of drive-by appraisals, automated valuations or real estate broker's price opinions. . . .  In its underwriting analysis, Residential Funding Corporation may also consider the applicable Credit Score of the related mortgagor used in connection with the origination of the mortgage loan, as determined based on a credit scoring model acceptable to the depositor.

625.    The Prospectuses for each of the other Certificates contained the same representations regarding RFC's underwriting before selling to Residential Accredit.

626.    The RALI Offering Materials' statements also misled investors about defendant Residential Accredit's use of underwriting standards.  For example, the RALI 2005-QA5 Prospectus represented:

> With respect to the depositor's underwriting standards, as well as any other underwriting standards that may be applicable to any mortgage loans, such underwriting standards typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards.

- 179 -

627.   The Prospectuses for each of the other Certificates contained the same misrepresentations about compensation factors.

## (1)   RALI's Expanded Criteria Program

628.   The RALI Trusts were composed predominately of Alt-A mortgages.   RALI promised investors that these mortgages conformed to their "Expanded Criteria Program" and that Program's "Seller's Guide" for underwriting.  In fact, the Program's title was a misnomer.  Instead of "expanding" criteria, the Program permitted a lax review requiring reduced criteria.  Undisclosed to investors was the fact that RALI hid behind the Expanded Criteria Program's loosened standards in order to underwrite mortgages without regard to *any* criteria at all.

629.   In choosing originators of mortgages under the purview of the Expanded Criteria Program, RFC was supposed to adhere to the qualifications in the program's Seller's Guide. According to the RALI 2005-QA5 Trust:

> In determining whether to approve a mortgage collateral seller, Residential Funding Corporation generally considers, among other things: the financial status of the mortgage collateral seller; the previous experience of the mortgage collateral seller in originating mortgage loans and its potential origination volumes; the prior delinquency and loss experience of the mortgage collateral seller (if available); the underwriting standards employed by the mortgage collateral seller and its quality control procedures; and, if applicable, the servicing operations of the mortgage collateral seller.

630.   Describing the Expanded Criteria Program's underwriting standards, RALI represented in the RALI 2005-QA5 Trust:

> In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of

- 180 -

deposits at financial institutions where the mortgagor had demand or savings accounts. . . .

Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.

631.    RALI further represented in the Prospectus for RALI Series 2005-QA5:

Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for most of the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide.

632.    The above misrepresentations were repeated in the other RALI Prospectuses.

633.    Finally, RALI also represented in its Offering Materials that it hired third parties to review compliance with its underwriting criteria: "A portion of the mortgage loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria."

> **b.      RALI Issued False or Misleading Statements About Appraisals and LTV Ratios**

634.    RALI misrepresented the validity and accuracy of the appraisals used for loans packaged into RMBS it sold to Plaintiffs.  In each of the RALI Trust's Offering Materials, RALI purported to describe the role of appraisals: "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide."  In fact, any determination that the collateral was adequate for supporting the loan was false because appraisals were systematically inflated.

635.    With respect to the RALI Series 2005-QA5 Trust, the Prospectus stated:

- 181 -

The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

636.    The Prospectuses for each of the Certificates contained the same representations regarding the manner in which appraisals were conducted with respect to loans underlying the Certificates.

637.    The RALI Series 2005-QA5 Prospectus also stated:

The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance.

638.    Each of the other Prospectuses for the RALI Series Trusts contained the same representation regarding the originators' assessment of the appraisal value in relation to the loan.

639.    Despite RALI's knowledge of distortions in the LTV ratios, due to inflated appraisals, the RALI Series Trusts' Prospectuses provided investors with the inaccurate weighted average LTV ratios of the underlying mortgage pools.  The chart below sets forth the disclosed LTV ratios for the RALI Certificates:

| Certificates | LTV Ratio[5] |
|---|---|
| RALI 2005-QA5 M-3 | 76.29% |
| RALI 2005-QA9 M-1 | 76.76% |

---

[5]        *Denotes that the relevant Class of Loans is supported by a sub-group of loans rather than the entire underlying pool.  The LTV ratio is listed accordingly.

| Certificates | LTV Ratio[5] |
|---|---|
| RALI 2005-QS7 M-3 | 77.03% |
| RALI 2005-QS9 M-3 | 76.55% |
| RALI 2005-QS14 I-M-1 | 67.33%* |
| RALI 2006-QS2 II-M-1 | 65.89%* |
| RALI 2006-QS6 II-M-1 | 66.90%* |
| RALI 2006-QS18 II-M-1, II-M-2, and II-M-3 | 64.89%* |

640.    RALI further represented in each Prospectus for the Trusts at issue: "Under the depositor's underwriting standards, a mortgage collateral seller is usually permitted to provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, provided that the combined LTV ratio is not greater than 100%."

### c.    RALI Issued False and Misleading Statements about the Underlying Borrowers' Ability to Support the Loans

641.    RALI's Offering Materials contained misstatements concerning whether the borrowers for the underlying mortgages could maintain their loan payments in relation to their income.

642.    For example, the Prospectus for RALI Series 2005-QA5 represented: "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses."

643.    The other RALI Trusts made substantially the same representation.  These statements were false because RALI discarded underwriting standards and failed to properly evaluate borrowers' ability to pay their mortgages.

### d. RALI Issued False and Misleading Statements About Owner Occupancy

644.   The Offering Materials contained specific disclosures about the occupancy status of the loans underlying the Certificates.  The following chart sets forth the occupancy status disclosed by RALI with respect to the certificates:[6]

| Certificates | Primary Residence | Secondary/ Vacation Residence | Investment Property | Total Number of Loans | Percentage of Owner Occupied Loans |
|---|---|---|---|---|---|
| RALI 2005-QA5 M-3 | 637 | 22 | 126 | 785 | 83.11% |
| RALI 2005-QA9 M-1 | 1,972 | 68 | 445 | 2,485 | 83.49% |
| RALI 2005-QS7 M-3 | 1,225 | 46 | 664 | 1,935 | 77.16% |
| RALI 2005-QS9 M-3 | 1,456 | 43 | 496 | 1,995 | 77.63% |
| RALI 2005-QS14 I-M-1* | 517 | 38 | 237 | 792 | 69.59% |
| RALI 2006-QS2 II-M-1* | 455 | 32 | 292 | 779 | 65.71% |
| RALI 2006-QS6 II-M-1* | 380 | 20 | 163 | 563 | 74.79% |
| RALI 2006-QS18 II-M-1, II-M-2, and II-M-3* | 373 | 30 | 116 | 519 | 76.90% |

645.   As alleged below, the data provided by RALI as set forth in the above table was materially misstated because owner-occupancy rates for the property that collaterized the loans in the Trust were materially lower than represented which greatly increase the risk of substantial default and loss on such loans.

### e. RALI Issued False and/or Misleading Statements About the Removal of Mortgages

646.   The Offering Materials represented that the trustees of the RALI Series Trusts reviewed the mortgage documents in order to remove any materially defective mortgages. The following statement is found in the Prospectus for RALI 2006-QS18, and is substantially similar to statements describing the trustee's removal power found in the other RALI Series Trusts' Prospectuses:

---

[6]    *Denotes that the relevant Class of Loans is supported by a sub-group of loans rather than the entire underlying pool.  The owner occupancy levels are listed accordingly.

- 184 -

Within 45 days after receipt thereof, the trustee or the custodian, as applicable, will review the mortgage notes delivered to it.  If any such mortgage note is found to be defective in any material respect, the trustee or the custodian shall promptly notify [RFC] or the designated seller, if any, and the depositor.  If [RFC] or the designated seller, as the case may be, cannot cure the defect within 60 days. . . .  RFC] or designated seller, as applicable will be obligated no later than 90 days after such notice . . . to either repurchase the related mortgage loan . . . from the trustee or substitute a new mortgage loan.

In fact, RALI knew that defective mortgage loans were not being removed from the Trusts.

### f.   RALI Issued False and/or Misleading Statements Regarding the Ratings of its Trusts

647.   For RALI to sell its RMBS, it was necessary that its tranches be rated as disclosed in the Prospectuses.  Each Prospectus contained substantially the same language making the sale of RMBS conditional on achieving the stated rating in the Prospectus for a tranche: "It is a condition of the issuance of the [specified Class of] Certificates that they be rated not lower than [the specified rating] by [S&P, Moody's or Fitch]."[7]

648.   Since the sale of its RMBS was conditioned on achieving a certain rating, RALI solicited evaluations from credit rating agencies on the probability of default for the underlying mortgage pool.  The representations regarding the three credit rating agencies' ratings were substantially the same among the RALI Series Trusts:

- *Moody's*:  The ratings assigned by Moody's to the offered Certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement.  Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement.

---

[7]   For example, the Prospectus for RALI 2005-QA9 states: "It is a condition of the issuance of the Class M-1, Class M-2 and Class M-3 Certificates that they be rated not lower than 'AA,' 'A' and 'BBB,' respectively, by Standard & Poor's, and 'Aa2,' 'A2' and 'Baa2,' respectively, by Moody's." As another example, the Prospectus for RALI 2005-QS7 states: "It is a condition of the issuance of the Class M-1, Class M-2 and Class M-3 Certificates that they be rated not lower than 'AA,' 'A' and 'BBB', respectively, by Fitch."

- *S&P*:  The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. S&P's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the Certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the Certificates.

- *Fitch*:  The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the transaction structure. Fitch's ratings reflect its analysis of the riskiness of the underlying mortgage loans and the structure of the transaction as described in the operative documents.

649.    According to RALI's representations in its Prospectuses, the assigned credit ratings reflected the likelihood that investors like Union Central would receive the distributions to which they were entitled.  Put simply, the rating was supposed to describe the riskiness of the investment in the tranche.

650.    In reliance on the representations in the Prospectuses, Union Central purchased Certificates from RALI rated "investment grade," with many of the Certificates receiving an almost perfect rating – supposedly meaning that the obligor has a very strong capacity to meet its financial commitments.  For example, S&P assigned "AA" to many of the RALI Series Trusts at issue.  The following table sets forth the ratings of the Certificates when purchased by Union Central:

| Certificate | Original Rating |
|---|---|
| RALI 2005-QA5 M-3 | BBB |
| RALI 2005-QA9 M-1 | AA |
| RALI 2005-QS7 M-3 | BBB |
| RALI 2005-QS9 M-3 | BBB |
| RALI 2005-QS14 I-M-1 | AA |
| RALI 2006-QS2 II-M-1 | AA |
| RALI 2006-QS6 II-M-1 | AA |
| RALI 2006-QS18 II-M-1 | AA |
| RALI 2006-QS18 II-M-2 | A |
| RALI 2006-QS18 II-M-3 | BBB |

651.    In obtaining these ratings for the subject Certificates, RALI concealed the adverse information alleged herein from the rating agencies.  Had the rating agencies known the true value of

- 186 -

the loans underlying the Certificates, the Certificates would have been rated significantly lower, or not at all.

### 3.    Defendants' Statements Were Knowingly False and Misleading

652.    RALI knew, or was reckless in not knowing, that the statements identified above were materially false and misleading, and/or it had omitted material facts necessary to make the statements made not misleading.  As set forth herein, RALI had actual knowledge that the stated underwriting guidelines were not adhered to and, rather than provide truthful information and disclosures to Union Central and other investors, used such knowledge to reap massive profits for itself.

### a.    RALI Abandoned Its Underwriting Standards

653.    Despite the representations regarding compliance with the underwriting guidelines, in actuality, RALI's loan originators had – with the knowledge, if not approval, of RALI – abandoned the stated underwriting guidelines with respect to loans in the subject Trusts.

654.    RALI's originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate:  (1) the borrowers' ability to repay the debt; and (2) the lender and/or investors' ability to recover against the pledged collateral in the event of a default.  Instead, originators, using RALI's financing and encouraged by RALI and other investment banks' insatiable appetite for mortgages to feed their loan securitization businesses, approved loans they knew were based on falsified information and did not comply with any of the stated underwriting guidelines.

655.    In fact, in its 2011 Form 10-K, Ally admitted that its underwriting practices were inadequate:  "The total exposure of the applicable Mortgage Companies to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting

standards and risk-mitigation actions implemented in 2008 and forward."  In reaction to the damage

done by its RMBS business, Ally discontinued its activities in "lending to real estate developers and

homebuilders in the United States and the United Kingdom; purchasing, selling and securitizing

nonconforming residential mortgage loans (with the exception of U.S. prime jumbo mortgage loans)

in both the United States and internationally; and certain conforming origination channels closed in

2008 and our mortgage reinsurance business."

**b.      The Skyrocketing Default Rates on RALI Trusts Are
Evidence of Abandoned Underwriting**

656.      The Certificates purchased by Union Central were supposed to be stable, long-term

investments backed by investment-grade credit ratings.  However, the extraordinary number of

defaults on the mortgage loans underlying Union Central's Certificates is prima facie evidence that

the stated underwriting standards and loan characteristics represented in the Offering Materials were

materially false and misleading.

657.      The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as

well as collateral cumulative losses as of June 2010, for certain RALI Certificates purchased by

Union Central:

| Certificate | Original Deal Size | Delinquent, Bankruptcy, Foreclosure, REO Actual Balance | Collateral Cumulative Losses |
|---|---|---|---|
| RALI 2005-QA5 | $236,761,800 | $7,083,339 | $4,564,844 |
| RALI 2005-QA9 | $650,482,392 | $73,332,830 | $10,602,032 |
| RALI 2005-QS7 | $369,979,162 | $33,499,972 | $5,883,848 |
| RALI 2005-QS9 | $370,978,359 | $31,286,652 | $3,712,571 |
| RALI 2005-QS14 (Group 1) | $130,938,205 | $4,267,392 | $474,243 |
| RALI 2006-QS2 (Group 2 and 3) | $131,448,942 | $8,456,630 | $178,560 |
| RALI 2006-QS6 (Group 2) | $106,652,100 | $6,982,926 | $407,716 |
| RALI 2006-QS18 | $104,211,498 | $8,477,978 | $1,364,709 |

- 188 -

658.     Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of delinquency, bankruptcy and foreclosure would be far lower than the current rates.   Moody's maximum expected collateral losses for the life of the certificates, where known, is set forth in the table below:

| Certificate | Maximum Expected Loss |
|---|---|
| RALI 2005-QA5 | N/A |
| RALI 2005-QS14 | $589 221.92 |
| RALI-2006-QS2 | N/A |
| RALI-2006-QS6 | NA |
| RALI 2005-QS7 | $2 774 843.72 |
| RALI 2005-QS9 | $2 596 848.51 |
| RALI-2005-QA9 | $5 854 341.53 |
| RALI-2006-QS18 | N/A |

### c.      RALI Used Inflated Appraisals and LTV Ratios

659.     The RALI Offering Materials' descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.   Undisclosed in the Offering Materials, and in violation of any legitimate appraisal standards, RALI used appraisals that had been manipulated and inflated to guarantee that the collateral property would be valued at a price sufficient to support the loan.

660.     Recent analyses using modeling performed by other parties who purchased RALI RMBS during the relevant period confirm that appraisals connected with RALI's securitizations in 2005-2006 were routinely inflated.   For instance, the plaintiffs in *Mass. Mutual Life Ins. Co. v. Residential Funding Co.*, No. 3:11-cv-30035 (D. Mass. Feb. 9, 2011) ("*Mass. Mutual*"), conducted an AVM analysis of a sample of the property underlying the RALI offerings at issue in that litigation.   *Mass. Mutual* Complaint (Dkt. No. 1), ¶¶74-181.   The RALI securitizations at issue in the

- 189 -

*Mass. Mutual* case occurred at the same time and are essentially similar to the securitizations sold to Plaintiffs. The *Mass. Mutual* plaintiffs' analysis demonstrates that valuation of loans underlying their certificates were materially and consistently inflated, and as a result, the stated LTV ratios were materially overstated, which in turn greatly increased the risk of default on those loans.

661. The *Mass Mutual* Plaintiffs' AVM analysis revealed that all of the RALI loan pools at issue in the *Mass. Mutual* case should have disclosed significantly higher weighted average LTV ratios. The following chart summarizes the findings of the *Mass. Mutual* plaintiffs' forensic review:

| Trust | Weighted Average LTV of the Collateral Loans as Represented in the Offering Materials | Actual Weighted Average LTV Per Forensic Review | Percentage of Collateral Loans with LTV of Greater than 90% | Actual Percentage of Collateral Loans with LTV of Greater than 90 Per Forensic Review |
|---|---|---|---|---|
| RALI 2005-QO3 | 73.84% | 81.35% | 0.51% | 16.56% |
| RALI 2005-QO4 | 74.25% | 83.71% | 1.21% | 19.81% |
| RALI 2006-QA6 | 76.97% | 85.58% | 1.01% | 18.84% |
| RALI 2006-QO1 | 74.51% | 84.06% | 1.61% | 24.71% |
| RALI 2006-QO3 | 74.31% | 85.53% | 1.22% | 20.94% |
| RALI 2006-QO14 | 74.27% | 83.10% | .92% | 21.64% |
| RALI 2006-QO5 | 74.67% | 84.15% | 1.26% | 19.54% |
| RALI 2006-QO6 | 74.66% | 85.69% | 1.56% | 23.98% |
| RALI 2006-QO9 | 75.15% | 89.46% | .54% | 32.42% |

662. The FHFA also brought a lawsuit against the RALI Defendants regarding more than $6 billion in RMBS purchased from Trusts sponsored and underwritten by RALI. *FHFA v. Ally Financial Inc., et al.*, No. 11-7010 (S.D.N.Y.) ("*FHFA v. RALI*") originally filed in the Supreme Court of the State of New York, Index No. 652441/2011 (Sept. 2, 2011). The FHFA performed a similar AVM review to determine the accuracy of the LTV ratios in the RALI Trusts at issue there. The FHFA found that for every securitization they analyzed, the percentage of loans having LTV

- 190 -

ratios 80% or less was overstated.  Further, the percentage of loans having LTVs of over 100% ranged from 2% to as high as 23%.  *FHFA v. RALI* Complaint, ¶¶99-104.

663.    Property valuations were overstated, thereby decreasing stated LTV ratios, through the manipulation of the appraisals conducted on the underlying properties.  Instead of conducting appraisals designed to accurately value the subject property in compliance with USPAP, many of the appraisals conducted on the underlying properties, if they were conducted at all, were designed to hit valuation targets that would allow loans to be funded and sold in RMBS.

664.    As set forth in §§IV.F. and IV.H.2., RALI was a participant in the routine practice of pressuring appraisers to misstate appraisals in order to ensure that loans were funded regardless of the quality of the underlying collateral.

### d.       RALI Falsified Debt-to-Income Ratios

665.    RALI's Offering Materials materially misstated the thoroughness of RALI's evaluation of whether the borrowers' income would be able to cover their mortgage debt.  In addition, RALI systematically understated the DTI ratios provided in RALI's loan schedules, even though it knew the rating agencies relied on that misstated data for their ratings.

666.    RALI and its originators knew that borrowers routinely falsified their stated incomes in order to have loans approved.  In the case of stated income loans, for example, RALI and its originators knew that many borrowers claimed incomes that did not come anywhere near a reasonable level for their stated occupations.

667.    Plaintiffs have examined certain of the loans contained in the RALI 2005-QA9, RALI 2005-QS7, RALI 2005-QS9, and RALI 2006 QS18 Trusts and found numerous examples of loans where DTI ratios were falsified and where obvious signs of fraud or misrepresentations were either accepted or ignored.

### (1)     RALI 2005-QA9

668.     This Trust contained a loan from April 2005 meant to refinance what was claimed to be a primary residence in Draper, Utah.  However, when the borrower went bankrupt ***within six months*** of completing the loan, the borrower listed a different primary address on the bankruptcy filings.  That there was a failure by RALI to investigate the borrower's ability to keep up with its mortgage payments is clear here.  Not only did bankruptcy occur immediately following the mortgage's closure, but the stated DTI is 33% on the mortgage loan schedule was significantly lower than the borrower's true DTI, which was in excess of 102% to 115%.

669.     Another loan in this Trust was for refinancing a primary residence in Minneapolis, Minnesota in June 2005.  Had RALI diligently investigated this loan file they would have found that within three months of the refinancing, the borrower had taken on two other debts that were over $100,000.  Even more egregiously, based on public records, the borrower had negative income for 2005, reflecting a potentially ***infinite*** DTI, rather than the 38% reported in the loan schedule.

670.     Plaintiffs' investigation uncovered another loan from this Trust that had potentially infinite DTI, though the loan schedule reported a DTI of 42%.  This mortgage, dated May 2005, was meant to provide 100% financing for a couple's property in Lathrop, California.  The mortgage was in the name of the wife.  Because her name was on the purchase papers, only her income should have been considered to qualify her for the loan.  However, public records list her occupation as a "homemaker" suggesting RALI failed to fully investigate the source of income that would support the mortgage.  Even with the total income the couple reported from employment and unemployment disbursements, it should have been obvious that the income could not likely support the debt.

- 192 -

### (2)    RALI 2005-QS7

671.    Another loan included in the Trust was dated May 2005 for a property in Memphis, Tennessee.  Based on available public records, the loan was to refinance one of the thirty-nine investment properties from which the borrower ended up incurring over $2.5 million in secured debt owed.  The borrower was a self-employed contractor who, despite any apparent prior experience in investing or managing property, went on a purchasing spree from 2003 to 2005 with a credit score of 632 and no reported income in 2005.  Without an income, the borrower's DTI was infinite, not the reported 38%.

### (3)    RALI 2005-QS9

672.    A mortgage included in this Trust was for the purchase in May 2005 of a home in Springfield, Illinois as an investment property.  The filing used "stated/easy" documentation and listed a DTI of 28%.  In fact, the borrower's DTI exceed 100%.  The property was one among several properties purchased by the borrower over the preceding three years; however, preceding property purchases were apparently not disclosed on the filing.  In addition, the borrower was an agent of the originator, which under typical underwriting guidelines, should have required full documentation since the transaction was not at arm's length.  However, the borrower exploited the stated-doc loan to more easily obtain the property while the originator booked a profit on the transaction, and it was then securitized and sold to investors, including Plaintiffs.

673.    This Trust also included a mortgage dated August 2004 for a property in Jasper, Georgia.  The borrower's credit score was 655 and the recorded DTI was 41%.  However, according to public records, the borrower's true DTI was 530%.  Also, contrary to the representation on the loan schedule, the property was not owner occupied within sixty days of closing.  Instead, the property continued to be under construction for more than six months.

- 193 -

705280_1

674.    Another loan refinanced a property in Bay City, Michigan in May 2005.  Based on public records, the borrower's DTI was 86% rather than the 44% reported on the loan schedule.  Yet another loan dated April 2005 to purchase property in Wesley Chapel, Florida listed a DTI of 35% when public records indicated a DTI as high as 132%.  The borrower for that loan had to obtain a second lien on the property within one year of completing the mortgage put into the Trust.

### (4)    RALI 2006-QS18

675.    The RALI 2006-QS18 Trust included the refinance in November 2006 of a home in Stone Mountain, Georgia.  The lender was HomeComings, a RALI affiliate.  Despite underwriting guidelines, the borrower had not had a stable and continuing income for the two years prior to the loan's extension.  Additionally, underwriting guidelines generally disapprove a borrower who started a business within one month prior to the completion of the loan.  This borrower, however, had apparently started a real estate investment business through an LLC within the month prior to completing the loan.  Further demonstrating the lack of diligent underwriting, the borrower for this mortgage had a credit score of 643 and a DTI in excess of 136%, misstated as 41%.  By the time the borrower filed for bankruptcy, the borrower held eighteen mortgages, including refinancings that the borrower would complete sometime within two months of obtaining the initial loan.

676.    Another mortgage pooled into the Trust refinanced a property in Lawndale, California.  The lender was HomeComings, and according to public records, the borrower had a credit score of 629 and an occupation involving janitorial services.  The borrower already owned four properties at the time the loan was completed and had a reported DTI of 50% – well above the industry's accepted level.  Yet even with the many red flags that a proper due diligence review should have revealed, the loan was allowed into the Trust.

- 194 -

677.    RALI's rush to securitize mortgages resulted in granting loans to borrowers who could not keep up with payments on their mortgages.  Further, RALI's failure to screen out bad loans meant that the false DTIs included in the loan schedules distorted the ratings assessed by the rating agencies for the Trusts.  Investors, such as Plaintiffs, who had relied on the distorted ratings in purchasing the Certificates, suffered losses when the borrowers inevitably became delinquent.

### e.    RALI Falsified Owner-Occupancy Rates

678.    In addition to the above examples which demonstrate that RALI's Offering Materials misrepresented the owner-occupancy rates of subject properties underlying the Trusts, other litigants' loan-level analysis of thousands of loans securitized by RALI at the same time as the Certificates at issue here, also show RALI's widespread practice of routinely misstating owner-occupancy rates with respect to the loans underlying RALI RMBS offerings during the relevant time period.  In addition to their LTV analysis, the *Mass. Mutual* plaintiffs undertook a sophisticated forensic analysis to determine whether a given borrower actually occupied the property as claimed.  *Mass. Mutual* Complaint, ¶¶182-203.  The *Mass. Mutual* plaintiffs analyzed tax records, credit records, bills, property records and lien records, to determine whether a borrower was actually living in the property subject to the loan.

679.    The results of the *Mass. Mutual* plaintiffs' analysis demonstrates that the percentage of owner-occupied properties disclosed by RALI in their Prospectuses was consistently false and that the true rate was much lower, and thus those RMBS investments were much less safe than RALI led investors to believe.  This was highly material because borrowers are more likely to keep up with their payments on a property in which they live than on a second home or investment property.  The following chart shows the results of their analysis:

- 195 -

| Certificate | % Represented in Offering Materials as Primary Residences | Actual % | Overstatement |
|---|---|---|---|
| RALI 2005-QO3 | 84.16% | 73.26% | 10.90% |
| RALI 2005-QO4 | 79.62% | 68.17% | 11.45% |
| RALI 2006-QA6 | 72.96% | 60.42% | 12.54% |
| RALI 2006-QO1 | 81.65% | 70.86% | 10.79% |
| RALI 2006-QO3 | 84.66% | 75.49% | 9.17% |
| RALI 2006-QO4 | 84.37% | 72.98% | 11.39% |
| RALI 2006-QO5 | 85.31% | 75.12% | 10.19% |
| RALI 2006-QO6 | 85.57% | 73.21% | 12.36% |
| RALI 2006-QO9 | 83.86% | 71.05% | 12.81% |

680.     As part of its allegations against the RALI Defendants, the FHFA conducted a similar analysis that found RALI had vastly understated the percentage of non-owner-occupied properties. ¶98.  The following chart summarizes these FHFA findings:

| Certificate (with Supporting Loan Group) | % Represented in Offering Materials as Non-Owner Occupied Residences | Actual % | Understatement |
|---|---|---|---|
| RALI 2005-QO4 (Group I) | 18.32% | 30.52% | 12.19% |
| RALI 2006-QO4 (Group I) | 20.86% | 32.62% | 11.76% |
| RALI 2006-QO5 (Group I) | 18.87% | 29.53% | 10.66% |
| RALI 2006-QO8 (Group II) | 18.22% | 29.00% | 10.78% |
| RALI 2006-QO9 (Group II) | 19.01% | 30.22% | 11.21% |

681.     RALI engaged in a consistent pattern of misconduct designed to make the mortgages underlying its securitizations appear to be much safer investments than they actually were.  By concealing the fact that there were fewer owner-occupied properties in the Trusts – and therefore that there was a much greater likelihood that borrowers who defaulted on their loan would never cure the default but rather would abandon the property – RALI deceptively made the Trusts appear to be safer investments than they actually were.

### f.     RALI Knew that Its Originators Violated Underwriting Guidelines

682.     While the RALI Offering Materials set forth detailed underwriting guidelines which were supposed to have been applied in evaluating borrowers whose loans were in the Trusts, in fact the stated underwriting guidelines had been abandoned by the loan originators.

- 196 -

683.    RALI's originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default.

684.    HomeComings had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to RALI for inclusion in the subject Trusts, as alleged above at §IV.I.

685.    Before placing the mortgages into pools for securitization, RALI knew that the quality of the loans did not meet prudent underwriting practices and standards because it also analyzed those loans to determine which ones it would securitize and get off its books.  ResCap's 2006 Form 10-K described RALI's decision-making process with respect to whether to retain mortgages on its books or to get them off its book through securitizations sold to investors:

> Our portfolio of residential mortgage loans held for investment and interests that continue to be held from our securitization activities includes some residential mortgage loans we own directly, having decided to hold these loans in our portfolio instead of selling them through whole-loan sales or securitizations.  A decision to retain certain assets in our portfolio is dependent upon a variety of factors, including the type of mortgage product, the interest rate environment, general economic conditions, the availability of efficient funding sources and other factors in the capital markets.  These factors impact our assessment of the value of the asset and its ability to generate revenues over time.

686.    RALI securitized a large percentage of its high-risk, bad loans that had not been properly underwritten and which it knew would go into default, result in losses and would not generate revenues over time, and to avoid this risk it purposefully put those assets into securitizations for investors.

687.    RALI also had access to and reviewed the underlying mortgages and actual loan tapes for the loan securitizations sold to Plaintiffs.  As part of that review process RALI learned the loans

had not been properly underwritten but it willfully disregarded that the loans did not meet the stated underwriting standards.

688.    Indeed, RALI's wrongful loan securitization practice is also confirmed by others' investigations.  MBIA Insurance found that "[a]t least 89% of the 4,104 delinquent or charged-off loans" of the RMBS it insured for RALI "were not originated in material compliance with GMAC Mortgage's Underwriting Guidelines."  Complaint, *MBIA Insurance Corp. v. GMAC Mortgage, LLC (f/k/a/ GMAC Mortgage Corporation)*, Index No. 600837/2010 (Sup. Ct. N.Y. Apr. 1, 2010) (Dkt. No. 2), ¶6.  In another complaint against Defendant RFC, MBIA found that less than 7% of 1,847 mortgage loans reviewed were originated in material compliance with RFC's representations and warranties.  Complaint, *MBIA Insurance Corp. v. Residential Funding Co., LLC*, Index No. 603552/2008 (Sup. Ct. N.Y. Dec. 4, 2008) (Dkt. No. 1), ¶47.

689.    Ally's 2011 Form 10-K discloses that as a result of its practice of securitizing bad loans Ally had paid out $91 million of original unpaid principal balance through settlements, repurchases, indemnification payments, and rescinded claims due to the junk mortgages it originated and underwrote as of year end 2011.

g.    **RALI Knew that Its In-House Originator Participated in Discriminatory/Predatory Lending**

690.    HomeComings, a wholly owned subsidiary of Defendant RFC, was the source of many of the underlying mortgages RALI packaged in the RALI Series Trusts.  In a letter dated January 22, 2009, the Federal Trade Commission ("FTC") reported its findings from an "extensive" investigation conducted of HomeComings.[8]  The FTC staff concluded that HomeComings had

---

[8]    *See* http://www.ftc.gov/os/closings/090122homecomingfinancialclosingletter.pdf.

systematically set higher prices on mortgages for African-American and Hispanic borrowers.[9]  The FTC's investigation found that "Homecomings originated the vast majority of its loans through independent brokers" who HomeComings permitted "to assess discretionary charges."  Taking advantage of HomeComings' policy, brokers charged African-American and Hispanic borrowers "substantially more for home purchase and refinance loans than similarly-situated non-Hispanic whites" by tacking on higher fees charged at origination or by charging higher interest rates, from which brokers earned greater yield spread premiums from HomeComings.  The FTC determined that the disparities based on race in discretionary charges were "substantial, statistically significant, and [could not] be explained by any legitimate underwriting or credit characteristics."  By making these loans more expensive than they should have been, HomeComings increased the likelihood of default.

691.   According to the FTC's letter, these practices violated federal law – in direct contravention of the representations RALI made in its Offering Materials that its originations complied with federal law.  Furthermore, these violations properly should have been stopped by HomeComings' and RALI's quality control over the brokers and the mortgages processed for securitization.  The fact that these wrongful practices could thrive within RALI's operations is further indication that RALI had discarded its underwriting standards to ensure the faster accumulation of mortgages, particularly those with higher interest rates, for its RMBS.

---

[9]   The letter was to inform that the FTC staff had closed the investigation of HomeComings because it had ceased originating mortgages and its indirect parent company, ResCap, had indicated in a filing with the SEC that HomeComings would likely soon cease to be a going concern.  In fact, Ally reported in its 2011 Form 10-K that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations."  Furthermore, much of its former business has been extinguished.

h.      **RALI Purposefully Loosened Its Underwriting**
        **Standards to Grow Its Warehouse Lending Program**

692.    Defendant ResCap was the parent to RFC and Residential Accredit.  Its mortgage business featured an enormous multi-billion dollar warehouse lending operation.  Warehouse lending provided financing to originators who did not have access to saving deposits and other loan funding sources.  It also provided access to and control over originators' underwriting practices.  Using RALI's financing the originators were then able to make mortgage loans and sell them back to RALI.

693.    Because of its financial arrangements with warehouse lenders, ResCap was essentially committed to buying the loans that secured its warehouse lines regardless of their quality and the results of ResCap's due diligence.  ResCap purchased the loans with little or no objection to keep the lenders supplied with capital for paying the fees and interest owed on the lines of credit.  It was also important to ResCap that it protect its business relationships with warehouse lenders in order to ensure a steady flow of loans for securitization.

694.     Warehouse lenders like ResCap had the ability to put back a loan that failed to meet underwriting standards, but ResCap knew that too many rejections would financially starve those originators.  As a result, ResCap was incentivized to accept defective mortgages for RALI securitizations.

695.     In fact, ResCap reported in its 2005 Form 10-K filed with the SEC: "We believe we are the largest provider of warehouse lending facilities to correspondent lenders and other mortgage originators in the United States."  ResCap claimed this leadership position again in its 2006 Form 10-K.  ResCap's lucrative business was fueled by permitting the funding of more and more mortgages, which were then securitized and sold to investors, regardless of whether those loans had been properly underwritten.

- 200 -

696.     Furthermore, RALI's position as a source of "warehouse" lines of credit gave it unique knowledge of the conditions under which mortgage loans were originated.  The lines of credit allowed RALI to control the origination practices of these lenders and gave RALI an inside look into the true quality of the loans they originated.

**(i)      Government Investigations Confirm that
RALI Failed to Properly Underwrite the
Mortgages in the RMBS**

697.     RALI has been the subject of numerous criminal and regulatory probes related to its mortgage underwriting practices.   These investigations further confirm that RALI's misrepresentations were not mere isolated, innocent mistakes, but the result of the company's reckless or intentional misconduct.

698.     As Ally reported in its 2011 Form 10-K filed with the SEC, the Federal Reserve Board ("FRB") and FDIC conducted an examination of Ally and ResCap, among other related Ally entities.  The FRB entered an FDIC Consent Order on April 13, 2011 requiring the Ally entities "to make improvements to various aspects of [their] residential mortgage loan-servicing business, including compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight by the boards of the Ally Entities."  The Consent Order also requires Ally to "retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions."

699.     Government-sponsored Freddie Mac and Fannie Mae have also brought actions against Ally, requiring certain of the RALI Defendants to repurchase $285 million of original unpaid principal for mortgages originated in 2004-2008.  In addition, certain RALI Defendants made one-time payments to Freddie Mac and Fannie Mae in exchange for a release from repurchase obligation

- 201 -

for mortgage loans sold to the GSEs prior to June 30, 2010.  The agreement however, does not release RALI from private label RMBS.  (According to the FCIC report, Freddie Mac put back $453 million delinquent loans to Ally.)  Indeed, the FHFA, as conservator for Freddie Mac, has brought a lawsuit against RALI for its failed $6 billion investment in Ally Trusts.  *FHFA v. RALI* Complaint.

700.    Further, on June 29, 2011, the SEC and United States Department of Justice ("DOJ") issued subpoenas as part of an investigation involving Ally's issuance of RMBS.  According to a news article on the investigation, the DOJ sought "documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans."  The SEC investigated "payments Ally received from mortgage originators in exchange for Ally agreeing not to make [the originators] buy the loans back if the borrowers didn't make payments."

701.    RALI's abandonment of prudent loan underwriting also had a negative impact on its own financial condition because RALI was unable to securitize and remove from its own books all the bad loans it was originating and acquiring during 2005 through 2007.  The United States government continues to control a 74% stake in Ally after bailing it out and as a result of its wrongful conduct.  Meanwhile, in March 2012, despite $17 billion taxpayer dollars sunk into Ally, it failed the Federal Reserve's "stress-test."

### 4.    Residential Funding's Liability as an Underwriter of the RALI Certificates

702.    RFS made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by RFS in the sale of certificates to investors.

703.    As underwriter, RFS edited, drafted and controlled the content of the RALI Trusts' Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with its due diligence conducted in connection with the offering of the RALI

- 202 -

Certificates to Plaintiffs, RFS received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts. As underwriter, RFS then disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

704.   RFS, as a subsidiary within RALI, had knowledge that RALI, as alleged herein, failed to adhere to underwriting standards when it pooled mortgage loans for its RMBS, including for the RALI Trusts, and provided distorted information to the rating agencies that was purposefully manipulated to meet the targeted rating. Further, RFS knew, or was reckless in not knowing, of the defective loans in the RALI Trusts as a result of its due diligence performed as an underwriter for the RALI Trusts. RFS had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans RALI deposited in the RALI Trusts had a practice of routinely and systematically disregarding the stated underwriting standards.

705.   RFS also knew that mortgage loans deposited into the RALI Trusts were not properly underwritten because RFS was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged herein. In addition to the RALI Trusts, RFS underwrote and sold many other RALI RMBS and had in that context gained inside knowledge of its improper loan securitization practices that were also used for the Trusts.

### 5.   UBS's Liability as an Underwriter of the RALI Certificates

706.   UBS Securities made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by UBS Securities in the sale of certificates to investors.

- 203 -

707.    As underwriter, UBS Securities edited, drafted and controlled the content of the RALI 2005-QA9, RALI 2005-QS7 and RALI 2005-QS9 Trusts' Offering Materials, including with respect to the material misstatements and omissions alleged above in §V.F.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, UBS Securities received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject trusts.  As underwriter, UBS Securities then used and disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

708.    UBS Securities also knew that mortgage loans deposited into the RALI 2005-QA9, RALI 2005-QS7 and RALI 2005-QS9 Trusts were not properly underwritten because UBS Securities was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged in Section V.G.  In addition to the RALI 2005-QA9, RALI 2005-QS7 and RALI 2005-QS9 Trusts, UBS Securities underwrote and sold many other RMBS, including as alleged below in Section V.G., and had in that context gained inside knowledge of the poor quality loan underwriting.

      **6.**      **Citigroup Global Markets, Inc's Liability as an Underwriter of the RALI Certificates**

709.    CGMI  made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by CGMI in the sale of Certificates to Plaintiffs.

710.    As underwriter, CGMI edited, drafted and controlled the content of the RALI 2005-QS7 and RALI 2005-QS14 Trusts' Offering Materials, including with respect to the material misstatements and omissions alleged above in §V.F.  In connection with its due diligence conducted

- 204 -

in connection with the offering of the Certificates to Plaintiffs, CGMI received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.  As underwriter, CGMI then used and disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

711.    CGMI also knew that mortgage loans deposited into the RALI 2005-QS7 and RALI 2005-QS14 Trusts were not properly underwritten because CGMI was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged in Section V.B.  In addition to the RALI 2005-QS7 and RALI 2005-QS14 Trusts, CGMI underwrote and sold many other such RMBS to investors and had in that context gained inside knowledge of the poor quality loan underwriting.

### 7.    Deutsche Bank's Liability as an Underwriter of the RALI Certificates

712.    DB Securities acted as the underwriter in the sale of Certificates from the RALI 2006-QS2 and RALI 2006-QS18 Trusts.  DB Securities made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by DB Securities in the sale of those Certificates to Plaintiffs.

713.    As underwriter, DB Securities edited, drafted and controlled the content of the RALI 2006-QS2 and RALI 2006-QS18 Trusts' Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, DB Securities received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject Trusts.  As underwriter, DB Securities then used and disseminated

- 205 -

these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

714.    DB Securities knew, or was reckless in not knowing, of the defective loans in the RALI 2006-QS2 and RALI 2006-QS18 Trusts as a result of its due diligence performed as an underwriter of these RMBS offerings.  DBS Securities had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans RALI deposited in the RALI 2006-QS2 and RALI 2006-QS18 Trusts had a practice of routinely and systematically disregarding the stated underwriting standards.

715.    During the relevant time period in 2006, DB Securities also routinely engaged in the wrongful practice of underwriting and selling to investors securitizations of toxic mortgages.  As a result of this misconduct regarding other RMBS, DB Securities was made aware that loan originators in connection with the RALI 2006-QS2 and RALI 2006-QS18 Trusts had a practice of failing to comply with the stated underwriting standards.

716.    DB Securities was a sophisticated market-maker and subsidiary of Deutsche Bank AG (Deutsche Bank), which provided DB Securities with institutional and inside knowledge regarding the quality of the underwriting for the mortgage loans in the RALI Trusts.  Deutsche Bank was a major player in the RMBS market and participated in virtually every aspect of the securitization process.  Deutsche Bank had subsidiaries that originated loans, including MortgageIT Inc. ("MortgageIT") and DB Home Lending LLC.  Deutsche Bank provided warehouse financing to other loan originators where those loans were then acquired and securitized into RMBS.  Deutsche Bank acted as sponsor, depositor, trustee and underwriter for RMBS, and it arranged, structured and marketed CDOs, as well as the credit default swaps ("CDSs") that shorted its structured products.

705280_1

717.    Deutsche Bank's loan underwriting standards were similarly defective.  When Clayton reviewed a sample of Deutsche Bank's mortgage loans from January 2006 through June 2007, it rejected 35% of the loans outright because they failed to meet underwriting guidelines and did not have any compensating factors.  But for the loans Clayton rejected outright, Deutsche Bank waived through the securitization process an astonishing 50% that ended up in its RMBS trusts sold to investors.

718.    As an affiliate of Deutsche Bank, DB Securities was party to a corporate-wide practice and process of creating RMBS with loans that did not meet prudent underwriting standards and then selling those toxic RMBS to investors.  DB Securities engaged in a similar process when selling the RALI 2006-QS2 and RALI 2006-QS18 Trust Certificates to Plaintiffs without disclosing the true facts surrounding the underlying loans.

719.    As detailed in a complaint filed by the DOJ, Deutsche Bank was aware of serious lapses in MortgageIT's loan underwriting practices, including the chronic failure to verify basic information concerning its borrowers, such as income and employment status.  *See United States v. Deutsche Bank AG, et al.*, No. 11-CIV-2976 (S.D.N.Y.).  The DOJ alleges Deutsche Bank failed to review the early payment defaults on the subprime loans it originated, as it was required to by its fiduciary duty to HUD to maintain its Direct Endorsement Lender status.  Deutsche Bank's poorly-underwritten HUD-guaranteed loans are reportedly expected to cost the government more than $1 billion.

720.    In July 2010, the Financial Industry Regulatory Authority fined Deutsche Bank $7.5 million for misrepresenting the delinquency rates of mortgages that it securitized into RMBS during the 2006-2007 time period.

- 207 -

721.     Deutsche Bank also profited from its awareness of the lack of proper loan underwriting.  After Deutsche Bank packaged and sold mortgage loans with inferior – or no – underwriting into its RMBS and then re-packaged them into CDOs, Deutsche Bank simultaneously shorted certain of these deals by purchasing CDS on the very same mortgage-backed investment it was selling to investors.  Greg Lippmann ("Lippmann"), Deutsche Bank's head CDO trader, and his team sold CDOs to clients while failing to disclose that Deutsche Bank had bet against those deals by purchasing CDSs on them.

722.     At the same time that DB Securities was selling RALI 2006-QS2 and RALI 2006-QS18 Certificates to Plaintiffs, Deutsche Bank was betting against residential mortgages and mortgage- backed investments because it was well aware of the widespread problems with loan underwriting practices and that a high percentage of these types of poorly underwritten mortgage loans would fail.  Deutsche Bank's internal documents reveal that by 2006, Lippmann was describing the CDO business as a "Ponzi scheme," and he recommended shorting deals that were made up of RMBS, which he described as "pigs," "horrible," and "crap."   In a September 2006 internal communication Lippmann described the mortgage-backed product Deutsche Bank was selling to investors as the "crap we shorted."  In a December 2006 internal e-mail regarding another RMBS transaction he wrote to a trader "DOESN'T THIS DEAL BLOW," to which the trader replied "yes it blows I am seeing 20-40% writedowns."

723.     As a signatory to the Offering Materials, DB Securities represented that the relevant statements contained in the RALI 2006-QS2 and RALI 2006-QS18 Offering Materials were true and correct.  But as the above facts indicate, DB Securities knew, or it was reckless in not knowing, that these Trusts were riddled with loans where originators had systematically disregarded prudent loan underwriting standards.  Thereafter, the RALI depositor and sponsor and DB Securities underwriter

- 208 -

had jointly waived these bad loans through the securitization process.  DB Securities knew the loans in the RALI 2006-QS2 and RALI 2006-QS18 Trusts had a high risk of defaulting, but it failed to accurately disclose the risks to Plaintiffs.  As Deutsche Bank knew, or was reckless in not knowing, was highly likely based on its inside information, Plaintiffs suffered millions of dollars in losses when the bad loans subsequently failed.

### 8.    RBS'S Liability as an Underwriter of the RALI Certificates

724.    Defendant RBS Securities, Inc. ("RBS Securities"), formerly known as both Greenwich Capital Markets, Inc. and RBS Greenwich Capital, is a broker-dealer registered with the SEC.  It is a Delaware corporation headquartered in Connecticut, and is a wholly owned subsidiary of Greenwich Capital Holdings, Inc., which is an indirect wholly owned subsidiary of The Royal Bank of Scotland Group plc ("RBS Group").  RBS underwrote the RALI 2006-QS6 Trust.

725.    RBS Securities acted as the underwriter in the sale of Certificates from the RALI 2006-QS6 Trust.  As underwriter, it drafted and disseminated the RALI 2006-QS6 Offering Materials, which contained false and misleading statements about the quality of the underlying mortgages and the underwriting standards applied by RALI and its loan originators in connection with the sale of Certificates to Plaintiffs.

726.    RBS Securities knew, or was reckless in not knowing, of the defective loans in the RALI 2006-QS6 Trust as a result of its due diligence performed as an underwriter of this RMBS offering.  RBS Securities had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans RALI deposited in RALI 2006-QS6 Trust had a practice of routinely and systematically disregarding the stated underwriting standards.

727.    RBS Securities also knew that mortgage loans deposited into the RALI 2006-QS6 Trust were not properly underwritten because RBS Securities was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged herein. In addition to the RALI 2006-QS6 Trust, RBS Securities had underwritten and sold many other such RMBS to investors and had gained inside knowledge of the poor quality loan underwriting in that context too.

728.    RBS Securities also participated in the improper securitization and sale of these RMBS to Plaintiffs in order to grow its profits.  In its 2006 Form 20-F Annual Report filed with the SEC, RBS Group touted that it "ranked first among managers of global asset-backed and mortgage backed securitizations."

729.    As a result of their participation in the securitizing of improperly underwritten loans, such as those deposited in the RALI 2006-QS6 Trust, RBS Group and RBS Securities have subsequently faced significant litigation relating to such matters.  In five lawsuits filed by the FHFA (against Ally, Countrywide, JP Morgan, Morgan Stanley and Nomura) RBS Securities is a named defendant based on its underwriting of RMBS for the sponsors of the RMBS at issue in those cases.

730.    The National Credit Union Administration Board, an independent government agency, as the liquidating agent of the U.S. Central Federal Credit Union, has also brought suit against RBS Securities and other Defendants based on allegedly false statements made in RMBS offerings.  *Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc., et al.*, No. 2:11-cv-2340 (D. Kans. June 20, 2011).

731.    In another lawsuit brought by Massachusetts Mutual Life Insurance Company against RBS Securities and its affiliates, it is alleged that of the 10 securitizations in which Mass. Mutual

- 210 -

purchased Certificates, approximately 25% or more of the loans had defaulted, with one securitization reaching a default level of more than 50%.  Complaint, *Mass. Mutual v. RBS Fin. Prods. Inc. et al.*, 3:11-cv-30044 (D. Mass. Feb. 24, 2011), ¶6.

732.    The *Mass. Mutual v. RBS* plaintiffs conducted an industry-standard AVM analysis of the underlying loans there in securitizations by RBS Securities affiliates, and it further indicates RBS Securities was party to a widespread corporate practice of selling RMBS offerings that were replete with bad loans made with deficient underwriting practices.  The chart below summarizes the *Mass. Mutual v. RBS* plaintiffs' findings:

| Trust | Sellers | Weighted Average LTV of Collateral Loans Represented in Offering Materials | Actual Values of LTV | % of Collateral Loans with LTV Greater than 90% As Represented in Offering Materials | Actual % with LTV Greater than 90% | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|---|
| DSLA Mortgage Loan Trust 2005-AR3 | Greenwich Capital Financial Products, Inc. ("GCFP") (Seller); Greenwich Capital Acceptance, Inc. ("GCA") (Depositor); RBS Securities (Underwriter) | 71.62% | 75% | 0% | 8.75% | 16.53% |
| DSLA Mortgage Loan Trust 2005-AR6 | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 73.63% | 78.20% | 1.44% | 13.85% | 24.58% |
| Harborview Mortgage Loan Trust 2005-8 | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 77.54% (Group 1-A1) | 83.64% (Group 1-A1) | 6.52% (Group 1-a1) | 23.59% (Group 1-A1) | 22.01% |
| Harborview Mortgage Loan Trust 2005-13 | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 77.60% | 86.355 | 5.21% | 18.04% | 21.60% |
| HarborView Mortgage Loan Trust 2006-4 | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 75.94% | 87.87% | 8.12% | 24.04% | 35.35% |
| Soundview Home Loan Trust 2006-WF1 | GCFP (Sponsor); Financial Asset Securities Corp. (Depositor); RBS | 82.74% | 93.10% | (n/a) | (n/a) | 35.97% |

- 211 -

| Trust | Sellers | Weighted Average LTV of Collateral Loans Represented in Offering Materials | Actual Values of LTV | % of Collateral Loans with LTV Greater than 90% As Represented in Offering Materials | Actual % with LTV Greater than 90% | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|---|
| | Securities (Underwriter) | | | | | |
| HarborView Mortgage Loan Trust 2006-SB1 | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 72.22% | 81.49% | 0.94% | 19.75% | 29.95% |
| RBSGC Mortgage Loan Trust 2007-A | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 73.38% | 83.37% | 7.17% | 19.27% | 24.62% |
| RBSGC Mortgage Loan Trust 2007-B | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 72.35% (Pool 1); 63.65% (Pool 2) | 80.96% (Pool 1); 84.10% (Pool 2) | 7.47% (Pool 1); 2.33% (Pool 2) | 16.88% (Pool 1); 18.14% (Pool 2) | 17.52% |
| HarborView Mortgage Loan Trust 2007-2 | GCFP (Sponsor); GCA (Depositor); RBS Securities (Underwriter) | 76.41% | 90.42% | 4.59% | 34.38% | 50.25% |

733.    In October 2010 the SEC commenced an inquiry into the document deficiencies and repurchase requests associated with RBS Group securitizations. The SEC converted the inquiry into a formal investigation in January 2011 and expanded its probe to include information related to early payment defaults. RBS Group also disclosed in its filings that the SEC had begun a non-public, formal investigation in March 2008 of the Group's sub-prime securities and RMBS exposures. In December 2010, the SEC expanded its investigation to include CDOs.

734.    In June 2009 the Massachusetts Attorney General initiated an investigation that included RBS Group and sought information regarding residential mortgage lending practices and the sale and securitization of residential mortgage loans. In November 2011, RBS Group settled with the Massachusetts Attorney General for $52 million.

735.    RBS Group also faces ongoing investigations led by the New York State Attorney General and the Nevada State Attorney General regarding similar RMBS issues.

- 212 -

736.    As a signatory to the Offering Materials, RBS Securities represented that the relevant statements at issue herein contained in the RALI 2006-QS6 Trust were true.  But as the above facts indicate, RBS Securities knew, or it was reckless in not knowing, that the RALI 2006-QS6 Trust was loaded with bad loans where originators had systematically disregarded underwriting standards and the depositor, sponsor and underwriter had all waived these bad loans through the securitization process.  As a result of this fraudulent misconduct, these bad loans were destined to fail, just as they subsequently did, to serious detriment of Plaintiffs.

**G.    UBS**

**1.    UBS's Securitizations**

737.    Union Central purchased three certificates sponsored by UBS between June 2005 and April 2006, representing an investment of approximately $13 million:

| CUSIP | Description | Issuing Entity | Issue Date | Purchase Date |
|-------|-------------|----------------|------------|---------------|
| 57643MKV5 | MASTR 2005-1 B3 | MASTR Asset Securitization Trust 2005-1 | 5/1/2005 | 6/10/2005 |
| 57643MMX9 | MASTR 2006-1 B1 | MASTR Asset Securitization Trust 2006-1 | 3/1/2006 | 4/6/2006 |
| 57643MLQ5 | MASTR 2005-2 B1 | MASTR Asset Securitization Trust 2005-2 | 10/1/2005 | 11/8/2005 |

738.    The UBS Trusts were $273-$416 million deals comprising fixed-rate mortgages with mostly 30-year terms.

**2.    False and Misleading Statements in UBS' Offering Materials**

**a.    False and Misleading Statements About Compliance with Underwriting Standards**

739.    As sponsor of the securitizations, the UBS Defendants either originated the underlying mortgages through UBS's own programs, or purchased the underlying mortgage loans from other originators, including Bank of America, JP Morgan Chase and SunTrust Mortgage.  The

- 213 -

Offering Materials represented that each of the loan sellers applied underwriting standards which were designed to ensure that the borrower could repay the loan.

740.    The UBS Prospectus Supplement for each Certificate stated that the originators had collected various financial information about a borrower to ensure that the borrower could repay the loan:

> Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. . . .

> Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.

741.    Similarly, with respect to MASTR 2006-1, the Offering Materials stated the following regarding SunTrust Mortgage's underwriting standards:

> SunTrust underwriting guidelines generally follow standard Fannie Mae guidelines. They are designed to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing and cash reserves, and to evaluate the acceptability and marketability of the property to be used as collateral. . . .

> The real estate lending processes for one-to four-family mortgage loans follow standard procedures, designed to comply with applicable federal and state laws and regulations. SunTrust requires that the borrower's sources of income have the probability of continuance, are stable sources and are sufficient to support repayment of the mortgage loan requested. A borrower is required to complete an application designed to provide pertinent information about the borrower, the property to be financed and the type of loan desired.

### b.    False and Misleading Statements About Appraisals and LTV Ratios

742.    The UBS Offering Documents represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.  The Offering Materials for the

- 214 -

UBS Certificates represented that Defendants required and relied upon industry-standard appraisals to determine the adequacy of the underlying collateral. For example, the Offering Materials for each of the UBS Certificates stated:

> The adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. . . .  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.

743.    Similarly, with respect to loans originated by SunTrust, the 2006-1 Prospectus stated:

> To determine the acceptability and marketability of the mortgaged property as collateral, generally an independent appraisal is made of each mortgaged property considered for financing. An appraiser is required to inspect the mortgaged property and verify that it is in acceptable condition and that construction, if recent, has been completed. The evaluation is based on the appraiser's estimate of value, giving appropriate weight to both the market value of comparable housing, as well as the cost of replacing the mortgaged property. The underwriting guidelines require that the value of the mortgaged property being financed, as indicated by the independent evaluation, currently supports and is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values, although there can be no assurance that such value will support the outstanding loan balance in the future.

744.    The Prospectus also contains representations concerning the LTV ratios of the mortgage loans underlying each securitization. Specifically, the 2005-1, 2005-2 and 2006-1 Certificates disclosed LTV ratios of 66.5%, 65.9%, and 67.7%, respectively.  These representations were false.

### c.    False and Misleading Statements About Debt-to-Income Ratios

745.    The Offering Materials stated that in the course of the loan application process, borrowers were generally required to provide information regarding their assets, liabilities and

income in order to determine the borrowers' ability to repay the debt. For example, the Offering

Materials for each of the Certificates stated:

> As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy

746.    Where provided, such information was converted into DTI ratios, which were a

material part of the underwriting process, and specific DTI ratios for the loans underlying the

Certificates were utilized by the rating agencies to determine the ratings for the certificates in the

Trust.

### d.    False and Misleading Statements About Owner-Occupancy

747.    The Offering Materials contained specific disclosures about the occupancy-rate status

of the loans underlying the Certificates.

748.    The Series 2005-1 Offering Materials stated that 490 out of the 506 loans, or 96.8%

of the aggregate principal balance of the mortgage loans, were for owner-occupied properties.

Fourteen of the remaining loans were purportedly for second homes and four were for investment.

749.    The Series 2005-2 Offering Materials stated that 651 out of the 698 loans, or 94.5%

of the aggregate principal balance of the mortgage loans, were for owner-occupied properties.

Twenty-three of the remaining loans were for second homes and 23 were for investment.

750.    The Series 2006-1 Offering Materials stated that 745 out of the 810 loans, or 92.6%

of the aggregate principal balance of the mortgage loans, were for owner occupied properties. Forty-

three of the remaining loans were for second homes and 22 were for investment.

e.     **False and Misleading Statements About Ratings**

751.    The Offering Materials for the UBS Certificates stated that the ratings of the

Certificates as set forth in the Prospectus for a condition to their issuance, and that the ratings

reflected the likelihood that investors would receive the distributions to which they were entitled:

> It is a condition to the original issuance of the offered certificates that each
> class of offered certificates will have received the ratings set forth on the table
> beginning on page S-6 of this prospectus supplement.
>
> *        *        *
>
> A securities rating addresses the likelihood of the receipt by the
> certificateholders of distributions on the offered certificates.
>
> *        *        *
>
> The ratings assigned by the Rating Agencies to mortgage pass-through
> certificates address the likelihood of the receipt of all distributions on loans by
> certificateholders under the agreements pursuant to which the certificates are issued.
> The ratings of the Rating Agencies take into consideration the credit quality of the
> related mortgage pool, including any credit support providers, structural and legal
> aspects associated with the certificates, and the extent to which the payment stream
> on the mortgage pool is adequate to make the payments required by the certificates.

752.    The Offering Materials also set forth the specific ratings for the Certificates

purchased by Union Central.  The Series 2005-2 and 2006-1 Certificates were rated AA by S&P.

The Series 2005-1 Certificates was rated BBB by Fitch.

753.    In obtaining these ratings for the subject Certificates, UBS concealed the adverse

information alleged herein from the rating agencies.  Had the rating agencies known the true value of

the loans underlying the Certificates, the Certificates would have been rated significantly lower, or

not at all.

**3.     Defendants' Statements Were Knowingly False and Misleading**

754.    The UBS Defendants knew, or were reckless in not knowing, that the statements

identified above were materially false and misleading and/or omitted material facts necessary to

- 217 -

make the statements made not misleading.  As set forth herein, the UBS Defendants had actual knowledge that the stated underwriting guidelines were not being adhered to and, rather than provide truthful information and disclosures to Union Central and other investors, used such knowledge to reap massive profits for itself by betting against the very mortgage-backed products they were selling investors.

### a.      Underwriting Standards Had Been Abandoned

755.    While the Offering Materials set forth detailed underwriting guidelines which were supposed to be applied in evaluating borrowers and loans, in fact the stated underwriting guidelines had been abandoned by the loan originators.  Loan originators abandoned the fundamental principle that underwriting was supposed to meaningfully evaluate the borrowers' ability to repay the debt, and the lender and/or investors' ability to recover against the pledged collateral in the event of a default.

756.    BofA had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to UBS for inclusion in the subject Trusts, as alleged above at §IV.I.1.

757.    Greenpoint had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to UBS for inclusion in the subject Trusts, as alleged above at §IV.I.3.

758.    SunTrust had abandoned all prudent underwriting practices with respect to the loans that it had originated and sold to UBS for inclusion in the subject Trusts, as alleged above at §IV.I.4.

### (1)      Skyrocketing Default Rates Are Evidence of Abandoned Underwriting

759.    The Certificates purchased by Union Central were supposed to be stable, long-term investments backed by investment-grade credit ratings.  However, the extraordinary default rates on the mortgage loans underlying Union Central's Certificates is prima facie evidence that the stated

underwriting standards and loan characteristics represented in the Offering Materials were materially false and misleading.

760.    The following chart sets forth the delinquency, bankruptcy or foreclosure amounts, as well as collateral cumulative losses (the losses from defaulted loans that have already been realized by the Trusts), for each of the Certificates purchased by Union Central as of June 2010:

| Certificate | Original Deal Size | Delinquent, Bankruptcy Foreclosure, REO Actual Bal. | Collateral Cumulative Losses |
|---|---|---|---|
| **2005-1** | $273,151,063 | $ n/a | $ n/a |
| **2005-2** | $339,007,792 | $13,751,324 | $862,774 |
| **2006-2** | $419,235,122 | $23,134,724 | $3,740,235 |

761.    Had the loans been issued in accordance with the stated underwriting guidelines, and had the loans in fact had the characteristics described in the Offering Materials, the rate of delinquency, bankruptcy and foreclosure would be far lower than the current rates.  Indeed, Moody's maximum expected collateral losses for the life of the 2005-2 Certificate was only $1.19 million. Moody's maximum expected collateral losses for the life of the 2006-1 Certificate was only $1.47 million.

**(2)     Appraisals and LTV Ratios Were Inflated**

762.    The descriptions of appraisal standards, as well as the LTV ratios derived from such appraisals, were materially false and misleading.  Undisclosed in the Offering Materials, and in violation of any legitimate appraisal standards, a high percentage of loans underlying the Certificates had been approved through the use of manipulated appraisals that guaranteed that the collateral property would be valued at a price sufficient to support the loan.  UBS's practice of using and permitting inflated appraisals in connection with its loan securitizations has been confirmed through

- 219 -

modeling performed by other litigants, which demonstrates that appraisals conducted with UBS securitizations in 2006 were routinely inflated.

763.    For instance, the FHFA conducted an AVM analysis of a sample of the property underlying the 16 MASTR offerings at issue in their litigation against MASTR and UBS.  Second Amended Complaint, *FHFA v. UBS Americas, Inc.*, No. 11-5201 (S.D.N.Y. July 27, 2011) (Dkt. No. 1), ¶¶289-295.  AVM's are routinely used in the industry as a way of valuing properties during prequalification, origination portfolio review and servicing.  The FHFA's analysis demonstrates that the valuation of the loans underlying those Certificates were materially and consistently inflated, and therefore that the stated LTV ratios were materially overstated, which in turn greatly increased the risk of default for the loans underlying the certificates.

764.    For example, with respect to three of the certificates at issue in the FHFA's case, MABS 2005-WF1, MABS 2006-FRE2, and MABS 2006-NC2, the offering materials stated that the percentage of loans having an LTV ratio of 80% of less was 56.13%, 61.59%, 67.99% respectively.  However, the FHFA's analysis showed the actual percentage of loans having an LTV ratio of 80% or less was much lower, at 47.09%, 35.05%, 41.59% respectively.  While none of the certificates were supposed to contain loans that had an LTV ratio over 100%, the FHFA's analysis found that a significant number of loans indeed had LTV ratios of over 100% – in other words, the value of loan was more than the value of the property.  With respect to the MABS 2005-WF1, MABS 2006-FRE2, and MABS 2006-NC2 Certificates, the FHFA found LTV ratios greater than 100% in 12.26%, 15.07%, and 14.36% of the loans, respectively.

765.    Instead of conducting appraisals designed to accurately value the subject property in compliance with USPAP, many appraisals UBS sanctioned and accepted, if they were conducted at

all, were designed to hit valuation targets that would allow loans to be funded and securitized into RMBS so UBS could sell them to investors, including Plaintiffs.

766.    Not only did UBS have access to the loan files and monitoring results that indicated to Defendants there were inflated appraisals used to support the loans in the subject UBS Trusts, but they were also privy as industry-insiders to the non-public information alleged in §V.G. regarding the widespread wrongful appraisal practices and the pressures that UBS's loan originators were applying to appraisers in an effort to close the loans and continue to feed UBS with raw material it needed to continue the highly profitable loan securitization businesses.

### (3)    Debt-to-Income Ratios Were Falsified

767.    The statements contained in the UBS Offering Materials regarding the acceptability and evaluation of DTI ratios, as well as many of the specific DTI ratios disclosed, were materially false and misleading.  In fact, UBS and the originators knew that borrowers routinely falsified their stated incomes in order to have loans approved.

### (4)    Owner-Occupancy Rates Were Falsified

768.    In addition to the examples above which demonstrate that the Offering Materials misrepresented the owner-occupancy rates of subject properties underlying the Trusts, other litigants' loan-level analysis of thousands of loans securitized by UBS at the same time as the Certificates at issue here, have confirmed that UBS's RMBS Offering Materials routinely misstated the owner-occupancy rates of the loans underlying the Certificates.  In addition to their LTV analysis, the FHFA undertook a sophisticated analysis to determine whether a given borrower actually occupied the property as claimed in the UBS Offering Materials. *FHFA v. UBS* Complaint, ¶¶283-288.  For almost every MASTR offering at issue there, the FHFA analyzed at least 1,000

loans.  The FHFA analyzed tax records, credit records, bills, property records and lien records, to determine whether a borrower was actually living in the property subject to the loan.

769.    The results of the FHFA's analysis demonstrates that the percentage of owner-occupied properties disclosed by UBS in their prospectuses was consistently false and that the true rate was much lower.  For the MASTR certificates at issue there, the FHFA found that the percentage of non-owner-occupied properties was understated by between 7%-13%.

**(5)     Defendants Knew that Underwriting Standards
Were Being Abandoned**

770.    Based on its review of the loans in question, UBS had actual knowledge that the loans it securitized in the Trusts sold to Union Central did not comply with the stated underwriting guidelines contained in the Offering Materials, that the quantitative and qualitative data contained in the Offering Materials was materially false and misleading.  UBS also accepted poorly underwritten loans in order to grow its securitization business.

**b.      UBS Had Actual Knowledge of the Defective Loans
They Were Securitizing**

771.    Documents recently released by Clayton confirm UBS's practices resulting in there being rampant underwriting violations in the loan pools backing the UBS Certificates.  As the FCIC described, in the internal Clayton "Trending Report" made public by the Government in conjunction with testimony given in September 2010, UBS received regular reports regarding defective loans, and *13%* of the loans Clayton reviewed for UBS "failed to meet guidelines."  These loans were not subject to any proper "exceptions," as they did not have any "compensating factors."  Rather, these loans were plainly defective.

772.    Despite such a high level of nonconforming loans, UBS nevertheless continued utilizing, and indeed funding, the same originators who had placed the nonconforming loans in the pools and "waived in" to its pools 33% of those toxic loans that Clayton had identified as being

- 222 -

outside the guidelines.  Such waivers were never disclosed to Union Central or any of the investors who purchased UBS Certificates.

773.   The Clayton data demonstrates that underwriting guidelines were being routinely violated, and that UBS was informed of such violations.

774.   In their zeal to securitize as many loans as possible, UBS securitized a substantial number of loans which they knew did not comply with the stated underwriting guidelines.  Indeed, the due diligence that UBS did conduct gave them actual knowledge that many of the loans backing the Certificates failed to comply with the stated underwriting guidelines.

**(1)   UBS Succumbed to Competitive Pressure to Securitize Bad Loans**

775.   UBS's business plan and strategic effort to grow its loan securitization business was a key element driving UBS to acquire, securitize and sell mortgage loans regardless of whether those loans had been properly underwritten or whether borrowers had the willingness and ability to repay the debt.

776.   By 2005 it was internally recognized within UBS that of all the businesses conducted by UBS's Investment Banking group, the biggest competitive gap was in Fixed Income – the business that acquired and securitized mortgages.  In fact, it was a key point of internal discussion that UBS's Fixed Income positioning had declined vis-à-vis leading competitors since 2002.

777.   In an effort to close this competitive gap, UBS made a concerted effort to grow its mortgage securitization business.  To formulate a strategic and tactical plan to its increase market share of asset-backed securitization business, and in order to keep up with competitors, UBS hired a consulting firm who recommended to UBS's Investment Banking group – the group that operated in the United States through Defendant UBS Securities LLC – that they invest in developing RMBS

- 223 -

operations that focused on subprime and adjustable rate mortgage products.  The consultant specifically recommended these areas as significant revenue growth opportunities.

778.   At the same time that UBS was seeking to expand its Investment Banking group's loan securitization business, it was in the process of transferring its Mortgage Origination Services Group to the separate and newly created Dillon Read Capital Management ("DRCM") business unit. Because DRCM was not viewed as an outsourcing of the Investment Banking group's fixed income and securitization business, UBS Defendants needed even more mortgage securitizations to make up for the loss of the Mortgage Origination Services Group to DRCM.  This transfer of securitization operations to DRCM put additional pressure on the UBS Defendants to acquire and securitize more mortgages to meet the targeted growth plan regardless of whether those loans had been properly underwritten.

779.   UBS's strategic plan to grow its business by increasing fixed income market share with an expanded appetite for high-yield and subprime loans was partially reflected in UBS's Form 20-F SEC filing for year end 2005:

> We are seeking to expand our fixed income business further by pursuing opportunities in credit, high yield and asset-backed securities.  We will expand our leveraged finance and high yield appetite and extend our client footprint in debt capital markets.  Within asset-backed securities, we will match our strength in the agency business with non-agency and sub-prime business as well as developing local currency asset-backed and mortgage-backed securities.

780.   UBS's Form 20-F SEC filing for year end 2005 identified its competitors for the available share of the loan securitization business: "As a global investment banking and securities firm, we compete against other major international players such as Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs . . . and Morgan Stanley."  As alleged herein, these Defendants were all engaged in a competitive "race to the bottom" by secretly abandoning prudent loan underwriting

requirements for the loans they were acquiring, securitizing and selling to investors, including plaintiffs, during the 2005 to 2007 time period.

(2)    <b>UBS's Financial Incentives for Securitizing Defective Loans</b>

781.    The UBS Defendants had enormous financial incentives to complete as many RMBS offerings as quickly as possible without regard to the accuracy or completeness of the Registration Statements, and while concealing the adverse information that they were securitizing bad loans that had been waived through the due diligence process.  For example, UBS Securities, as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.  Similarly, UBS Real Estate and MASTR received substantial revenues and additional fees from UBS Securities for the sale of the Certificates.

782.    The UBS Defendants were successful in their efforts to grow profits by increasing loan securitizations regardless of the huge undisclosed risks presented by the wide-spread abandonment of prudent loan underwriting practices.  As a result, in 2005 UBS increased its fixed income underwriting fees by 36% compared to fees earned from those operations in 2004.  UBS's Form 20-F SEC filing for year-end 2006 reported that this increase in fixed income underwriting in 2005 was "due to significantly improved market conditions and our enhanced competitive position." The UBS Defendants benefited from this growth as net profits attributable to UBS shareholders grew by 75% during 2005.

783.    2006 was UBS's Investment Banking group's most profitable year ever, and pre-tax profits for that group grew by 15% over 2005 results.  UBS attributed to this growth to "progress in our plan to expand our . . . mortgage-backed securities [and other lines of business]."  UBS's Form 20-F SEC filing for year-end 2006 reported: "Overall, net fee and commission income now contributes 55% to total operating income in 2006."  In addition, the 2006 Form 20-F reported:

- 225 -

"Fixed income activities saw stronger results driven by positive market conditions and improved performance in derivatives, mortgage-backed securities and commodities."

784.   Pursuant to the UBS Defendants' conscious initiative to grow market share by expanding the mortgage and asset securitization business, UBS's balance sheet grew by approximately 17% in 2005 and 2006, and UBS's Investment Banking group's share of the total balance sheet assets was always over 80%.  By late 2007, however, various regulators commenced investigations relating to UBS's involvement in the securitizations of residential mortgages, including the due diligence practices of UBS securities.

(3)   **UBS's Internal Investigation into Loan Securitization Practices**

785.   In order to facilitate its loan securitizations, UBS held and retained for its own account certain super-senior tranches of the RMBS trusts it was selling to investors.  UBS took various steps in an effort to hedge the publicly undisclosed risk resulting from holding these securities on its own books, but those attempts were not entirely successful.  For example, UBS purchased insurance on many of the RMBS tranches it was holding for its own account, but the insurer experienced financial difficulties and the ultimate lack of protection/coverage caused UBS to write down mortgage-backed securities it held on its books.

786.   On December 24, 2007, Swiss regulators announced that the Swiss banking department charged with oversight of Swiss investment banks would be initiating a full investigation into how UBS incurred massive losses in connection with subprime mortgages in the United States. In April 2008, UBS AG presented Swiss banking regulators with a report detailing the reasons for its massive losses related to the United States subprime mortgage market.  In that report, which was summarized in a shareholder report issued by UBS AV on April 21, 2008, UBS admitted that its

- 226 -

losses in the United States subprime mortgage market were due to a litany of errors including inadequate risk management and a focus on revenue growth.

787.    UBS's report to shareholders identified management's "[f]ailure to demand a holistic risk assessment."  The report went on to explain: "It appears that the focus of the IB [*i.e.*, Investment Bank group] was revenue growth and filling the gap to competitors.  This contrasts with the level of debate at the same time within relevant Group governance committees such as the GRSC [*i.e.*, the Risk Subcommittee of the Group Executive Committee of UBS]."

788.    With the subsequent publication of the FCIC Report and based upon the other factual information that has recently come to light, it is clear that UBS Investment Banking group not only failed to employ a "holistic risk assessment" in its drive to grow its loan securitization business and keep up with the competition, but UBS ignored the high-level internal debates, the internal reports and outside reports (including Clayton reports) all of which revealed to the UBS Defendants that the mortgages they were securitizing did not meet prudent loan underwriting standards.  The UBS knew, or were reckless in not knowing, that there was a very high percentage of bad loans securitized and deposited in the Trusts that it sold to Plaintiffs.

### 4.    UBS's Liability as an Underwriter of the UBS Certificate

789.    UBS Securities made the false and misleading statements alleged above, which were contained in the Prospectus Supplement endorsed and used by UBS Securities in the sale of certificates to Plaintiffs.

790.    As underwriter, UBS Securities edited, drafted and controlled the content of the UBS Trusts' Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with its due diligence conducted in connection with the offering of the Certificates to Plaintiffs, UBS Securities received, considered and understood the adverse

- 227 -

705280_1

information alleged above regarding the lack of proper underwriting for the loans deposited in the USB Trusts. As underwriter, UBS Securities then used and disseminated these false and misleading Offering Materials to Plaintiffs in connection with the sale of the Certificates and in order to profit at Plaintiffs' expense.

791.    UBS Securities, as a subsidiary within UBS, had knowledge that UBS, as alleged herein failed to adhere to underwriting standards when it pooled mortgage loans for its RMBS, including for the UBS Trusts. Further, UBS Securities, knew or was reckless in not knowing, of the defective loans in the UBS Trusts as a result of its due diligence performed as an underwriter for these Trusts. UBS Securities had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans UBS deposited in the UBS Trusts had a practice of routinely and systematically disregarding the stated underwriting standards.

792.    UBS Securities also knew that mortgage loans deposited into the UBS Trusts were not properly underwritten because UBS Securities was a knowledgeable insider in the mortgage securitization industry who, unlike Plaintiffs, was privy to the widespread abandonment of prudent loan underwriting practices in connection with the securitization of loans, as alleged herein. In addition to these Trusts, UBS Securities underwrote and sold many other such RMBS to investors and had in that context gained inside knowledge of the poor quality loan underwriting.

### 5.    SunTrust's Liability as an Underwriter of the UBS Certificates

793.    Defendant SunTrust Capital Markets, Inc., ("SCM") operates as the investment banking arm of SunTrust Banks Inc. ("STB"), of which it is a wholly owned subsidiary. Collectively, they are referred to as "SunTrust."

- 228 -

794.   SCM acted as the underwriter in the sale of Certificates from the MASTR Asset Securitization Trust 2006-1.  As underwriter, it drafted and disseminated the MASTR 2006-1 Offering Materials, which contained false and misleading statements about the quality of the underlying mortgages and the underwriting standards applied by UBS and its loan originators for that offering.

795.   SCM knew that mortgages pooled into the MASTR RMBS had failed to meet underwriting standards because SCM engaged in the routine practice of underwriting and selling securitizations of toxic mortgages, such as those in the MASTR 2006-1 Trust.  SCM also knew, or was reckless in not knowing, of the defective loans in the MASTR 2006-1 Trust as a result of its due diligence performed as an underwriter of that RMBS offering.

796.   SCM had access to the detailed loan tapes and actual loan files, and its review of these materials showed it (or it was reckless in not understanding) that originators of the loans UBS deposited in MASTR 2006-1 Trust had a practice of routinely and systematically disregarding the stated underwriting standards.

797.   Indeed, SunTrust Mortgage was an SCM affiliate and was a loan originator for the MASTR 2006-1 Trust.  SCM knew of SunTrust's corporate-wide practice of effectively abandoning prudent loan underwriting in the pursuit of greater profits.  SCM also understood that bad loans had been deposited in the MASTR 2006-1 Trust because SCM was aware that SunTrust Mortgage had originated many of the loans in the Trust and SCM knew, or was recklessly in not knowing, SunTrust Mortgage had a widespread practice of abandoning prudent underwriting standards when originating loans, as alleged at §III.I.4.

798.   SCM also routinely performed due diligence on SunTrust Mortgage loans that had been securitized  in other RMBS that SCM was underwriting and selling to investors.  SCM's

- 229 -

experience with those other RMBS transactions provided it with further knowledge of SunTrust Mortgage's custom and practice of originating loans regardless of whether borrowers had the ability to repay the loans.

799.    SCM had further awareness of the bad loans in the MASTR 2006-1 Trust because SCM and its affiliates participated in the widespread process of originating, securitizing and selling toxic loans.  From 2006 to 2007, SunTrust expanded its RMBS business at an enormous rate – growing from $141 million RMBS in trading assets in 2006 to $939 million in 2007.

800.    Other parties have also experienced the toxic quality of mortgages originated by SunTrust and its affiliates.  For example, the FCIC Report explains that Fannie Mae performed a review of delinquent loans originated by a SunTrust affiliate.  As a result of its review, from 2007 through 2010, Fannie Mae put back $898 million worth of mortgages for which SunTrust had breached its representations and warranties.

801.    In addition, SunTrust agreed to a Consent Order with the Federal Reserve on April 13, 2011, in which SunTrust agreed to strengthen and improve its oversight, compliance, and risk management programs for its mortgage businesses.

802.    As a signatory to the Offering Materials, SCM represented that the statements in the MASTR 2006-1 Offering Materials were true.  But based on the above facts, it knew, or it was reckless in not knowing, that those representations were materially false and misleading.

## VI.    DISCLOSURES EMERGE ABOUT THE PROBLEMS UNDERLYING THE LOANS

803.    Years and months after Plaintiffs made purchases of the Certificates, the credit rating agencies began to lower ratings on certain of the Certificates.  Many of the Certificates were downgraded by the credit rating agencies from "investment grade" to "junk" status.

804.    The ratings action represents only a partial picture of the rapid deterioration of the Certificates issued pursuant to the Trusts, as other performance measures of the Certificates showed substantial decay due to the prevalence of bad loans.  No further interest or principal payments will be received on some of Union Central's Certificates, and as a result, Union Central has experienced a complete loss on these investments.

805.    The table below sets forth the current pricing and current ratings (compared to original ratings) with respect to the Certificates purchased by Plaintiffs:

| Certificate | Current Trading Price as a Percentage of Par[10] | Original Rating | Current Rating |
|---|---|---|---|
| • Citigroup Mortgage Loan Trust 2007-10 1B1 | 11% | AA | CCC |
| • Citicorp Mortgage Securities Trust, Series 2007-5 B1 | 6% | AA | CC |
| • Citicorp Mortgage Securities Trust, Series 2007-8 B1 | 10% | AA | CC |
| • IndyMac IMJA Mortgage Loan Trust 2007-A1 B1 | 0% | AA | D |
| • GSR Mortgage Loan Trust 2006-7F M1 | 1% | AA+ | C |
| • GSR Mortgage Loan Trust 2006-9F M1 | 5% | AA+ | C |
| • MASTR Asset Securitization Trust 2005-1 B3 | 2% | BBB | C |
| • MASTR Asset Securitization Trust 2005-2 B1 | Sold at 30% | AA | CCC |
| • MASTR Asset Securitization Trust 2006-1 B1 | 3% | AA | D |
| • Morgan Stanley Mortgage Loan | Sold at 4% | AA | D |

10      Per *Bloomberg*, April 2011.

705280_1

| Certificate | Current Trading Price as a Percentage of Par[10] | Original Rating | Current Rating |
|---|---|---|---|
| Trust 2005-5AR B1 | | | |
| • RALI Series 2005-QA9 Trust M1 | 0% * | AA | D |
| • RALI Series 2005-QS7 Trust M3 | 0% * | BBB | D |
| • RALI Series 2005-QS9 Trust M3 | 0% * | BBB | D |
| • RALI Series 2005-QS14 Trust 1M1 | 18% | AA | D |
| • RALI Series 2005-QA5 Trust M3 | 0% * | BBB | C |
| • RALI Series 2006-QS6 Trust 2M1 | 4% | AA | D |
| • RALI Series 2006 QS18 Trust 2M1 | 0% | AA | D |
| • RALI Series 2006-QS18 Trust 2M2 | 0% * | A | D |
| • RALI Series 2006 QS18 Trust 2M3 | 0% * | BBB | D |
| • RALI Series 2006-QS2 Trust 2M1 | 7% | AA | D |
| • Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 B3 | 0% * | BBB | D |

**\*** No further interest or principal payments will be received on these Certificates.

806. However, even as problems in the mortgage loan portfolio became apparent, investors were not aware of Defendants' intentional misconduct until the findings of the FCIC investigation were revealed in part in 2010 and 2011.

807. The loan defaults and related drop in value for Plaintiffs' Certificates were caused by Defendants' wrongdoing. In fact, Defendants' failure to honor, enforce and apply prudent and

- 232 -

proper loan underwriting in their rush to securitize mortgages was a central contributor to the ensuring financial crisis. As the Senate PSI Report concluded: "Investment banks were the driving force behind the structured finance products that provided a steady stream of funding for lenders originating high risk, poor quality loans and that magnified risk throughout the U.S. financial system. The investment banks that engineered, sold, traded, and profited from mortgage related structured finance products were a major cause of the financial crisis."

## VII.   UNION CENTRAL'S RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

808.   The Certificates for all offerings were issued pursuant to the Offering Materials, which contained the false and misleading statements set forth above.

809.   In deciding to purchase the Certificates, Union Central relied on Defendants' false and misleading representations and omissions of material fact regarding the Certificates ratings and underwriting standards that had been applied to the loans backing the Certificates. But for Defendants' fraudulent representations and omissions, Union Central would not have purchased the Certificates.

810.   Union Central reasonably relied upon Defendants' representations in the Offering Materials regarding loan quality and believe at the time that Defendants would not engage in the wrongful conduct alleged herein. Union Central did not know at the time it purchased the Certificates, and could not have known, that Defendants were knowingly and recklessly securitizing loans where originators were routinely abandoning the stated underwriting guidelines, leading to a drastic increase in the origination of defective loans. Nor did Union Central know that the property appraisals used by the originators and accepted by Defendants were falsely inflated. Union Central also did not know that Defendants and the originators knowingly accepted false information about material facts such as borrowers' stated income, which caused Defendants' representations to be

- 233 -

false as alleged above.  Union Central did not know that Defendants' due diligence had identified significant problems with the originators' loans, and that Defendants' practice was to waive these bad loans into the Trusts.  If Union Central had known these and other material facts regarding Defendants' fraudulent misrepresentations and omissions of material fact contained in the Offering Materials, Union Central would not have purchased the Certificates.

811.    Defendants' misrepresentations and omissions of material fact caused Union Central to suffer losses on the Certificates because the Certificates were far riskier – and their rate of default far higher – than the Offering Materials represented them to be.  The mortgage loans underlying the Certificates experienced defaults and delinquencies at a much higher rate due to the wholesale abandonment of loan-origination guidelines.

812.    Union Central purchased each Certificate in reliance on the information contained in the applicable Offering Materials.  In connection with the offers and sales of the Certificates to Union Central, Defendants provided directly or indirectly to Union Central's investment personnel or managers the Offering Materials and/or pitchbooks and other documentation containing information and data regarding the Certificates.  Similar information was sent to and analyzed by Union Central's investment personnel and managers if the Certificates were sold to them in the secondary market.

813.    Union Central reviewed and analyzed the Offering Materials provided directly or indirectly by Defendants with respect to each Certificate offering.

814.    Union Central justifiably relied on the Offering Materials provided directly or indirectly by Defendants when purchasing the Certificates.

705280_1

## COUNT I

### For Common Law Fraud Against All Defendants

815.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

816.     This is a claim for common law fraud against all Defendants.

817.     Defendants made materially inaccurate written representations and omissions in materials distributed to Plaintiffs with respect to the documents and trusts for which Defendants were responsible, as alleged and identified above.

818.     The Individual Defendants are liable for the false statements made in connection with the Trusts for which they served as directors or officers.

819.     The Underwriter Defendants and the other Defendants made the false and misleading statements contained in the Offering Materials, including regarding about the quality of the collateral underlying the RMBS.  Such statements and the reasons why they are false and misleading are set forth with particularity above.

820.     Defendants knew or recklessly disregarded the false and misleading nature of their representations and omissions.  The bases for Defendants' knowledge or reckless disregard are set forth with particularity above.

821.     Defendants made the materially misleading statements and omissions for the purpose of inducing Union Central to buy and retain the Certificates.

822.     Union Central justifiably relied on Defendants' materially misleading statements and omissions, which went to the core of Union Central's investment decision on the Certificates: the risk attending such notes and the determination of whether the interest adequately compensated

- 235 -

investors.  The Certificates would not have issued and would have been unmarketable but for Defendants' misleading statements and omissions.

823.    Defendants' misrepresentations and omissions went to the credit quality of the Certificates and the underlying collateral assets.  As a result of Defendants' misconduct alleged above, the value of the Certificates has subsequently collapsed.  Only later, after the FCIC findings were disclosed, did Union Central begin to learn it had been defrauded.

824.    Defendants continued throughout the relevant time period to conceal information about the credit quality of the Certificates and the collateral assets acquired by Union Central.

825.    Defendants undertook to sell billions of dollars in Certificates to investors.  Having elected to make representations to investors in order to sell Certificates to them, Defendants owed such investors a duty to disclose all material information, including adverse information.

826.    Defendants were in a superior position to investors in the Certificates as a consequence of their selling and trading of assets, such as collateralized assets.  Knowing that Plaintiffs purchased millions of dollars of RMBS from Defendants and knowing that Plaintiffs were sold Certificates that were represented to be secure and stable investments, Defendants had a duty to report to Plaintiffs that their due diligence investigation had found material defects in the loans which Defendants had disregarded.

827.    Union Central has been injured as its Certificates are worthless or severely impaired.

## COUNT II

### Claim for Unjust Enrichment
### Against All Defendants

828.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

- 236 -

829.    The Defendants received substantial compensation for selling the Certificates to investors.  On information and belief, these fees were derived from the volume of Certificates sold to Union Central and other investors.  Thus, the more Certificates sold from the Trusts, the more money Defendants received.   This economic incentive to sell the Certificates, even in the face of undisclosed, adverse information as to the quality of the loan underwriting, explains but does not justify the Defendants' failure to accurately report information about the collateral.

830.    The Defendants directly contributed to the destruction of millions of dollars in investment value as a result of their structuring, rating and doing business with the Trusts.  The Defendants stood in conflicted positions relative to the Certificates.  The Defendants failed to exercise reasonable care in conducting their specific oversight roles with respect to the RMBS, but were paid substantial profits and fees from the securitizations.

831.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is one of the leading financial centers in the world.  The Defendants' ill-gotten gains should be disgorged in favor of Plaintiffs in order to protect and promote this public policy.

### COUNT III

### Claim for Aiding and Abetting
### Against All Defendants

832.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

833.    This is a claim against Defendants for aiding and abetting the other Defendants' violations of law alleged herein.

834.    This claim is alleged in the alternative to each Count against Defendants to the extent such claim does not proceed.

- 237 -

835.    Defendants knew of each of the other Defendants' violations of laws and substantially assisted in such violations.

836.    Plaintiffs were damaged thereby.

### COUNT IV

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against RALI, Citi, Goldman, IndyMac, HSBC, Deutsche Bank, UBS Securities and RBS

837.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

838.    This claim is brought under §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against RALI, Citi, Goldman, IndyMac, HSBC, Deutsche Bank, UBS Securities and RBS (the "§10(b) Defendants") with respect to their involvement in the following trusts: RALI Series 2006-QS2 Trust; RALI Series 2006-QS6 Trust; RALI Series 2006 QS14 Trust; RALI Series 2006 QS18 Trust; Citigroup Mortgage Loan Trust 2007-10; Citicorp Mortgage Securities Trust, Series 2007-5; Citicorp Mortgage Securities Trust, Series 2007-8; GSR Mortgage Loan Trust 2006-7F; GSR Mortgage Loan Trust 2006-9F; and IndyMac IMJA Mortgage Loan Trust 2007-A1, as alleged herein.   The §10(b) Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Union Central, in violation of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

839.    The §10(b)Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the

705280_1

securitizations from Union Central, as reflected in the misrepresentations and omissions set forth above.

840.    The §10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

841.    As a result of the §10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Union Central was misled into believing that the Certificates were more creditworthy investments than they actually were.

842.    Union Central purchased the Certificates without knowing that the §10(b) Defendants had misstated or omitted material facts about the securitizations.  In purchasing the Certificates, Union Central relied directly or indirectly on false and misleading statements made by the §10(b) Defendants and/or an absence of material adverse information that was known to the §10(b) Defendants or recklessly disregarded by them but not disclosed in the Offering Materials or their communications with Union Central.  Union Central was damaged as a result of its reliance on the §10(b) Defendants' false statements and misrepresentations and omissions of material facts.

843.    At the time of the §10(b) Defendants' false statements, misrepresentations and omissions, Union Central was ignorant of their falsity and believed them to be true.  Union Central would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

844.    Union Central filed this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Union Central's claim, and within five years after the violations.

705280_1

845.     By virtue of the foregoing, the §10(b) Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

846.     As a direct and proximate result of the §10(b) Defendants' wrongful conduct, Union Central has suffered damages in connection with the purchase and subsequent decline in value or default of the Certificates.

## COUNT V

**For Violation of §20(a) of the 1934 Act Against Citigroup, Goldman Sachs, Ally, CGMI, RFS, UBS Securities, HSBC, Deutsche Bank, RBS, Krueger, Costa, Sparks and Paradis**

847.     Union Central repeats and realleges the allegations above as if fully set forth herein.

848.     This claim is brought under §20(a) of the 1934 Act against Citigroup, Goldman Sachs, Ally, CGMI, RFS, UBS Securities, HSBC, Deutsche Bank, RBS, Krueger, Costa, Sparks and Paradis (the "§20(a) Defendants") with respect to their involvement in the following trusts: RALI Series 2006-QS2 Trust; RALI Series 2006-QS6 Trust; RALI Series 2006 QS14 Trust; RALI Series 2006 QS18 Trust; Citigroup Mortgage Loan Trust 2007-10; Citicorp Mortgage Securities Trust, Series 2007-5; Citicorp Mortgage Securities Trust, Series 2007-8; GSR Mortgage Loan Trust 2006-7F; GSR Mortgage Loan Trust 2006-9F; and IndyMac IMJA Mortgage Loan Trust 2007-A1, as alleged herein.

849.     Citigroup, Goldman Sachs, Ally controlled and had the authority to control the content of certain documents, including the Offering Materials.  Because of their involvement in the everyday activities of their subsidiaries, including the Depositors and Sponsors, and because of their wide-ranging supervisory authority, these defendants reviewed or had the opportunity to review those documents prior to their issuance and therefore knew, or were reckless in not knowing, that those documents contained the alleged misrepresentations.  These Defendants reviewed or could have reviewed these documents prior to their issuance or could have prevented their issuance or

- 240 -

caused them to be corrected so as to accurately and properly disclose all material adverse information.

850.    As underwriters of the above trusts, CGMI, Goldman Sachs, RFS, UBS, HSBC, Deutsche Bank and RBS controlled the content of the Offering Materials, including with respect to the material misstatements and omissions alleged above.  In connection with the due diligence conducted in connection with the offering of the Certificates to plaintiffs, CGMI, Goldman Sachs, RFS, UBS, HSBC, Deutsche Bank and RBS received, considered and understood the adverse information alleged above regarding the lack of proper underwriting for the loans deposited in the subject trusts.  CGMI, Goldman Sachs, RFS, UBS, HSBC, Deutsche Bank and RBS then used and disseminated these false and misleading offering materials to plaintiffs in connection with the sale of the Certificates and in order to profit at plaintiffs' expense.  As underwriters, including through their contractual rights and responsibilities with respect to the trusts, CGMI, Goldman Sachs, RFS, UBS, HSBC, Deutsche Bank and RBS had control over the trusts they underwrote, including over the false and misleading statements and omissions described in detail herein.

851.    Krueger, Costa, Sparks, Paradis, by virtue of their status and their high-level positions, as well as their participation in and awareness of their respective organization's operations and public statements, were able to and did influence and control their organization's decision making, including controlling the content and dissemination of the documents that Union Central contend contained materially false and misleading information and on which Union Central relied.

852.    The §20(a) Defendants directly or indirectly controlled the conduct of those respective Defendants' businesses and their representations to Union Central within the meaning of §20(a) of the 1934 Act.  The §20(a) Defendants directly or indirectly controlled the content of the Registration Statements and Prospectus Supplements that they used to sell Union Central the

- 241 -

Certificates within the meaning of §20(a) of the 1934 Act.  Therefore, Defendants are jointly and severally liable for the fraud alleged herein.

853.    The §20(a) Defendants had the power to control or influence the particular transactions giving rise to the securities violation alleged herein, as set forth more fully above.

854.    As set forth above, the §10(b) Defendants each violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the §20(a) Defendants are also liable pursuant to §20(a) of the 1934 Act.

855.    Union Central filed this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Union Central's claim, and within five years after the violations.

856.    As a direct and proximate result of defendants' wrongful conduct, including the wrongful conduct of the §20(a) Defendants, Union Central suffered damages in connection with its purchases of the Certificates at issue herein.

## COUNT VI

**For Violation of §20(b) of the 1934 Act Against Citigroup, Goldman Sachs, Ally, CGMI, RFS, UBS, HSBC, Deutsche Bank, RBS, Krueger, Costa, Sparks and Paradis**

857.    Union Central repeats and realleges the allegations above as if fully set forth herein.

858.    Defendants Citigroup, Goldman Sachs, Ally, CGMI, RFS, UBS, HSBC, Deutsche Bank, RBS, Krueger, Costa, Sparks and Paradis unlawfully engaged in manipulative practice in violation of Section 20(b) of the Exchange Act.

859.    Citigroup, Goldman Sachs, Ally, CGMI, RFS, UBS Securities, HSBC, Deutsche Bank, RBS, Krueger, Costa, Sparks and Paradis: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary

- 242 -

to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs.

860.    Defendants Citigroup, Goldman Sachs, Ally, CGMI, RFS, UBS Securities, HSBC, Deutsche Bank, RBS, Krueger, Costa, Sparks and Paradis had the power and authority to cause the §10(b) to engage in the wrongful conduct complained of herein, which made the statements alleged herein materially false and misleading.  By reason of such conduct, these defendants are liable pursuant to Section 20(b) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.    Awarding statutory damages; and

D.    Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

705280_1

DATED: May 4, 2012

ROBBINS GELLER RUDMAN
 & DOWD LLP
JOHN J. STOIA, JR.
STEVEN W. PEPICH

_____
          STEVEN W. PEPICH

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
CHRISTOPHER M. WOOD
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiffs

**Exibit 1**
**Plaintiffs' Certificates Purchased**

| Description | Issuing Entity | Issue Date | Purchase Date | Original Face Value |
|---|---|---|---|---|
| CMSI 2007-5 B1 | Citicorp Mortgage Securities Trust, Series 2007-5 | 6/1/2007 | 12/19/2007 | 5,860,000 |
| CMSI 2007-8 B1 | Citicorp Mortgage Securities Trust, Series 2007-8 | 9/1/2007 | 10/03/2007 | 5,372,000 |
| CMLTI 2007-10 1B1 | Citigroup Mortgage Loan Trust 2007-10 | 10/1/2007 | 01/22/2008 | 2,378,000 |
| GSR 2006-7F M1 | GSR Mortgage Loan Trust 2006-7F | 7/1/2006 | 02/27/2007 | 6,712,000 |
| GSR 2006-9F M1 | GSR Mortgage Loan Trust 2006-9F | 10/1/2006 | 02/27/2007 | 6,726,000 |
| IMJA 2007-A1 B1 | Indymac IMJA Mortgage Loan Trust 2007-A1 | 6/1/2007 | 09/17/2007 | 3,807,000 |
| MASTR 2005-1 B3 | MASTR Asset Securitization Trust 2005-1 | 5/1/2005 | 6/10/2005 | 961,000 |
| MASTR 2005-2 B1 | MASTR Asset Securitization Trust 2005-2 | 10/1/2005 | 11/8/2005 | 4,747,000 |
| MASTR 2006-1 B1 | MASTR Asset Securitization Trust 2006-1 | 3/1/2006 | 4/6/2006 | 7,338,000 |
| MSM 2005-5AR B1 | Morgan Stanley Mortgage Loan Trust 2005-5AR | 8/1/2005 | 9/22/2005 | 12,152,000 |
| RALI 2005-QA5 M3 | RALI Series 2005-QA5 Trust | 4/1/2005 | 9/27/2005 | 2,176,500 |
| RALI 2005-QA9 M1 | RALI Series 2005-QA9 Trust | 8/1/2005 | 9/9/2005 | 14,189,000 |
| RALI 2005-QS7 M3 | RALI Series 2005-QS7 Trust | 6/1/2005 | 7/14/2005 | 1,849,900 |
| RALI 2005-QS9 M3 | RALI Series 2005-QS9 Trust | 6/1/2005 | 7/19/2005 | 1,854,900 |
| RALI 2005-QS14 1M1 | RALI Series 2005-QS14 Trust | 9/1/2005 | 11/13/2007 | 2,881,400 |
| RALI 2006-QS2 2M1 | RALI Series 2006-QS2 Trust | 2/1/2006 | 11/13/2007 | 3,090,300 |
| RALI 2006-QS6 2M1 | RALI Series 2006-QS6 Trust | 6/1/2006 | 11/13/2007 | 2,879,900 |
| RALI 2006-QS18 2M1 | RALI Series 2006-QS18 Trust | 12/1/2006 | 01/09/2007 | 1,876,200 |
| RALI 2006-QS18 2M2 | RALI Series 2006-QS18 Trust | 12/1/2006 | 1/9/2007 | 416,900 |
| RALI 2006-QS18 2M3 | RALI Series 2006-QS18 Trust | 12/1/2006 | 1/9/2007 | 312,600 |
| WMALT 2005-3 B3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-3 | 4/1/2005 | 4/29/2005 | 4,322,000 |

**CERTIFICATE OF SERVICE**

I, Kelly Stadelmann, hereby certify that on May 4, 2012, I caused a true and correct copy of the annexed document to be served by U.S. mail to all counsel listed on the attached service list.

Kelly Stadelmann

MBS UNION CENTRAL
Service List - 5/1/2012    (11-0081)
Page 1 of 3

**Counsel For Defendant(s)**

Jeffrey A. Lipps
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 N. High Street
Columbus, OH  43215
  614/365-4100

Richard W. Clary
Michael T. Reynolds
Julie A. North
Cravath, Swaine & Moore LLP
825 Eighth Avenue, Worldwide Plaza
New York, NY  10019
  212/474-1000
  212/474-3700(Fax)

Eric B. Epstein
Dorsey & Whitney, LLP
250 Park Avenue
New York, NY  10177
  212/415-9200
  212/953-7201(Fax)

Mark G. Vaughan
Law Offices of Joseph D'Elia
464 New York Avenue, Suite 200
Huntington, NY  11743
  631/673-3222
  631/673-4958(Fax)

Victor L. Hou
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
  212/225-2000
  212/225-3999(Fax)

Brian S. Weinstein
Daniel J. Schwartz
James P. Rouhandeh
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017
  212/450-4000
  212/701-5800(Fax)

David M. Harris
Timothy M. Huskey
Greenfelder, Hemker & Gale, P.C.
10 S. Broadway, Suite 200
St. Louis, MO  63102
  314/241-9090
  314/345-8624(Fax)

Michael O. Ware
S. Christopher Provenzano
Mayer Brown LLP
1675 Broadway
New York, NY  10019
  212/506-2500
  212/262-1910(Fax)

MBS UNION CENTRAL
Service List - 5/1/2012      (11-0081)
Page 2 of 3

Christian K. Wrede
Erin J. Cox
James C. Rutten
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
   213/683-9100
   213/687-3702(Fax)

Susanna M. Buergel
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
   212/373-3000
   212/757-3990(Fax)

Dan F. Laney III
James W. Cobb
Jeffrey W. Willis
Rogers & Hardin LLP
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA  30303-1601
   404/522-4700
   404/525-2224(Fax)

Jeffrey A. Wurst
Mark S. Mulholland
Robert F. Regan
Ruskin Moscou Faltischek, P.C.
1425 Rexcorp Plaza, East Tower, 15th Floor
Uniondale, NY  11556
   516/663-6535
   516/663-6735(Fax)

Thomas C. Rice
Alan C. Turner
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017-3954
   212/455-2000
   212/455-2502(Fax)

Christopher J. Dunne
Jason D. Padgett
Michael T. Tomaino, Jr.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
   212/558-4000
   212/558-3588(Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173(Fax)

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
   415/288-4545
   415/288-4534(Fax)

MBS UNION CENTRAL

Service List - 5/1/2012    (11-0081)

Page 3 of 3

David C. Walton
John J. Stoia, Jr.
Steven W. Pepich
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
    619/231-1058
    619/231-7423(Fax)